# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12560 (KJC)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 2397** |

## DECLARATION OF BRADLEY D. SHARP IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF WOODBRIDGE GROUP OF COMPANIES, LLC AND ITS AFFILIATED DEBTORS

I, Bradley D. Sharp, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. I am President and CEO of Development Specialists, Inc. ("DSI"), located at 333 S. Grand Avenue Suite 4070, Los Angeles, California 90071, and the Chief Restructuring Officer ("CRO") of WGC Independent Manager LLC, a Delaware limited liability company ("WGC Independent Manager"), which is the sole manager of debtor Woodbridge Group of Companies, LLC, a Delaware limited liability company and an affiliate of each of the debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases"). I am also Chief Restructuring Officer of each of the Debtors. I submit this Declaration in support of (i) confirmation of the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. 2397] (as amended,

---

[1] The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC.

01:23758481.2

Case 17-12560-KJC    Doc 2829    Filed 10/19/18    Page 2 of 17

supplemented, or modified from time to time pursuant to the terms thereof, the "<u>Plan</u>"[2]) proposed by the Debtors, and (ii) the *Debtors' Motion for Approval of Certain Compromises and Settlements, Partial Substantive Consolidation, and Related Relief with Respect to the Plan* [Docket No. 2721] (the "<u>Plan Settlements Motion</u>").

2.      On February 13, 2018, the Court entered an order authorizing the Debtors to retain and employ DSI as their restructuring advisor and to designate me as CRO, *nunc pro tunc* to January 26, 2018.  In such capacity, I am familiar with the day-to-day operations and financial affairs of the Debtors.  I am one of the individuals responsible for devising and implementing the Debtors' wind-down and liquidation strategies and overseeing the Debtors' financial and operational affairs.  I have been consistently involved in or am familiar with the Debtors' wind-down activities and development of the Plan.  I have reviewed and am familiar with the terms and provisions of the Plan.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based on: (a) my direct personal knowledge of the Debtors' assets, operations, and finances; (b) information learned from my review of relevant documents; and/or (c) opinion based on experience and knowledge of the Debtors' business affairs and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

### I.  GENERAL BACKGROUND

4.      On December 4, 2017, a total of 279 Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code.  Thereafter, on February 9, 2018, March 9, 2018, March 23, 2018, and March 27, 2018, additional affiliated Debtors (27 in total) commenced voluntary cases under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the

---

[2]  Capitalized terms used but not otherwise defined in this Declaration have the meanings ascribed to those terms in the Plan.

2

Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

5.    The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee has been appointed in the Chapter 11 Cases.  An official committee of unsecured creditors (the "Unsecured Creditors' Committee") was appointed on December 14, 2017 [Docket No. 79].  On January 23, 2018, the Court approved a settlement providing for the formation of an official ad hoc noteholder group (the "Noteholder Committee") and an official ad hoc unitholder group (the "Unitholder Committee" and with the Noteholder Committee and the Unsecured Creditors' Committee, the "Committees"), as well as a replacement board (the "New Board") and management for the Debtors [Docket No. 357].

## II.  BACKGROUND REGARDING THE PLAN PROCESS

6.    Immediately following the appointment of the New Board, the Debtors focused on bringing the Chapter 11 Cases to a rapid consensual resolution, so as to return as much money as possible, as promptly as possible, to creditors.

7.    To that end, the Debtors' counsel at Klee, Tuchin, Bogdanoff & Stern LLP ("KTBS") hosted several all-day negotiating sessions at its offices in Los Angeles.  First, on March 8, 2018, KTBS hosted a full-day meeting attended by counsel for the Debtors and the Committees.  Then, during the week of March 19, 2018, KTBS hosted three all-day meetings attended by the parties and their professionals.  At these meetings, the parties engaged in extensive debate and discussion regarding, among other things, key legal issues in the Chapter 11 Cases.  Certain of the parties circulated detailed "position papers" regarding such topics in advance of the meetings.

8.    The negotiations were ultimately fruitful, as they culminated with the signing of a *Summary Plan Term Sheet*, dated as of March 22, 2018 [Docket No. 828] (the "Plan Term

<u>Sheet</u>").  The Plan Term Sheet memorialized an agreement in principle by and among the Debtors, the Unsecured Creditors' Committee, the Noteholder Committee, and the Unitholder Committee regarding the fundamental terms of a chapter 11 plan, while providing a basis for further discussion regarding the specific details of the plan and related transactions, which details remained subject to further review, comment, and final approval by the parties.

9.      Following execution of the Plan Term Sheet, the parties continued to extensively negotiate the details of the potential plan.  After many weeks of further discussion and negotiations with the Committees, the Debtors finalized and filed the Plan, which substantially incorporates and expands upon the Plan Term Sheet.  On July 9, 2018, the Debtors filed the initial versions of the Plan [Docket No. 2138] and Disclosure Statement [Docket No. 2139].  On September 24, 2018, the Debtors filed the Plan Supplement [Docket No. 2657].

10.     Based on my own interactions with parties in interest in these Chapter 11 Cases, I believe that the Plan has been proposed following extensive, arm's-length negotiations and discussions with and among key constituencies in these Chapter 11 Cases, including the negotiations described above.  I also believe that the Plan has been proposed in good faith with the legitimate and honest purpose of maximizing the ultimate recoveries for all of the Debtors' creditor constituencies and efficiently resolving the Debtors' Estates.

### III.  THE PLAN AND PLAN SETTLEMENTS

**A.      Partial Substantive Consolidation**

11.     The Plan proposes to substantively consolidate (i) the Fund Debtors into Woodbridge Mortgage Investment Fund 1, LLC, and (ii) the Other Debtors into Woodbridge Group of Companies, LLC ("<u>WGC</u>").  In addition, the Plan Settlements Motion seeks, to the extent necessary or appropriate, substantive consolidation of the Other Debtors into WGC independent of the Plan.

4

12.     First, based on the balloting results, I understand that each class of Creditors that will be affected by the proposed consolidation has voted to accept the Plan, which makes such consolidation consensual.

13.     Second, the affairs of the Other Debtors were hopelessly commingled as part of the overall scheme Robert Shapiro ("Shapiro") implemented.  Once individual investor funds had been obtained by the Fund Debtors, those funds were almost always transferred and commingled into one central bank account at WGC (and before 2016, at Woodbridge Structured Funding ("WSF")).  Thus, with respect to PropCo and MezzCo loans, even though the underlying loan documents facially referenced a loan by a specific prepetition Fund Debtor to the applicable Other Debtor (as defined in the Plan Settlements Motion), in reality, the funds typically originated from a commingled account and generally cannot be traced to any particular prepetition Debtor.  In almost every single case, WGC (or, before 2016, WSF) – rather than any prepetition Fund Debtor or Other Debtor – was the only source of funds used to purchase or develop a property.  Moreover, the amount of money that an Other Debtor promised to repay a particular Fund cannot be correlated with the amount an Other Debtor received from that Fund or what the PropCo paid to purchase or develop a property.  Indeed, in several circumstances, investors hold documents evidencing a note and deed of trust from a PropCo that never even acquired the underlying property.

14.     The Debtors' funds were also used for various other purposes, often without detailed records or accounting and some clearly improper.  For example, Shapiro used these funds to pay for (i) general corporate overhead, (ii) broker commissions of approximately $80 million, (iii) payment of purported returns to old investors (as part of perpetuation of a Ponzi scheme, as discussed further below) of approximately $425 million, and (iv) at least $30 million

5

Case 17-12560-KJC   Doc 2829   Filed 10/19/18   Page 6 of 17

for the benefit of Shapiro and his wife, as well as their related entities (including (a) approximately $3.1 million for chartering private planes, (b) approximately $2.2 million for other travel expenses, (c) approximately $2.6 million on home improvements and expenses, (d) approximately $1.8 million for personal tax obligations, (e) approximately $1.4 million to Shapiro's ex-wife, (f) approximately $800,000 on political contributions, (g) approximately $600,000 on vehicle purchases and leases, (h) approximately $330,000 on country club fees, (i) over $6 million on other personal purchases and expenses, and (j) at least $10 million of payments to Shapiro's wife and related entities).  In many instances, the transfers made by WGC (or WSF) to or for the benefit of one or more of the Other Debtors were funneled through attorney trust accounts or directly to escrow companies without any clear indication why the transfers were being made or complete records of where the money ultimately went after it was initially transferred to the trust accounts or escrow companies.  Shapiro further used the commingled funds to pay for improvements, maintenance, operating expenses, or other expenses for individual properties.

15.     Professionals at DSI working under my supervision have examined what are literally tens of thousands of transactions made between or among WGC (or WSF) and the Other Debtors, or by WGC (or WSF) or another Other Debtor on behalf of a different Other Debtor – including based on QuickBooks entries, bank records, and discussions with Woodridge employees.  Based on that review, I have determined that it would be exceptionally difficult, if not literally impossible, to trace, reconcile, and reconstruct a reliable and complete allocation of assets and liabilities across WGC (or WSF) and the Other Debtors.  This conclusion comports with that reached by a separate forensic accounting investigation conducted on behalf of the SEC by Soneet R. Kapila of KapilaMukamal, LLP, as set forth in a declaration dated December 18,

Case 17-12560-KJC    Doc 2829    Filed 10/19/18    Page 7 of 17

2017, and filed in the SEC's enforcement action, Case No. 1:17-cv-24624-MGC, ECF No. 36-2 (S.D. Fla. Dec. 26, 2017), which I have reviewed and am familiar with (and which is attached hereto as **Exhibit A**).

16.     The simple fact of the matter is that, from an accounting point of view, WGC (or WSF) and the Other Debtors were not treated as legitimate separate entities.  Instead, Shapiro effectively used WGC (or WSF) as an aggregated and wide-open "piggy bank" and spent money from a commingled account as and when he saw fit.  The result is a tangled web of commingled and intermingled affairs, which would require consuming massive resources simply trying to untangle (without any guarantee that result could even be achieved at all).

17.     In addition to the lack of accounting formalities, there also is little documentation regarding transactions among and between WGC (or WSF) and the Other Debtors.  For example, funds advanced by WGC (or WSF) for the benefit of the Other Debtors were not regularly documented (or even documented at all) as intercompany loan transactions, equity infusions, or some other specified relationship.  Rather, consistent with Shapiro's treatment of the commingled account and Other Debtors as an undifferentiated mass freely available to him, many funds flowed on an undocumented basis, which means the Debtors' books and records simply do not contain materials that could in theory allow for a robust reconstruction of how assets and liabilities should be allocated based on formal agreements. Even if such a hypothetical allocation could somehow be constructed, it would have to rest on assumptions and allocation percentages regarding how to apportion operational costs and relative historic liabilities for various expenses and expenditures, as well as potential litigation claims against third parties and other intangible assets, among and between hundreds of different entities.  Some assumptions and allocations would likely have the effect of benefiting certain creditors at the

expense of other creditors, and any effort to analyze and fix each separate entity's "fair share" would be a difficult, guess-work process that would likely be subject to significant challenge and ultimately result in costs that would decrease creditor recoveries across the board.

18.    Based on the above factors, it is not surprising that the three Committees – each with the benefit of its own retained professionals – have concluded that substantive consolidation of the Other Debtors into WGC is appropriate.

19.    It is also my understanding that the Plan makes clear that the proposed substantive consolidation into WGC will not affect the rights of the few creditors that may have valid, perfected security interests in specific real property owned by the Other Debtors as a result of directed interactions involving only such specific property, including, for example, mechanics' lien holders, and tax lien holders.  As such, substantive consolidation will give effect to any reasonable expectations of any secured creditors who had created a specific and enforceable relationship with a specific property, is not prejudicial to such creditors, and is otherwise fair under the circumstances.

**B.    Ponzi Scheme Finding**

20.    Section 3.11.2(f) of the Plan provides that the Debtors will seek a finding in the Confirmation Order regarding how Shapiro used the Debtors to conduct a Ponzi scheme.  Based on the investigation and analysis conducted by the SEC and separately by me and others at DSI under my supervision, it is my conclusion that Shapiro conducted a significant Ponzi scheme through the Debtors.

21.    Under Shapiro's control and during the period from August 2012 through December 1, 2017, the prepetition Debtors raised more than $1.29 billion from over 10,000 unsuspecting investors nationwide by selling those investors two primary products, five-year Units and twelve to eighteen month Notes.  The Unit transactions provided for a five-year term

8

with a 6% to 10% aggregate annual return paid monthly and a 2% "accrued preferred dividend." The Note transactions promised Noteholders 5% to 8% annual interest paid monthly with a return of their principal at the end of their Note's term.

22.    Repayment of both Units and Notes, the prepetition Debtors claimed, would be based on the purported revenues the prepetition Debtors purportedly would receive from issuing short-term loans to unrelated third-party property owners.  As marketed by the prepetition Debtors, the Debtors would make short-term loans, between $1 million and $100 million, to bona-fide third-party commercial property borrowers at high rates of interest, approximately 11%-15%, secured by a first-position mortgage on the property.  These loans to third-parties would supposedly be provided at loan-to-value ratios of approximately 60%-70%.  The result, according to the sales pitch, would be a robust and safe cash-flow stream that would provide revenues for the Fund Debtors to repay the Units and the Notes without issue.

23.    In reality, there was no robust and safe cash flow stream from third party borrowers, as a very small fraction of investor money flowed from the prepetition Fund Debtors to unrelated third parties.  Rather, Shapiro created disguised affiliates (the PropCos and MezzCos (each as defined in the Plan Settlements Motion)) to which money was loaned.  These "borrowers" did not even have bank accounts  and clearly they had no ability to service the required interest payments on an ongoing basis.  In addition, they had no ability to retire the debt when due, other than through the sale of the underlying property, which doesn't appear to have been contemplated and certainly wasn't effectuated (as described below).

24.    With regard to sales of real property, the annual cash flow from such sales (which sales were not frequent) was well below the amount of principal and interest paid by Shapiro to investors.  In 2013, no properties were sold and approximately $3.4 million was paid to investors

in principal and interest. In 2014, no properties were sold and approximately $17.6 million was paid to investors in principal and interest. In 2015, 10 properties with approximate net proceeds of $18.5 million were sold and approximately $84.1 million was paid to investors in principal and interest. In 2016, 15 properties with approximate net proceeds of $28.4 million were sold and approximately $138.2 million was paid to investors in principal and interest. In 2017, 16 properties with approximate net proceeds of $71.4 million were sold and approximately $181.8 million was paid to investors in principal and interest. Clearly, Shapiro knew that he could not make payment of interest and principal only through sales of properties—the above numbers evidence that there were, in fact, grossly insufficient proceeds to permit such payments of principal and interest, and there was no other material source of revenue to pay interest and principal other than from the sale of additional Notes and Units.

25.      Accordingly, instead of being repaid with legitimate business proceeds, the prepetition Debtors used funds received primarily from new investors to make payments to old investors. In the absence of sufficient cash inflows from sources other than investors, Shapiro and the prepetition Debtors, which he controlled, paid approximately $425 million of "interest" and "principal" to existing investors, primarily from funds received from new investors. As previously discussed, Shapiro also used commingled investor money to pay approximately $80 million in commissions, primarily to sales agents who sold these fraudulent "investments" and used investor money to pay at least $30 million for the benefit of Shapiro and his wife, as well as their related entities (including, for example, purchasing luxury items, travel, wine, and the like). While funds from the commingled account were used to purchase the Debtors' real properties, these purchases were directly contrary to material  representations made to investors.

10

26.    Moreover, investments were solicited, and payments of "interest" were made to existing investors, without regard to whether such investors' investment realized value (or even existed).  For example, on certain occasions, Shapiro issued Notes in respect of properties that the Debtors never actually acquired, including properties at 778 Sarbonne Road in Los Angeles and 53 Huron Street in Brooklyn.  Nevertheless, investments were solicited from investors, and liens and security interests were purportedly granted to the Fund Debtors, to secure "loans" relating to such properties.  Another example concerns the property at 800 Stradella Road in Los Angeles, where Shapiro issued about $24.7 million in "first-lien" Notes for the stated purpose of funding a $26 million Fund Debtor-to-PropCo loan that was never made (the PropCo instead took a $26 million loan from the third-party seller of the property at the time of acquisition).  And much like the famous play "The Producers," the Debtors purchased the "Owlwood Estate" in September 2016 for $90 million, but signed notes to the Fund Debtors for alleged borrowings in the aggregate amount of $112 million—well above the purchase price of the property.

27.    In late 2017, Shapiro's fraudulent scheme unraveled.  As federal and state investigations intensified and unfavorable press reports began to emerge, the prepetition Debtors found it increasingly difficult to raise new capital from investors.  As noted above, the prepetition Debtors were reliant on funds from new investors to make the payments promised to existing Unitholders and Noteholders.  When new investment dried up, the inability to make required Notes and Units servicing payments became inevitable; indeed, the prepetition Debtors were unable to make the December 1, 2017 interest and principal payments due on the Notes, which quickly precipitated the filing of the initial Debtors' bankruptcy cases.

28.    On December 20, 2017, the SEC filed a complaint (the "SEC Complaint") against, among other parties, Shapiro and many of the Debtors in the U.S. District Court for the

11

Southern District of Florida as Case No. 1:17-cv-24624-MGC (the "SEC Action"), which I have reviewed. The SEC Complaint alleged repeatedly and expressly that Shapiro had used the Debtors to conduct a massive Ponzi scheme. On December 21, 2017, the District Court in the SEC Action entered an order unsealing the SEC Complaint and allowing the docket of the SEC Action to be accessible to the public.

## C.    Nature of Claims Asserted by Noteholders and Unitholders

29.    The Debtors have determined that no Noteholder is in physical possession of any Purported Noteholder Collateral, and that no UCC-1 financing statement was filed in Delaware on behalf of any Noteholder with respect to any of the Purported Noteholder Collateral. Attached hereto as **Exhibit B** is a representative Note issued by the Debtors to a Noteholder.

30.    Facts potentially supporting the determination that the Unitholders hold "claims" against, or "debt" of, the Fund Debtors include, without limitation, (i) Unitholders received monthly interest checks, not dividends, and received from the Debtors 1099-INT tax forms characterizing these payments as interest income for each annual period prepetition; and (ii) the Units were recorded on the Debtors' books and records as a liability and treated as a liability in the Debtors' tax returns.

31.    Facts potentially supporting the determination that the Unitholders do not hold "claims" against, or "debt" of, the Fund Debtors include, without limitation, (i) the Units have some characteristics of preferred equity, including the prospect of incentive compensation and profit sharing from the Debtors' various real estate investments, which creates equity-like "upside" potential; (ii) the offering memoranda regarding the Units indicates that the Debtors would distribute, at least annually, returns of 6% to 10% per annum to Unitholders on account of any capital invested, but only to the extent of available funds *after* creditor claims are adequately provided for; and (iii) other nomenclature used in the offering materials connotes that the Units

12

were conceptualized as "equity" or "capital" investments.  Attached hereto as **Exhibit C** is a representative offering memorandum for the sale of Units.  Attached hereto as **Exhibit D** is a representative Unit issued by the Debtors to a Unitholder.

**D.      Other Confirmation Requirements**

32.      <u>Compromises and Settlements</u>.  It is my belief that the settlements and compromises incorporated in the Plan are appropriate under the circumstances.  Among other things, as noted above, the terms of those settlements and compromises were negotiated extensively over a period of many months by and among the Debtors and the Unsecured Creditors' Committee, the Noteholder Committee, and the Unitholder Committee, which represent the key creditor constituencies in these Chapter 11 Cases.  The settlements and compromises are a cornerstone of the Plan, which was designed and is intended to be a vehicle to resolve many thorny issues that otherwise could take years to resolve with finality.  In my business judgment, it is manifestly in the best interests of all Creditors to obtain these resolutions and attendant certainty and to avoid the years of litigation and associated expense, delay, and uncertainty associated therewith.

33.      <u>Releases, Exculpations, and Limitations of Liability</u>.  Article XI of the Plan includes certain release, exculpation, and limitation of liability provisions.  I am not aware of any viable Causes of Action against the Released Parties.  Moreover, I believe that the Released Parties have provided many valuable contributions to the progress of the Chapter 11 Cases, including stewarding the Debtors through the bankruptcy process, negotiating and implementing settlements with various parties, pursuing Confirmation of the Plan, and otherwise preserving Estate Assets for the benefit of all stakeholders.  In light of these different contributions, I believe the releases and exculpations included as part of the overall compromise and settlement embodied by the Plan are fair, equitable, and reasonable.

34.    <u>Liquidation Under Chapter 7</u>.  The Plan is a plan of liquidation.  The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage.

35.    Significantly, the benefits of the Plan Term Sheet, the terms of which are substantially incorporated into the Plan, are available only under the Plan.  The Plan embodies a comprehensive, extensively negotiated settlement and compromise of myriad novel and complex legal and factual issues, including, among other things, (i) whether the Notes are unsecured claims or are indirectly secured by valid, perfected security interests in property of the Estates, (ii) whether the Units are debt or equity interests, (iii) whether any of the Debtors have valid or enforceable Intercompany Claims or Intercompany Liens against Estate Assets owned by other Debtors, and (iv) whether substantive consolidation of the Debtors' Estates is warranted under the circumstances.  In the event of conversion, the chapter 7 trustee, Noteholders, Unitholders, and Holders of General Unsecured Claims would have to confront the pursuit of extensive litigation to resolve all of these and other issues, or would need to try to negotiate an alternative settlement. Even if it led to the same ultimate result, this process would be extremely time-consuming and costly, and would reduce and delay any recoveries available for Creditors of the Estates.

36.    In addition, a chapter 7 trustee might decide instead to conduct an immediate sale of the Wind-Down Assets, including because (i) a chapter 7 trustee probably might not have adequate staffing or funding to dispose of the Debtors' real property over an extended period of time, and (ii) a chapter 7 trustee would need to seek authorization to operate the Debtors' remaining business.  In light of, among other things, the limited universe of potential buyers for

14

Case 17-12560-KJC    Doc 2829    Filed 10/19/18    Page 15 of 17

luxury high-end residential properties, such a forced sale by a chapter 7 trustee would likely ultimately result in significantly lower recoveries from the sale of the Wind-Down Assets, as set forth in the liquidation analysis attached as Exhibit B to the Disclosure Statement (the "Liquidation Analysis").

37.     I and other professionals at DSI prepared the Liquidation Analysis. I believe that the Liquidation Analysis reflects the Debtors' best estimate of projected recoveries under the scenarios set forth therein based on currently available information. I further believe that the analysis and such assumptions were prepared in good faith with regard to a hypothetical chapter 7 liquidation of the Debtors. Among other things, the Liquidation Analysis shows that even in the "High Case" scenario analysis for the Holders of Standard Note Claims and Unit Claims, as applicable (which analysis makes the most favorable possible assumptions regarding the outcome that could be obtained by the subject constituency through litigation), the estimated recovery on such Claims is greater under the Plan than in a chapter 7 liquidation scenario. Nothing has come to my attention that would lead me to believe the Liquidation Analysis should be revised based on information I have learned since the approval of the Disclosure Statement.

38.     Conversion to chapter 7 of the Bankruptcy Code would also mean the establishment of a new claims bar date, which would result in new General Unsecured Claims, Note Claims, or Unit Claims being asserted against the Estates, thereby potentially diluting the recoveries of other Holders of Allowed Claims. Conversion to chapter 7 could also create various asset and liability allocation and intercompany reconciliation issues, which would ultimately adversely affect the net proceeds available for distribution to creditors in those converted cases.

Case 17-12560-KJC    Doc 2829    Filed 10/19/18    Page 16 of 17

39.     On balance, I believe that a chapter 7 trustee would be less likely to maximize the value available from all the Estate Assets and would be unable to obtain many or perhaps even any of the benefits of the compromises and settlements available under the Plan.  Therefore, I have concluded that confirmation of the Plan will provide each Holder of a General Unsecured Claim, Note Claim, or Unit Claim with an equal or greater recovery than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

40.     Plan Feasibility.  The Plan specifically proposes a liquidation and eventual dissolution of each of the Debtors.  I believe the Debtors' current Cash and additional proceeds to be generated from the Wind-Down Assets and the Liquidation Trust Assets will be sufficient to allow the Liquidation Trust to make all payments the Liquidation Trust is required to make under the Plan, including (i) paying in full all Allowed Administrative Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, and Priority Claims as required by the Plan; and (ii) allowing for periodic payments to holders of Allowed Class 3, Class 4, and Class 5 Claims (none of which are guaranteed a particular recovery under the Plan, including due to the risk factors detailed in the Disclosure Statement) consistent with the Plan.

41.     No Gerrymandering.  I believe Claims and Equity Interests have been separately classified under the Plan based on differences in the economic nature, legal rights, or priority of such Claims and Equity Interests.  I do not believe Claims and Equity Interests under the Plan were separately classified with the intent to create an impaired accepting class.

42.     Executory Contracts.  I believe that the executory contracts and unexpired leases (i) that the Debtors have chosen to assume and assign to the Wind-Down Entity are those that may be necessary for the Wind-Down Entity to carry out its duties under the Plan and effectuate the orderly wind down of the Wind-Down Assets, and (ii) that the Debtors have chosen to reject

16

Case 17-12560-KJC    Doc 2829    Filed 10/19/18    Page 17 of 17

are no longer necessary for those purposes and would otherwise be a net burden on the Estates.

Accordingly, I believe the Debtors have exercised sound business judgment in identifying the

executory contracts and unexpired leases to be assumed and assigned, or to be rejected, pursuant

to the Plan.

43.     <u>Inapplicability of Certain Bankruptcy Code Provisions</u>.  The Debtors (a) do not

provide retiree benefits; (b) are not required by any judicial or administrative order, or by statute,

to pay any domestic support obligation; (c) are not individuals; and (d) are not nonprofit

corporations.

44.     <u>Bankruptcy Code Section 1129(d)</u>.  I do not believe that the principal purpose of

the Plan is avoidance of taxes or the avoidance of the application of section 5 of the Securities

Act of 1933.

## IV.  CONCLUSION

45.     I believe that the Plan will achieve a successful liquidation of the Debtors.  I

believe that the Plan provides significant and perhaps otherwise unattainable benefits to the

Debtors and all their various stakeholders and provides the best opportunity for creditors to

maximize recoveries under the circumstances.  As such, I believe the Bankruptcy Court should

confirm the Plan and grant the Plan Settlements Motion.


Executed this 19th day of October, 2018, at New York, New York.


                                        */s/ Bradley D. Sharp*
                                        Bradley D. Sharp

Case 17-12560-KJC    Doc 2829-1    Filed 10/29/18    Page 1 of 66

## **Exhibit A**

## **Kapila SEC Enforcement Declaration**

01:23758481.1

# Woodbridge Entities

# Declaration of Soneet R. Kapila

**December 18, 2017**





CPAs, Forensic and Insolvency Advisors

## Table of Contents

**Declaration of Soneet R. Kapila**

**Exhibits**

| | |
|---|---|
| **Resume of Soneet Kapila** | **A** |
| **Resume of Melissa Davis** | **B** |
| **Ponzi Fraud Cases** | **C** |
| **Bank Record Inventory** | **D** |
| **Credit Card Statement Record Inventory** | **D.1** |
| **QuickBooks Files Provided** | **E** |
| **Consolidated Bank Reconstruction** | **F** |
| **Summary of Bank Reconstructions** | **F.1** |
| **Bank Reconstruction Categories** | **F.2** |
| **Summary of Credit Card Activity** | **G** |
| **Credit Card Account Reconstruction Categories** | **G.1** |
| **Summary of Net Payments to Insiders** | **H** |



## Declaration of Soneet R. Kapila

Pursuant to 28 U.S.C § 1746, the undersigned states as follows:

I, Soneet R. Kapila, declare and state that the following facts are known to me personally and that I am competent to testify about them.

### I.   RETENTION

1.   I am over eighteen years of age and have personal knowledge of the matters set forth herein.

2.   I am the founding partner of KapilaMukamal, LLP ("KM"), a forensic consulting and insolvency advisory firm that was retained by the United States Securities and Exchange Commission ("SEC") to conduct a forensic accounting investigation in this matter.

3.   In conducting my investigation and analysis, I was assisted by other KM professionals with extensive experience in insolvency and forensic investigations working under my direct supervision.  Any references to "I", "my", "KM" or "Kapila" within the Declaration would incorporate my efforts with the assistance of my co-professionals working under my direct supervision.

### II.   QUALIFICATIONS

4.   I am a Certified Public Accountant (CPA), a Certified Fraud Examiner (CFE), Certified in Financial Forensics (CFF) conferred by the AICPA, and a Certified Insolvency and Restructuring Advisor (CIRA). The CIRA designation is conferred by the Association of Insolvency and Restructuring Advisors (AIRA), after a three-

1



part examination and a required 4,000 hours of prior qualified insolvency experience.

5.    I am a Fellow of the American College of Bankruptcy. This recognition is based on recommendations by peers in the insolvency industry at a national level, invitation by the American College of Bankruptcy and induction into this College.

6.    KM is a niche practice focusing on forensic investigative work, creditors' rights, bankruptcy, insolvency and fiduciary services.  Several of the core professionals of KM have similar certifications as identified in ¶4 above.

7.    I have served as a Federal Bankruptcy Trustee, Bankruptcy Examiner, Chief Restructuring Officer, SEC Corporate Monitor and Federal and State Court Receiver in numerous matters in the Southern and Middle Districts of Florida and the District of New Jersey.

8.    I have served as a Federal Bankruptcy Trustee on the panel of U.S. Bankruptcy Trustees in the Southern District of Florida from approximately 1992 to present. I have been appointed as a Chapter 11 Trustee, Chapter 7 Trustee, post confirmation Liquidating Trustee or other post confirmation fiduciary roles. In these roles I have investigated frauds, Ponzi schemes, distressed businesses and their failures, financial affairs of bankruptcy debtors, evaluated asset recoveries and claims against third parties. These roles routinely include tracing assets, assessing for possible fraud and successor businesses.  I have also investigated causes of action against management, professionals and under Chapter 5 of the Bankruptcy Code.  My duties have extended to evaluating, bringing and overseeing litigation

2



Kapila/Mukamal

CPAs, Forensic and Insolvency Advisors

claims. Such claims have included tort litigation against professionals and directors and officers.

9. As a court appointed Examiner, I have reported to the Bankruptcy Courts on issues whose defined scope of the duties is in the Bankruptcy Court's mandate, investigating the conduct of businesses and management and making recommendations to the Bankruptcy Court.

10. As a Federal Court approved Corporate Monitor appointed by the SEC, I have operated a public company international business and negotiated its sale to a foreign company, and I am overseeing the restructuring of a healthcare business of multiple entities in the senior living facilities industry.

11. I have been qualified as an expert dozens of times in federal and state courts regarding Ponzi schemes, insolvency, fraudulent transfers, funds and asset tracing, lost profits, damages and other subject matters as well as a non-testifying expert in many other cases. A true and correct copy of my Resume and Case Experience is attached hereto as ***Exhibit A***. Also attached as ***Exhibit B*** is the Resume of Melissa Davis, a partner in KM with a similar concentration, who functioned as the lead partner assisting me with this investigation and analysis. ***Exhibit C*** is a selective summary of the credentials of KM relating to fraud investigation experience, including Ponzi schemes.

III. <u>**RELEVANT ENTITIES**</u>

12. This Declaration is based upon my review, investigation and analysis of the available accounting and bank records for the period from July 11, 2012 to

3



September 30, 2017 ("Relevant Time Period") of the following entities (collectively the "Woodbridge Entities"):

### Table 1 – List of Relevant Entities

*Source: Bank Reconstruction and QuickBooks Files*

| Entity Name | Defined As |
| --- | --- |
| Woodbridge Group of Companies, LLC | "Group" |
| Woodbridge Structured Funding, LLC | "Structured" |
| Woodbridge Mortgage Investment Fund 1, LLC | "WMIF 1" |
| Woodbridge Mortgage Investment Fund 2, LLC | "WMIF 2" |
| Woodbridge Mortgage Investment Fund 3, LLC | "WMIF 3" |
| Woodbridge Commercial Bridge Loan Fund 1, LLC | "Bridge 1" |
| Woodbridge Commercial Bridge Loan Fund 2, LLC | "Bridge 2" |
| Woodbridge Mortgage Investment Fund 3a, LLC | "WMIF 3a" |
| Woodbridge Mortgage Investment Fund 4, LLC | "WMIF 4" |

13. Collectively, Group and Structured are referred to herein as the "Woodbridge Operating Entities".

14. WMIF 1, WMIF 2, WMIF 3, WMIF 3a and WMIF 4 (collectively, the "Woodbridge Fund Entities") were formed and managed by Robert Shapiro ("Shapiro") purportedly for purposes of investing in first mortgages, mezzanine loans and other real estate acquisitions using funds raised from investors located throughout the country ("WMIF Investors").[1] The WMIF Investors included two types:

a. Purportedly accredited investors that invested pursuant to the Confidential Offering Memorandums described below ("Fund Investors"). The terms of these loans were five years; and

---

[1] Offering Memorandums

4



b.  Short-term investors that loaned money on a short term basis, primarily one year, ("FPCM Investors") and in turn allegedly received a first position commercial mortgage as security for their investment.

15.  Structured is a Delaware limited liability company formed in July 2009 by Shapiro. In March 2013, Structured submitted an application to transact business in Florida. Structured has offices in Florida and California that purportedly specialize in purchasing structured settlements, annuity and lottery payments.[2]   Structured raises money from investors and uses the funds to buy the annuity payment stream at a discount.  The investor would then receive the future payment stream.

16.  Group is a Delaware Corporation formed in December 2014. It has several divisions that purportedly specialize in real estate, buying/selling notes, hard money lending and alternate financial space.  Its divisions include[3]:

a.  Woodbridge Realty Unlimited – a Colorado limited liability company formed in August 2014[4] as a boutique full service Colorado real estate firm.[5]

b.  Woodbridge Wealth – an entity located in California that offers investors a variety of investment options including: [6]

i.  First Position Commercial Mortgages ("FPCM") – investors are private lenders that give short term loans, primarily on a one-year basis, to Woodbridge Fund Entities in return for 5% annual interest payable

---

[2] https://www.woodbridgeinvestments.com/about-woodbridge/
[3] www.woodbridgecompanies.com
[4] Colorado Secretary of State
[5] https://www.woodbridgerealtyco.com/about
[6] https://www.woodbridgewealth.com/financial-products/

5



monthly.[7] The loans are purportedly "backed" by a dedicated commercial real estate property.  FPCM purportedly works as follows:[8]

1. The investor lends money to the Woodbridge Fund Entities primarily for a one year period and will receive an annual 5% interest, payable monthly;

2. The Woodbridge Fund Entities pool money received from the short-term investors to make loans to commercial borrowers for a maximum of two years and up to only 70% of the value of the real estate.  The Woodbridge Fund Entities conduct all due diligence including title search and appraisal on the commercial properties and borrowers. When the Woodbridge Fund Entities make the loan, the short-term lenders receive a first lien position on the property and the Woodbridge Fund Entities receive a subordinated position to the short-term investors.

3. The Woodbridge Fund Entities fund the real estate property loan and receive payments from the real estate owner.

4. The property owner makes payments to the Woodbridge Fund Entities and the investor receives monthly interest payments based on a 5% annual interest rate and a first lien position as security.

---

[7] I noted that in certain instances the interest rate exceeded 5% and the loan terms was in excess of 12 months.

[8] https://www.woodbridgewealth.com/financial-products/first-position-commercial-mortgages/

6



     ii.  Commercial Bridge Loan Fund – offers investment in a security with a 6% annual preferred return payable monthly for one year. If the investor holds the investment for a period greater than one year and up to five years, it offers an additional 1% accrued incentive return if the investment is held for five years.

     iii.  Second Market Annuities – offers investment in a fixed annuity payment stream with a 5% annual return. The investment funds a variety of obligations at a discount, including lottery winnings, personal injury settlements and investments.

c.  Riverdale Funding, LLC – a hard money lender that specializes in providing asset-based one to three-year interest only commercial loans to borrowers. Loans range from $250,000 to $5 million.

## IV. <u>SCOPE</u>

17.  The SEC requested that I determine the following for the Relevant Time Period:

a.  The amount of funds the Woodbridge Entities raised from WMIF Investors and the number of WMIF Investors;

b.  The amount of funds the Woodbridge Entities paid to WMIF Investors for principal and interest payments to FPCM Investors and dividend payment to Fund Investors (the interest and dividends collectively "Returns");

c.  The amount of funds remaining due to WMIF Investors;

d.  The total amount of WMIF Investor funds that were derived from an IRA custodian and the number of such WMIF Investors;

7



e.   The amount of WMIF Investor funds derived from investors located in the Southern District of Florida and the number of such WMIF Investors;

f.   The amount of funds received from WMIF Investors residing in states where state governments issued orders precluding the sale of the Woodbridge Entities' FPCM investment vehicles and the number of such WMIF Investors;

g.   Whether or not WMIF Investors' funds were commingled;

h.   Whether or not the Woodbridge Entities' business activities were:

   i.   Dependent on continued infusion of outside investor money;

   ii.   The investor money was used for the stated purpose;

   iii.   The investor money was used to pay the returns promised to earlier investors;

   iv.   If the business enterprise generated sufficient profits to pay the promised returns to investors; and

   v.   If the business activities were consistent with the model promoted.

i.   Whether or not the Woodbridge Entities' accounting records reflect the correct amount of the income generated and assets as compared with the actual cash flow in the Woodbridge Entities' bank records;

j.   The amount of funds paid by the Woodbridge Entities to or for the benefit of Shapiro, his relatives or related entities; and

k.   The amount of funds paid by the Woodbridge Entities for commission payments, including the amount of commissions paid to sales agents located in the Southern District of Florida.

8



## V.    SUMMARY OF FINDINGS

18.    Kapila's findings are as follows:

a.    During the Relevant Time Period, the Woodbridge Entities raised approximately $1.2 billion from over 8,400 WMIF Investors nationwide. [¶85]

b.    During the Relevant Time Period, the Woodbridge Entities paid approximately $265 million of principal to WMIF Investors and $103 million in Returns to WMIF Investors. [¶85]

c.    As of September 30, 2017, the amount remaining due to WMIF Investors is approximately $961 million. [¶85]

d.    As of September 30, 2017, there were at least 2,600 WMIF Investors that invested approximately $394 million through IRA custodians. [¶102]

e.    As of September 30, 2017, there were approximately 700 WMIF Investors from the Southern District of Florida who invested approximately $114 million. [¶85]

f.    The Woodbridge Entities derived funds from FPCM Investors in states after government authorities for such states had issued cease and desist orders precluding the sale of the Woodbridge Entities' FPCM investment vehicles as follows [¶103]:

i.    $3.2 million from 11 WMIF Investors in Massachusetts.

ii.    $2.3 million from 25 WMIF Investors in Texas.

iii.    $900,000 from 13 WMIF Investors in Arizona.

iv.    $2.6 million from 31 WMIF Investors in Pennsylvania.

9



Kapila/Mukamal

CPAs, Forensic and Insolvency Advisors

g.    WMIF Investor funds were commingled within the Woodbridge Operating Entities' bank accounts. [¶89]

h.    The Woodbridge Entities' business activities were [¶80]:

    i.    Dependent on continued infusion of outside investor money;

    ii.   The investor money was not used for the stated purpose;

    iii.  The investor money was used to pay the returns promised to earlier investors;

    iv.   The business enterprise did not generate sufficient profits to pay the promised returns to investors; and

    v.    The business activities were not consistent with the model that was promoted.

i.    The Woodbridge Entities' accounting records do not reflect the correct amount of income and assets that is consistent with the cash flow activity reflected in Woodbridge Entities' bank records, resulting in artificial representation of the income generated and assets available. [¶78]

j.    The Woodbridge Entities made net payments of $21.2 million to or for the benefit of Shapiro, his relatives or related entities. [¶104]

k.    The Woodbridge Entities paid $64.5 million in commission payments, of which over $12 million was paid to 20 sales agents located in the Southern District of Florida. [¶107]

10



Kapila/Mukamal

CPAs, Forensic and Insolvency Advisors

## VI.   BACKGROUND

### Woodbridge Entities – Business Model

19.   The Woodbridge Entities' business model as represented by Shapiro was to borrow money from investors and to use that money to make real estate related loans to borrowers.  The difference between the monthly interest rate charged to the borrowers and the monthly rate paid to the investors would serve as an income source to the Woodbridge Fund Entities.  For example, if the Woodbridge Fund Entities borrowed funds from an investor at a rate of 5% but charged its borrowers 11%, the difference in the rate of 6% would be income available to the Woodbridge Fund Entities that could be used to pay expenses, including the operating expenses and sales agent commissions.

20.   Importantly, the monthly interest payments the Woodbridge Fund Entities received from the borrowers would be the source of funds to make the monthly Returns to the WMIF Investors.

### Woodbridge Entities – Financial Products

21.   WMIF Investor funds were deposited into each of the Woodbridge Fund Entities' bank accounts for the intended use in investing in first mortgages, mezzanine loans and real estate acquisitions and investments.  The WMIF Investors included Fund Investors and FPCM Investors.

11



Kapila/Mukamal

CPAs, Forensic and Insolvency Advisors

**WMIF 1**[9]

22.   WMIF 1 is a Delaware limited liability company formed in June 2012 to invest in mortgages and other real estate ventures. WMIF 1's president and chief executive officer is Shapiro and its managing member is WMF Management, LLC ("WMF"). Shapiro is the managing member of WMF.

23.   In July 2012, WMIF 1 issued a Confidential Offering Memorandum to raise money from investors.  WMIF 1's stated purpose was to offer accredited investors up to $10 million for 100 units of WMIF 1 for $100,000 each.

24.   Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of WMIF 1.

25.   WMIF 1 was to use the proceeds of the offering to invest in first mortgages, mezzanine loans and other real estate acquisitions and investments that were to be "secured" and titled in the name of WMIF 1.

26.   The investors, referred to as "unit holders", were to be repaid as follows:

a.   8% per annum based on capital contribution;

b.   After five years, repayment of initial investment; and

c.   After five years, 50% of the cumulative profits of the company earmarked for all unit holders.

---

[9] Woodbridge Mortgage Investment Fund 1, LLC Confidential Offering Memorandum.

12



27.    The July 2012 Offering Memorandum was amended in September 2012 increasing the 8% preferred dividend to a 10% preferred dividend and 2% additional accrued preferential dividend after 5 years[10].

***WMIF 2*** [11]

28.    WMIF 2 is a Delaware limited liability company formed in December 2013 to invest in domestic and foreign first mortgages and other real estate ventures. WMIF 2's president and chief executive officer is Shapiro and its managing member is WMF.

29.    In January 2014, WMIF 2 issued a Confidential Offering Memorandum to raise money from investors.  WMIF 2's stated purpose was to offer accredited investors up to $25 million for 250 units for $100,000 each.

30.    Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of WMIF 2.

31.    WMIF 2 was to use the proceeds of the offering to invest in both domestic and foreign first mortgages, mezzanine loans and other real estate acquisitions and investments that were to be "secured" and titled in the name of WMIF 2.

32.    The investors, referred to as "unit holders" were to be repaid as follows:

    a.    10% annual preferred dividend and 2% additional accrued preferential dividend after five years from the date of purchase of each corresponding unit;

---

[10] Amended Woodbridge Mortgage Investment Fund 1, LLC Confidential Offering Memorandum.
[11] Woodbridge Mortgage Investment Fund 2, LLC Confidential Offering Memorandum.

13



b.    After five years, repayment of initial investment; and

c.    After five years, investors share in 50% of the cumulative profits of the company earmarked for all unit holders.

**WMIF 3** [12]

33.    WMIF 3 is a Delaware limited liability company formed in September 2014 to invest in domestic and foreign first mortgages and other real estate ventures.  WMIF 3's president and chief executive officer is Shapiro and its managing member is WMF.

34.    In October 2014, WMIF 3 issued a Confidential Offering Memorandum to raise money from investors.  WMIF 3's stated purpose was to offer accredited investors up to $50 million for 500 units for $100,000 each.

35.    Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of WMIF 3.

36.    WMIF 3 was to use the proceeds of the offering to invest in both domestic and foreign first mortgages, mezzanine loans and other real estate acquisitions and investments that were to be "secured" and titled in the name of WMIF 3.

37.    The investors, referred to as "unit holders" were to be repaid as follows:

a.    10% annual preferred dividend and 2% additional accrued preferential dividend after five years from the date of purchase of each corresponding unit;

b.    After five years, repayment of initial investment; and

---

[12] Woodbridge Mortgage Investment Fund 3, LLC Confidential Offering Memorandum.

14



    c.      After five years, investors share in 50% of the cumulative profits of the company earmarked for all unit holders.

***Bridge 1*** [13]

**38.**    Bridge 1 is a Delaware limited liability company formed in May 2015 to provide senior position loans to various Woodbridge Fund Entities affiliates.

**39.**    Bridge 1's president and chief executive officer is Shapiro and its managing member is WMF.

**40.**    In June 2015, Bridge 1 issued a Confidential Offering Memorandum to raise money from investors.  Bridge 1's stated purpose was to offer accredited investors up to $50 million for 500 preferred incentive units for $100,000 each.

**41.**    Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of Bridge 1.

**42.**    Bridge 1 was to use the proceeds of the offering to originate and finance short-term commercial loans to WMIF Entities on a secured basis to facilitate WMIF's financing of separate third party commercial lending transactions that WMIF has consummated or intends to consummate.

**43.**    The investors, referred to as "unit holders", were to be repaid as follows:

    a.      6% dividend per annum and 1% accrued incentive after five years; and

    b.      After five years, repayment of initial investment.

---

[13] Woodbridge Commercial Bridge Loan Fund 1, LLC Confidential Offering Memorandum.



Kapila/Mukamal

CPAs, Forensic and Insolvency Advisors

***WMIF 3a*** [14]

44.    WMIF 3a is a Delaware limited liability company formed in July 2015 to invest in domestic and foreign first mortgages and other real estate ventures. WMIF 3a's president and chief executive officer is Shapiro and its managing member is WMF.

45.    In October 2015, WMIF 3a issued a Confidential Offering Memorandum to raise money from investors.  WMIF 3a's stated purpose was to offer accredited investors up to $100 million for 1,000 units for $100,000 each.

46.    Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of WMIF 3a.

47.    WMIF 3a was to use the proceeds of the offering to invest in domestic first mortgages, construction loans, and other real estate acquisitions investments that were to be "secured" and titled in the name of WMIF 3a.

48.    The investors, referred to as "unit holders", were to be repaid as follows:

a.    10% annual preferred dividend and 2% additional accrued preferential dividend after five years from the date of purchase of each corresponding unit;

b.    After five years, repayment of initial investment; and

c.    After five years, investors share in 50% of the cumulative profits of the company earmarked for all unit holders.

---

[14] Woodbridge Mortgage Investment Fund 3a, LLC Confidential Offering Memorandum.

16



**WMIF 4** [15]

49. WMIF 4 is a Delaware limited liability company formed in June 2015 to invest in domestic and foreign first mortgages and other real estate ventures. WMIF 4's president and chief executive officer is Shapiro and its managing member is WMF.

50. In November 2016, WMIF 4 issued a Confidential Offering Memorandum to raise money from investors.  WMIF 4's stated purpose was to offer accredited investors up to $100 million for 1,000 units for $100,000 each.

51. Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of WMIF 4.

52. WMIF 4 was to use the proceeds of the offering to invest in domestic first mortgages, construction loans, and other real estate investments that were to be "secured" and titled in the name of WMIF 4.

53. The investors, referred to as "unit holders" were to be repaid as follows:

   a. 10% annual preferred dividend and 2% additional accrued preferential dividend after five years from the date of purchase of each corresponding unit; and

   b. After five years, repayment of initial investment.

---

[15] Woodbridge Mortgage Investment Fund 4, LLC Confidential Offering Memorandum.

17



### Bridge 2 [16]

54. Bridge 2 is a Delaware limited liability company formed in July 2015 to provide senior position loans to WMIF Entities.

55. Bridge 2's president and chief executive officer is Shapiro and its managing member is WMF.

56. In February 2016, Bridge 2 issued a Confidential Offering Memorandum to raise money from investors. Bridge 2's stated purpose was to offer accredited investors up to $100 million for 1,000 preferred incentive units for $100,000 each.

57. Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of Bridge 2.

58. Bridge 2 was to use the proceeds of the offering to originate and finance short-term commercial loans to WMIF Entities on a secured basis to facilitate WMIF's financing of separate third party commercial lending transactions that WMIF had consummated or intended to consummate.

59. The investors, referred to as "unit holders", were to be repaid as follows:

   a. 6% dividend per annum and 1% accrued incentive after five years;

   b. After five years, repayment of initial investment; and

   c. After five years, investors share in the cumulative profits of the company earmarked for all unit holders equal to their respective pro rata share.

---

[16] Woodbridge Commercial Bridge Loan Fund 2, LLC Confidential Offering Memorandum.

18



## VII.    METHODOLOGY

### Bank Reconstructions

60.    The Woodbridge Entities maintained their bank accounts with Comerica Bank. A complete list of the accounts is at **Exhibit D**. As of September 30, 2017 the combined cash balance in the bank accounts was $9.5 million. The SEC provided me with the bank account record productions it received from Comerica Bank. In my role as forensic accountant to the SEC in this matter, I reviewed, analyzed and reconstructed the entire activity in the bank accounts of the Woodbridge Entities ("Bank Reconstruction").   The Comerica Bank records are the source documents for the Bank Reconstruction.

61.    Shapiro was the authorized signor on each of the Comerica bank accounts and signed the thousands of checks that were issued from the bank accounts during the Relevant Time Period.

62.    The Bank Reconstruction is a database of the details of each transaction (receipts and disbursements) that occurred in the Woodbridge Entities bank accounts. I prepared a separate Bank Reconstruction for each of the Woodbridge Entities' bank accounts.   The Bank Reconstruction includes the following fields of information for each transaction:

a.    Bank account number reference;

b.    Transaction date;

c.    Transaction type;

d.    Transaction amount;

19



Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors

  e.  Payee/recipient; and

  f.  Ending balance.

63. To conduct my analysis, I used Actionable Intelligence Technologies Inc.'s Comprehensive Financial Investigative Solution ("CFIS"), which is a computer software company that converts bank statements from financial institutions into searchable databases ("CFIS Databases"). I understand that CFIS is widely employed as a financial investigation tool by U.S. government agencies/organizations including the Internal Revenue Service and the Federal Bureau of Investigation.

64. I used the data from the CFIS Databases to populate the transactions in the Bank Reconstructions in chronological order. I verified that the data from the CFIS Databases matched the transactions listed in the bank statements by reconciling the following items on a monthly basis:

  a.  Beginning bank account balance;

  b.  Total credits/receipts;

  c.  Total debits/disbursements; and

  d.  Ending bank account balance.

65. Where the CFIS Databases did not include a payee/recipient for each transaction, I populated the payee/recipient information in the bank reconstruction using one of two sources:

  a.  The bank statement support which included:

    i. Canceled checks;

    ii. Deposit slips and copies of checks deposited; and

20



     iii. Wire transfer support.

    b.    Data from the QuickBooks general ledgers, which was verified on a test basis to the bank statement support further discussed below.

66.    The Woodbridge Entities maintained their accounting general ledgers in QuickBooks accounting software ("QuickBooks"). The SEC provided me with the QuickBooks files listed in *Exhibit E*. See ¶73 for a comprehensive discussion regarding the QuickBooks analysis. The activity in QuickBooks I analyzed was from July 2012 through April 28, 2017. I extracted the activity for each Woodbridge Entities' bank account from QuickBooks and utilized the data as a source in populating the following additional fields in the bank reconstruction:

    a.    QuickBooks account; and

    b.    In some instances, to complete the process of populating payee/recipient details, I utilized data from the QuickBooks accounting software to populate the payee/recipient information in the Bank Reconstruction.

67.    The SEC provided me with CFIS Databases that had been partially populated with data. I verified the information on a test basis.

68.    Based on my years of training and experience, I assigned each transaction in the Bank Reconstruction to a category for purposes of analyzing and summarizing the data. In some instances, I assigned the QuickBooks category that was associated with the transaction. *Exhibit F.2* includes the major categories I utilized in the Bank Reconstruction.

69.    I aggregated the transactions in the Bank Reconstruction by category to prepare summaries of the activity in each Woodbridge Entities' bank account. *Exhibit F*



is a combined summary of the Bank Reconstruction and ***Exhibit F.1*** is a combined summary of the Bank Reconstruction presented by entity**.**

**Credit Card Reconstruction**

70. The SEC provided me with the statements and CFIS Databases for the 16 credit card accounts listed in ***Exhibit D.1***, which were all in the name of Jeri S. Shapiro, the spouse of Shapiro ("Shapiro Credit Card Accounts").

71. I prepared a reconstruction ("Credit Card Reconstruction") of the activity in the Shapiro Credit Card Accounts.  See ¶106 for a discussion regarding the Credit Card Reconstruction analysis.

72. During the Relevant Time Period, approximately $24 million was paid towards the Shapiro Credit Cards Accounts, of which 99% of the payments were made from Woodbridge Entities. ***Exhibit G*** is a summary of the Credit Card Reconstruction subtotaled by charge category.  I categorized the credit card transactions by payee and assigned a category. ***Exhibit G.1*** includes the major categories utilized in the Credit Card Reconstruction.

**VIII.   ANALYSIS**

**Accounting Investigation**

73. I investigated and analyzed the  Woodbridge Entities' QuickBooks and evaluated if the transactions recorded by the Woodbridge Entities were consistent with the Bank Reconstruction.

74. The following are notable issues of concern and red flags with the Woodbridge Entities' accounting records:



a.  The Woodbridge Operating Entities' intercompany QuickBooks accounts did not reconcile with the Woodbridge Fund Entities' intercompany accounts.

b.  The Woodbridge Fund Entities' QuickBooks reflect mortgages receivable and some owned real estate assets.[17] The manner in which the Woodbridge Fund Entities recorded these assets primarily comprised of journal entries as a "due to" in an intercompany account.  There was no transfer of cash from the Woodbridge Fund Entities in such transaction, effectively creating assets with only book entries and not represented by a cash transaction.

c.  A significant amount of the interest income revenue recorded in the Woodbridge Fund Entities' QuickBooks was not cash collected from third parties but instead was recorded as an intercompany receivable transaction with the Woodbridge Operating Entities.  Although an intercompany receivable transaction was recorded in the Woodbridge Fund Entities' QuickBooks, in many instances, no corresponding cash receipt was identified in the Woodbridge Operating Entities' bank account nor was a corresponding journal entry reflecting the intercompany transaction recorded in the Woodbridge Fund Entities' QuickBooks.[18]

d.  The Woodbridge Fund Entities recorded assets duplicative of the Woodbridge Operating Entities.

---

[17] The real estate assets owned by the WMIF Entities had a book value of approximately $11 million.
[18] In some instances, Structured transferred funds to the Woodbridge Fund Entities but there was no corresponding deposit from a third party noted in Structured's QuickBooks.

23



Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors

**75.** As discussed in ¶60 of this Declaration, I prepared the Bank Reconstruction. I then compared the activity in the Bank Reconstruction to the Woodbridge Entities' QuickBooks. The QuickBooks records covered a period through April 28, 2017 while the Bank Reconstruction covered the period through September 30, 2017.

**76.** Given the business model discussed in ¶19, it would be customary for the books and records of the Woodbridge Fund Entities to reflect the following accounting and banking transactional flow:

- Receipt of funds from a WMIF Investor would be recorded as an increase to cash and a corresponding liability due to the WMIF Investor for the same amount.

- The WMIF Investor funds would then be utilized to make loans in the form of mortgages to borrowers. Accordingly, when the Woodbridge Fund Entities made a loan to a borrower, there would be a decrease in cash and a corresponding asset (Loan Receivable) recorded for the amount of the loan.

- When loan payments were received from the borrower, the Woodbridge Fund Entities would record an increase in cash along with a corresponding entry for interest income or principal reduction, if applicable.

- When the Woodbridge Fund Entities did not receive the monthly interest due from the borrowers, the correct accounting treatment would be to record an interest income receivable.

24



- WMIF Investors are paid Returns on a monthly basis. Accordingly, when the monthly payments were made there would be a reduction in cash for the amount of the payment made to the WMIF Investor along with a corresponding entry for "interest expense".

- When a WMIF Investor's note matured, the Woodbridge Fund Entities would make a payment to the WMIF Investor for the principal amount of the note which results in a decrease in cash and a reduction of the liability due to the WMIF Investor.

- When a borrower's note became due, the Woodbridge Fund Entities would receive cash from the borrower for the principal amount of the note which results in an increase in cash and reduction of the note receivable asset.

77.  The above accounting transactions describe what one would expect to see in the bank accounts and the Woodbridge Fund Entities' QuickBooks.

78.  Instead, the account transactional flow reflected in the Woodbridge Fund Entities' accounting and bank records is as follows:

- Receipt of funds from a WMIF Investor are received by one of the respective Woodbridge Fund Entities and were recorded as an increase to cash and a corresponding liability due to the investor for the same amount.

- Rather than using the funds to make loans to borrowers, the respective Woodbridge Fund Entities instead transferred the WMIF Investor funds



to one of the Woodbridge Operating Entities (Structured or Group).[19] When this occurred, the Woodbridge Fund Entities recorded a reduction to cash and an increase in intercompany receivable.

- As a general rule, the Woodbridge Operating Entities utilized the commingled WMIF Investor funds to make large transfers to attorney trust accounts. The Woodbridge Operating Entities recorded these transfers to the attorney trust accounts as a reduction to cash and an increase to an asset in QuickBooks without identifying any specific asset purchased or money loaned.

- At the same time, the Woodbridge Fund Entities also recorded the outflow of the same funds transferred to an attorney trust account by the Woodbridge Operating Entities as an increase to assets in their respective QuickBooks. Accordingly, there was a duplication of assets since the entry was recorded in both the Structured or Group's QuickBooks as well as in the individual Woodbridge Fund Entities' QuickBooks. **Table 2** compares the disbursements for Mortgage/Real Estate Investments per the Bank Reconstruction and the Mortgage/Real Estate Investments recorded in QuickBooks during the period from July 11, 2012 to April 28, 2017 (the date of the last QuickBooks data

---

[19] Investor funds for Fund 1, 2, 3 were transferred to Structured. Around approximately January 2016, the investor funds stopped being transferred to Structured and began being transferred to Group. Structured's bank account was closed in March 2016.

26



available) and illustrates that the Woodbridge Entities assets are potentially overstated by at least $790 million.

### Table 2 - Comparison of Mortgage/Real Estate Investments per QuickBooks and Bank Reconstruction as of April 28, 2017

*Source: Bank Reconstruction and QuickBooks Files*

| Category | Amount | Percentage |
|---|---|---|
| Mortgage/Real Estate Investments per QuickBooks | $ 1,382,276,592 | 100.0% |
| Mortgage/Real Estate Investments per Bank Reconstruction | 592,174,371 | 42.8% |
| **Variance** | **$  790,102,221** | 57.2% |

- Although one would expect to see a regular flow of mortgage interest payments from the borrowers reflected in the Woodbridge Fund Entities' bank accounts, I determined that there was minimal cash received from borrowers for mortgage interest payments. **Table 3** illustrates the difference between the cash the Woodbridge Entities actually received for mortgage interest income and the mortgage interest income recorded in QuickBooks during the period from July 11, 2012 to April 28, 2017 (the date of the last QuickBooks data available):

### Table 3 - Comparison of Mortgage Interest Income per QuickBooks and Bank Reconstruction as of April 28, 2017

*Source: Bank Reconstruction and QuickBooks Files*

| Category | Amount | Percentage |
|---|---|---|
| Mortgage Interest Income per QuickBooks | $ 92,909,206 | 100.0% |
| Mortgage Interest Income per Bank Reconstruction | 13,312,415 | 14.3% |
| **Variance** | **$ 79,596,791** | 85.7% |



Kapila/Mukamal

CPAs, Forensic and Insolvency Advisors

- Essentially, the Woodbridge Fund Entities recorded the mortgage interest income in QuickBooks as if it had been received but instead of increasing cash, it increased an intercompany receivable account because the entire $92.9 million was not actually received in cash, only $13.3 million was. In other words, there is a potential overstatement of approximately $80 million of book revenue due to the fact that the loans were made to entities that are affiliated with Shapiro ("Affiliated Entities") and they did not make the monthly interest payments. The manner in which the Woodbridge Fund Entities recorded these transactions was deceptive. One would expect that any interest not collected would be recorded as an "interest income receivable" asset. Instead, the Woodbridge Fund Entities masked these transactions by recording them as "intercompany", which makes it difficult for a reader of the financial statements to identify that there were large amounts of interest income which had not been collected.

79. The manner in which the Woodbridge Entities recorded their transactions was not reflective of the customary accounting entries one would expect. The Woodbridge Entities' accounting records do not reflect the correct amount of income and assets that is consistent with the cash flow activity reflected in the Woodbridge Entities' bank records, resulting in an artificial representation of the income generated and assets available to pay WMIF Investors.

28



### Ponzi Scheme - Definitions and Attributes

**80.**    The SEC defines a Ponzi scheme as follows:[20]

*"A Ponzi scheme is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors.  Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. In many Ponzi schemes, the fraudsters focus on attracting new money to make promised payments to earlier-stage investors to create the false appearance that investors are profiting from a legitimate business."*

**81.**    *The Forensic & Valuation Services Practice Forensic Accounting* – Fraud Investigations, published by the American Institute of Certified Public Accountants, defines a Ponzi scheme as follows:

*"A Ponzi or pyramid scheme is usually a venture wherein earlier investors are repaid principal plus interest with funds provided by later investors.  There may or may not be a legitimate business purpose for the venture, but the need for capital creates and continues the scheme.  Often, unusually high investment returns or other inducements are offered by the promoters to attract investors.* "[21]

**82.**    Each Ponzi scheme typically shares three common characteristics:

- The business activity depends on outside investor money.

- The investor money is not used according to the stated purpose.  Some of the investor money is used to pay the returns promised to earlier investors.

- The business enterprise lacks profits sufficient to provide the promised returns and, therefore, depends on an ever-increasing supply of investor money.

---

[20] http://www.sec.gov/answers/ponzi.htm
[21] Forensic & Valuation Services Practice Aid Forensic Accounting – Fraud Investigations, published by the American Institute of Certified Public Accountants 2014, page 58 – *Ponzi.*



83.   The fuel for a Ponzi scheme is new investor money, in whatever form and label. Out of necessity such a scheme cannot survive in perpetuity and is doomed to collapse. New money is the fuel to perpetuate the life span of a Ponzi scheme. Ponzi schemes manifest in various forms and portray the following characteristics:

a.   Raising funds from investors/lenders. Such sources may include individuals or financial institutions in the form of debt or equity. However, such distinction is of little importance and is irrelevant since accepting the investor money conceives an obligation to return the funds. Furthermore, the profits necessary to provide a return to the investors are nonexistent in a Ponzi scheme.

b.   Ponzi schemes invariably make false promises to investors that they cannot deliver on.

c.   Extensive comingling of funds through multiple entities and layers.

d.   Making of false promises and pitching a business as legitimate while knowing that the money would be used to feed the promises made to prior investors for personal benefits.

e.   There is no supportable business activity generating profits or working capital, thus the only source of funds to fulfill the commitments to the investors is new investor funds.

f.   Ponzi schemes often record transactions in a circular and convoluted manner and maintain accounting records that reflect assets and income are sufficient to fulfill the promises made to investors.



Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors

g.    The accounting records are window-dressed to reflect assets and income based on book entries versus actual transactions, thereby giving a false impression that the funds raised from investors were wisely invested and generating profits.

h.    The business model as represented by the schemer to the investors is not consistent with the true activities and manner of conducting transactions.

## Ponzi Analysis

84.    My analysis and investigation revealed that the Woodbridge Entities conducted transactions in a manner consistent with the attributes of Ponzi scheme.

### *Raising Funds from Investors/Lenders*

85.    *Exhibit F* is a combined summary of the Bank Reconstruction. During the Relevant Time Period, the Woodbridge Entities received $1.2 billion from 8,400 WMIF Investors and made principal payments to WMIF Investors totaling approximately $265 million, resulting in a net liability due to WMIF Investors of approximately $961 million.   Also during this period, Returns payments made to WMIF Investors totaled approximately $103 million.  Approximately 700 of the WMIF Investors resided in the Southern District of Florida and invested approximately $114 million.

86.    From July 11, 2012 through September 30, 2017, the Woodbridge Entities generated approximately $47.9 million of income, of which only $13.7 million was interest payments from borrowers. Conversely, they funded more than $103 million of Returns to WMIF Investors labeled as interest and dividend payments. Based on the Bank Reconstruction, other than investor funds, there was no other



meaningful source of operating or other cash flow to the Woodbridge Entities to fund the difference between the WMIF Investor Returns and mortgage interest income.[22]  This mismatch of interest income and Returns was not consistent with the business model represented to WMIF Investors.

87.     As early as the third quarter of 2012 (the first quarter in which there were funds received from WMIF Investors), the Woodbridge Entities did not generate sufficient income to pay investor Returns, operating expenses and insider activity, creating a net operating cash flow deficit. Until the first quarter of 2013, the Woodbridge Entities utilized a cash balance carried over from Structured's activities, funds received from certain other Shapiro related entities, and funds received from other non-WMIF investors to fund the cash flow deficits. Beginning in the second quarter of 2013, the Woodbridge Entities had continuing cash flow deficits (excess of investor Returns and operating expenses over income earned and sources available from other Shapiro related entities and other non-WMIF investors) in each quarter and the only source of funds available to fund the cash flow deficits was WMIF Investor funds.  This cash flow deficit grew to more than $250 million as of September 2017.

88.     The Woodbridge Entities did not generate sufficient cash flow from mortgage receivables, other real estate investments or any other source to fund the payments to investors. Clearly, even with the use of the cash balance carried over

---

[22] Structured received $31 million of income in years 2012 to 2014 which was related to its structured settlement business.  This revenue did not appear to be related to the Woodbridge Fund Entities business.

32



from Structured's activities the only other source of funds available to the Woodbridge Entities to make the $265 million of principal payments and $103 million in Returns to WMIF Investors were funds from later investors, a classic Ponzi scheme attribute.

### *Commingling of Funds*

89.  Although each of the Woodbridge Entities maintained a separate bank account and QuickBooks file, there were transfers totaling approximately $1.66 billion, exceeding 10,700 transactions, between the Woodbridge Entities resulting in extensive commingling of investor funds.

### *No Supportable Business Activity*

90.  The Woodbridge Fund Entities were supposed to generate revenues from mortgage interest income but the execution of their business model was flawed. A substantial amount of the loans made by the Woodbridge Fund Entities were not arms- length transactions and did not generate cash flow.

91.  I determined that when a borrower's note became due, the Woodbridge Fund Entities generally did not receive the amount due, yet the Woodbridge Fund Entities continued to accrue mortgage interest payments.

92.  The SEC provided me with information regarding the borrowers including copies of promissory notes for certain borrowers and information related to the properties that serve as collateral for the loans.  Very pertinently, the documents indicated that many of the borrowers are not third party or unrelated arms-length entities; rather they are Affiliated Entities.

33



93. All the Woodbridge Fund Entities loaned funds to both third parties and Affiliated Entities. However, from July 2012, when WMIF 1 began raising funds from WMIF Investors, the amount of funds loaned to non-Affiliated entities, including loans outstanding and paid off, was approximately 75% and approximately 25% was loaned to Affiliated Entities. Beginning in December 2013, when WMIF 2 was formed, and subsequently with WMIF 3, WMIF 3a, WMIF 4, the amount of funds loaned to Affiliated Entities, including loans outstanding and paid off, was in excess of 70% (and as high as 98%).[23]

94. I analyzed the promissory notes the Woodbridge Entities were party to, including the mortgage receivables recorded in QuickBooks. I determined that as of April 28, 2017[24] out of $736 million in loans outstanding[25], $718 million (98%) are due from Affiliated Entities. I determined that these borrowers are not making regular interest payments and the Woodbridge Fund Entities simply recorded interest income for book purposes only.[26]

95. By way of example, I analyzed the widely publicized purchase of the Owlwood Estate located in California. One of the Affiliated Entities purchased the Owlwood Estate in September 2016 for $90 million. The Woodbridge Fund Entities made two loans totaling $90 million at the time of the purchase (effectively a 100%

---

[23] These amounts were determined using known borrowers.
[24] The date of the QuickBooks file.
[25] I was not able to determine if the loan was outstanding if the promissory note was not provided. Additionally, I did not receive the promissory notes for the mezzanine loans, as such I assumed the mezzanine loan had the same maturity date as the regular mortgage.
[26] The Woodbridge Entities received approximately $2.9M from the Affiliated Entities. In all instances, with one exception, the Woodbridge Entities recorded these receipts as a reduction to an asset labeled as "investment" on the balance sheet.

34



financing at the time of purchase) and a third loan for development summarized in

**Table 4** as follows:

**Table 4 – Owlwood Estate Loan Summary**
*Source: QuickBooks*

| Entity | Loan Type | Loan Amount |
|---|---|---|
| WMIF 3a | Regular Mortgage | $ 63,000,000 |
| WMIF 3a | Mezzanine Loan | 27,000,000 |
| | **Subtotal** | **90,000,000** |
| WMIF 3a | Development Loan | 22,000,000 |
| | **Total** | **$ 112,000,000** |

96. The Owlwood property was more than 100% financed. WMIF 3a has recorded more than $9 million in accrued interest income but has not collected any cash flow related to this property.

### *Benefits to Insiders of Ponzi Scheme*

97. As discussed in ¶104 below, Shapiro, his family members and related entities benefited from the Ponzi scheme and received more than $21.2 million during the Relevant Time Period.

### **Woodbridge Fund Entities' Investors**

98. As discussed in ¶21, the WMIF Investors included both FPCM and Fund Investors. Approximately 76% of the WMIF Investors were originally recorded as FPCM Investors or short -term investors.[27]

---

[27] Some investors may have transferred their investment from FPCM to Fund. The Bank Reconstruction and information presented here is based on the original investor classification and does not consider this transfer.

35



Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors

99.     **Table 5** summarizes the WMIF Investor activity for the Woodbridge Entities. I
classified a WMIF Investor to the Woodbridge Entities based on where the WMIF
Investor funds were originally deposited. I determined if a WMIF Investor was a
FPCM or Fund Investor based on the QuickBooks category associated with the
transaction.[28]

### Table 5 – Incoming Investor Funds Summary

*Source: Exhibit F.1*

| Entity | FPCM Investor Funds | Fund Investor Funds | Unknown Type Investors | Total |
|---|---|---|---|---|
| Structured Group | $   4,290,934 | $      469,153 | $           - | $   4,760,087 |
| | 1,319,268 | - | - | 1,319,268 |
| WMIF 1 | 85,850,185 | 9,337,500 | 4,172,382 | 99,360,067 |
| WMIF 2 | 140,075,674 | 22,506,789 | 3,008,841 | 165,591,304 |
| WMIF 3 | 325,096,443 | 44,683,952 | 18,460,042 | 388,240,437 |
| WMIF 3a | 269,705,650 | 61,011,339 | 30,972,583 | 361,689,572 |
| WMIF 4 | 111,258,929 | 23,344,852 | 71,382,717 | 205,986,498 |
| **Total** | **$937,597,083** | **$ 161,353,585** | **$ 127,996,565** | **$1,226,947,233** |
| **Percentage** | **76.4%** | **13.2%** | **10.4%** | **100.0%** |

100.    Given that the business model of the Woodbridge Fund Entities is to borrow funds
from investors and use those funds to make real estate loans to borrowers, since
at least 76% of investors were FPCM Investors with a short investment term, the
business model would have collapsed because many of the Affiliated Borrowers
are not repaying the loans when they become due (see ¶94). But the scheme

---

[28] For the time period in which the QuickBooks file was not available I categorized WMIF Investor funds
using deposit memos and payee names (i.e. if the payee was from a previous investor). I also assumed
funds received from individuals in rounded dollar amounts (in even $5,000 increments) or funds from
previously identified trust companies. I determined that monthly interest income payments and mortgage
principal repayments were commonly for uneven amounts and were mainly from corporations, law firms
or escrow/title companies.



continued to survive because FPCM Investors rolled over their investments and kept their money invested in the WMIF Fund Entities and the Woodbridge Entities continued to raise new investor funds.

101. When a WMIF Investors' note matured, the Woodbridge Fund Entities make a payment to the WMIF Investors for the principal amount of the note which results in a decrease in cash and a reduction of the liability due to the investor.   My analysis revealed that in most instances WMIF Investors were not paid when their notes became due and instead their principal investment was retained by the Woodbridge Fund Entities.

102. The Woodbridge Entities received $394 million from IRA custodian accounts from more than 2,600 WMIF Investors. These funds were received by the Woodbridge Entities directly from the various IRA Custodians for the benefit of the WMIF Investors. Over 75% of the total funds from IRA Custodians were received from two IRA Custodians.

**<u>Cease and Desist Orders</u>**

103. Texas, Massachusetts, Arizona and Pennsylvania have issued cease and desist orders. Using addresses from the bank records, I identified WMIF Investors who invested in the Woodbridge Fund Entities after the cease and orders were filed in each state. The cease and desist order applied to FPCM investments.

    a.    On May 4, 2015, the Massachusetts cease and desist order was issued.[29] Subsequent to that date through September 30, 2017, 11 WMIF Investors

---

[29] Commonwealth of Massachusetts Office of the Secretary of the Commonwealth Securities Division Order, May 04, 2015, Docket E-2015-0039.

37



in Massachusetts have invested $3.2 million in the Woodbridge Fund Entities' FPCM investments.[30]

b.   On July 17, 2015, the Texas cease and desist order was issued.[31] Subsequent to that date through September 30, 2017, 25 WMIF Investors in Texas have invested $2.3 million in the Woodbridge Fund Entities' FPCM investments.[32]

c.   On October 04, 2016, the Arizona cease and desist order was issued.[33] Subsequent to that date through September 30, 2017, 13 WMIF Investors in Arizona have invested $900,000 in the Woodbridge Fund Entities' FPCM investments.[34]

d.   On April 24, 2017, the Pennsylvania cease and desist was issued.[35] Subsequent to that date through September 30, 2017, 31 WMIF Investors in Pennsylvania have invested $2.6 million in the Woodbridge Fund Entities' FPCM investments.[36]

---

[30] Additionally, I identified an additional 4 WMIF Investors who invested $635,000, for which the investment type (i.e. FPCM or Fund) is unknown.

[31] Texas State Securities Board, Emergency Cease and Desist Order, July 17, 2015, Order ENF-15-CDO-1740.

[32] Additionally, I identified an additional 4 WMIF Investors who invested $320,000, for which the investment type (i.e. FPCM or Fund) is unknown.

[33] Temporary Order to Cease and Desist and Notice of Opportunity for Hearing, Arizona Corporation Commission, October 04, 2016, Docket No. S-20988A-16-0354.

[34] Additionally, I identified 4 WMIF Investors who invested $200,000, for which the investment type (i.e. FPCM or Fund) is unknown, 2 of these WMIF Investors also invested in FPCM investments during this time period.

[35] Commonwealth of Pennsylvania Department of Banking and Securities Consent Agreement and Order, April 24, 2017, Docket No. 17-0008 (SEC-OSC).

[36] Additionally, I identified 56 WMIF Investors who invested $4.1 million, for which the investment type (i.e. FPCM or Fund) is unknown, 4 of these WMIF Investors also invested in FPCM investments during this time period.

38



**Payments to or for the Benefit of Shapiro**

104.   During the Relevant Time Period, the Woodbridge Entities made payments totaling $53.2 million to Shapiro or entities or individuals associated with him.  The Woodbridge Entities received $32 million from Shapiro or entities or individuals associated with him for net payments totaling $21.2 million, while the payment of promised Returns to investors was being funded from new investor money. ***Exhibit H*** is a summary of these payments.

105.   Of the $21.2 million in net payments to Shapiro or entities or individuals associated with him, approximately $15.5 million were payments made on behalf of Shapiro and approximately $5.7 million were payments made to entities or individuals associated with him, as follows:

a.   The composition of the $15.5 million in payments made on behalf of Shapiro is as follows:

   i.   $8.9 million were payments to the Shapiro Credit Card Accounts for personal charges;

   ii.   $3.1 million were for private plane expenses which primarily comprised of payments to charter companies; and

   iii.   $3.5 million were also payments made to third parties for the benefit of Shapiro categorized in the Woodbridge Entities' QuickBooks as "executive salary - Bob" such as:

   1.   Joy Gravenhorst          $1.2 million

   2.   Luxury vehicles          $340,000

   3.   The Falls Country Club          $130,000

39



    b.    The composition of the $5.7 million in net payments made to entities or individuals associated with Shapiro, included the following :

        i.  $1.7 million were payments to Moorpark Boca Funding, LLC

        ii.  $1.3 million were payments to Scott Schwartz and Up and Coming Capital, LLC

        iii.  $1.3 million were payments to Jeri Shapiro

106.  Of the $8.9 million in payments to the Shapiro Credit Card Accounts for personal charges as described above, the   following are examples of the personal credit card charges[37]:

    a.    $1.6 million was spent on travel expenses. Table 6 is a summary of the travel expenses:

---

[37] In total, the Woodbridge Entities paid $24 million to the Shapiro Credit Card Accounts of which $8.9 million were for personal charges.

40



**Table 6 – Travel Expense[38]**

*Source: Credit Card Reconstruction*

| Payee | Amount |
|-------|-------:|
| Four Seasons Hotels | $      120,073 |
| The London | 83,972 |
| United | 78,297 |
| Ritz Carlton | 72,456 |
| Seagate Hotel And Spa | 67,300 |
| Virgin America | 56,868 |
| American Airlines | 50,445 |
| Hertz Rent-A-Car | 50,322 |
| Mr. C's Hotel | 45,352 |
| Rocky Mountain Limo | 40,382 |
| Delta | 38,158 |
| Ventanas Al Paraiso | 35,587 |
| Hotel Le Bristol | 35,302 |
| Snowmass Ski Area | 32,852 |
| Lax Maria's Limo | 34,180 |
| Other | 749,977 |
| **Total Travel Expense** | **$    1,591,523** |

b.      $1.6 million was spent on retail items that's include furniture, décor and

other home related items. **Table 7** is a summary of these expenses:

---

[38] I included only the significant payees in the table, the remaining payee charges are totaled in "Other" payees that appear to be travel related.

41



### Table 7 - Furniture, Décor & Home Expense[39]
*Source: Credit Card Reconstruction*

| Payee | Amount |
|---|---|
| Roaring Fork Furniture | $ 143,406 |
| Flooring Liquidators & More | 93,187 |
| Angulo Custom Furnishing | 90,512 |
| Lowes | 75,655 |
| Restoration Hardware | 59,303 |
| Moda Italia Home Furnishing | 70,673 |
| Mitchell Litt Antiques | 69,530 |
| Christie's Ny Auction | 63,125 |
| Aspen Design Room | 49,397 |
| Nest Furnishings & Con | 43,693 |
| Bed Bath & Beyond | 42,030 |
| Custom Blind & Carpet | 40,494 |
| Other | 759,610 |
| **Total Retail - Furniture, Décor & Home Expense** | **$ 1,600,615** |

c.    $1.4 million was spent on luxury retail items. **Table 8** is a summary of these

expenses:

### Table 8 – Luxury Retail Purchases[40]
*Source: Credit Card Reconstruction*

| Payee | Amount |
|---|---|
| XIV Karats Ltd | $ 436,627 |
| Bvlgari | 152,439 |
| Louis Vuitton | 130,294 |
| Vhernier | 90,200 |
| Chanel | 58,868 |
| Jimmy Choo | 51,048 |
| Ermenegildo Zegna | 42,845 |
| Dolce & Gabbana | 42,486 |
| FarFetch | 26,876 |
| Fendi | 32,625 |
| Other | 307,211 |
| **Total Luxury Retail Expense** | **$ 1,371,518** |

---

[39] I included only the significant payees in the table, the remaining payee charges are totaled in "Other" payees that appear to be related to Furniture, Décor & Home purchases.

[40] I included only the significant payees in the table, the remaining payee charges are totaled in "Other" payees that appear to be luxury retailers.

42



    d.      **Table 9** summarized charges that I identified as other personal related charges:

### Table 9 – Other Personal Charges
*Source: Credit Card Reconstruction*

| Payee | Amount |
|---|---:|
| US Treasury | $ 1,187,839 |
| Meals & Entertainment Charges | 697,143 |
| Political Donations | 586,538 |
| Clothing, Beauty & Accessories | 514,926 |
| Technology Stores (including Best Buy and Apple) | 429,542 |
| Department Stores(including Amazon) | 340,721 |
| Wine on the Way (an online wine store) | 308,511 |
| Groceries and Pharmacies | 101,628 |
| Medical Charges (including doctors and vets) | 80,864 |
| Spas and Salons | 26,457 |
| Cigar Stores | 14,208 |
| O'Gara Coach Co - Luxury Car Dealer | 11,513 |
| Dirty Devil Customs Auto Body Shop | 10,280 |
| **Total Other Personal Charges** | **$ 4,310,170** |

## Operating Expenses

### *Commission Expense*

107. The Woodbridge Entities paid commissions totaling approximately $64.5 million during the Relevant Time Period. Additionally, I determined that over $12 million of the commission expense was paid to 20 different sales agents located in the Southern District of Florida. I used the addresses on the last check paid to each sales agent to determine where the payments were being mailed.



### *Other Operating Expenses*

108. Operating expenses were paid out of the Woodbridge Operating Entities' bank accounts. The Woodbridge Fund Entities did not make payments for operating expenses other than a minimal amount of bank fees.

109. Per **Exhibit F**, operating expenses paid during the Relevant Time Period includes $43 million for payroll, $16.6 million for professional fees and $44 million for other operating expenses.

110. By way of example, other operating expenses of $44 million includes the following items:

   a. $14 million in payments to Chase and $4 million in payments to Citibank where Woodbridge Entities categorized the transaction as an operating expense.[41]

   b. Over $2.4 million in payments to Blue Cross & Blue Shield of Florida for health insurance.

   c. Over $1.8 million in rent payments for the California and Boca offices. This includes $1.2 million in payments to SMP, LLC and $.6 million in payments to Glades First Center, LLC. I determined these transactions were related to the rental of office space based on check memos.

   d. $1.1 million to Viacom Receivables Funding Corp and $1 million to TBS Funding. These transactions were categorized as "TV Commercial/Media" in Structured's QuickBooks.

---

[41] These payments are included in the $24 million discussed in Footnote No. 37.



e.  Over $900,000 to Blanchard & Company Inc., a rare coin and precious metal firm[42]. These transactions were categorized as "Client Gifts" expense in the Woodbridge Operating Entities' QuickBooks.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

111.  As of the filing date of this Declaration, certain bank, accounting and other financial records remain pending.  My analysis and findings are based on the documents referenced herein and information to date.

112.  I reserve the opportunity to revise or supplement this Declaration based on additional information that may become available.

I declare under penalty of perjury that the foregoing is true, correct, and made in good faith.

Dated: December 18, 2017

_Soneet Kapila_
Soneet R. Kapila, CPA, CIRA, CFF, CFE

---

[42] https://www.blanchardgold.com/about/gold-company/

45

Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors



# Soneet R. Kapila, CPA, CIRA, CFE, CFF

kapila@kapilamukamal.com



Soneet R. Kapila is a founding partner of *KapilaMukamal, LLP* (formerly Kapila & Company). For over 20 years, he has concentrated his efforts in the areas of    consulting in insolvency, fiduciary and creditors' right matters.    Recognized for his acumen as a "business man", he has been appointed in Federal District Court, Bankruptcy Court  and Florida State Court and served in the roles of Chief Restructuring Officer, S.E.C. Corporate Monitor, Examiner, Chapter 11 Trustee of Operating Businesses, Liquidating Trustee and Receiver, among others.

## *Professional Experience*

Mr. Kapila's practice is focused on restructuring, creditors' rights, bankruptcy, fiduciary matters and financial transactions litigation. He represents other bankruptcy trustees, debtors and both secured and unsecured creditors in and out of bankruptcy court. He also regularly advises clients about insolvency and implications involved in business transactions and the operation of distressed businesses. As a Trustee plaintiff, Mr. Kapila has managed complex litigation in significant cases.

As a fiduciary, he has advised and represented debtors and creditors' committees in formulating, analyzing and negotiating plans of reorganization. Recognized as a expert in fraudulent conveyance, Ponzi schemes and insolvency issues, Mr. Kapila has provided expert testimony and extensive litigation support services to law firms involving complex insolvency issues and commercial damages. He is a sitting trustee on the panel of U.S. Bankruptcy Trustees (Southern District of Florida) and has served in numerous matters in both the Southern and Middle Districts of Florida.

He has conducted numerous forensic and fraud investigations and has worked in conjunction with the Securities and Exchange Commission (SEC),  Federal Bureau of Investigation (FBI) and the United States Attorney's Office.

## EDUCATION / QUALIFICATIONS

**Certified Public Accountant (CPA) - Florida**

**Certified Insolvency and Restructuring Advisor (CIRA)**

**Certified Fraud Examiner (CFE)**

**Certified in Financial Forensics (CFF)**

**Certified in Bankruptcy Mediation—Training —St. John's University (2014)**

**MBA, Cranfield School of Management Studies, England (1978)**

## ROLES
**Bankruptcy Trustee—Chapter 7, 11**
**Liquidating Trustee / Plan Administrator**
**Chief Restructuring Officer**
**Corporate Monitor / Examiner**
**Receiver / Assignee**

## AREAS OF EXPERTISE
**Bankruptcy and Insolvency**
**Creditors Rights**
**Restructuring**
**Financial Transactions Litigation**
**Complex Commercial Litigation**

## PROFESSIONAL AFFILIATIONS

**American College of Bankruptcy**
**American Institute of Certified Public Accountants**
**Florida Institute of Certified Public Accountants**
**Association of Insolvency & Restructuring Advisors**
**Association of Certified Fraud Examiners**
**American Bankruptcy Institute**
**National Association of Bankruptcy Trustees**
**National Association of Federal Equity Receivers**

## ACCOMPLISHMENTS
* **Fellow, American College of Bankruptcy** – 2013
* **Top CPAs and Litigation Support Professionals**, South Florida Legal Guide—multiple years
* **Power Leaders in Law and Accounting** – South Florida Business Journal – 2015, 2014
* **Best Trustee** – Daily Business Review's Best of 2012
* **Key Partners Award Honoree** – South Florida Business Journal – 2010
* **Bronze Medal Award** – 3rd highest score, Examination of the Association of Insolvency and Restructuring Advisors – 1996



CPAs, Forensic and Insolvency Advisors

EXHIBIT A



## Soneet R. Kapila, CPA, CIRA, CFE, CFF

kapila@kapilamukamal.com

---

### SPEAKING ENGAGEMENTS

American Bankruptcy Institute
New York Law School
St. Thomas University Law School
National Conference of Bankruptcy Judges
National Association of Bankruptcy Trustees
Association of Insolvency & Restructuring Advisors
Bankruptcy Bar Association for the Southern District of Florida
Central Florida Bankruptcy law Association
Florida Bankruptcy Bar
Florida Institute of Certified Public Accountants
National Business Institute
Turnaround Management Association
University of Miami, School of Law
Florida International University, School of Law
Stetson College of Law, Insolvency Symposium – Germany
American Bar Association

---

### CIVIC, VOLUNTEER AND PHILANTHROPIC

### - Past and Present

**The Kapila Family Foundation -** Director

**American Bankruptcy Institute** -
   Member of Board of Directors - 2016
   Southeast Regional Conference:
      Chairperson of Advisory Board, 2016
      Advisory Board, - 2012-2017 and Co-Chair 2015
   Caribbean Insolvency Symposium -
      Advisory Board—2010-2014 amd Co-Chair 2015

**Association of Insolvency and Restructuring Advisors** -
   Board of Directors
   Past Chairman and Past President

**The Florida Bar**, Member, Grievances Committee

**Hialeah-Miami Springs, NW Dade Chamber of Commerce** -
   Board of Directors (Past)

**The American Group of CPA Firms -** Chairman
   – Litigation Support Services Committee of the
    National Training and Experience Sharing Program

**Florida Institute of Certified Public Accountants -**
   Practice Review Committee

---

KapilaMukamal, LLP
1000 S. Federal Highway, Suite 200
Fort Lauderdale, FL  33316
954-761-1011
**www.kapilamukamal.com**

---

### REPRESENTATIVE CLIENTS

**City of Detroit, Michigan**    *Financial Advisors to Fee Examiner*

**SMF Energy Corporation**    *CRO, Liquidating Trustee*

**Fontainebleau Las Vegas, LLC**    *Chapter 7 Trustee*

**Universal Health Care Group, LLC/
American Managed Care, Inc.**  *Chapter 11 / Liquidating Trustee*

**Simply Fashion Stores, LLC**    *Chief Restructuring Officer*

**Spear & Jackson, Inc**    *Corporate Monitor – SEC Appointment*

**Pan American Hospital**    *Examiner / Plan Administrator*

**Louis J. Pearlman / TransContinental Airlines, et al** –
   *Chapter 11 Trustee / Liquidating Trustee*

**Levitt & Sons**    *Chief Administrator*

**Planet Hollywood International, Inc**    *Examiner*

**Banco Latino International**    *Financial Consultants to
Official Committee of Unsecured Creditors*

**Southeast Bank Corp**    *Financial Advisors to Chapter 7 Trustee*

**Innovida Holdings, LLC /Claudio Osorio**    *Chapter 7 Trustee*

**Prime Capital Corporation**    *Chapter 7 Trustee*

**GunnAllen Financial, Inc.**    *Ch 11 Examiner/Liquidating Trustee*

**SEC v. Christopher Freeman Brogdon**    *Corporate Monitor
   - SEC Appointment*

---

### PUBLICATIONS

"*Best Practices in the Treasury Functions of a Chapter 7 Trustee's Office*" – American Bankruptcy Trustee Journal (NABT) (Fall, 2015)

"*Fraud and Forensics: Piercing Through The Deception In A Commercial Fraud Case*" – American Bankruptcy Institute – 2015

"*Ponzi Schemes: Fiduciaries May Be The Saving Grace*", ABI Journal (2014)

"*A Health Care Fraud and Bankruptcy Primer*", Southern District of Florida Bankruptcy Bar Association Journal (2014)

"*Hidden Resources in a Small Business*"



CPAs, Forensic and Insolvency Advisors

EXHIBIT B



## Melissa Davis, CPA, CIRA, CFE

mdavis@kapilamukamal.com



Melissa Davis is a Partner at *KapilaMukamal, LLP.* She joined the firm in 1998. Her practice concentrates on insolvency and fiduciary matters. Ms. Davis has qualified as an expert in federal court, testified in trials, hearing and depositions. She has served as a court appointed Assignee for the Benefit of Creditors and as Plan Trustee in Chapter 11 bankruptcy matters. She has worked on numerous high profile cases.

### *Professional Experience*

Ms. Davis concentrates on providing bankruptcy, litigation and forensic investigation services to debtors, creditors, receivers, assignees, bankruptcy trustees, examiners and liquidating trusts. Her practice also includes forensic accounting, fraud investigations and litigation support and family law matters.

Ms. Davis has served as a financial advisor to fiduciaries operating distressed companies in a variety of industries including mobile fueling, health insurance, real estate, retail, hospitality, assisted living facilities/nursing homes, metal extrusion, stevedoring and waste management. Her experience includes distressed business operations, management, preservation of collateral and asset divestiture services.

Ms. Davis has investigated fraudulent and preferential transfers, prepared defense, solvency and liquidation analyses. She has worked on asset tracing, tracing of commingled funds, provided litigation support and damage calculation services, including forensic and securities fraud investigations and corporate business conduct analysis. Ms. Davis has extensive experience in fraud and Ponzi-scheme investigations and commingled funds tracing analysis. Her forensic and fraud investigations have involved working in conjunction with the Securities and Exchange Commission (SEC.), the Federal Trade Commission (FTC), the Federal Bureau of Investigation (FBI) and various United States Attorneys Offices.

Ms. Davis has testified in court and depositions and served as Liquidating Trustee and court appointed Assignee for the Benefit of Creditors.

### *EDUCATION / QUALIFICATIONS*

**Certified Public Accountant (CPA) - Florida**
**Certified Insolvency and Restructuring Advisor (CIRA)**
**Certified Fraud Examiner (CFE)**

**Florida Atlantic University, Boca Raton, Florida —**
**Bachelor of Business Administration,**
**Major in Accounting,**

### *AREAS OF EXPERTISE*

**Forensic Accounting**
**Bankruptcy and Insolvency**
**Creditors Rights**
**Restructuring**
**Financial Transactions Litigation**
**Complex Commercial Litigation**

### *PROFESSIONAL AFFILIATIONS*

**American Institute of Certified Public Accountants**
**Florida Institute of Certified Public Accountants**
**Association of Insolvency & Restructuring Advisors**
**Association of Certified Fraud Examiners**
**American Bankruptcy Institute**
**International Women's Insolvency & Restructuring Confederation**
**Bankruptcy Bar Association, Southern District of Florida**
**National Association of Federal Equity Receivers**



CPAs, Forensic and Insolvency Advisors

EXHIBIT B



## Melissa Davis, CPA, CIRA, CFE

mdavis@kapilamukamal.com

### SPEAKING ENGAGEMENTS

American Bankruptcy Institute 2017 Annual Spring Meeting— *"Fraudulent Transfers—The Long Claw of The Law"* - April 2017

IWIRC 23rd Annual Fall Conference—*"The Dissection of a Ponzi Scheme"* - October 2016

Florida Institute of Certified Public Accountants – North Dade/South Broward Chapter – *"Tracing Commingled Funds"* - July 2016

Jacksonville Bankruptcy Bar Association 23rd Annual Bankruptcy Seminar – *"E-Discovery in Bankruptcy: Why Should You Care?"* - August 2015

American Bankruptcy Institute 2015 Southeast Bankruptcy Workshop – *"Time for Trial: Evidentiary Issues in Bankruptcy Litigation"* - July 2015

Central Florida Bankruptcy Law Association – *"What Do Boy Bands and Healthcare Have in Common"*, -July 2014

Florida Bar Business Law Section – *"Professional Fiduciaries: Responsibilities and Duties"* - May 2014

Tampa Bay Bankruptcy Bar Association – *"What Do Boy Bands and Healthcare have in Common"* - March 2014

Bankruptcy Bar Association of the Southern District of Florida – *"Valuation Issues in Bankruptcy"* - May 2013

American Bankruptcy Institute Southeast Regional Conference – *"Ponzi Schemes and Barring Claims Against the Guilty"* - July 2012

Turnaround Management Association – *"Current Issues in Real Estate"* - April 2012

### PUBLICATIONS

*"Fraud and Forensics: Piercing Through The Deception In A Commercial Fraud Case"* – American Bankruptcy Institute – (2015)

*"Ponzi Schemes: Fiduciaries May Be The Saving Grace"*, ABI Journal (2014)

*"A Health Care Fraud and Bankruptcy Primer"*, Southern District of Florida Bankruptcy Bar Association Journal (2014)

*"Rising Tide in the Wake of Ponzi,"* ABI Journal (2013)

### ACCOMPLISHMENTS

**Top CPAs and Litigation Support Professionals**—South Florida Legal Guide, 2015—2017

### CIVIC, VOLUNTEER AND PHILANTHROPIC
### Past and Present

**American Bankruptcy Institute**—

- Advisory Board—ABI Southeast Regional Conference (2017-2018)
- Advisory Board—ABI Caribbean Insolvency Symposium (2016-2018)
- ABI Commercial Fraud Committee (2016-2018)

**Credit Abuse Resistance Education (C.A.R.E.) Volunteer**

**The Kapila Family Foundation -** Executive Coordinator of the Kapila Family Foundation Endowment Fund for the Broward Center of the Performing Arts

**Summit Questa Montessori School**—PTO Board Member 2013-17

**Leukemia & Lymphoma Society**—Team in Training Participant and Volunteer 2012-2014

**Women in Distress of Broward County** —Annual Back to School and Thanksgiving Drives 2011-2017

*KapilaMukamaI, LLP*
1000 S. Federal Highway, Suite 200
Fort Lauderdale, FL  33316
Main   954-761-1011
Direct 954-712-3205
*www.kapilamukamal.com*



| | | | EXHIBIT C |
|---|---|---|---|
| **SONEET R. KAPILA** <br> **Experience in Matters Involving PONZI / FRAUD including SEC and FTC Matters** | | | |
| **Case Name** | **Industry / Type** | **Role** | **Description** |
| *SEC Matters* | | | |
| **SEC v. Christopher Freeman Brogdon and Connie Brogdon, Tygh Brogdon, Brogdon Family, LLC, Gordon Jensen Healthcare Association, Inc., JRT Group Properties, LLC, Mobama Nursing, LLC, National Assistance Bureau, Inc., Saint Simons Healthcare, LLC and Winter Haven Homes, Inc.** | Securities Fraud | SEC Corporate Monitor | Securities Fraud |
| **SEC v. Dennis Crowley, Spear & Jackson, et al** | Hedge Funds | Corporate Monitor (SEC Appointment) Forensic Experts | Securities Fraud |
| **SEC v. Amante Corporation, et al** | Securities Fraud | SEC Receiver | Receiver |
| **SEC v. North American Clearing Inc. v. Richard Goble** | Broker Dealer | Corporate Monitor, SEC Retentions, Hedge Funds | Securities fraud - broker-dealer |
| **SEC v. Tel-One, Inc., et al** | Pump & Dump | Claims Administrator / Disbursing Agent - SEC Appointment | Pump and Dump Scheme - Securities Fraud |
| **SEC v. A.B. Financing and Investment, Inc.** | Financing | Forensic Consultants and Expert Witness for the SEC | Quantification of investors losses |
| **SEC v. IDT Group, Inc.** | Securities Fraud | Forensic Accountants | Securities Fraud |
| **SEC v. Aubrey Lee Price; PFG, LLC; PFGBI, LLC; Montgomery Asset Management, LLC f/k/a PFG Asset Management, LLC** | Securities Fraud | Forensic Accountants to the SEC Receiver | Securities Fraud |
| **SEC v. Comcoa, Ltd.** | Wireless communications | Forensic Accountants to the SEC Receiver | Fraud - wireless telecommunications |
| **SEC v. Commodities OnLine, LLC** | Securities Fraud | Forensic Accountants to the SEC Receiver | Securities Fraud |
| **SEC v. Creative Capital Consortium, LLC, et al** | Securities Fraud | Forensic Accountants to the SEC Receiver | Securities Fraud - Haitian-American Community Investment Clubs |
| **SEC v. Edward S. Digges, Jr., Nexstar Communications, LLC, TMT Equipment Company, LLC, TMT Management Group,LC, et al** | Securities Fraud | Expert Witness and Forensic Accountants to the SEC Receiver | Securities Fraud |

|  |  | EXHIBIT C |
| --- | --- | --- |

### SONEET R. KAPILA
#### Experience in Matters Involving PONZI / FRAUD including SEC and FTC Matters

| Case Name | Industry / Type | Role | Description |
| --- | --- | --- | --- |
| SEC v. Financial Federated Title & Trust, Inc. a/k/a Assets Security Corp., a/k/a Viatical Asset Recovery Corp, a/k/a Quad B Ltd., a/k/a American Benefits Services, Inc. - Various adversaries | Viatical Insurance Settlements | Forensic Accountants to the SEC Receiver | Ponzi Scheme / viatical insurance settlements - Assisted Trustee in adjudication of over 3,000 claims; multiple distributions over a period of years to a creditor body in three related cases totaling 20,000+ distribution checks |
| SEC v. International Capital Management, Inc.. Jose Santiago / MBA | Securities Fraud; Foreign Exchange Currency | Forensic Accountants to the SEC Receiver | Ponzi Scheme - Funds Tracing / co-mingling |
| SEC v. JCS Enterprises, Inc., d/b/a JCS Enterprises, Services, Ind., T.B.T.I., Joseph Signore and Paul L. Schumack, II | ATM Machines | Forensic Accountants to the SEC Receiver | Ponzi Scheme |
| SEC v. Joseph Hilton, f/k/a Joseph Yurkin, Pacific Northwestern Energy, LLC, Rock Castle Drilling Fund, LP, Rock Castle Drilling Fund II LP and New Horizon Publishing, Inc. | Oil Drilling Projects | Forensic Accountants to the SEC Receiver | Ponzi scheme selling unregistered securities in companies purportedly generating profits from oil drilling projects in Kentucky |
| SEC v. Mark David Shiner, Leon Switchkow, Timothy Wetherald and Telecom Advisory Services, Inc., et al - Mile High Telecom | Telecommunications | Forensic Accountants to the SEC Receiver - Expert Witness | Ponzi Scheme - Telecommunications |
| SEC v. Medco, Inc., Mark R. Blacher, Defendants & The Hi Lily Company & National Health Services, Inc., Relief Defendants | Medical Equipment | Forensic Accountants to the SEC Receiver | Medical equipment Ponzi Scheme |
| SEC v. Transamerica Wireless Systems, Inc. and Intercontinental Telecommunications Co. and Danny Sterk | Telecommunications | Forensic Accountants to SEC Receiver | Ponzi Scheme - wireless telecommunications |
| SEC v. WorldCorp FX & Company, Inc. | International Currency | Forensic Accountants to SEC Receiver | Ponzi / Fraud involving trading of international currencies |

Kapila/Mukamal

Page 2 of 3

| | | | EXHIBIT C |
|---|---|---|---|

## SONEET R. KAPILA
### Experience in Matters Involving PONZI / FRAUD including SEC and FTC Matters

| Case Name | Industry / Type | Role | Description |
|---|---|---|---|
| **FTC Matters** | | | |
| **FTC v. American Precious Metals, LLC** | **Precious Metals** | **Accountants to the FTC Receiver** | *Ponzi Scheme* |
| **FTC v. Nationwide Connections, Inc., Access One Communications, Inc., Network One Services, Inc., Willoughby Farr, et al** | **Telecommunications** | **Forensic Accounts to the FTC Receiver** | *Accountants to FTC Receiver* |
| **FTC v. World Class Limousine** | **Limousine** | **Accountants to the FTC Receiver** | *Ponzi Scheme* |
| **FTC vs. Fereidoun "Fred" Khalilian and The Dolce Group Worldwide, LLC** | **Extended car warranties** | **Forensic Accountants to the FTC Receiver** | *Ponzi scheme* |
| **FTC vs. Timeshare Mega Media and Marketing Group, Inc., et al** | **Condo timeshares** | **Forensic Accountants to the FTC Receiver** | *Ponzi scheme investigation* |
| **Other Ponzi/Fraud Matters** | | | |
| **Associated Record Distributors** | **Records** | **Forensic Accountants to the SEC Receiver** | *Ponzi scheme* |
| **ATM Financial Services, LLC** | **ATM Machines** | **Forensic Accountants** | *Ponzi - ATM machines* |
| **Lancer Offshore Receivership; Lancer Management Group, LLC; Lancer Management Group II, LLC and Michael Lauer** | **Hedge Funds** | **Accountants to Receiver** | *Hedge Fund* |
| **Louis J. Pearlman / TransContinental Airlines** | **Securities Fraud** | **Chapter 11 Trustee** | *Classic Ponzi Scheme of approximately $500 million; 100 related entities and over 1,400 victims* |
| **Razorback Funding, LLC et al v. Scott Rothstein, et al** | **Hedge Funds** | **Litigation Consultants and Forensic Experts; Expert Witness** | *Hedge Funds/ Banks* |
| **State of Texas v. Edward S. Digges, Jr.** | **Securities Fraud** | **Expert Witness** | *Securities Fraud* |
| **U.S. Commodity Futures Trading Commission v. Hunter Wise Commodities, Inc., Inspired Ventures, Inc., Jesse Alper and Victor Alper** | **Securities Fraud** | **Forensic Accountants** | *Securities Fraud* |
| **Wealth Pools International, Inc., Robert E. Lane, and Recruit for Wealth, et al** | **Securities Fraud** | **Forensic Accountants - Expert Witness** | *Ponzi-Securities Fraud* |

Kapila/Mukamal

| | | | | | | **Exhibit D** |
|---|---|---|---|---|---|---|

**Woodbridge Entities**

**Bank Record Inventory**

**Source**: Bank Records and Underlying support

| Entity | Bank | Type | Signer on the Account | Account # | Beginning Date | Ending Date |
|---|---|---|---|---|---|---|
| **Accounts Reconstructed:** | | | | | | |
| Woodbridge Commercial Bridge Loan Fund 1 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX8333 | 09/21/15 | 09/30/17 |
| Woodbridge Commercial Bridge Loan Fund 2 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX1498 | 12/08/16 | 09/30/17 |
| Woodbridge Group of Companies LLC Operating Account | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX8192 | 11/25/15 | 09/30/17 |
| Woodbridge Group of Companies LLC Special Holding | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX8200 | 11/25/15 | 09/30/17 |
| Woodbridge Mortgage Investment Fund 1 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX0647 | 07/11/12 | 09/30/17 |
| Woodbridge Mortgage Investment Fund 2 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX3483 | 12/30/13 | 09/30/17 |
| Woodbridge Mortgage Investment Fund 3 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX2992 | 10/10/14 | 09/30/17 |
| Woodbridge Mortgage Investment Fund 3a LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX7897 | 11/02/15 | 09/30/17 |
| Woodbridge Mortgage Investment Fund 4 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX2703 | 06/26/15 | 09/30/17 |
| Woodbridge Structured Funding LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX7690 | 01/01/10 | 03/24/16 |
| Woodbridge Structured Funding LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX2482 | 01/01/10 | 04/11/16 |
| | | | | | | |
| **Other Accounts Considered** | | | | | | |
| Woodbridge Capital Investments LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX9476 | 01/01/10 | 06/30/16 |
| Woodbridge Crowdfunding 1 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX8358 | 07/27/15 | 09/30/17 |
| Woodbridge Lending Fund 1 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX8317 | 09/30/15 | 09/30/17 |
| Woodbridge Luxury Homes of California Inc. | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX3297 | 11/20/14 | 09/30/17 |
| Woodbridge Luxury Homes of California Inc. DBA Mercer Wine | Comerica Bank | Business Money Market | Robert Shapiro | XXXXXXX2653 | 06/17/15 | 09/30/17 |
| Woodbridge Luxury Homes of California Inc. DBA Mercer Wine | Comerica Bank | Business Checking | Robert Shapiro and Adam Jason Rosenfeld | XXXXXXX2661 | 06/17/15 | 09/30/17 |
| Woodbridge Pre-Settlement Funding 2 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX0761 | 02/21/13 | 09/30/17 |
| Woodbridge Pre-Settlement Funding LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX9598 | 05/05/11 | 09/30/17 |
| Woodbridge Pre-Settlement Funding LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX0821 | 11/08/11 | 09/30/17 |
| Woodbridge Pre-Settlement Funding LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX9580 | 04/05/11 | 04/13/11 |
| Woodbridge Realty of Colorado LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX2984 | 10/16/14 | 09/30/17 |
| Woodbridge Structured Funding LLC Special Investor Holding | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX0472 | 09/07/12 | 03/23/16 |
| Woodbridge Structured Settlement Investments LLC | Comerica Bank | Commercial Checking | Robert Shapiro | XXXXXXX9062 | 01/01/10 | 09/30/17 |

**See accompanying Declaration dated December 18, 2017**

*Kapila Mukamal*
CPAs, Forensic and Insolvency Advisors
Page 1 of 1

**Exhibit D.1**

| **Woodbridge Entities** |
| :---: |

| **Credit Card Statement Record Inventory** |
| :---: |

**Source**: Credit Card Statements

| Entity | Bank | Type | Account # | Beginning Date | Ending Date |
|---|---|---|---|---|---|
| *Credit Cards Reconstructed:* | | | | | |
| Chase Hyatt - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-8260 | 12/05/11 | 07/04/13 |
| Chase Hyatt - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-7053 | 11/05/13 | 02/04/17 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-3902 | 12/19/11 | 02/18/14 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-8308 | 02/19/14 | 01/18/15 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-8221 | 01/19/15 | 11/18/15 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-2292 | 10/19/15 | 03/18/16 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-4855 | 11/19/15 | 02/18/17 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-2092 | 02/19/17 | 03/18/17 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-2059 | 03/19/17 | 06/18/17 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-9684 | 03/19/12 | 10/18/12 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-5969 | 10/19/12 | 08/18/13 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-4660 | 08/19/13 | 03/18/14 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-0348 | 03/19/14 | 12/18/14 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-2366 | 03/19/16 | 06/16/16 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-4159 | 06/19/16 | 05/18/17 |
| CitiBank - Jeri Shapiro | CitiBank | Credit Card | 0481 | 07/19/12 | 05/17/17 |

**See accompanying Declaration dated December 18, 2017**

Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors
Page 1 of 1

**Exhibit E**

**Woodbridge Entities**

**QuickBooks Files Provided**

**Source**: QuickBooks

| Entity | Beginning Date | Ending Date |
|---|---|---|
| Woodbridge Structured Funding LLC | 04/01/11 | 04/11/17 |
| Woodbridge Mortgage Investment Fund 1 LLC | 07/03/12 | 04/28/17 |
| Woodbridge Mortgage Investment Fund 2 LLC | 01/07/14 | 04/28/17 |
| Woodbridge Mortgage Investment Fund 3 LLC | 10/10/14 | 04/28/17 |
| Woodbridge Group of Companies LLC | 06/01/15 | 04/21/17 |
| Woodbridge Mortgage Investment Fund 4 LLC | 07/15/15 | 04/28/17 |
| Woodbridge Commercial Bridge Loan Fund 1 LLC | 09/21/15 | 04/28/17 |
| Woodbridge Mortgage Investment Fund 3a LLC | 12/01/15 | 04/28/17 |
| Woodbridge Commercial Bridge Loan Fund 2 LLC | 12/29/16 | 04/13/17 |

**See accompanying Declaration dated December 18, 2017**

Kapila/Mukamal

CPAs, Forensic and Insolvency Advisors

Exhibit F

**Woodbridge Entities**

**Consolidated Summary of the Bank Reconstruction (Note 1)**
**Woodbridge Mortgage Funds 1, 2, 3, 3a, 4, Bridge Loan 1, Bridge Loan 2, Structured Funding and Group of Companies**
**July 11, 2012 - September 30, 2017**

Source: Bank Reconstruction; QuickBooks files

| Category | Reference | Inflows | Outflows | Net |
|---|---|---|---|---|
| **Net Investor Activity (Principal)** | | | | |
| Investor - FPCM | | $ 937,597,083 | $ 259,124,550 | $ 678,472,533 |
| Investor - Fund | | 161,353,585 | 6,230,415 | 155,123,170 |
| Investor - Type Unknown | | 127,996,565 | 137,000 | 127,859,565 |
| **Total WMIF Investors** | **A** | **1,226,947,233** | **265,491,965** | **961,455,268** |
| Investor - Structured Funding | | 79,565,367 | 72,454,136 | 7,111,231 |
| Investor - Held in Escrow | | 46,971,607 | 36,614,913 | 10,356,694 |
| Investor - Group of Companies | | 23,216,500 | 29,845,438 | (6,628,938) |
| Investor - Bridge Loans | | 1,900,147 | 1,142,508 | 757,639 |
| **Total Other Investors** | **B** | **151,653,621** | **140,056,995** | **11,596,626** |
| **Total Investor Activity** | **C = A + B** | **1,378,600,854** | **405,548,960** | **973,051,894** |
| **Net Mortgage Lending/Investment Activity (Principal)** | | | | |
| Mortgage Lending | | 112,330,391 | 62,120,367 | 50,210,024 |
| Other - Return of Investment | | 24,298,115 | - | 24,298,115 |
| Other Investments | | 35,312,719 | 784,461,100 | (749,148,380) |
| **Total** | **D** | **171,941,225** | **846,581,467** | **(674,640,242)** |
| **Potential Investor Liability in excess of Mortgage Lending/Investments Outstanding** | **E = C + D** | | | **298,411,652** |
| **Income** | | | | |
| Company Income (Structured Settlement Business) | | 30,934,250 | - | 30,934,250 |
| Income - Mortgage Interest Payments | | 13,680,268 | - | 13,680,268 |
| Commission Income | | 2,333,529 | - | 2,333,529 |
| Other Income Earned | | 582,754 | - | 582,754 |
| Gain/Loss on Investments | | 379,126 | | 379,126 |
| **Total Income** | **F** | **47,909,927** | **-** | **47,909,927** |
| **Expenses** | | | | |
| WMIF Investor - Returns | | - | 103,215,844 | (103,215,844) |
| Commissions to Sales Agents | | - | 64,596,323 | (64,596,323) |
| Other Operating Expenses | | - | 44,147,485 | (44,147,485) |
| Payroll | | - | 42,963,430 | (42,963,430) |
| Professional fees | | - | 16,572,369 | (16,572,369) |
| Other Investor - Interest Expense | | - | 3,631,972 | (3,631,972) |
| **Total Expenses** | **G** | **-** | **275,127,423** | **(275,127,423)** |
| **Net Income (Loss)** | **H = F + G** | | | **(227,217,496)** |
| **Other Cash Activity** | | | | |
| Intercompany | | 22,169,080 | 47,028,634 | (24,859,554) |
| Insider Activity **(See Exhibit H)** | | 31,968,699 | 51,211,046 | (19,242,347) |
| Other | | 15,428,285 | 29,037,494 | (13,609,209) |
| Client Funding | | 56,843,327 | 60,194,764 | (3,351,437) |
| Transfers on behalf of other funds | | 10,028,477 | 12,357,994 | (2,329,517) |
| **Total Other Activity** | **I** | **136,437,868** | **199,829,932** | **(63,392,064)** |
| Intracompany Activity | **J** | 1,662,377,781 | 1,662,377,781 | - |
| **Net Cumulative Cash Flow Activity** | **K = E + H + I + J** | **3,397,267,655** | **3,389,465,563** | **7,802,092** |
| **Beginning Balance as of July 11, 2012** | | | | **1,719,417** |
| **Ending Cash Balance as of September 30, 2017** | | | $ | **9,521,509** |

**Note 1)** See **Exhibit F.2** in the accompanying report for a description of the categories in this Exhibit.

**See accompanying Declaration dated December 18, 2017**

Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors
Page 1 of 1

Case 1:17-cv-24624-MGC   Document 36-2   Entered on FLSD Docket 12/26/2017   Page 59 of 65

**Exhibit F.1**

**Woodbridge Entities**

**Summary of Bank Reconstructions**
**Consolidated Category Summary**
**07/11/2012 - 09/30/2017**

Source: Bank Reconstruction and QuickBooks

| Category | 07/11/2012 - 04/06/2016 Structured | 07/11/2012 - 09/30/2017 WMIF 1 | 12/30/2013 - 09/30/2017 WMIF 2 | 10/10/2014 - 09/30/2017 WMIF 3 | 06/26/2015 - 09/30/2017 WMIF 4 | 9/20/2015 - 09/30/2017 Bridge 1 | 11/02/2015 - 09/30/2017 WMIF 3a | 11/25/2015 - 09/30/2017 Group | 12/08/2016 - 09/30/2017 Bridge 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Inflows:** | | | | | | | | | | |
| **WMIF Investors:** | | | | | | | | | | |
| Investor - FPCM | $ 4,290,934 | $ 85,850,185 | $ 140,075,674 | $ 325,096,443 | $ 111,258,929 | $ - | $ 269,705,650 | $ 1,319,268 | $ - | $ 937,597,083 |
| Investor - Fund | 469,153 | 9,337,500 | 22,506,789 | 44,683,952 | 23,344,852 | - | 61,011,339 | - | - | 161,353,585 |
| Investor - Type Unknown | - | 4,172,382 | 3,008,841 | 18,460,042 | 71,382,717 | - | 30,972,583 | - | - | 127,996,565 |
| **Total WMIF Investor Inflows** | 4,760,087 | 99,360,067 | 165,591,304 | 388,240,437 | 205,986,498 | - | 361,689,572 | 1,319,268 | - | 1,226,947,233 |
| | | | | | | | | | | |
| **Other Investors** | | | | | | | | | | |
| Investor - Structured Funding | 23,215,500 | 41,023,500 | 12,815,367 | 2,511,000 | - | - | - | - | - | 79,565,367 |
| Investor - Held in Escrow | 42,577,205 | 218,525 | - | - | - | - | - | 4,175,877 | - | 46,971,607 |
| Investor - Group of Companies | 980,000 | 19,335,000 | - | - | - | - | - | 2,901,500 | - | 23,216,500 |
| Investor - Bridge Loans | - | - | - | - | - | 1,695,747 | - | - | 204,400 | 1,900,147 |
| **Total Other Investor Inflows** | 66,772,705 | 60,577,025 | 12,815,367 | 2,511,000 | - | 1,695,747 | - | 7,077,377 | 204,400 | 151,653,621 |
| | | | | | | | | | | |
| **Mortgage/Real Estate/Other Investments:** | | | | | | | | | | |
| Mortgage Lending Principal | 7,177,847 | 40,688,012 | 25,153,812 | 35,060,975 | 658,669 | - | 3,428,975 | 162,101 | | 112,330,391 |
| Other Investments | 7,055,289 | 4,042,729 | - | 3,500,000 | - | - | - | 20,714,701 | | 35,312,719 |
| Other Return of Investment | - | 3,147,342 | 4,830,778 | 320,016 | 6,259,283 | - | 9,740,696 | - | | 24,298,115 |
| Mortgage Interest Income | 91,288 | 6,827,370 | 4,096,555 | 2,352,082 | - | - | 318,498 | (5,525) | | 13,680,268 |
| Other Investment Income Earned | 1,800 | 615,965 | 10,647 | (77,500) | - | - | - | 31,842 | | 582,754 |
| Gain/Loss on Investments | 532,009 | (1,414,175) | 391,989 | 629,303 | - | - | - | 240,000 | | 379,126 |
| **Total Inflows from Investing Activity** | 14,858,233 | 53,907,243 | 34,483,781 | 41,784,876 | 6,917,952 | - | 13,488,169 | 21,143,119 | - | 186,583,373 |
| | | | | | | | | | | |
| **Other Income** | | | | | | | | | | |
| Company Income | 31,041,762 | 94,980 | - | - | - | - | - | (202,492) | | 30,934,250 |
| Commission Income | 2,268,579 | 64,950 | - | - | | | - | | | 2,333,529 |
| **Total Other Income** | 33,310,341 | 159,930 | - | - | - | - | - | (202,492) | - | 33,267,779 |
| | | | | | | | | | | |
| Client Funding Inflows | 56,577,311 | - | - | - | - | - | - | 266,016 | | 56,843,327 |
| Insiders (See Exhibit H) | 13,072,915 | 500,000 | 952,158 | 289,000 | - | - | 500,000 | 16,654,626 | | 31,968,699 |
| Intercompany Transfers in | 16,980,938 | 410,000 | - | 550,000 | - | - | - | 4,228,142 | - | 22,169,080 |
| Other Inflows | 624,800 | 249,486 | 396,679 | 1,954,533 | 5,119,241 | - | 6,325,136 | 758,410 | | 15,428,285 |
| Transfers received on behalf of another fund | 3,830,945 | 3,456,561 | 2,531,965 | (86,263) | - | 100 | 56,960 | 238,209 | | 10,028,477 |
| **Total Inflows** | 210,788,275 | 218,620,312 | 216,771,254 | 435,243,583 | 218,023,691 | 1,695,847 | 382,059,837 | 51,482,675 | 204,400 | 1,734,889,874 |
| | | | | | | | | | | |
| **Outflows:** | | | | | | | | | | |
| **WMIF Investors:** | | | | | | | | | | |
| Investor - FPCM Repayment | 1,900,000 | 37,581,397 | 57,267,824 | 107,470,902 | 7,208,732 | - | 47,695,695 | - | - | 259,124,550 |
| Investor - Fund Repayment | - | 465,000 | 747,183 | 802,000 | 69,139 | - | 4,147,093 | - | - | 6,230,415 |
| Investor - Type Unknown | - | - | - | - | 89,000 | | 48,000 | | | 137,000 |
| **Total WMIF Principal Repayment** | 1,900,000 | 38,046,397 | 58,015,007 | 108,272,902 | 7,366,871 | - | 51,890,788 | - | - | 265,491,965 |
| | | | | | | | | | | |
| Investor - FPCM Interest Expense | 40,556 | 6,171,427 | 9,293,121 | 20,105,527 | 922,324 | - | 11,013,451 | | | 47,546,406 |
| Investor - Unknown Returns | 1,510,576 | 1,188,846 | 5,273,146 | 13,984,092 | 3,714,567 | - | 11,744,662 | - | - | 37,415,889 |
| Investor - Fund Dividend Expense | 10,000 | 3,028,380 | 4,989,106 | 6,127,785 | 520,398 | - | 3,577,880 | | | 18,253,549 |
| **Total WMIF Returns** | 1,561,132 | 10,388,653 | 19,555,373 | 40,217,404 | 5,157,289 | - | 26,335,993 | - | - | 103,215,844 |
| | | | | | | | | | | |
| **Total WMIF Investor Outflows** | 3,461,132 | 48,435,050 | 77,570,380 | 148,490,306 | 12,524,160 | - | 78,226,781 | - | - | 368,707,809 |

Case 1:17-cv-24624-MGC    Document 36-2    Entered on FLSD Docket 12/26/2017    Page 60 of 65

| | | | | | | | | | **Exhibit F.1** |

**Woodbridge Entities**

**Summary of Bank Reconstructions**
**Consolidated Category Summary**
**07/11/2012 - 09/30/2017**

Source: Bank Reconstruction and QuickBooks

| Category | 07/11/2012 - 04/06/2016 Structured | 07/11/2012 - 09/30/2017 WMIF 1 | 12/30/2013 - 09/30/2017 WMIF 2 | 10/10/2014 - 09/30/2017 WMIF 3 | 06/26/2015 - 09/30/2017 WMIF 4 | 9/20/2015 - 09/30/2017 Bridge 1 | 11/02/2015 - 09/30/2017 WMIF 3a | 11/25/2015 - 09/30/2017 Group | 12/08/2016 - 09/30/2017 Bridge 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Other Investors** | | | | | | | | | | |
| Investor - Structured Funding Repayments | 72,454,136 | - | - | - | - | - | - | - | | 72,454,136 |
| Investor - Held in Escrow Repayments | 35,409,102 | - | - | - | - | - | - | 1,205,811 | | 36,614,913 |
| Investor - Group of Companies Repayments | - | - | - | - | - | - | - | 29,845,438 | | 29,845,438 |
| Investor - Bridge Loans Repayments | - | - | - | - | - | 1,044,508 | - | - | 98,000 | 1,142,508 |
| Other Investors - Interest Expense | 2,263,048 | 9,500 | - | - | - | 93,291 | - | 1,262,131 | 4,002 | 3,631,972 |
| **Total Other Investor Outflows** | 110,126,286 | 9,500 | - | - | - | 1,137,799 | - | 32,313,380 | 102,002 | 143,688,967 |
| | | | | | | | | | | |
| **Mortgage/Real Estate/Other Investments:** | | | | | | | | | | |
| Other Investments | 294,068,866 | - | - | - | - | - | - | 490,392,235 | | 784,461,101 |
| Mortgage Principal | 50,292,367 | 973,000 | - | 10,855,000 | - | - | - | - | | 62,120,367 |
| **Total Mortgage/Real Estate/Other Investments:** | 344,361,233 | 973,000 | - | 10,855,000 | - | - | - | 490,392,235 | - | 846,581,468 |
| | | | | | | | | | | |
| Other Expenses | 63,857,858 | 84,276 | 44,358 | 89,190 | 25,695 | 801 | 69,698 | 39,511,240 | 168 | 103,683,284 |
| Commission to Sales Agents | 27,039,040 | - | - | - | - | - | - | 37,557,283 | | 64,596,323 |
| Client Funding Outflows | 57,018,663 | - | - | - | - | - | - | 3,176,101 | | 60,194,764 |
| Payments to/for the benefit of Insiders **(See Ex H)** | 29,188,090 | 138,389 | 221,722 | 5,000 | - | - | - | 21,657,845 | | 51,211,046 |
| Intercompany Transfers Out | 36,748,232 | 544,000 | 1,020,000 | 1,075,000 | - | - | - | 7,641,402 | - | 47,028,634 |
| Other Outflows | 3,715,641 | 476,933 | 919,094 | 3,561,676 | 2,473,807 | 24,460 | 6,147,512 | 11,715,289 | 3,082 | 29,037,494 |
| Amounts paid on behalf of another fund | 10,624,670 | 434,933 | 663,935 | 105,555 | - | - | 1,770 | 527,131 | | 12,357,994 |
| **Total Outflows** | 686,140,845 | 51,096,081 | 80,439,489 | 164,181,727 | 15,023,662 | 1,163,060 | 84,445,761 | 644,491,906 | 105,252 | 1,727,087,783 |
| | | | | | | | | | | - |
| **Net Activity** | (475,352,570) | 167,524,231 | 136,331,765 | 271,061,856 | 203,000,029 | 532,787 | 297,614,076 | (593,009,231) | 99,148 | 7,802,091 |
| | | | | | | | | | | |
| Intracompany Inflows | 674,916,707 | 31,276,441 | 49,588,638 | 86,330,067 | 8,802,789 | 4,742,050 | 49,469,172 | 757,153,917 | 98,000 | 1,662,377,781 |
| Intracompany Outflows | 201,283,552 | 198,355,327 | 185,457,528 | 356,414,350 | 208,685,000 | 5,117,000 | 344,944,450 | 161,930,574 | 190,000 | 1,662,377,781 |
| **Net Intracompany Activity** | 473,633,155 | (167,078,886) | (135,868,890) | (270,084,283) | (199,882,211) | (374,950) | (295,475,278) | 595,223,343 | (92,000) | (0) |
| | | | | | | | | | | |
| **Beginning Balance as of July 11, 2012** | 1,719,417 | - | - | - | - | - | - | - | - | 1,719,417 |
| **Ending Cash Balance as of September 30, 2017** | $ 2 | $ 445,345 | $ 462,875 | $ 977,573 | $ 3,117,818 | $ 157,837 | $ 2,138,798 | $ 2,214,112 | $ 7,148 | $ 9,521,508 |

**See accompanying Declaration dated December 18, 2017**

**Exhibit F.2**

**Woodbridge Entities**

**Bank Reconstruction Categories**

**Source**: Bank Records and Underlying support

| Inflows | Description |
|---|---|
| **WMIF Investors** | Funds received for investments by the Woodbridge Fund Entities from FPCM Investors, Fund Investors and Unknown Investors. Investors – Type Unknown include those investors in which KM was unable to determine if their investment was for specific properties (indicative of FPCM investors) or for fund Units (indicative of Fund investors). |
| **Other Investors** | Funds received for investments other than the Woodbridge Fund Entities. This includes Bridge 1 and Bridge 2 investors, and investors who invested directly into Structured and Group. |
| **Mortgage/Real Estate/Other Investments:** | Receipts from various mortgage and real estate investing activity. See below for more details: |
| *Mortgage Lending Principal* | Principal payments received from mortgage borrowers. |
| *Mortgage Interest Income* | Monthly interest payments received from mortgage borrowers. |
| *Gain/Loss On Investments* | Monies received in excess or less than the mortgage principal loaned or investment made. |
| *Other Investments* | Monies received from liquidation of real estate owned or other investments. KM determined based on how the items were reported in QuickBooks. |
| *Other Investment Income Earned* | Monies received for rental income or amounts coded in QuickBooks as income including funds sent to investors for profit sharing. |
| *Other Return Of Investment* | Funds received that are a return of principal, but KM is unable to determine what portion is principal, gain/loss, or closing fees. |
| **Other Income** | Funds received which were categorized in QuickBooks as "company income" or "commission income". Based on KM's analysis of the general ledger and the nature of the transactions, "company income" was related to Structured's settlement investing business that was active prior to the Woodbridge Fund Entities being formed and "commission income" was earned by Structured for referring mortgage investments to the WMIF's. |
| **Insiders** | Funds received from Shapiro or individuals or entities associated with Shapiro. |
| **Transfers Received On Behalf Of Another Fund** | Funds categorized in QuickBooks as an intercompany account. |
| **Client Funding Inflows** | Funds categorized in QuickBooks to the Client Funding account. Based on KM's analysis of the general ledger and the nature of the transactions, "client funding" was related to Structured's settlement investing business that was active prior to the Woodbridge Fund Entities. |
| **Other Inflows** | Miscellaneous transactions that are not related to investors or mortgage investing including items requiring further investigation. |
| **Intercompany And Intracompany Transfers In** | Funds received from other Woodbridge Entities that are not included in the Bank Reconstruction. |

**Kapila**/**Mukamal**
CPAs, Forensic and Insolvency Advisors
Page 1 of 2

| | **Exhibit F.2** |

| **Woodbridge Entities** |

| **Bank Reconstruction Categories** |

**Source**: Bank Records and Underlying support

| **Outflows** | **Description** |
|---|---|
| **WMIF Investors** | Funds paid to investors in the Woodbridge Fund Entities for Returns and principal repayment The category is broken down into FPCM Investors, Fund Investors and Unknown Investors. |
| **Other Investors** | Funds paid to investors other than the Woodbridge Fund Entity investors. This includes Bridge 1 and Bridge 2 investors, and investors who invested directly into Structured and Group. |
| **Mortgage/Real Estate/Other Investments** | Includes funds loaned to borrowers for mortgage investments and funds paid for other investments which include investments not categorized as mortgages in QuickBooks and capitalized construction costs. |
| **Commission Expense** | Funds paid to sales agents for commissions earned by referring investors to Woodbridge Entities. |
| **Other Expenses** | Funds for various expenses including payroll, professional fees, and business expenses including marketing, advertising, postage & delivery, office supplies, and rent. |
| **Payments To/For The Benefit Of Insiders** | Funds paid to Shapiro or individuals or entities associated with Shapiro. |
| **Amounts Paid On Behalf Of Another Fund** | Funds categorized in QuickBooks to the intercompany account. |
| **Client Funding Outflows** | Funds categorized in QuickBooks to the Client Funding account. Based on KM's analysis of the general ledger and the nature of the transactions, "client funding outflows" was related to Structured's settlement investing business that was active prior to the Woodbridge Fund Entities. |
| **Other Outflows** | Miscellaneous transactions that are not related to investors or mortgage investing including items in the bank reconstruction requiring further investigation. |
| **Intercompany Transfers Out** | Funds sent to other Woodbridge Entities. |

**See accompanying Declaration dated December 18, 2017**

**Exhibit G**

**Woodbridge Entities**

**Summary of Credit Card Net Activity**
**06/01/2012 - 06/18/17**
**Summarized by Category**

Source: Credit Card Reconstructions

**Credit Card Accounts - Net Activity**

| Category | 11/05/13 - 02/04/17 Chase 7053 | 01/19/15 - 11/18/15 Chase 8221 | 11/19/15 - 2/18/17 Chase 4855 | 02/19/17 - 03/18/17 Chase 2092 | 03/19/17 - 06/18/17 Chase 2059 | 10/19/15 - 03/18/16 Chase 2292 | 03/19/16 - 06/18/16 Chase 2366 | 06/19/16 - 05/18/17 Chase 4159 | 06/01/12 - 10/18/12 Chase 9684 | 10/19/12 - 08/18/13 Chase 5969 | 08/19/13 - 03/18/14 Chase 4660 | 03/19/14 - 12/18/14 Chase 0348 | 06/01/12 - 02/18/14 Chase 3902 | 02/19/14 - 01/18/15 Chase 8308 | 06/01/12 - 07/04/13 Chase 8260 | 07/19/12 - 05/17/17 Citi 0481 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Business Expense | $ - | $ 44,732 | $ 15,052 | $ 177 | $ - | $ 830,092 | $ 356,841 | $ 768,402 | $ 1,004,771 | $ 2,908,251 | $ 1,106,387 | $ 1,551,623 | $ 75,449 | $ - | $ - | $ 3,370,724 | $ 12,032,501 |
| Retail - Furniture, Décor & Home | - | 86,936 | 87,062 | 1,408 | 7,715 | 89,954 | 38,556 | 620,377 | 84,690 | 164,558 | 99,699 | 135,333 | 103,619 | 72,612 | - | 8,096 | 1,600,615 |
| Travel | - | 59,515 | 19,700 | - | 202 | 242,954 | 86,163 | 346,814 | 88,919 | 190,973 | 174,056 | 199,446 | 124,616 | 48,902 | 2,304 | 6,959 | 1,591,523 |
| Retail - Luxury | - | 103,484 | 155,966 | 19,755 | 19,816 | 87,954 | 5,573 | 46,107 | 24,974 | 30,445 | 109,810 | 126,344 | 127,086 | 71,747 | - | 442,457 | 1,371,518 |
| US Treasury Payment | - | - | - | - | - | 300,392 | - | 160,000 | 135,000 | 55,000 | 195,169 | 342,278 | - | - | - | - | 1,187,839 |
| Other/FIR | - | 4,613 | 20,319 | 715 | 2,199 | 75,157 | 103,109 | 329,075 | 28,893 | 92,135 | 31,797 | 91,236 | 20,482 | 8,930 | - | - | 808,660 |
| Meals & Entertainment | - | 66,795 | 75,142 | 4,677 | 20,159 | 93,646 | 25,286 | 97,763 | 24,020 | 29,155 | 30,673 | 40,205 | 114,107 | 74,366 | - | 1,149 | 697,143 |
| Political Contribution | - | 800 | - | - | - | 176,900 | 166,065 | 182,698 | 5,500 | - | - | 28,450 | 81 | 1,044 | - | 25,000 | 586,538 |
| Taxes, Fees & Dues | - | - | 855 | - | 938 | 31,337 | 122,892 | 72,666 | 5,129 | 22,920 | 73,553 | 195,263 | - | - | - | - | 525,553 |
| Retail - Clothing, Beauty & Accessories | - | 85,752 | 103,082 | 6,137 | 14,420 | 21,854 | 216 | 28,304 | 4,878 | 13,705 | 2,914 | 5,803 | 132,890 | 91,891 | - | 3,080 | 514,926 |
| Retail - Other | - | 4,452 | 6,195 | 196 | 303 | 41,527 | 29,801 | 175,022 | 9,734 | 58,308 | 41,997 | 55,187 | 38,476 | 9,895 | - | - | 471,093 |
| Retail - Technology | - | 229 | 4,043 | - | - | 14,562 | 47,433 | 121,499 | 17,530 | 122,270 | 37,816 | 63,053 | 655 | 452 | - | - | 429,542 |
| Professional Fees | - | - | - | - | - | 66,732 | - | 202,500 | 4,256 | 2,436 | 195 | 13,637 | - | - | - | 115,482 | 405,238 |
| Retail - Office Furniture & Supplies | - | 145 | - | - | - | 181,482 | 12,768 | 66,049 | 19,941 | 39,175 | 19,485 | 41,093 | 115 | - | - | - | 380,253 |
| Retail - Department Store | - | 23,304 | 38,062 | 785 | 1,134 | 13,920 | 8,960 | 78,937 | 18,082 | 67,153 | 11,418 | 10,870 | 50,314 | 17,782 | - | - | 340,721 |
| Utilities/Telecommunications | - | 39 | 204 | 19 | 38 | 43,806 | 20,256 | 76,092 | 14,202 | 36,981 | 24,479 | 34,205 | 618 | 140 | - | - | 251,079 |
| Real Estate Related | - | 510 | 140 | - | - | 31,413 | 41,342 | 40,486 | 2,730 | 25,308 | 12,524 | 34,730 | 606 | - | - | 500 | 190,289 |
| Storage/Moving/Courier Expense | - | - | 3,216 | - | - | 31,252 | 14,687 | 57,006 | 7,947 | 18,668 | 23,412 | 28,410 | 1,351 | 30 | - | - | 185,979 |
| Grocery/Pharmacy | - | 12,479 | 20,828 | 2,238 | 5,153 | 595 | 214 | 8,021 | 883 | 2,631 | 180 | 52 | 32,017 | 16,221 | - | 116 | 101,628 |
| Medical | - | 5,901 | 15,470 | - | 2,558 | 1,304 | 2,775 | 10,342 | 500 | 1,470 | 9,773 | 1,315 | 12,410 | 9,801 | - | 7,245 | 80,864 |
| Auto | - | 1,557 | 846 | 55 | 345 | 7,501 | 2,300 | 5,587 | 1,086 | 10,533 | 3,255 | 23,725 | 6,909 | 6,707 | - | 62 | 70,468 |
| Insurance | - | - | - | - | - | 18,396 | 2,121 | 95 | 2,338 | 7,745 | 5,858 | 15,904 | 1,865 | - | - | - | 54,322 |
| Bank & Service Fees | 300 | 85 | 85 | - | 85 | 7,032 | 446 | 4,295 | 3,173 | 1,806 | 6,229 | 11,484 | 85 | 85 | 75 | 792 | 36,057 |
| Spa/Salon | - | 2,975 | 6,897 | 155 | 853 | 1,525 | - | 2,987 | - | - | - | - | 8,058 | 2,929 | - | 78 | 26,457 |
| Returned Funds | - | - | 7 | - | - | - | - | - | - | 150 | - | 5 | - | - | - | - | 162 |
| **Total Charges** | **300** | **504,303** | **573,171** | **36,317** | **75,918** | **2,411,287** | **1,087,804** | **3,501,124** | **1,509,176** | **3,901,776** | **2,020,679** | **3,049,651** | **851,809** | **433,534** | **2,379** | **3,981,740** | **23,940,968** |
| Credit Card Payments | 300 | 509,302 | 567,616 | 38,404 | 76,423 | 2,375,390 | 1,122,305 | 3,513,199 | 1,526,084 | 3,890,033 | 2,021,764 | 3,043,775 | 848,339 | 432,511 | 2,379 | 3,981,740 | 23,949,565 |
| Beginning Balance | - | 1,156 | (3,843) | 1,710 | (377) | 3,758 | 39,653 | 5,153 | 78,540 | 61,632 | 73,373 | 72,288 | (3,334) | 134 | - | - | 329,843 |
| **Ending Balance** | **$ -** | **$ (3,843)** | **$ 1,712** | **$ (377)** | **$ (882)** | **$ 39,655** | **$ 5,152** | **$ (6,922)** | **$ 61,632** | **$ 73,375** | **$ 72,288** | **$ 78,164** | **$ 136** | **$ 1,157** | **$ -** | **$ -** | **$ 321,247** |

**See accompanying Declaration dated December 18, 2017**

**Exhibit G.1**

**Woodbridge Entities**

**Credit Card Reconstruction Categories**

**Source**: Bank Records and Underlying support

| Category | Description |
|---|---|
| **Auto** | Charges for parking, auto repairs, payments to car companies and other automobile expenses |
| **Bank & Service Fees** | Bank Fees and other service fees including service fees charged to make online payments |
| **Business Expense** | Charges for business related expenses which mainly includes marketing & advertising expenses |
| **Grocery/Pharmacy** | Charges at various grocery stores and pharmacies |
| **Insurance** | Insurance companies |
| **Meals & Entertainment** | Charges for meals & entertainment, including event tickets, golf courses and tourist attractions |
| **Medical** | Charges for hospitals, doctors and vets |
| **Other/FIR** | Miscellaneous transactions including items that required further investigation required |
| **Political Contribution** | Funds sent to various political campaigns or organizations |
| **Professional Fees** | Law Firms, Accounting Firms, etc. |
| **Real Estate Related** | Charges for real estate related services, including locksmiths, home inspections, contractors, real estate agents, etc. |
| **Retail - Clothing, Beauty & Accessories** | Purchases at retail stores that sell clothing, beauty items (make up, skin care, etc.) and accessories (shoes, handbags, etc.) |
| **Retail - Department Store** | Purchases at department stores including Amazon, Nordstrom, Target, etc. |
| **Retail - Furniture, Décor & Home** | Purchases at retail stores that sell furniture, décor & other items for the home. These items could be for personal or business |
| **Retail – Luxury** | Purchases at luxury retail stores including jewelry stores and high end designers (Louis Vuitton, Chanel, Jimmy Choo, etc.) |
| **Retail - Office Furniture & Supplies** | Purchases at retail stores that sell office furniture and supplies |
| **Retail – Other** | Purchases at other retail stores that do not belong in the other retail categories including liquor stores, vitamin stores, cigars, flower stores, etc. |
| **Retail – Technology** | Purchases at retail stores that sell technology items (Best Buy, Apple, etc.) |
| **Returned Funds** | Charges for items that have been returned |
| **Spa/Salon** | Charges at Spas to Salons |
| **Storage/Moving/Courier Expense** | Charges at storage locations, moving companies and shipping companies (FedEx, USPS, etc.) |
| **Taxes, Fees & Dues** | Taxes (excluding those to the US Treasury), Fees paid to various courts for record searches, etc. |
| **Travel** | Charges for Airlines, Hotels, Limos, Taxis, Rental Cars, etc. |
| **US Treasury Payment** | Payments to the United States Treasury |
| **Utilities/Telecommunications** | Charges to utility companies and telecommunication companies including internet, telephones, security systems, etc. |

**See accompanying Declaration dated December 18, 2017**

Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors
Page 1 of 1

Case 1:17-cv-24624-MGC   Document 36-2   Entered on FLSD Docket 12/26/2017   Page 65 of 65

| | | | | | | | | | Exhibit H |

**Woodbridge Entities**

**Summary of Net Payments to Insiders**
**07/11/2012 - 9/30/2017**

Source: Bank Reconstruction and QuickBooks

| Insider | 07/11/2012 - 04/06/2016 Structured | 07/11/2012 - 09/30/2017 WMIF 1 | 12/30/2013 - 09/30/2017 WMIF 2 | 10/10/2014 - 09/30/2017 WMIF 3 | 11/02/2015 - 09/30/2017 WMIF 3a | 11/25/2015 - 09/30/2017 Group | Total Insider Payments | 06/01/2012 - 06/18/2017 Additional Credit Card Charges | Total Insider Payments |
|---|---|---|---|---|---|---|---|---|---|
| **Receipts:** | | | | | | | | | |
| Payments made on behalf of Robert Shapiro | $ 56,000 | $ - | $ - | $ - | $ - | $ 4,486 | $ 60,486 | $ - | $ 60,486 |
| Moorpark Boca Funding, LLC | 3,975,000 | - | 640,000 | 250,000 | - | 4,225,000 | 9,090,000 | - | 9,090,000 |
| Scott Schwartz / Up & Coming Capital LLC | - | - | - | - | - | - | - | - | - |
| Jeri Shapiro | - | - | - | 39,000 | - | 340,140 | 379,140 | - | 379,140 |
| Payments made on behalf of 3X a Charm | 3,000 | - | - | - | - | - | 3,000 | - | 3,000 |
| Schwartz Media Buying Company, LLC | 4,372,415 | 500,000 | 280,000 | | 500,000 | 11,590,000 | 17,242,415 | - | 17,242,415 |
| 3X A Charm | - | - | - | - | - | - | - | - | - |
| Joy Gravenhorst | - | - | - | - | - | - | - | - | - |
| Cash | - | - | - | - | - | 250,000 | 250,000 | - | 250,000 |
| Riverdale Funding, LLC | 4,666,500 | - | 32,158 | - | - | 245,000 | 4,943,658 | - | 4,943,658 |
| **Total Receipts** | **13,072,915** | **500,000** | **952,158** | **289,000** | **500,000** | **16,654,626** | **31,968,699** | **-** | **31,968,699** |
| **Disbursements:** | | | | | | | | | |
| Payments made on behalf of Robert Shapiro | (9,327,731) | - | - | - | - | (4,279,833) | (13,607,564) | (1,964,544) | (15,572,108) |
| Moorpark Boca Funding, LLC | (6,392,500) | - | - | - | - | (4,400,002) | (10,792,502) | - | (10,792,502) |
| Scott Schwartz / Up & Coming Capital LLC | (1,154,400) | - | - | - | - | (164,920) | (1,319,320) | - | (1,319,320) |
| Jeri Shapiro | (1,159,600) | - | - | - | - | (480,718) | (1,640,318) | - | (1,640,318) |
| Payments made on behalf of 3X a Charm | (971,625) | - | - | - | - | - | (971,625) | - | (971,625) |
| Schwartz Media Buying Company, LLC | (5,432,916) | (138,389) | (221,722) | (5,000) | - | (11,990,018) | (17,788,045) | - | (17,788,045) |
| 3X A Charm | (148,800) | - | - | - | - | (166,000) | (314,800) | - | (314,800) |
| Joy Gravenhorst | - | - | - | - | - | (155,000) | (155,000) | - | (155,000) |
| Cash | - | - | - | - | - | (21,354) | (21,354) | - | (21,354) |
| Riverdale Funding, LLC | (4,600,518) | - | - | - | - | - | (4,600,518) | - | (4,600,518) |
| **Total Disbursements** | **(29,188,090)** | **(138,389)** | **(221,722)** | **(5,000)** | **-** | **(21,657,845)** | **(51,211,046)** | **(1,964,544)** | **(53,175,590)** |
| **Net Payments:** | | | | | | | | | |
| Payments made on behalf of Robert Shapiro | (9,271,731) | - | - | - | - | (4,275,347) | (13,547,078) | (1,964,544) | (15,511,622) |
| Moorpark Boca Funding, LLC | (2,417,500) | - | 640,000 | 250,000 | - | (175,002) | (1,702,502) | - | (1,702,502) |
| Scott Schwartz / Up & Coming Capital LLC | (1,154,400) | - | - | - | - | (164,920) | (1,319,320) | - | (1,319,320) |
| Jeri Shapiro | (1,159,600) | - | - | 39,000 | - | (140,578) | (1,261,178) | - | (1,261,178) |
| Payments made on behalf of 3X a Charm | (968,625) | - | - | - | - | - | (968,625) | - | (968,625) |
| Schwartz Media Buying Company, LLC | (1,060,501) | 361,611 | 58,278 | (5,000) | 500,000 | (400,018) | (545,630) | - | (545,630) |
| 3X A Charm | (148,800) | - | - | - | - | (166,000) | (314,800) | - | (314,800) |
| Joy Gravenhorst | - | - | - | - | - | (155,000) | (155,000) | - | (155,000) |
| Cash | - | - | - | - | - | 228,646 | 228,646 | - | 228,646 |
| Riverdale Funding, LLC | 65,982 | - | 32,158 | - | - | 245,000 | 343,140 | - | 343,140 |
| **Total Net Insider Payments** | **$ (16,115,175)** | **$ 361,611** | **$ 730,436** | **$ 284,000** | **$ 500,000** | **$ (5,003,219)** | **$ (19,242,347)** | **$ (1,964,544)** | **$ (21,206,891)** |

**See accompanying Declaration dated December 18, 2017**

Case 17-12560-KJC    Doc 2829-2    Filed 10/29/18    Page 1 of 23

**Exhibit B**

**Representative Note**

01:23758481.1

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

## PROMISSORY NOTE

September 8, 2016
$24,000.00                                Sherman Oaks, California

**FOR VALUE RECEIVED**, the undersigned, **WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**, a Delaware limited liability company having an office and a mailing address at 14225 Ventura Boulevard, Suite 100, Sherman Oaks, California 91423 (hereinafter referred to as the "Borrower") does hereby promise to pay to the order of **SUNWEST TRUST AS CUSTODIAN FOR JUDY SPOONER IRA,** an entity having an address of P.O. Box 36371, Albuquerque, New Mexico 87176 (hereinafter referred to as "Lender"), at such place as the Lender may designate by written notice to Borrower, the principal sum of Twenty-Four Thousand and 00/100 Dollars ($24,000.00), together with interest on all unpaid balances beginning as of the date hereof, at the fixed rate per annum as set forth in Section 1 hereof.

1. **Interest Rate.** The unpaid balance of the principal sum of Twenty-Four Thousand and 00/100 Dollars ($24,000.00) shall bear interest from the date hereof through April 1, 2018, at a fixed rate of interest equal to six and 00/100 percent (6.00%) per annum. The rate of interest charged hereunder shall never exceed the maximum amount, if any, allowable by law. Interest shall be charged on the principal balance from time to time outstanding on the basis of the actual number of days elapsed computed on the basis of a 360 day year.

2. **Default Interest Rate.** During the continuance of any Event of Default (as more particularly defined in Paragraph 6 below) under this Note, or after the maturity of the loan evidenced hereby, by acceleration or otherwise, interest shall accrue from and after such event at four (4) percentage points above the interest rate then in effect hereunder (the "Default Interest Rate").

3. **Repayment.** Borrower promises to pay the interest and principal on this Note, as set forth below:

a. Monthly payments of interest shall be made commencing on October 1, 2016 and continuing on the same day of each and every month to occur thereafter, both before and after maturity by acceleration or otherwise.

The entire principal balance plus accrued and unpaid interest thereon, and all other sums and charges due the Lender hereunder, unless sooner paid, shall be due and payable on April 1, 2018 (the "Maturity Date").

b. On or after (but not before) the earlier to occur of the Maturity Date or the date upon which Craven Investments, LLC, a Delaware limited liability company having an office and a mailing address at 14225 Ventura Boulevard, Suite 100, Sherman Oaks, California 91423, or its successors or assigns, sells or disposes of the property described in the "Underlying Documents" as that term is defined in the Collateral Assignment Documents (hereinafter defined), **and provided at such time Lender continues to be owed any principal due hereunder,** an additional payment of Three and 00/100 percent (3.00%) per annum of such unpaid balance of principal shall be made to Lender.

4. **Application of Payments.** All payments pursuant to this Note shall be made in legal tender of the United States of America and shall be applied first to the payment of delinquency or late

1

```
Property ID : Ashley Ridge Road Mezzanine –
             Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

charges, if any; second, to the payment of accrued and unpaid interest on this Note; and third, the balance on account of the principal of this Note.

5. **Cure Period and Notice of Default.** Failure of Borrower to pay by its due date any installment of the principal or of interest within thirty (30) days from the date the same becomes due and payable, shall constitute a "Payment Default" under this Note. Borrower shall have a cure period of not less than thirty (30) days after receipt of written notice ("Notice of Default") of any alleged breach or Payment Default under the terms of this Note to cure the same.

6. **Event of Default.** Any alleged breach or Payment Default under this Note that is not fully cured following the expiration of the applicable cure period specified in a given Notice of Default shall constitute an event of default ("Event of Default") under this Note.

7. **Waiver of Rights.**

   a. BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY COURT AND IN ANY SUIT ACTION OR PROCEEDING OR ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE FINANCING TRANSACTIONS OF WHICH THIS NOTE OR THE COLLATERAL ASSIGNMENT DOCUMENTS (AS DEFINED BELOW) ARE A PART AND/OR THE ENFORCEMENT OF ANY OF LENDER'S RIGHTS AND REMEDIES. BORROWER ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, VOLUNTARILY AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER.

   b. Borrower hereby waives diligence, demand, presentment for payment, protest and notice of protest, and notice of any renewals or extensions of this Note, and agrees that the time for payment of this Note may be changed and extended at Lender's sole discretion, without impairing its liability thereon, and further consents to the release of any party liable for this obligation, or the release of all or any part of the collateral given as security for the payment of this Note, without affecting its liability with respect hereto.

8. **Lender's Rights.** Lender's rights hereunder shall be cumulative and not exclusive and may be exercised at the sole discretion of Lender with respect to priority, order and type of collateral or security realized upon or applied toward the indebtedness evidenced hereby until this Note and all accrued and unpaid interest and other sums and charges due hereunder shall have been paid in full. Further, no failure on the part of Lender to exercise any right or remedy hereunder, whether before or after the occurrence of an Event of Default hereunder, shall constitute a waiver thereof, and no waiver of any past default shall constitute waiver of any future default or of any other default.

9. **Prepayment.** The Borrower shall have the right to prepay this Note in whole or in part at any time without penalty.

10. **Binding Effect.** This Note shall bind the successors and assigns of Borrower and shall inure to the benefit of the Lender, its successors and assigns.

11. **Captions and Section Headings.** The captions and section headings used in this Note are for convenience only and shall not be used to interpret, modify or affect in any way the covenants and agreements herein contained.

2

Property ID : Ashley Ridge Road Mezzanine -
       Hidden Hills, CA
Principal : $24,000.00
Int. Rate : 6.00%

12. **Severability.** In the event that any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part, or in any respect, or in the event that any one or more of the provisions of this Note shall operate or would prospectively operate, to invalidate this Note, then the remaining provisions of this Note shall remain operative and in full force and effect, shall be valid, legal and enforceable and shall in no way be affected, prejudiced or disturbed thereby.

13. **Governing Law.** This Note shall be governed by and construed in accordance with the laws of the State of Delaware.

14. **No Assignment.** Neither this Note, the Loan Agreement of even date herewith between Borrower and Lender, nor all other instruments executed or to be executed in connection therewith (collectively, the "Collateral Assignment Documents") are assignable by Lender without the Borrower's written consent and any such attempted assignment without such consent shall be null and void.

15. **Commercial Transaction.** Lender and Borrower each acknowledge and stipulate that the Loan is a commercial transaction.

16. **Security.** This Note will be secured inter alia by the Collateral Assignment Documents upon execution thereof.

17. **No Additional Profits Payment.** LENDER SHALL NOT RECEIVE ANY SHARE WHATSOEVER OF ANY PROFITS GENERATED IN CONNECTION WITH THE SALE OR DISPOSITION OF THE PROPERTY DESCRIBED IN THE UNDERLYING DOCUMENTS.

**WOODBRIDGE MORTGAGE
INVESTMENT FUND 3A, LLC**

By: _____
  Robert Reed
  Its Authorized Representative

Accepted and Agreed to by Lender:

**SUNWEST TRUST AS CUSTODIAN FOR
JUDY SPOONER IRA**

By: _____
  Name:
  Title:

Accepted and Agreed to by Account Holder:

_____
JUDY SPOONER

3

Property ID : Ashley Ridge Road Mezzanine –
              Hidden Hills, CA
Principal  : $24,000.00
Int. Rate  : 6.00%

12. **Severability.** In the event that any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part, or in any respect, or in the event that any one or more of the provisions of this Note shall operate or would prospectively operate, to invalidate this Note, then the remaining provisions of this Note shall remain operative and in full force and effect, shall be valid, legal and enforceable and shall in no way be affected, prejudiced or disturbed thereby.

13. **Governing Law.** This Note shall be governed by and construed in accordance with the laws of the State of Delaware.

14. **No Assignment.** Neither this Note, the Loan Agreement of even date herewith between Borrower and Lender, nor all other instruments executed or to be executed in connection therewith (collectively, the "Collateral Assignment Documents") are assignable by Lender without the Borrower's written consent and any such attempted assignment without such consent shall be null and void.

15. **Commercial Transaction.** Lender and Borrower each acknowledge and stipulate that the Loan is a commercial transaction.

16. **Security.** This Note will be secured inter alia by the Collateral Assignment Documents upon execution thereof.

17. **No Additional Profits Payment.** LENDER SHALL NOT RECEIVE ANY SHARE WHATSOEVER OF ANY PROFITS GENERATED IN CONNECTION WITH THE SALE OR DISPOSITION OF THE PROPERTY DESCRIBED IN THE UNDERLYING DOCUMENTS.

WOODBRIDGE MORTGAGE
INVESTMENT FUND 3A, LLC

By: _____
Robert Reed
Its Authorized Representative

Accepted and Agreed to by Lender:

SUNWEST TRUST AS CUSTODIAN FOR
JUDY SPOONER IRA

By: _____
Name: Cynthia Hatheloek
Title: Exec VP

Accepted and Agreed to by Account Holder:

_____
JUDY SPOONER

3

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") made on this September 8, 2016, by and between **SUNWEST TRUST AS CUSTODIAN FOR JUDY SPOONER IRA**, an entity having an address of P.O. Box 36371, Albuquerque, New Mexico 87176 (hereinafter referred to as the "Lender") and **WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**, a Delaware limited liability company, having an office at 14225 Ventura Boulevard, Suite 100, Sherman Oaks, California 91423 ("Woodbridge").

## WITNESSETH:

WHEREAS, Lender wishes to make a loan (the "Loan") to Woodbridge to fund, in part, a loan to a third-party borrower, as more fully defined below (the "Pledged Mezzanine Loan"); and

WHEREAS, Lender advanced to Woodbridge a portion of the funds that, with other funds from Woodbridge, will be used to make the Pledged Mezzanine Loan; and

WHEREAS, Lender acknowledges that Woodbridge has executed or intends to execute other notes and loan agreements to fund the Pledged Mezzanine Loan on a pari passu basis with other lenders; and

WHEREAS, Woodbridge has agreed to execute and deliver to Lender a promissory note payable to Lender in the amount tendered by Lender to Woodbridge pursuant to the Loan; and

WHEREAS, Woodbridge has further agreed to execute and deliver a collateral assignment of its interest in the Loan Documents (as defined below) in favor of Lender on a pari passu basis as security for the Loan; and

WHEREAS, Woodbridge and Lender have agreed to the foregoing transaction on the terms and conditions and in reliance upon the representations and warranties of Woodbridge and Lender hereinafter set forth:

NOW, THEREFORE, in consideration of the foregoing and in further consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1. **Amount and Terms of Lender's Loan.** Lender has agreed to lend Woodbridge the sum of Twenty-Four Thousand and 00/100 Dollars ($24,000.00). The foregoing obligation shall be evidenced by Woodbridge's promissory note to Lender, in the original principal amount of Twenty-Four Thousand and 00/100 Dollars ($24,000.00), in the form of Exhibit A hereto and made a part hereof (as the same may be amended or modified from time to time, the "Note), with appropriate insertion of dates.

The Note shall bear interest at a rate equal to six and 00/100 percent (6.00%) per annum, subject to such default rates and additional interest payments as may be set forth in the Note; provided, however, that the rate of interest charged thereunder shall never exceed the maximum amount, if any, allowable by law. Interest shall be payable as provided in the Note and shall be charged on the daily outstanding principal balance on the basis of the actual days elapsed and on a three hundred sixty (360) day year.

Interest shall be payable as provided in the Note. The entire outstanding principal balance of the Note shall be due and payable in full on April 1, 2018, unless sooner prepaid. Woodbridge may prepay the Note without penalty at any time.

1

```
Property ID : Ashley Ridge Road Mezzanine -
             Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

2. **Security Interest.** Woodbridge hereby grants to the Lender a security interest in all of the Woodbridge's present and future right, title and interest in and to any and all of the following (the "Collateral"):

(a) That certain mezzanine loan in the principal amount of Two Million Six Hundred Ten Thousand and 00/100 Dollars ($2,610,000.00) (the "Pledged Mezzanine Loan") extended or to be extended by Woodbridge to H56 Craven Holding Company, LLC ("Borrower") and secured by a pledge of Borrower's entire and controlling membership interest in Craven Investments, LLC, an entity which owns real property located at 25085 Ashley Ridge Road, Hidden Hills, California 91302 ("Premises"), subject to any first or second priority mortgage loans secured by the Premises to which that certain mezzanine loan would be structurally subordinate;

(b) The promissory note evidencing the Pledged Loan (the "Underlying Note");

(c) The pledge and security agreement securing the Pledged Mezzanine Loan to Woodbridge (the "Underlying Pledge and Security Agreement"); and

(d) Title insurance policies and such other instruments or documentation as may be executed and delivered to Woodbridge in conjunction with the Pledged Mezzanine Loan (said Underlying Note, Underlying Pledge and Security Agreement and other associated loan documents collectively hereafter referred to as the "Loan Documents").

(e) Upon the consummation of the Pledged Mezzanine Loan, Woodbridge will execute and deliver to Lender collateral assignment documents substantially in the form attached hereto as Exhibits B and C.

(f) Lender acknowledges that they are only providing the financing for a portion of the Pledged Mezzanine Loan and, therefore, Woodbridge retains the right to execute other notes, loan agreements, assignments, and collateral assignments in favor of other lenders as may be necessary to fund the Pledged Mezzanine Loan secured by the Collateral on a pari passu basis with such other lenders. Lender further agrees that it, and any such other lenders, shall execute an Intercreditor Agreement substantially in the form attached hereto as Exhibit D in order to confirm that their interests in the Collateral are of equal priority.

3. **Representations and Warranties.**

(a) Woodbridge represents and warrants to Lender that Woodbridge has or will have good and marketable title to the Pledged Mezzanine Loan and the Collateral free from any adverse liens, security interests or encumbrances on record as of the date of the Pledged Loan.

(b) The execution and delivery of the Note, this Agreement, and every other agreement, instrument or document executed and delivered to Lender by Woodbridge pursuant to the terms hereof, are valid, legal and binding upon it and enforceable in accordance with their respective terms.

(c) All information furnished or to be furnished by Woodbridge pursuant to the terms hereof will not, at the time the same is furnished, contain any untrue statement of a material fact and will not omit to state a material fact necessary to make the information so furnished, in the light of the circumstances under which such information is furnished, not misleading.

(d) Lender represents and warrants to Woodbridge that: (i) the Loan Documents and the Pledged Mezzanine Loan they evidence constitute a commercial loan transaction and are not for investment purposes; and (ii) Lender has reviewed the Loan Documents and the associated other information on the Borrower of the Pledged Mezzanine Loan, and has had the opportunity to review said documents and information with its

2

own legal counsel, and has had sufficient access to all of said documents and information to allow it to make its own credit decision with respect to the Pledged Mezzanine Loan, and has, in fact, made its own credit decision in making the Loan.

### 4. General Provisions.

**(a)** This Agreement is an integrated document and all terms and provisions are embodied herein and shall not be varied by parol;

**(b)** This Agreement is made, executed and delivered in the State of Delaware and it is the specific desire and intention of the parties that it shall in all respects be construed under the laws of the State of Delaware;

**(c)** The captions for the paragraphs contained in this Agreement have been inserted for convenience only and form no part of this Agreement and shall not be deemed to affect the meaning or construction of any of the covenants, agreements, conditions or terms hereof;

**(d)** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that Lender shall not assign, voluntarily, by operation of law or otherwise, any of its rights hereunder without the prior written consent of Woodbridge and any such attempted assignment without such consent shall be null and void;

**(e)** No delay or failure of Lender in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise preclude any further exercise thereof or the exercise of any other rights, powers or privileges; and

**(f)** This Agreement, the security interest hereby granted to Lender by Woodbridge and every representation, warranty, covenant, promise and other then herein contained shall survive until the Note has been paid in full.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK, SIGNATURE PAGE TO FOLLOW]**

3

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals, the day and year first above written.

_(signature)_
_____
(Witness)

_(signature)_
_____
(Witness)

_(signature)_
_____
(Witness)

_____
(Witness)

_Lily Golden_

_Karen Horne_

**SUNWEST TRUST AS CUSTODIAN FOR JUDY SPOONER IRA**

By: _____
    Name:
    Title:

_Judy Spooner_
JUDY SPOONER

**WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**

By: _____
    Robert Reed
    Its Authorized Representative

4

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals, the day and year first above written.

(Witness)

(Witness)

(Witness)

(Witness)

**SUNWEST TRUST AS CUSTODIAN FOR JUDY SPOONER IRA**

By:

Name:

Title:

JUDY SPOONER

**WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**

By: _____

Robert Reed

Its Authorized Representative

4

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

## EXHIBIT LIST

EXHIBIT A     Note from Woodbridge to Lender

EXHIBIT B     Form of Assignment

EXHIBIT C     Form of Collateral Assignment

EXHIBIT D     Form of Intercreditor Agreement

Case 17-12560-KJC    Doc 2829-2    Filed 10/19/18    Page 12 of 23

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

## EXHIBIT A

## Note from Woodbridge to Lender

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

## EXHIBIT B

## Form of Assignment

### ASSIGNMENT OF PROMISSORY NOTE
### AND PLEDGE AND SECURITY AGREEMENT

THIS ASSIGNMENT OF PROMISSORY NOTE AND PLEDGE AND SECURITY AGREEMENT (this "**Assignment**") made as of the ___ day of _____, 20__, by **WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**, a Delaware limited liability company with an office and a mailing address at 14225 Ventura Boulevard, Suite 100, Sherman Oaks, California 91423 (the "**Assignor**"), in favor of _____, having an address of _____ (the "**Assignee**").

WHEREAS, Assignee has extended a mezzanine loan (the "Loan") in the original principal amount of ___ Hundred Thousand and 00/100 Dollars ($___,000.00) to Assignor (the obligations of Assignor in respect of the Promissory Note evidencing said Loan being hereinafter referred to as the "**Obligations**"); and

WHEREAS, it is a condition of Assignee's agreement to extend such Loan that Assignor assign to Assignee its interest in certain documents hereinafter described, and the indebtedness related thereto, as security for the Obligations;

NOW, THEREFORE, as security for the Obligations, and as an inducement to Assignee to extend the Loan and in consideration therefor, and in consideration of Ten Dollars ($10.00) to Assignor paid, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby grants, bargains, sells, assigns, conveys, transfers and sets over unto Assignee a security interest in and lien upon, all of Assignor's right, title and interest in, to and under: (a) a certain mezzanine pledge and security agreement from _____ ("Borrower"), dated ____, 20__, in favor of Assignor (the "**Assigned Pledge**"), (b) a certain mezzanine promissory note in the principal amount of ____ Hundred Thousand and 00/100 Dollars ($___,000.00), dated _____, 20__, made by _____ and payable to the order of Assignor (the "**Assigned Note**"), (c) a certain mezzanine loan agreement dated _____, 20__, by and between Assignor and Borrower (the "**Assigned Loan Agreement**"), and all proceeds thereof and all other documents securing or guarantying the same (the Assigned Pledge, the Assigned Note, and all other documents or instruments securing or guarantying the same being hereinafter referred to collectively as the "**Assigned Documents**").

Assignor further covenants and agrees as follows:

1.     The occurrence of an "Event of Default" under the Promissory Note evidencing the Loan, or under the Collateral Assignment dated of even date herewith, beyond the applicable notice and cure period shall constitute an "**Event of Default**" under this Assignment. So long as no Event of Default shall have occurred, Assignor shall be entitled to collect all payments of interest and all scheduled payments of principal (collectively, "**Scheduled Payments**") on the Assigned Documents.

2.     In the event of any payment (other than Scheduled Payments or pre-payments) under the Assigned Note, the obligor under the Assigned Documents ("**Borrower**") is hereby irrevocably authorized and directed to make such payment directly to Assignee or to such person as Assignee shall otherwise direct. Assignor shall immediately pay over to Assignee any such payment received directly from Borrower.

3.     Upon written notice from Assignee that an Event of Default exists, Borrower shall thereafter make, and is hereby irrevocably authorized and directed to make, all payments under the Assigned Documents directly to Assignee or to such person as Assignee shall otherwise direct, to be applied against the Obligations until such Obligations are satisfied. Upon satisfaction of such Obligations, all remaining payments under the Assigned Documents, if any, shall resume to be made and directed to Assignor.

7

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

4.    Upon the occurrence of an Event of Default, Assignor will not grant any waivers, indulgences, modifications, extensions or other departures by Borrower from or of the obligations required to be performed by Borrower under the Assigned Documents and any security or other agreement executed in connection therewith, without the prior written consent of Assignee. At Assignee's request, Assignor shall also provide to Assignee such other information regarding the Borrower or the Premises (as defined in the Assigned Documents), as Assignor may have in its possession.

5.    This Assignment is executed only as security for the Obligations. The execution and delivery of this Assignment shall not subject Assignee to, or transfer or pass to Assignee, or in any way affect or modify, the liability of Assignor under any or all of the Assigned Documents.

6.    In the exercise of its powers hereunder or under any documents relating to the Obligations, no liability shall be asserted or enforced against Assignee, all such liability being hereby expressly waived and released by Assignor. Assignor hereby agrees to indemnify Assignee, and hold it harmless, from any and all liabilities, losses, or damages which Assignee shall incur by reason of this Assignment or the Assigned Documents and from any and all claims and demands whatsoever which may be asserted against Assignee by reason of any alleged obligations or, undertakings required to be performed by Assignor in connection with the Assigned Documents.

7.    Assignor hereby agrees and acknowledges that neither the acceptance of this Assignment by Assignee nor the exercise of, or failure to exercise, any right, power or remedy in this instrument conferred upon Assignee shall be deemed or construed to obligate Assignee, or its successors or assigns, to pay any sum of money, take any action or incur any liability in connection with any of the Assigned Documents. It is further agreed and understood by Assignor that neither Assignee nor its successors or assigns shall be liable in any way for any costs, expenses or liabilities connected with, or any charges or liabilities resulting from, any of the Assigned Documents.

8.    This Assignment shall be binding upon Assignor and its successors and assigns, and shall inure to the benefit of Assignee and its successors and assigns. Notwithstanding anything contained herein, however, neither the Note nor the other Loan Documents are assignable by Assignee without the Assignor's written consent, and any such attempted assignment without such consent shall be null and void. This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

9.    (a) Any notice, report, demand, request or other instrument or communication authorized or required under this Assignment to be given to Assignor, Assignee or Borrower shall be deemed given if addressed to the party intended to receive the same, at the address of such party set forth below, (i) when delivered at such address by hand or by overnight delivery service, or (ii) three (3) days after the same is deposited in the United States mail as first class certified mail, return receipt requested, postage paid, whether or not the same is actually received by such party:

Assignor:          Woodbridge Mortgage Investment Fund 3A, LLC
                   14225 Ventura Boulevard
                   Suite 100
                   Sherman Oaks, California 91423

Assignee:          _____
                   _____
                   _____

(b)    Any party may change the address to which any such notice, report, demand, request or other instrument or communication to such party is to be delivered or mailed, by giving written notice of such change to the other parties, but no such notice of change shall be effective unless and until received by such other parties.

10.    Upon full payment and performance of the Obligations, this Assignment shall terminate and shall be of no further force and effect. Upon such termination, Assignee shall indorse the Assigned Note to the order of Assignor

8

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

(or otherwise as Assignor may direct), without recourse, warranty or representation, and Assignee shall deliver the Assigned Note to Assignor.

11.     Notwithstanding anything to the contrary set forth in this Assignment, unless and until Assignee shall have exercised its rights under paragraph 3 above, Assignor shall be entitled to enforce the Assigned Pledge.

**IN WITNESS WHEREOF**, the Assignor has executed this Assignment as of the date first written above.


Assignor:

**WOODBRIDGE MORTGAGE
INVESTMENT FUND 3A, LLC**


_____          By:_____
                                             Robert Reed
                                             Its Authorized Representative

_____

9

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

## EXHIBIT C

## Form of Collateral Assignment

### COLLATERAL ASSIGNMENT OF PROMISSORY NOTE, PLEDGE AND SECURITY AGREEMENT, AND OTHER LOAN DOCUMENTS

THIS COLLATERAL ASSIGNMENT OF PROMISSORY NOTE, PLEDGE AND SECURITY AGREEMENT, AND OTHER LOAN DOCUMENTS (this "Assignment"), dated as of this ____ day of _____ 20__, is made and given by **WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**, a Delaware limited liability company ("Borrower"), having an address at 14225 Ventura Boulevard, Suite 100, Sherman Oaks, California 91423, and in favor of _____, having an address of _____, his or her successors and assigns ("Lender").

#### Background:

Lender has agreed to make, and Borrower has agreed to accept, a loan in the original maximum principal amount of ____ Hundred Thousand and 00/100 Dollars ($_____,000.00) (the "Loan") upon the terms and conditions set forth in that certain Promissory Note, dated _____, in the original principal amount of ____ Hundred Thousand and 00/100 Dollars ($_____,000.00) made by Borrower and payable to Lender (as the same may be amended or modified from time to time, the "Note").

Lender understands that Borrower shall utilize the proceeds of the Loan to fund a mezzanine loan to a third party borrower, such loan to be made pursuant to the "Underlying Documents" more particularly described in Section 2.1.1 below. As a condition to making the Loan, Lender has required Borrower to assign to Lender, as additional security for the Loan, all of Borrower's right, title and interest in and to the promissory notes, security instruments and other loan documents conveyed including without limiting the generality of the foregoing, all rights to receive payments under such collateral.

#### Statement of Agreement

**NOW, THEREFORE,** for valuable consideration, separate and distinct from the consideration given by Lender with respect to the Loan, the receipt and adequacy of which are hereby acknowledged, Borrower agrees as follows:

1.    **Recitals.** The Recitals are incorporated herein by this reference.

2.    **Assignment.** As security for the performance of all obligations of Borrower to Lender under the Note, the Assignment of Promissory Note and Pledge and Security Agreement, and all other documents now or hereafter evidencing, securing or related to the Loan (collectively, the "Loan Documents"), Borrower hereby assigns and transfers to Lender, on a non-exclusive basis, all of its right, title and interest in and to the following collateral (the "Collateral"):

2.1.1. All right, title, interest, claims or rights of Borrower now or hereafter in and to the notes, security instruments, guaranties and other loan documents (collectively, the "Underlying Documents") described on **Exhibit "A"** attached hereto and incorporated herein by this reference; and

2.1.2. Any and all proceeds of a casualty or condemnation, repayment of loans, membership interests, distributions, proceeds of enforcement of security interests, and payments of any kind or nature whatsoever, now or hereafter distributable or payable to Borrower by reason of Borrower's ownership of the Underlying Documents; and

10

```
Property ID : Ashley Ridge Road Mezzanine –
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

2.1.3. All accounts, contract rights, security entitlements, investment property and general intangibles now or hereafter evidencing, arising from or relating to any of the foregoing; and

2.1.4. All right of Borrower to collect and enforce payments pursuant to the terms of the Underlying Documents; and

2.1.5. All documents, writings, leases, books, files, records, computer tapes, programs, ledger books and ledger pages arising from or used in connection with any of the foregoing; and

2.1.6. All renewals, extensions, additions, substitutions or replacements of any of the foregoing; and

2.1.7. All powers, options, rights, privileges and immunities pertaining to any of the foregoing; and

2.1.8. All proceeds of any of the foregoing and all cash, security or other property distributed on account of any of the foregoing.

**3.     Representations and Warranties.** Borrower hereby represents and warrants that: (a) Borrower is or will be the true owner of the interests under the Underlying Documents; (b) Borrower has not assigned or granted a security interest in the Collateral to any person or entity that is or will be superior to that of the Lender; and (c) to Borrower's knowledge, (i) Borrower's interest in the Collateral is not and will not be subject to any claims, setoffs, encumbrances or deductions, and (ii) the Loan Documents constitute and will constitute valid and binding obligations of Borrower.

**4.     No Assumption by Lender and Covenants of Borrower.** Neither this Assignment nor any action or actions on the part of Lender after the date hereof shall constitute an assumption by Lender of any obligations under the Underlying Documents, and Borrower shall continue to be liable for all obligations thereunder arising after the date hereof. Borrower agrees to perform punctually any and all obligations it may have under the Underlying Documents, to take such steps as it may deem necessary or appropriate to secure performance by the obligor(s) and guarantor(s) of the Underlying Documents thereon of all of its obligations under the applicable Underlying Documents.

**5.     Benefits Conditionally Retained by Borrower.** Lender hereby grants Borrower the right to continue to receive the benefits of, and exercise the rights under, the Underlying Documents unless an Event of Default (as described in Section 14 below) exists, in which event such rights may be revoked at any time thereafter at the option of Lender.

**6.     Action by Lender Following Event of Default.** Lender shall have the right, but not an obligation, at any time while an Event of Default exists, without notice and without taking possession of the security interest or any part thereof, to take in Lender's name or in the name of Borrower such action as Lender may, at any time or from time to time, reasonably determine to be necessary to cure any default under the Underlying Documents or to protect or exercise the rights of Borrower or Lender thereunder, and may otherwise exercise any other rights or remedies Lender has under the Loan Documents. Lender shall incur no liability if any action taken by it or on its behalf pursuant to this Assignment shall prove to be in whole or in part inadequate or invalid; and Borrower hereby agrees to indemnify, defend, and hold Lender free and harmless from and against any loss, costs, liability or reasonable expense (including, without limitation, reasonable attorneys' and accountants' fees and expenses, court costs and investigation expenses) actually incurred by Lender in connection with its actions under this Section 6.

**7.     Power of Attorney.** Borrower hereby irrevocably constitutes and appoints Lender as its true and lawful agent and attorney-in-fact, with full power of substitution, to demand, receive and enforce all rights of Borrower under the Underlying Documents, following the occurrence and during the continuance of an Event of Default, to modify, supplement and terminate the Underlying Documents, to transfer the Underlying Documents to

11

Property ID : Ashley Ridge Road Mezzanine –
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%

Lender, to give appropriate releases, receipts for or on behalf of Borrower in connection with the Underlying Documents, to file, pursue, receive payment and acquittances for or otherwise compromise each and every claim Borrower has or may have against the obligor(s) and guarantor(s) of the Underlying Documents for payment or otherwise under the Underlying Documents, all in the name, place and stead of Borrower or in Lender's name, with the same force and effect as Borrower could have if this Assignment had not been made. Borrower authorizes any third party to rely exclusively on the certificate of an officer of Lender or its successor for the establishment of an Event of Default and hereby waives and releases any claim Borrower may have against such third party for such reliance. Borrower hereby agrees to deliver to Lender, upon Lender's written demand and after the occurrence and during the continuance of an Event of Default, all instruments and documents as Lender may reasonably require in order to permit Lender's succession to the right, title and interest of Borrower in and to the Underlying Documents as provided herein. Borrower appoints Lender as its attorney-in-fact to execute any and all such documents on Borrower's behalf upon any failure of Borrower to so execute such documents, it is hereby recognized that the power of attorney herein granted is coupled with an interest and is irrevocable. At Lender's option, Lender may record this Assignment in the recording office. By acceptance of this Assignment, Lender agrees that it shall not exercise the power of attorney granted herein unless there shall have occurred and be continuing an Event of Default.

**8.    Binding Effect.** This Assignment shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Lender and its successors and assigns, including without limitation any purchaser upon enforcement of the security interests created by the Underlying Documents.

**9.    No Release or Termination.** The taking of this Assignment by Lender shall not affect the release of any other collateral now or hereafter held by Lender as security for the obligations of Borrower under the Loan Documents, nor shall the taking of additional security for any such obligations hereafter effect a release or termination of this Assignment, or any terms or provisions hereof.

**10.   No Waiver.** No failure or delay on the part of Lender in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies hereunder are cumulative and may be exercised by Lender either independently of or concurrently with any other right, remedy or power contained herein or in any instrument executed in connection with the Loan Documents.

**11.   Captions.** The section titles or captions contained in this Assignment are for convenience only and shall not be deemed to define, limit or otherwise modify the scope or intent of this Assignment.

**12.   Variation in Pronouns.** All the terms and words used in this Assignment, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context or sense of this Assignment or any paragraph or clause herein may require, the same as if such word had been fully and properly written in the correct number and gender.

**13.   Notices.** Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be given in the manner required by the Loan Documents.

**14.   Event of Default.** The occurrence of an Event of Default under the Note or any of the other Loan Documents beyond the applicable notice and cure period shall constitute an "Event of Default" under this Assignment.

**15.   Successors and Assigns.** This Assignment shall be binding upon Borrower and its successors and assigns and shall insure to the benefit of the Lender and Lender's successors; provided, however, and notwithstanding

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

anything contained herein, neither the Note nor the Loan Documents are assignable by Lender, in whole or in part, and any such attempted assignment shall be null and void.

**16.    Governing Law.** The parties hereby acknowledge, consent and agree this Assignment and the rights of all parties mentioned herein shall be governed by the laws of the State of Delaware.

**IN WITNESS WHEREOF**, the Borrower, acting by its duly authorized officer, has signed, sealed and delivered this Assignment on the date above written.

<u>BORROWER</u>:

**WOODBRIDGE MORTGAGE
INVESTMENT FUND 3A, LLC**

By:_____ (Seal)
    Robert Reed
    Its Authorized Representative

STATE OF CONNECTICUT    )
                        )    ss.
COUNTY OF TOLLAND       )

On this ___ of _____, 20__, before me, the undersigned notary public, personally appeared Robert Reed, Authorized Representative of Woodbridge Mortgage Investment Fund 3A, LLC, a Delaware limited liability company, to me known and known by me to be the party executing the foregoing <u>Collateral Assignment of Promissory Note, Pledge and Security Agreement, and Other Loan Documents</u> instrument on behalf of said limited liability company, in favor of _____, and acknowledged said instrument and the execution thereof, to be his free act and deed as such officer and the free act and deed of said limited liability company.

Notary Public _____
Printed Name:_____
My Commission Expires: _____
(Notary Seal)

13

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

## EXHIBIT A TO COLLATERAL ASSIGNMENT

1.  That certain mezzanine pledge and security agreement from _____, dated _____, in favor of Woodbridge Mortgage Investment Fund 3A, LLC, encumbering certain membership interests described therein.

2.  That certain mezzanine promissory note in the original principal amount of _____ Hundred Thousand and 00/100 Dollars ($___,000.00), dated _____, 20__, made by _____ and payable to the order of Woodbridge Mortgage Investment Fund 3A, LLC.

3.  That certain mezzanine loan agreement dated _____, 20__, by and between _____ and Woodbridge Mortgage Investment Fund 3A, LLC.

4.  That certain UCC1 Financing Statement filed with the Secretary of State Office for the State of Delaware identifying _____ as the "Debtor" and Woodbridge Mortgage Investment Fund 3A, LLC as the "Secured Party" and covering certain membership interests in _____.

14

```
Property ID : Ashley Ridge Road Mezzanine -
             Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

## EXHIBIT D

## Form of Intercreditor Agreement

### INTERCREDITOR AGREEMENT (PARI PASSU)

THIS INTERCREDITOR AGREEMENT ("Agreement") is entered into by and between _____, having an address at _____ ("First Party") and _____, having an address at _____ ("Second Party") (First Party and Second Party are sometimes herein referred to collectively as the "Lenders" and individually as a "Lender"), as of the date written below.

WITNESSETH

WHEREAS, the Lenders have agreed collectively to lend $_____ to Woodbridge Mortgage Investment FUND 3A, LLC, a Delaware limited liability company ("Woodbridge"), and

WHEREAS, in return for the loans by the Lenders, Woodbridge will execute and deliver to each of them promissory notes each in the original principal amount of $_____ (the "Notes"), and

WHEREAS, Woodbridge intends to use the funds (the "Loans") provided by Lenders to finance a mezzanine loan in the principal amount of $_____ to _____, to be evidenced by a promissory note and secured by a pledge of _____'s entire and controlling membership interest in _____, LLC, which owns property located at _____("Premises") (the "Underlying Mezzanine Note" and the "Pledge" respectively), and

WHEREAS, upon closing of the Loans, Woodbridge will deliver to each of the Lenders a collateral assignment of the Underlying Mezzanine Note, Pledge and Security Agreement, and Other Documents as security for the Notes (the "Collateral Assignments"); and

WHEREAS, the Lenders wish that each of them shall be treated equally with reference to the payment under the respective Notes and/or enforcement of the Collateral Assignments; and

WHEREAS, this Agreement shall be effective and bind the parties hereto.

NOW THEREFORE, the parties hereto agree as follows:

1.   The above recitals are hereby made a part of this Agreement.

2.   Unless explicitly agreed to the contrary in writing, the Lenders shall have equal rights of enforcement, priorities, duties, and obligations under the Notes, and the Collateral Assignments and any other documentation executed and delivered in connection therewith (the "Loan Documents").

3.   In the event of a default under any of the Notes, the Collateral Assignments or other Loan Documents, all of the Notes shall be in default, and shall be due and payable at the option of the Lenders acting in concert.

4.   If any of the Lender(s) desire to exercise any rights it may have under the Loan Documents, it shall notify the other Lender(s) as soon as practicable.

5.   All notices, consents, waivers, and other communications under this Agreement must be in writing and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by fax (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and fax numbers as set forth below (or to such other

15

```
Property ID : Ashley Ridge Road Mezzanine -
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

addresses and fax numbers as a party may designate by notice to the other parties):

    LENDERS:

    First Party

    And

    Second Party

6. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Delaware, or, if it has or can acquire jurisdiction in the United States District Court for the District of Delaware and each of the parties consents to the jurisdiction of such courts (and of the appropriate Appellate Courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

7. This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the Agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

8. If any provision of this Agreement is held invalid or unenforceable by any court or competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

9. This Agreement will be governed by the laws of the State of Delaware without regard to conflicts of interest principles.

10. This Agreement may be executed in any number of counterparts, each of which taken together shall constitute a single agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK, SIGNATURE PAGE TO FOLLOW]**

```
Property ID : Ashley Ridge Road Mezzanine –
              Hidden Hills, CA
Principal   : $24,000.00
Int. Rate   : 6.00%
```

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement as of the _____ day of _____, 20__.

LENDER(S):

_____

FIRST PARTY

_____

SECOND PARTY

Acknowledged and Agreed to by:

**WOODBRIDGE MORTGAGE
INVESTMENT FUND 3A, LLC**

By: _____
     Robert Reed
     Its Authorized Representative

17

**Exhibit C**

**Representative Offering Memorandum**

01:23758481.1

# WOODBRIDGE®

## MORTGAGE INVESTMENT FUND 3A, LLC

Document Number: _____

Delivered To: _____

# Woodbridge Mortgage Investment Fund 3A, LLC

### *Confidential Offering Memorandum*

### $100 Million Offering for 1000 Preferred Incentive Units

This Confidential Offering Memorandum (this "<u>Memorandum</u>") relates to the private offering to a limited number of accredited investors (this "<u>Offering</u>") of up to $100 million of Preferred Incentive Units (each a "<u>Unit</u>") of Woodbridge Mortgage Investment Fund 3A, LLC, a Delaware limited liability company (the "<u>Company</u>" or "<u>Woodbridge</u>"), for a purchase price of $100,000 per Unit. Each Unit consists of an equity interest and provides the investor ("<u>Unitholder</u>") with a right to receive distributions from the Company equal to a return of 10 percent per annum plus an additional 2 percent accrued preferred dividend after five years from the date of purchase of each respective Unit, all as more completely described in, and subject to the conditions and limitations contained in, this Memorandum.

Woodbridge has the right to accept subscriptions for less than $100,000 in its sole discretion. More particularly, the Company may accept some subscriptions for one-half of a Unit for $50,000 each.

This Offering will be conducted and subscriptions will be accepted on a continuous basis. Woodbridge will continue to accept subscriptions until it receives subscriptions aggregating $100 million.

There is no public market for any securities of Woodbridge, and no such market is expected to develop following this Offering. Woodbridge is offering the Units only to investors meeting certain qualifications specified herein. Woodbridge reserves the right to approve each investor. The Units are being offered by Woodbridge subject to its prior acceptance and subject to its right to reject any investment in whole or in part, in Woodbridge's sole discretion.



CONTACT INFORMATION

**WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**
14225 Ventura Boulevard
Suite 100
Sherman Oaks, California 91423
(866) 865-7044

The date of this offering memorandum is October 30, 2015

Confidential - Do Not Distribute

Case 17-12560-KJC   Doc 2829-3   Filed 10/19/18   Page 3 of 83

# CONFIDENTIAL OFFERING MEMORANDUM

*of*

# WOOBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC

*a Delaware limited liability company*

14225 Ventura Boulevard, Suite 100
Sherman Oaks, California 91423
Tel: (866) 865-7044

# 1,000 PREFERRED INCENTIVE UNITS

Maximum Offering: $100 million
Minimum Investment per Investor: $100,000

October 30, 2015

---

WOOBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC ("Woodbridge" or the "Company"), is a Delaware limited liability company engaged in the business of investing in domestic first mortgages, mezzanine financing, construction loans, and other real estate ventures. This Confidential Offering Memorandum (this "Memorandum") relates to the private offering to a limited number of accredited investors (this "Offering") of up to $100 million of Preferred Incentive Units (each a "Unit") of the Company, for a purchase price of $100,000 per Unit. Each Unit consists of an equity interest and provides the investor ("Unitholder") with a right to receive distributions from the Company equal to a return of 10 percent per annum plus an additional 2 percent accrued preferred dividend after five years from the date of purchase of each respective Unit, all as more completely described in, and subject to the conditions and limitations contained in, this Memorandum.

Woodbridge has the right to accept subscriptions for less than $100,000 in its sole discretion. More particularly, the Company may accept some subscriptions for one-half of a Unit for $50,000 each.

This Offering will be conducted and subscriptions will be accepted on a continuous basis. Woodbridge will continue to accept subscriptions until it receives subscriptions aggregating $100 million.

There is no public market for any securities of Woodbridge, and no such market is expected to develop following this Offering. Woodbridge is offering the Units only to investors meeting certain qualifications specified herein. Woodbridge reserves the right to approve each investor. The Units are being offered by Woodbridge subject to its prior acceptance and subject to its right to reject any investment in whole or in part, in Woodbridge's sole discretion.

**THE UNITS OFFERED HEREBY ARE SPECULATIVE AND ANY INVESTMENT IN THE UNITS INVOLVES A HIGH DEGREE OF RISK. INVESTORS MUST BE PREPARED TO BEAR THE ECONOMIC RISKS OF ANY INVESTMENT IN THE UNITS FOR AN INDEFINITE PERIOD AND BE ABLE TO WITHSTAND A TOTAL LOSS OF THEIR INVESTMENT. SEE THE SECTION ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS TO BE CONSIDERED BY PROSPECTIVE INVESTORS.**

**THE UNITS HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY APPLICABLE STATE OR FOREIGN SECURITIES LAWS, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE OR FOREIGN REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM OR ENDORSED THE MERITS OF THIS OFFERING, AND ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE UNITS ARE OFFERED PURSUANT TO EXEMPTIONS PROVIDED BY**

i

Confidential - Do Not Distribute

SECTION 4(a)(2) OF THE SECURITIES ACT AND REGULATION D AND REGULATION S THEREUNDER, CERTAIN STATE SECURITIES LAWS AND CERTAIN RULES AND REGULATIONS PROMULGATED PURSUANT THERETO. THE UNITS MAY NOT BE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE OR FOREIGN SECURITIES LAWS OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY AND ITS COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED.

THE COMPANY IS NOT REGISTERED AS AN INVESTMENT COMPANY AND IS NOT SUBJECT TO THE INVESTMENT RESTRICTIONS, LIMITATIONS ON TRANSACTIONS WITH AFFILIATES AND OTHER PROVISIONS OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"), IN RELIANCE UPON EXEMPTIONS FROM SUCH REGISTRATION PROVIDED IN § 3(C)(5) OF THE INVESTMENT COMPANY ACT. SHOULD SUCH LAWS OR THEIR INTERPRETATION CHANGE, THE COMPANY MAY NEED TO REGISTER UNDER THE INVESTMENT COMPANY ACT.

THIS MEMORANDUM IS CONFIDENTIAL AND PROPRIETARY AND IS BEING FURNISHED BY THE COMPANY TO PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING OF UNITS EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT SOLELY FOR SUCH INVESTOR'S CONFIDENTIAL USE WITH THE EXPRESS UNDERSTANDING THAT, WITHOUT THE PRIOR WRITTEN PERMISSION OF THE COMPANY, SUCH PERSONS WILL NOT RELEASE THIS DOCUMENT OR DISCUSS THE INFORMATION CONTAINED HEREIN OR REPRODUCE OR USE THIS MEMORANDUM FOR ANY PURPOSE OTHER THAN AN EVALUATION OF POTENTIAL INVESTMENT IN THE UNITS. THIS MEMORANDUM IS INDIVIDUALLY DIRECTED TO EACH PROSPECTIVE INVESTOR AND DOES NOT CONSTITUTE AN OFFER TO ANY OTHER PERSON OR TO THE PUBLIC GENERALLY TO SUBSCRIBE FOR OR OTHERWISE ACQUIRE THE UNITS OFFERED HEREIN. DISTRIBUTION OF THIS MEMORANDUM TO ANY PERSON OTHER THAN THE PROSPECTIVE INVESTOR, AND THOSE PERSONS, IF ANY, RETAINED TO ADVISE SUCH PROSPECTIVE INVESTOR WITH RESPECT THERETO, IS UNAUTHORIZED, AND ANY DISCLOSURE OF ANY OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY, IS PROHIBITED.

A PROSPECTIVE INVESTOR, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO PROMPTLY RETURN TO THE COMPANY THIS MEMORANDUM AND ANY OTHER DOCUMENTS OR INFORMATION FURNISHED IF THE PROSPECTIVE INVESTOR ELECTS NOT TO PURCHASE ANY OF THE UNITS OFFERED HEREBY, IF THE COMPANY ELECTS TO REJECT THE INVESTMENT BY SUCH PROSPECTIVE INVESTOR OR IF THE OFFERING IS TERMINATED OR WITHDRAWN.

THIS MEMORANDUM DOES NOT PURPORT TO BE ALL-INCLUSIVE OR TO CONTAIN ALL THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE IN EVALUATING THE COMPANY. EACH INVESTOR MUST CONDUCT AND RELY ON ITS OWN EVALUATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION WITH RESPECT TO THE UNITS. SEE THE SECTION ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS TO BE CONSIDERED BY PROSPECTIVE INVESTORS.

CERTAIN INFORMATION CONTAINED IN THIS MEMORANDUM HAS BEEN OBTAINED BY THE COMPANY AND/OR ITS OFFICERS AND MANAGEMENT FROM SOURCES DEEMED RELIABLE BY THE COMPANY. SUCH INFORMATION NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AND ESTIMATES AS WELL AS FACTUAL MATTERS. NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF SUCH INFORMATION. THE COMPANY WILL MAKE AVAILABLE TO EACH PROSPECTIVE INVESTOR, OR ITS, HIS OR HER AGENT, DURING THIS OFFERING AND PRIOR TO THE

Confidential - Do Not Distribute

SALE OF ANY SECURITIES OFFERED HEREBY, THE OPPORTUNITY TO ASK QUESTIONS OF THE OFFICERS OF THE COMPANY CONCERNING ANY ASPECT OF THE INVESTMENT AND TO OBTAIN ADDITIONAL INFORMATION, BUT ONLY TO THE EXTENT THAT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE UNITS IN ANY JURISDICTION WHERE, OR TO ANY PERSON TO WHOM, IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION IN SUCH JURISDICTION. THESE SECURITIES ARE BEING OFFERED ON A PRIVATE PLACEMENT BASIS. THIS OFFERING MEMORANDUM IS NOT, AND UNDER NO CIRCUMSTANCES IS TO BE CONSTRUED AS, A PROSPECTUS OR AN ADVERTISEMENT FOR A PUBLIC OFFERING OF SECURITIES. EXCEPT AS OTHERWISE INDICATED, THIS MEMORANDUM SPEAKS AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY AFTER THE DATE HEREOF.

EXCEPT AS DESCRIBED HEREIN, NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OTHER THAN THAT CONTAINED IN THIS MEMORANDUM, OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THE OFFERING, AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY. THE COMPANY DISCLAIMS ANY AND ALL OMISSIONS FROM THIS MEMORANDUM OR ANY OTHER WRITTEN OR ORAL COMMUNICATION TRANSMITTED OR MADE AVAILABLE TO THE RECIPIENT. EACH INVESTOR WILL BE ENTITLED TO RELY SOLELY ON THOSE REPRESENTATIONS AND WARRANTIES THAT MAY BE MADE TO SUCH INVESTOR IN ANY FINAL SUBSCRIPTION AGREEMENT RELATING TO THE PURCHASE OF THE UNITS.

INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, BUSINESS OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT SUCH INVESTOR'S OWN ATTORNEY, BUSINESS ADVISOR AND TAX ADVISOR AS TO LEGAL, BUSINESS, TAX AND RELATED MATTERS CONCERNING THE INVESTMENT DESCRIBED IN THIS MEMORANDUM AND ITS SUITABILITY FOR SUCH PROSPECTIVE INVESTOR. PROSPECTIVE INVESTORS ARE URGED TO REQUEST ANY ADDITIONAL INFORMATION THEY MAY CONSIDER NECESSARY IN MAKING AN INFORMED INVESTMENT DECISION.

NO SALE WILL BE MADE TO ANY PERSON WHO CANNOT DEMONSTRATE COMPLIANCE WITH THE SUITABILITY STANDARDS DESCRIBED IN THIS MEMORANDUM. IF YOU ARE IN ANY DOUBT AS TO THE SUITABILITY OF AN INVESTMENT IN THE SECURITIES OF THE COMPANY, DETAILS OF WHICH ARE GIVEN IN THIS MEMORANDUM, YOU SHOULD CONSULT YOUR INVESTMENT ADVISOR. NO SUBSCRIPTIONS WILL BE ACCEPTED FROM RESIDENTS OF ANY STATE UNLESS THE COMPANY, UPON CONSULTATION WITH ITS COUNSEL, IS SATISFIED THAT THE OFFERING IS IN COMPLIANCE WITH THE LAWS OF SUCH STATE.

THE COMPANY RESERVES THE RIGHT, IN ITS SOLE DISCRETION AND FOR ANY REASON WHATSOEVER, TO MODIFY, AMEND AND/OR WITHDRAW ALL OR A PORTION OF THE OFFERING AND/OR TO ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE INVESTMENT IN THE UNITS OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE NUMBER OF UNITS THAT SUCH INVESTOR DESIRES TO PURCHASE. THE COMPANY SHALL HAVE NO LIABILITY WHATSOEVER TO ANY OFFEREE AND/OR INVESTOR IN THE EVENT THAT ANY OF THE FOREGOING SHALL OCCUR.

[*REMAINDER OF PAGE LEFT INTENTIONALLY BLANK*]

Confidential - Do Not Distribute

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Statements included in this Memorandum and the accompanying materials that are not historical facts (including, but not limited to, any statements concerning investment objectives, other plans and objectives of WMF Management, LLC for future operations or economic performance or assumptions or forecasts related thereto) are forward-looking statements. These statements are only predictions. Forward-looking statements are not guarantees. Actual events or the Company's results of operations could differ materially from those expressed or implied in the forward-looking statements. Forward-looking statements are typically identified by the use of terms such as "may," "will," "should," "expect," "could," "intend," "plan," "anticipate," "estimate," "believe," "continue," "predict," "potential" or the negative of such terms and other comparable terminology.

The forward-looking statements included in this Memorandum and the accompanying materials are based upon the Company's expectations, plans, estimates, assumptions and beliefs, which involve numerous risks and uncertainties. Assumptions relating to the foregoing involve judgments with respect to, among other things, future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond our control. Although the Company believes that the expectations reflected in such forward-looking statements are based on reasonable assumptions, actual results and performance could differ materially from those set forth in the forward-looking statements. There can be no assurance that (i) the Company has correctly measured or identified all of the factors affecting its business or the extent or likelihood of their impact, (ii) any information with respect to these factors on which the Company's analysis is based is complete or accurate, (iii) the Company's analysis is correct or (iv) the Company's strategy, which is based in part on this analysis, will be successful. Factors that could have a material adverse effect on the Company's operations and future prospects include, but are not limited to:

- the ability to effectively deploy the proceeds raised in this Offering;
- changes in economic conditions generally and the real estate and securities markets specifically;
- legislative or regulatory changes;
- the availability of capital;
- interest rates; and
- the other risks described under the "Risk Factors" section of this Memorandum.

Any of the assumptions underlying forward-looking statements included in this Memorandum or the accompanying materials could be inaccurate and investors are cautioned not to place undue reliance on any such forward-looking statements. All forward-looking statements are made as of the date of this Memorandum and the risk that actual results will differ materially from the expectations expressed in this Memorandum will increase with the passage of time. Except as otherwise required by the federal securities laws, we undertake no obligation to update or revise any forward-looking statements after the date of this Memorandum, whether as a result of new information, future events, changed circumstances or any other reason. In light of the significant uncertainties inherent in the forward-looking statements included in this Memorandum, including, without limitation, the risks described under the heading "Risk Factors," the inclusion of such forward-looking statements should not be regarded as a representation by us or any other person that the objectives and plans set forth in this Memorandum will be achieved.

Any inquiries regarding the Company or this Offering should be directed to:

**WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**
**14225 Ventura Boulevard, Suite 100**
**Sherman Oaks, California 91423**
**(866) 865-7044**

Confidential - Do Not Distribute

# TABLE OF CONTENTS

**Page**

DESCRIPTION OF THE OFFERING ................................................................................1

DESCRIPTION OF UNITS .............................................................................................3

BUSINESS .....................................................................................................................6

MANAGEMENT .............................................................................................................8

RISK FACTORS ............................................................................................................9

SECURITIES LAWS CONSIDERATIONS ....................................................................18

CERTAIN US FEDERAL INCOME TAX CONSIDERATIONS .....................................19

ERISA CONSIDERATIONS .........................................................................................24

ADDITIONAL INFORMATION.....................................................................................26

EXHIBIT I: SUBSCRIPTION AGREEMENT

Confidential - Do Not Distribute

---

## DESCRIPTION OF THE OFFERING

---

This section provides a summary of the Offering and the terms of the Units to be offered and sold in the Offering. While this section summarizes the material terms of the Offering and the terms of the Units, it may not contain all of the information that is important to an investor in evaluating an investment in the Company. Investors should read this entire Memorandum and the other documents referred to herein carefully for a more complete understanding of the matters summarized below, including the Operating Agreement, the Subscription Agreement and the Accredited Investor Representation Letter (copies of all of which are attached to this Offering Memorandum). Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Operating Agreement of the Company.

**The Offering**

- $100 Million of Units

- $100,000 per Unit

- 10% Preferred Dividend and 2% Additional Accrued Preferential Dividend after 5 Years from the date of purchase of each corresponding Unit

- Investors Share in 50% of Cumulative Profits after 5 Years

- Total Unit Offering of 1,000 Units

- $100,000 Minimum Investment (the Company may accept smaller subscriptions in its sole discretion)

- Accredited Investors Acceptable to the Company Only

As of the date of this Offering Memorandum, the Company desires to commence an offering (this "Offering") of 1,000 Units (the "Units") for $100,000 per Unit. The Company has the right to accept subscriptions for less than $100,000 in its sole discretion. More particularly, the Company may accept some subscriptions for one-half of a Unit for $50,000 each.

The Company will continue to offer the Units on the terms described herein. The Offering will be conducted and subscriptions will be accepted on a continuous basis until the Company receives subscriptions aggregating $100 Million.

If the Offering is oversubscribed, the Company may elect, in its own discretion, to cut back the subscription amounts based on the order in which investors subscribe or to accept such oversubscriptions. The purchase and sale of the Units will occur at multiple closings as investments are accepted by the Company. Until such time as an investment is accepted by the Company, as evidenced by written notice from the Company, an investor will not have any rights as a Unitholder or investor in the Company and any sums advanced to the Company will be held in escrow pending such acceptance. Investors will not be entitled to interest on any amounts so held.

**Use of Proceeds**

The Company plans to use the net proceeds from this Offering to invest in domestic first mortgages, mezzanine loans and other real estate acquisitions and investments. All of these investments will be secured and titled in the Company; that is to say, the net proceeds from this Offering will be used towards investments that are secured and titled in Woodbridge. The Company may retain any of these items on its books or may elect to sell these items in the course of conducting the Company's business, all at the Company's discretion. The Company may also potentially finance the occasional purchase of structured settlements, lottery receivables, jackpots and contest awards, prior to resale, for which the Company shall earn an additional fee. The Company is also reserving up to $7.50 million for commissions to licensed broker/dealers (up to $7,500 per Unit sold).

**Minimum Purchase Requirements**

This Offering is only open to "Accredited Investors" as such term is defined under Rule 501 of Regulation D as promulgated by the SEC under the Securities Act. Accordingly, if a potential investor is not an accredited investor, that potential investor is prohibited from participating in this Offering. A potential investor should consult with his/her/its financial advisor to determine if he/she/it satisfies the suitability requirements for investment.

For administrative purposes, the Company has imposed a minimum investment requirement of $100,000 in connection with this Offering. However, the Company reserves the right to waive these requirements generally or on a case-by-case basis in the Company's sole discretion. The Company also reserves the right to reject any investment in whole or in part in the Company's sole discretion. Accordingly, the Company has the right to accept subscriptions for less than $100,000 in its sole discretion. More particularly, the Company may accept some subscriptions for one-half of a Unit for $50,000 each.

Each investor purchasing Units in connection with this Offering (an "Investor") will be required to execute and complete a Subscription Agreement (the "Subscription Agreement"), a Joinder Agreement, which is an instrument of accession to join the existing Operating Agreement of the Company as a Unitholder (the "Joinder Agreement"), and an Accredited Investor Representation Letter (the "Investor Representation Letter") as a condition to such investment, each of which are attached as exhibits to this Offering Memorandum. *See* the "Subscription Procedure" section below. You are strongly encouraged to carefully read each of those documents (including any attachments thereto) in evaluating a potential investment in the Company and the Units.

**Subscription Procedure**

Upon your review of this Memorandum and the exhibits attached thereto, if you would like to subscribe to the Offering, please complete (i) the Subscription Agreement, (ii) the Joinder Agreement, and (iii) the Accredited Investor Representation Letter (all of which are attached hereto) and return them to the Company at the address listed in the Contact Information included at the beginning of this Offering Memorandum, along with a certified check, subject to collection, in an amount equal to the purchase price for the Units, made payable to the order of the Company, or a wire transfer in such amount to such bank account as shall be designated by the Company. Subject to the Company's unconditional right to accept or reject such subscription, upon the Company's receipt and acceptance of such documents and funds, if the Company accepts such subscription, the Company shall deliver to the Investor: (a) an executed counterpart of the relevant agreements, and (b) notification that the Investor is the registered holder of the relevant Units. If the Company rejects such subscription, payment will be returned to Investor in full without deduction or interest.

The Units are being offered in reliance on the safe harbor exemption provided by Rule 506(b) of Regulation D of the Securities Act, and may be purchased only by Accredited Investors.

**[*Remainder of page left intentionally blank*]**

## DESCRIPTION OF UNITS

The Units being offered and sold in this Offering will be "Units" and will have the rights, preferences and limitations set forth in the Company's Certificate of Formation and Operating Agreement (copies of which are attached to the Subscription Agreement attached hereto) and in the Limited Liability Company Act of the State of Delaware.

| | |
|---|---|
| ***Purchase Price*** | Each Unit of the Company purchased by an Investor requires a capital contribution to the Company from that Investor of $100,000. Partial Units of the Company may be purchased for a corresponding pro rata amount at the discretion of the Company. More particularly, the Company may accept some subscriptions for one-half of a Unit for $50,000 each. |
| ***Additional Capital Contributions*** | No Investor will be required to contribute any additional capital to the Company; provided, however, that the Manager (as defined in the Operating Agreement) may determine that the Company needs to raise additional capital through the sale of additional Units or membership interests in accordance with the Company's Operating Agreement. |
| ***Time of Distributions*** | The revenues received by the Company shall be applied to the expenses and liabilities of the Company in such manner as the Manager shall determine. The Manager is entitled to establish reserves for future expenses and liabilities as it determines in its sole discretion. The balance will be distributed as set forth herein. |
| ***Distributions*** | All available cash proceeds, as determined by the Manager, will be distributed by the Company in the following order and priority. |
| ***10% Distribution*** | Distributions shall be made to each Unitholder pro rata, based on the number of Units held by each Unitholder, until each such Unitholder has received distributions in current and previous fiscal years equal to 10 percent of the Unitholder's capital contribution per annum ("Unitholder Return"). |
| ***Repayment of Units*** | A Unitholder, the date which is five (5) years after the date of purchase for each Unitholder of each corresponding Unit, unless the Manager in its sole discretion elects an earlier date, the Company shall repay the Unitholder and redeem the Unit, where such repayment shall be in an amount equal to the lesser of (i) the sum of the Unitholder's capital contribution or (ii) an amount equal to the Unitholder's entire Capital Account (as defined in the Operating Agreement) balance. Such redemption shall result in the Unitholder's withdrawal from the Company. The Company may suspend or postpone any redemption based on a number of factors, including such redemption jeopardizing the Company's status as a partnership for US federal income tax purposes. |
| ***2% Accrued Incentive*** | Then, on or after the date which is five (5) years after the date of purchase for each Unitholder of each corresponding Unit, if and only if the Unitholder continues to hold each such Unit on such date, and unless the Manager in its sole discretion elects an earlier date, distributions shall be made to each such Unitholder pro rata, based on the number of Units held by each Unitholder, until each such Unitholder has received distributions in current and previous fiscal years equal to an additional 2 percent of the Unitholder's capital contribution per annum, solely to the extent of available profits. |
| ***Distribution of Share of 50% of Profits after 5 Years*** | Then, on or after the date which is five (5) years after the date of purchase for each Unitholder, unless the Managing Member in its sole discretion elects an earlier date, distributions shall be made to each such Unitholder, based on the number of Units held by each Unitholder and the length of time each such Unit has been held, until each such Unitholder has received distributions in current and previous fiscal years equal to such Unitholder's pro rata share of the fifty percent of the cumulative profits of the Company earmarked for all Unitholders, solely to the extent of available profits. |

| | |
|---|---|
| *Voting Rights* | Unitholders may not vote on any matter relating to the Company, its Members or the Manager, except as specifically required by the Delaware Limited Liability Company Act. Unitholders do not need to hold meetings. |
| *Management* | The management of the Company shall be vested in its Manager, and the Members (not the Unitholders) shall appoint a Manager to manage the Company. The designation and removal of the Manager shall be made by a 51 percent vote of the Members by value. The initial Manager is WMF Management, LLC, a Delaware limited liability company. Except as otherwise provided in the Operating Agreement, the Manager shall have full, exclusive and complete power to manage and control the business and affairs of the Company and shall have all of the rights and powers provided to a Manager of a limited liability company by law, including the power to execute instruments and documents, to mortgage or dispose of any real property held in the name of the Company, and to take any other actions on behalf of the Company. The Unitholders shall not be entitled to participate in the day-to-day affairs and management of the Company, but, instead, the Unitholders' right to participate with respect to matters relating to the Company shall be limited to those matters as to which the express terms of the Securities Act, the Certificate of Formation, or the Operating Agreement vest in the Unitholders the right to so participate. |
| *Indemnification* | The Company shall, to the maximum extent provided by law, indemnify, defend and hold harmless each Unitholder to the extent of the Company's assets, for, from and against any liability, damage, cost, expense, loss, claim or judgment incurred by the Unitholder in any proceeding in which the Unitholder is a party because such party was a Unitholder, arising out of any claim based upon acts performed or omitted to be performed by the Unitholder in connection with the business of the Company, including without limitation, attorneys' fees and costs incurred by the Unitholder in settlement or defense or in connection with Company affairs shall be reimbursed by the Company. |
| *Unitholders vs. Members* | Investors shall be Unitholders in the Company. Unitholders shall not be considered Members of the Company, and Members shall not be considered Unitholders of the Company; provided, however, that a party may be both a Member and a Unitholder if such party has purchased both Member's Percentage Interests and Units, as in the case of the Manager. |
| *Restrictions on Transfer* | Under the Operating Agreement, all parties thereto (including the Investors) will be subject to restrictions on transfer of the Company's securities. Investors may not sell, exchange or otherwise dispose of their Units without the express written permission of the Manager. |
| *Restrictions on Withdrawal* | Investors agree not to withdraw from the Company. |
| *Other Provisions* | The Subscription Agreement includes standard customary representations and warranties of the Company and the Joinder Agreement and Accredited Investor Representation Letter contain standard and customary provisions. This summary of terms is intended by the parties to be non-binding. |
| *Expenses* | Legal and administrative costs associated with the purchase of Units by each Investor will be borne by such Investor. |
| *Conditions to Closing* | The closing of the purchase and sale of the Units shall be subject to standard and customary conditions. |
| *Certain Tax Considerations* | The Company expects to be treated as a partnership (and not as an association or a publicly traded partnership taxable as a corporation) for US federal income tax purposes and will treat the Units as equity interests therein. For more information regarding certain US federal and other tax considerations applicable to an investment in the Company, prospective investors should refer to "Certain US Federal Income Tax Considerations" and consult with their tax advisors. |

| *Capitalization* | The Company may issue membership interests and Units. Currently, 100 percent of the issued and outstanding membership interests are owned by WMF Management, LLC, Manager of the Company. The authorized Units of the Company are reserved for issuance in connection with the Offering described in this Memorandum. |
|---|---|

---

**BUSINESS**

---

**Company Overview and Structure**

*WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC*

WOOBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC ("Woodbridge", "WMIF" or the "Company"), is a Delaware limited liability company formed in July of 2015. Woodbridge will invest in domestic first mortgages, mezzanine financing, construction loans, and other real estate ventures. These investments will be privately issued asset-based loans, secured by mortgages and real estate or other fund-approved investments. All investments will be titled in Woodbridge. Woodbridge will invest in a broad array of real estate investments, including all kinds of commercial real estate including retail and industrial properties, land acquisitions and development, triple net leases and apartment buildings.

The management of the Company is vested in its Manager, and the Members (not the Unitholders) shall appoint a Manager to manage the Company. The initial Manager is WMF Management, LLC, a Delaware limited liability company and an affiliate of the Company. Except as otherwise provided in the Operating Agreement, the Manager shall have full, exclusive and complete power to manage and control the business and affairs of the Company and shall have all of the rights and powers provided to a Manager of a limited liability company by law, including the power to execute instrument and documents, to mortgage or dispose of any real property held in the name of the Company, and to take any other actions on behalf of the Company.

The Managing Member and Key Executives of the Company will compile and review careful summaries of potential properties for investment (including information regarding the area surrounding such property, the ownership of the property, the tenants at the property and certain financial projections). The Company intends to take full advantage of its many varied long-term relationships with real estate and mortgage brokers all over the country to create a portfolio of well-located investments, which will meet certain analytical criteria. Woodbridge plans to work hand-in-hand with its affiliate companies, including Riverdale Funding, LLC, which will conduct business with Woodbridge by sourcing for the Company first mortgages, mezzanine financing, construction loans and other real estate investments. Over time, Woodbridge will acquire a portfolio of real estate investments, ultimately using approximately seventy and 00/100 perfect (70.00%) leverage (loan to value ratio) with respect to its first position mortgages, subject to the discretion of the Managing Member.

The Managing Member and Key Executives of the Company have substantial experience attracting and securing a variety of commercial lending transactions, examples of which are described more particularly after the Risk Factors Section of this Memorandum.

**Experience; the Market**

The experience and due diligence practices of Woodbridge's Manager and its management give the Company a competitive advantage that separates them from their competitors. Woodbridge's finance team is committed to providing the highest level of customer service, ensuring that their clients are informed throughout the process.

Woodbridge's Manager and management have extensive experience in real estate investments, development, management, and finance matters. The Company's executives have a wealth of knowledge and relationships in the real estate market that will assist them in these matters. The Company will leverage this knowledge, their relationships and careful research to assemble a selective and diverse portfolio of investments with attractive returns.

Woodbridge plans to take full advantage of low-cost financing, which it will make the most of in the current low interest rate environment.

Woodbridge may also from time to time elect to finance the occasional purchase of structured settlements, lottery receivables, jackpots, and contest awards, prior to resale, for which the Company shall earn an additional fee.

**Research and Operations**

Woodbridge's executives work year round to identify ideal properties, mortgages and real estate investments. Woodbridge utilizes both innovative and traditional research strategies. Most importantly, the Company takes full advantage of its many varied long-term relationships with real estate and mortgage lenders and brokers all over the country to identify properties, mortgages and real estate investments, carefully reviewing all relevant appraisals.

Woodbridge works hand-in-hand with its affiliate companies, including Riverdale Funding, LLC, which conduct business with Woodbridge and its affiliates by sourcing for the Company first mortgages and other real estate investments.

Woodbridge has offices in Florida, California, New Jersey, Connecticut, Tennessee and Colorado, legal teams in all fifty states, and, through its affiliates, has at its disposal eight full time attorneys. Woodbridge is continually automating its processes and updating its resources.

[*Remainder of page left intentionally blank*]

## MANAGEMENT

### Robert Shapiro, President & CEO

Robert H. Shapiro has been active in the real estate and mortgage business since 1978, and has bought and sold hundreds of properties. Mr. Shapiro is a licensed real estate broker in New York. Companies under his leadership have originated thousands of mortgages totaling hundreds of millions of dollars. Mr. Shapiro has decades of experience in buying, owning and selling properties such as shopping centers, apartment buildings, co-ops and condominiums. Mr. Shapiro has owned construction companies, facilitated condominium conversions, and built hundreds of houses. Mr. Shapiro has been profiled on the front page of the Wall Street Journal, as well as featured in articles in the New York Times, Forbes, New York Post, Barron's New York Daily News, New York Magazine, Crain's and Manhattan, Inc.

### Richard Salvato, Executive Vice President

Richard Salvato has brought a wealth of experience to Woodbridge. Mr. Salvato has worked on and off with Robert Shapiro for over 17 years. Mr. Salvato has acquired and sold many properties. He oversees new business development, account planning and client interaction. In his role as Executive Vice President, his skills, talent, and professional experience will help drive efficient operations and impact bottom line results. Throughout his over 20 years in the real estate and financial industries, Mr. Salvato has held several leadership positions including CEO and Director of Acquisitions. Mr. Salvato has appeared on both a CNN 'Business Unusual' segment and CNBC's 'Power Lunch' program.

### Scott Schwartz, Vice President of Sales and Investor Relations

Scott Schwartz manages the sales department of Woodbridge Structured Funding, LLC, an affiliate of Woodbridge, and acts as a liaison to investors for the Company. Mr. Schwartz manages the Company's search for real estate investment opportunities in various markets. Mr. Schwartz leads the development and execution of the Investor Relations program. Mr. Schwartz's ambitious and driven personality, as well as his aggressive management skill set, help make Woodbridge a stronger force in the industry.

### Joe Hughis, Chief Compliance Officer and Mortgage Originator

Joe Hughis previously owned and operated a very successful mortgage business. Mr. Hughis has over 20 years of experience in the mortgage field and has worked with Robert Shapiro since 1989. Mr. Hughis has taken thousands of mortgage applications and reviewed thousands of appraisals. His wealth of expertise in the mortgage business and industry consists of, among other things, reading and deciphering title reports, clearing titles, reviewing appraisals, working with attorneys, and staying in compliance with the various state banking departments.

### David Golden, Vice President and General Counsel

David Golden brings over two decades of legal expertise, specializing in complex commercial finance transactions. In connection with his corporate governance and securities practice, Mr. Golden has advised and guided a broad range of prominent institutional, corporate, and sophisticated private investors and investment companies in achieving their business objectives in matters concerning venture capital investments; corporate mergers and acquisitions; public and private equity issuances, placements and exchanges; and corporate trust transactions. At Woodbridge, Mr. Golden leverages his legal and transactional acumen in the structuring, refinement, and implementation of Woodbridge's unique and innovative financial products.

## RISK FACTORS

Prospective investors should carefully consider the risks and uncertainties described below, as well as other risks and uncertainties that are common to early stage companies before deciding whether to invest in the Company. An investor may lose all or part of its investment in the Company.

*Risks Related to our Business*

***Actual results may be materially different than projections and forward-looking statements stated or inferred in this Memorandum.***

The projections, schedules and other forward-looking information contained in this Memorandum are good faith estimates based on current information and assumptions believed to be reasonable by the management of the Company. However, actual results may be materially different and there can be no assurance that such forward-looking information will prove to be accurate. Such assumptions might be incomplete or inaccurate, and unanticipated events and circumstances might occur that could have a material adverse effect, thereby inhibiting the achievement of such projections.

***The Company's commercial lending and real estate investment business is difficult to evaluate because of the cyclical nature of the mortgage and real estate business.***

The Company cannot be sure of real estate, mortgage or interest rate trends that may emerge and affect our business. Investors should evaluate the Company according to the expenses, problems, and uncertainties encountered by real estate and mortgage investment companies due to the cyclical nature of these markets. The Company may never overcome these obstacles and may never obtain profitability. In evaluating the Company, you should consider the risks and uncertainties frequently encountered by real estate and mortgage investment companies in evolving real estate markets. If we are not able to address these risks successfully, our business, operating results and prospects could be harmed. In addition, unexpected events threatening operations may arise due to logistical difficulties, geographic conditions, business reasons or otherwise.

***The Company depends on key personnel and must retain its personnel to be successful.***

The Company's success will depend upon the continued contributions of our executives and management personnel, who perform important functions, and would be difficult to replace. In addition, the Company's success may depend upon attracting, training, motivating and retaining highly skilled executives, particularly financial and executive personnel. The Company's failure to attract and retain the highly-trained personnel that are integral to our business may limit our ability to operate effectively. In the future, if the Company is unable to retain key executives or hire new qualified personnel, our business will be adversely affected.

***Management of the Company has broad discretion in the application of the proceeds from this Offering.***

The management of the Company has discretion over the use and expenditure of the proceeds from this Offering. The Company intends to use the funds raised through this Offering as described in the "Use of Proceeds" Section contained in this Memorandum. The Company does not contemplate material changes in the allocated Use of Proceeds from that disclosed in this Memorandum. To the extent the Company determines that changes are necessary or appropriate in order to address changed circumstances and/or opportunities, management may find it necessary to adjust the use of its capital, including the proceeds of this Offering. As a result, the success of the Company may be substantially dependent upon the discretion and judgment of the management of the Company with respect to the application and allocation of the net proceeds hereof.

***The Company has no operating history and there is no assurance that we will be able to successfully achieve our investment objectives.***

Because the Company is a new venture, it has no operating history to evaluate. Although management has substantial experience in secured financing and the methods to be utilized by us, no assurance can be given that our

operations will approximate the results of other projects or investments or that the management team will be successful in operating the Company.

***Factors beyond the control of the Company may affect the revenues and results of operations of the Company.***

Changes in interest rates in the United States and/or adverse governmental conditions may affect the Company's business and results of operations. There can be no assurance that the Company's operations will be profitable should any of these uncontrollable influences occur. These unforeseen conditions as well as terrorism, military repression, interference with private contract rights, or rates of inflation or taxation may cause the Company to delay its efforts and to miss opportunities to expand its operations.

***Unforeseen Lawsuits Could Result in Substantial Costs.***

Unforeseen lawsuits, whether as a plaintiff or a defendant, could require us to spend significant time and money in litigation or to pay significant damages. Any claims, whether or not successful, could seriously damage our reputation and our business.

***If the Company does not sell the maximum number of Units in this Offering, its ability to invest in mortgages and other real estate investments will be reduced, and therefore aggregate revenues may be affected, even if revenues per investor remain constant.***

If the maximum Units are not sold, the Company will be required to cut its forecast of expectations and investments, particularly with respect to the number of deals entered into in total, resulting in potentially not meeting current projections in the aggregate, even if individual investors would continue to receive the expected rate of return on each of their individual investments.

### *Need for Additional Financing*

The Company may require additional financing. A prospective investor should note there is no assurance that the Company would be able to raise additional capital. To the extent additional capital is required and cannot be raised successfully, the Company may then have to limit its then-current operations and/or may have to curtail certain of its business objectives and plans and/or go entirely out of business. The inability of the Company to raise additional financing as required will have a material adverse effect on the value of any investment in the Company. Incurring additional indebtedness could subject the Company to expand or restrict financial covenants. There can be no assurance that additional financing will be available on acceptable terms or at all. To the extent unplanned expenditures arise, or the Company's estimates of its capital requirements prove to be inaccurate, the Company may require such additional financing sooner than anticipated and in amounts greater than current expectations.

The Company does not yet have financial statements. The Company is too new for any financial records to have been prepared by the Company's management or to have been reviewed or audited by independent certified public accountants.

### *Risks Related to this Investment*

***An investment in Units involves a high degree of risk and is suitable only for investors whose financial resources are sufficient to enable them to bear the loss of all or a portion of their investment.***

Prospective Investors should carefully review and consider the risks described herein, as well as the other information set forth in this Memorandum before investing in any Units. Any of the information contained herein or incorporated by reference may constitute a forward-looking statement as defined in Section 27A(i)(1) of the Securities Act. The risk factors set forth herein are cautionary statements identifying important factors that could cause actual results to differ materially from those described in the forward-looking statements. The order in which these risk factors are presented is not intended to, and in fact may not correspond to, the relative magnitude of the risks. Other risks may be found elsewhere in this Memorandum, but their placement other than in this "Risk Factors" section should not be construed as an indication that such risks are less likely to occur or that they would be any less damaging to the Company, its business, financial condition, prospects, or results of operations. In addition to

the risks summarized herein, businesses are often subject to risks not foreseen or fully appreciated by management. In reviewing this Memorandum, prospective purchasers should keep in mind other possible risks that could be important.

*The absence of a market for the Units may lower the value of such Units*.

Purchasers of Units must be aware of the long-term nature of their investment and be able to bear the economic risks of their investment for an indefinite period of time. No trading market exists for the Units, and Units purchased by Investors in this Offering may not be resold or transferred without registration under federal or state securities laws, or an exemption from such registration. The Units have not been registered under the Securities Act, or the securities laws of any state. There is currently no public market for our securities and there can be no assurance that any such market will ever develop. If such market does develop, there can be no assurance that the Units could be resold at or above their offering price. If a public market does not develop, an Investor may be unable to dispose of his or her Units.

*Restrictions on transfer of the Units may lower the value of the Units*.

The Units are not being registered under any federal or state securities laws. The Units may not be sold by an Investor unless they are subsequently registered in accordance with the Securities Act and applicable state securities laws, or unless we receive an opinion of counsel satisfactory to us to the effect that an exemption is available. In addition, provisions in the Operating Agreement contain restrictions on the transfer of Units, including a right of first refusal and restrictions on sales and transfers. Accordingly, investors must therefore bear the economic risk of an investment in the Units for an indefinite period of time.

*Establishment of fair valuation of the Units can be difficult to determine*.

We are offering the Units in connection with this Offering at a purchase price of $100,000 each. If you purchase Units in this Offering, you will pay a price that was not established in a competitive market. We have not had the value of the Units or the Company independently appraised or assessed. The price for the Units has been determined as a result of the fact that a $100,000 investment will be secured by real estate investments of the same value purchased and titled in the Company. You must make your own determination as to whether $100,000 represents the fair value for each of the Units being offered in deciding whether or not to invest in the Company. The trading price, if any, of the Units that will prevail in any market that may develop in the future may be higher or lower than the price you pay.

*Management will have a high concentration of membership interest ownership*.

Based on the voting membership interests that are outstanding as of the commencement of the sale of the Units, management beneficially owns 100 percent of the Company's outstanding voting membership interest. Such a high level of ownership by such persons may have a significant effect in delaying, deferring or preventing any potential change in control of the Company. Additionally, as a result of its high level of ownership, management will be able to exclusively direct the actions of the Company.

*Neither we nor our Manager are registered under the Investment Company Act and certain other statutes and regulations.*

We are not registered under the Investment Company Act, which provides certain protections to investors and imposes certain restrictions on registered investment companies, including restrictions with respect to capital structure, operations, transactions with affiliates, and other matters. None of these restrictions will be applicable to us. In addition, the Manager is not registered as an investment adviser under the Investment Advisers Act, and consequently, is not subject to the recordkeeping, disclosure and other fiduciary obligations specified in the Investment Advisers Act.

The Company intends to rely on Section 3(c)(5)(c) for its Investment Company Act exemption, which requires that the Company have at least 55 percent of its portfolio invested in qualifying assets (which in general must consist of mortgage loans, mortgage backed securities that represent the entire ownership in a pool of mortgage loans and

other liens on and interests in real estate) and another 25 percent of its portfolio invested in other real estate-related assets. We classify our investments in mortgage loans that are collaterally assigned to us as qualifying assets, as long as the loans are "fully secured" by an interest in real estate. That is, if the loan-to-value ratio of the loan is equal to or less than 100 percent, then we consider the loan to be a qualifying asset. We do not consider loans with loan-to-value ratios in excess of 100 percent to be qualifying assets that come within the 55 percent basket, but only real estate-related assets that come within the 25 percent basket.

Rule 3a-2 provides a safe harbor exemption, not to exceed 1 year, for companies that have a bona fide intent to be engaged in an excepted activity but that temporarily fail to meet the requirements for another exemption from registration as an investment company. Reliance upon Rule 3a-2 is permitted only once every 3 years. If we fail to meet either the 55 percent test or the 25 percent test of Section 3(c)(5)(c), or if we otherwise fail to maintain our exclusion from registration, within a 3-year period, and another exemption is not available, we may be required to register as an investment company, or we may be required to acquire and/or dispose of assets in order to meet the Section 3(c)(5)(c) or other tests for exclusion. Any such asset acquisitions or dispositions may be of assets that we would not acquire or dispose of in the ordinary course of our business, may be at unfavorable prices or may impair our ability to make distributions to Unitholders. If we are required to register under the Investment Company Act, we would become subject to substantial regulation with respect to our capital structure (including our ability to use leverage), management, operations, transactions with affiliated persons (as defined in the Investment Company Act), and portfolio composition, including restrictions with respect to diversification and industry concentration and other matters. Accordingly, registration under the Investment Company Act could limit our ability to follow our current investment and financing strategies, impair our ability to make distributions to Unitholders and result in a decline in the price of Units.

### *Failure to comply with securities laws could result in material adverse consequences.*

The Units are being offered for sale in reliance upon certain exemptions from the registration requirements of the Securities Act and applicable state securities laws. If the sale of Units were to fail to qualify for these exemptions, Investors may seek rescission of their purchases of Units. If a number of purchasers of Units were to obtain rescission, the Company could face significant financial demands which could adversely its operations and business plan, as well as the interests and holdings any non-rescinding purchasers.

In particular, the Company is relying on Rule 506(b) under the Securities Act for its exemption from registration under the Securities Act. No federal or state agency has made a finding as to the fairness of an investment in the Company or the accuracy of the information set forth in this Memorandum. Because the securities being sold pursuant to this Offering have not been registered under the Securities Act or applicable blue sky laws, the sale, exchange or other disposition of the Units is restricted by applicable provisions of such laws. The Company will rely on the representations of Accredited Investor status made by the Investors for the securities law exemption under which the Units will be sold. Although the Company believes this Offering qualifies for an exemption from registration pursuant to Rule 506(b) under the Securities Act, there is no assurance that it currently qualifies or will continue at all times to so qualify. Pursuant to Rule 506(b), the Company will be required to adhere to SEC filing requirements and may only sell the Units to Accredited Investors. The Company may not be able claim an exemption pursuant to Rule 506(b) should any of its officers, directors or stockholders engage or be found to have engaged in certain prohibited conduct. Moreover, if the Company fails to comply with the current filing requirements, the Company may not be able to rely on the exemption provided by Rule 506(b). If the Company is unable to rely on the exemption provided under Rule 506(b), then its use of general solicitation in connection with the Offering may prevent the offer and sale of the Units from qualifying for any exemption from registration pursuant to the Securities Act or applicable blue sky laws. In such circumstances, each investor would likely be entitled to demand that the Company rescind his, her or its purchase of the Units. If such suits for rescission were brought for failure to register this Offering or for acts or omissions constituting certain prohibited practices under federal and state securities law, and especially if such suits were concluded in favor of the complainant, the Company's financial position would be adversely impacted and it would not likely be able to operate its business.

*The Manager may sponsor or manage additional mortgage portfolios and real estate programs and ventures.*

Officers and managers of the Manager may engage in activities apart from the Company. Such persons will devote such time to the business of the Company as is reasonably required in their judgment. Accordingly, they could have conflicts of interest in allocating their time between the Company and such other activities.

*We will be subject to a variety of risks inherent in the ownership of mortgages.*

Our investments will be subject to the risks generally attributable to the ownership of mortgages, including changes in national and local economic conditions; changes in the investment climate for real estate investments; changes in the demand for, or supply of, competing properties or loans; changes in local market conditions and neighborhood characteristics; further defaults by borrowers; the availability and cost of mortgage funds; changes in foreclosure-related conditions, environment, law or regulations; the obligation to meet any fixed and maturing obligations; unanticipated holding costs; the availability and cost of necessary utilities and services; changes in real estate tax rates and other operating expenses; changes in governmental rules and fiscal policies, including tax laws and regulations; changes in zoning and other land use regulations; environmental controls; acts of God, which may result in uninsured losses; and other factors beyond our control. Any negative changes in these factors could affect our ability to meet our obligations and our ability to make distributions.

*WMIF faces significant competition for investment opportunities from other purchasers of mortgage portfolios.*

Because of competition from other well-capitalized real estate investors, including bulge-bracket investment banks and large hedge funds and private equity funds, no assurance can be given that WMIF will be able to acquire desired mortgages to be collaterally assigned to us. Where it is possible for WMIF to acquire desired mortgages, no assurance can be given that we will be able to do so on advantageous terms. In addition, no assurance can be given that any such acquisitions will be financed on terms favorable to us or that such mortgages will meet our return expectations or conform to our investment criteria. Any one of the foregoing events could have an adverse effect on our financial condition, results of operations, cash flow and ability to pay distributions.

*Investigations of mortgage transactions may have an adverse effect on us.*

The Federal Reserve Bank and/or other governmental agencies have started to investigate the activities of certain mortgage servicing companies, including claims that such companies may have systematically rejected borrowers' efforts to lower their loan payments through government programs. Part of these claims include allegations that such companies denied loans without properly reviewing applications and that loans which qualified for government modifications were consistently denied. The Company and WMIF intend to conduct their operations in a manner consistent with all applicable laws and regulations, including properly reviewing and processing all mortgages and modification requests; however, no assurance can be given that such an investigation will not be commenced in the future. Any such investigation could have a material adverse effect on our ability to meet our obligations and our ability to make distributions. The Manager is not required to be registered as a HAMP, FHA, Fannie Mae or Freddie Mac servicer and, as such, is not currently governed by their respective regulations.

*Changes in laws and regulations governing mortgage loans may have an adverse effect on us.*

The mortgage loan business is subject to numerous federal and state banking and consumer protection laws, regulations, rules and specifications. These laws and regulations address and regulate, among other matters, how mortgage holders can communicate with borrowers, the disclosures that must be provided to borrowers, the enforcement of rights as a mortgagee, and the legal rates of interest that may be charged. Governmental agencies, in some cases, have the power under such laws to impose fines and penalties.

We believe that WMIF has obtained all permits and approvals and filed all registrations required for the conduct of its business and is in compliance in all material respects with the laws, regulations, rules, specifications and permits, approvals and registrations relating to mortgage lending. In the current regulatory environment, it is possible that additional laws, regulations, rules and specifications may be imposed upon WMIF or us which could impose significant compliance costs on us. Such costs could have a material adverse effect on our ability to meet our obligations and our ability to make distributions.

*Delays in liquidating defaulted mortgage loan investments could reduce investment returns.*

If there are defaults under the mortgages that are collaterally assigned to us, we may not be able to foreclose on or obtain a suitable remedy with respect to such investments. Specifically, we may not be able to repossess and sell the underlying real property quickly, which could reduce the value of our investment. For example, an action to foreclose on a property securing a mortgage loan is regulated by state statutes and rules and is subject to many of the delays and expenses of lawsuits if the defendant raises defenses or counterclaims. Additionally, in the event of default by a borrower, these restrictions, among other things, may impede our ability to foreclose on or sell the underlying real property or to obtain proceeds sufficient to repay all amounts due to us on the loan.

*Borrowers under mortgages acquired by us may take steps to prevent us from acquiring title to the underlying real estate securing such mortgages.*

In the event that a defaulting borrower does not agree to work with us or if such borrower further defaults on its obligations, we may seek to obtain title and become the owner of the real estate securing such mortgages through foreclosure or deed-in-lieu of foreclosure. In many instances, the borrower under such loans may cooperate with such foreclosure or deed-in-lieu of foreclosure in exchange for us providing a release to the borrower or its principals of any guarantees issued in connection with such loans and possibly a "cash for keys" payment. However, borrowers may take steps designed to prevent or delay us from acquiring title to the real property by, among other things, challenging the legal validity of any foreclosure by us or placing the borrower into bankruptcy. These and other similar actions could result in our failing to obtain title to the real estate, and thereby reduce our ability to realize any return on our investment, and could cause substantial legal and other expenses associated with challenging the actions of any borrowers. In the event any borrower subjects itself to bankruptcy, there is considerable risk that we could be forced to accept the real estate as complete satisfaction of the applicable loan secured by such real estate without any further recourse against any guarantor of the loan in question.

### Risks Related to Federal Income Taxes

There are substantial risks associated with the US federal income tax aspects of an investment in the Company and of purchasing and owning the Units, including the risks discussed below. The Internal Revenue Service ("IRS"), examines numerous tax issues that could affect the Company. Moreover, the US federal income tax consequences of an investment in the Company and of purchasing and owning the Units are complex, and tax legislation could be enacted in the future to the detriment of Investors. Because the material tax aspects of this Offering and the Units are complex and may differ depending on individual tax circumstances, prospective Investors are urged to consult and rely on their own, independent tax advisors concerning the tax aspects of this Offering, the purchasing and holding of the Units and their individual situations. No representation or warranty of any kind whatsoever is made with respect to the acceptance by the IRS of the treatment of any item by the Company or the Manager. The following summarizes some of the tax risks to the Unitholders who own Units. A discussion of certain tax aspects (including other tax risks) of the investment is set forth in "Certain US Federal Income Tax Considerations."

*Changes in US federal income tax law could change the tax treatment of an investment in the Company and of purchasing and holding the Units.*

The discussion of tax matters contained in this Memorandum is based on law presently in effect, judicial authorities, published positions of the IRS and other applicable authorities, and certain proposed US Treasury Regulations. Nonetheless, investors should be aware that new legislation, administrative, or judicial action could significantly change the tax aspects of an investment in the Company and of purchasing and holdings the Units and could be applied retroactively, causing a materially adverse effect on an investment in the Company and on purchasing and holdings the Units. The extent and effect of any such change is uncertain, but it could have significant adverse tax consequences for Unitholders.

***If the Company (or a portion thereof) were to be treated as a corporation for US federal income tax purposes, the Company would be subject to federal income taxation on its income at the regular federal corporate income tax rates, thereby decreasing the cash available for distribution to Unitholders.***

If the Company (or a portion thereof) were to be treated as a corporation for US federal income tax purposes, the Company would be subject to federal income taxation on its income at the regular federal corporate income tax rates, thereby decreasing the cash available for distribution to Unitholders. The Company could be treated as a corporation if it were a "publicly traded partnership" as a result of the Units being traded on an established market or readily tradable on a secondary market or the substantial equivalent thereof. The Operating Agreement includes restrictions on transfer of Units that are intended to establish that the Company will not be treated as a publicly traded partnership.

The Company (or a portion of the Company) could also be treated as a corporation for federal income tax purposes if the Company (or a portion of the Company) were to be a "taxable mortgage pool" described in Section 7701(i) of the Internal Revenue Code of 1986, as amended (the "Code") and the US Treasury Regulations thereunder. While the Manager intends to operate the Company so that neither the Company nor any portion thereof will so qualify, the taxable mortgage pool rules are complex and include anti-abuse rules of ambiguous application, and there can be no assurance that neither the Company nor any portion thereof will be treated as a taxable mortgage pool.

***Unitholders who are individuals or estates or trusts will generally be subject to the 3.8 percent tax on net investment income on their shares of the Company's income.***

For tax years beginning after December 31, 2012, individuals, estate and trusts are generally subject to a tax equal to 3.8 percent of the lesser of (i) the taxpayer's net investment income for the year or (ii) the excess of such taxpayer's modified adjusted gross income for such year (as determined for purposes of Section 1411 of the Code) over a specified threshold amount. For these purposes, a Unitholder's share of the Company's income will generally be treated as net investment income.

***A Unitholder's US federal income tax liability may exceed the distributions that it receives from the Company, requiring the Unitholder to satisfy the tax liability from other funds.***

The Company's items of tax items of income, gain, loss, deduction and credit will pass through to the Unitholders and each Unitholder will generally be required to take such items into account in determining its income tax liability even if the Company does not make distributions to the Unitholder during or with respect to the relevant tax period. The Operating Agreement does not require the Company to make distributions in amounts required to permit the Unitholders to satisfy their tax liabilities and there are a number of circumstances, including certain acquisitions by the Company of debt instruments issued with original issue discount, modifications of debt instruments held by the Company that are treated as taxable exchanges for federal income tax purposes, where the amount treated as realized by the Company on such exchange exceeds the Company's adjusted basis in the debt instrument that was modified, and certain foreclosures, where the Company's activities may give rise to income for US federal income tax purposes even in the absence of corresponding cash receipts. Thus, a Unitholder's tax liability associated with such Unitholder's Units may exceed distributions with respect to those Units, in which case the Unitholder would need to satisfy its US federal income tax liability from other assets.

***Unitholders may be subject to the passive activity rules with respect to their investment in the Company, which generally limit the use of losses from passive activities to offset non-passive income.***

All or a portion of the Company's activities may be treated as "passive activities" for US federal income tax purposes. Generally, losses from passive activities are deductible only to the extent of a Unitholder's income or gains from passive activities and will not be allowed as an offset against other income, including salary or other compensation, active business income or portfolio income. Passive activity losses that are not allowed in any taxable year are suspended and carried forward indefinitely and allowed in subsequent years as an offset against passive activity income in subsequent years.

***The IRS could challenge the Company's determination of its tax items.***

The Company's federal information returns may be audited by the IRS. An audit of the Company could lead to an IRS challenge to the Company's determination of a tax item, including the Company's determination regarding the deductibility of certain payments or regarding the timing, character or amount of the Company's income. Given the lack of certainty regarding the federal income tax treatment of certain of the Company's anticipated activities, there can be no assurance that an IRS challenge would not be successful, potentially with material adverse consequences to Unitholders. Such an IRS audit or challenge could lead to an examination of other items in Unitholders' returns unrelated to the Company or to an examination of prior tax returns. Moreover, Unitholders could incur substantial legal and accounting costs should the IRS challenge a position taken by the Company on its tax returns regardless of the outcome of such a challenge.

***The IRS could challenge the Company's allocation of tax items among the Unitholders, which could have an adverse effect upon a Unitholder's investment.***

The IRS may contend that the Company's allocation of tax items under the Operating Agreement does not have substantial economic effect, is not in accordance with the interests of the Unitholders or otherwise is not proper under Section 704(b) of the Code and the Treasury Regulations thereunder. Any successful IRS challenge could have an adverse effect upon a Unitholder's investment in the Units.

***The Company may generate income that is treated as "unrelated business taxable income."***

The Company may generate income that is taxable as unrelated business taxable income ("UBTI") to tax-exempt Unitholders, such as qualified pension, profit-sharing or other retirement trusts and individual retirement accounts. Each tax-exempt Unitholder that is not a governmental entity or political subdivision of a governmental entity generally will be subject to federal income tax on its share of the Company's UBTI. The potential for being allocated UBTI may have a significant effect upon any investment by a tax-exempt entity in the Company. The Company is not a suitable investment for tax-exempt investors that are unwilling to be allocated income that is treated as UBTI for US federal income tax purposes.

***Employee Benefit Plan and IRA Risks***

Each prospective investor that is (1) an employee benefit plan subject to Title I of ERISA ("ERISA Plan"), (2) a plan within the meaning of Section 4975(e)(1) of the Code (including an IRA and a retirement plan that only covers self-employed individuals (a "Keogh Plan"), an Archer MSA, a health savings account or a Coverdell education savings account), (3) an entity whose underlying assets are deemed to include assets of an ERISA Plan, Keogh Plan or IRA (a "Benefit Plan Entity"), or (4) a person investing assets of any ERISA Plan, Keogh Plan, IRA or Benefit Plan Entity, should consider the matters described below in determining whether to invest in the Company. Such ERISA Plans, Keogh Plans, IRAs and Benefit Plan Entities are referred to collectively herein as "Benefit Plans."

***If a fiduciary of a Benefit Plan fails to meet the fiduciary and other standards imposed under ERISA or the Code as a result of an investment in the Units, the fiduciary could be subject to criminal and civil penalties.***

Section 404(a)(l) of ERISA and the regulations promulgated thereunder by the US Department of Labor provide, as a general rule, that a fiduciary with respect to an ERISA Plan must discharge his duties with respect to the ERISA Plan in a prudent manner and must consider several factors in determining whether to invest in the Company, including the diversification of investments to protect against large losses. If a fiduciary with respect to any such ERISA Plan acts imprudently or otherwise fails in his fiduciary obligations, the fiduciary may be held personally liable for losses incurred by the ERISA Plan as a result of such imprudence. A person who has discretionary responsibility or authority with respect to the assets of an ERISA Plan or who provides investment advice for a fee with respect to such plan would generally be a fiduciary with respect to such plan. A person who has discretionary responsibility or authority with respect to the assets of a Benefit Plan Entity or who provides investment advice for a fee with respect to such entity would generally be subject to the same requirements under ERISA. Among the factors that should be considered by a potential Benefit Plan investor are: (1) whether the diversification and liquidity requirements of ERISA will continue to be met by an investment in the Company; (2) the potential returns

on a proposed investment in the Company, taking into account the risk of loss and opportunity for gain; (3) the place the proposed investment would occupy in the ERISA Plan's portfolio taken as a whole; and (4) whether the proposed investment is permitted under the documents and instruments governing the ERISA Plan. Although a Keogh Plan and IRA are not subject to ERISA, nevertheless a fiduciary or owner with respect to such Keogh Plan or IRA should consider whether the proposed investment is permitted under the documents and instruments governing such Keogh Plan or IRA, the liquidity of the proposed investment and whether the proposed investment otherwise satisfies tax qualification and other applicable requirements under the Code and other laws.

*A Benefit Plan investor must be mindful of distribution and liquidity requirements that may apply to such Benefit Plan, and any annual or more frequent valuation requirements that may apply to such Benefit Plan.*

A prospective Benefit Plan investor must take into consideration the liquidity of the Company given the minimum required distribution provisions of Section 401(a)(9) of the Code and the distribution requirements of such Benefit Plan. Even if distributions were made in Units, there could still be tax withholding requirements that could require liquidity so that cash could be paid to appropriate governmental agencies. Administrators or fiduciaries of Benefit Plans may be required to determine the fair market value of such plans' assets to provide valuation reports to governmental agencies or to participants or beneficiaries of such plans. The lack of liquidity of the Company may make it difficult for these requirements to be met.

*A Benefit Plan investor must be mindful of the prohibited transaction provisions of ERISA and the Code, or other similar prohibitions, and be sure that such prohibitions are not violated.*

ERISA also generally prohibits an ERISA Plan or a Benefit Plan entity that includes the assets of an ERISA Plan from engaging in a broad range of transactions (referred to as "prohibited transactions") involving the ERISA Plan and persons having a specified relationship to the ERISA Plan ("parties in interest") unless a statutory or administrative exemption applies. Similar prohibitions are contained in Section 4975 of the Code and generally apply with respect to other Benefit Plans (such as Keogh Plans, IRAs and certain other plans) except that the restricted persons are referred to as "disqualified persons." Although the definition of "disqualified person" under the Code is not identical to the definition of "party in interest" under ERISA, generally speaking, the two terms are very similar. If the assets of the Company are treated, for purposes of ERISA and Section 4975 of the Code, as the assets of the Benefit Plans that invest in the Company, certain transactions that the Company enters into in the ordinary course of its business might constitute "prohibited transactions" under ERISA and the Code.

Engaging in a prohibited transaction could potentially subject fiduciaries of the Benefit Plans to personal liability and civil penalties and potentially result in the imposition of an excise tax under Section 4975 of the Code upon any disqualified persons involved. Additionally, engaging in a prohibited transaction may result in a loss of tax-exempt status of a Benefit Plan (such as an IRA, Archer MSA, health savings account, or Coverdell education savings account). *See* "ERISA Considerations" for a more detailed discussion of prohibited transactions and certain regulations regarding plan assets. Governmental plans, church plans, and foreign plans generally are not subject to ERISA or the prohibited transaction rules of the Code, but may be subject to similar restrictions under other laws. A plan fiduciary making an investment in our Units on behalf of such a plan should consider whether the investment is in accordance with applicable law and governing plan documents.

*The acceptance of an investment in the Company by a Benefit Plan does not constitute a representation or judgment by the Company that an investment in the Company is an appropriate investment for that entity or that such an investment meets the legal requirements applicable to such entity. Those considering an investment in the Company remain responsible for the Benefit Plan's compliance with the legal requirements applicable to such entity, and they should consult their own advisors regarding such an investment.*

**[*Remainder of page left intentionally blank*]**

## SECURITIES LAWS CONSIDERATIONS

### Securities Act of 1933

The Units will not be registered under the Securities Act or any other securities law. The Units will be offered without registration in reliance upon the exemption contained in Section 4(a)(2) of the Securities Act or regulations of the SEC for transactions not involving a public offering. Each prospective Investor must be an Accredited Investor (as defined in Regulation D promulgated under the Securities Act). The Units are being offered in reliance on the safe harbor exemption provided by Rule 506(b) of Regulation D of the Securities Act, and may be purchased only by Accredited Investors.

Each prospective Investor will be required to represent, among other customary private placement representations, that it is acquiring the Units for investment purposes only and not with a view to resale or distribution. Further, each Investor must be prepared to bear the economic risk of the investment for an indefinite period, because the Units can be resold only pursuant to an offering registered under the Securities Act or with the express written consent of the Manager. It is extremely unlikely that the Units will ever be registered under the Securities Act.

### Investment Company Act of 1940

The Company will not be registered as an "investment company" under the Investment Company Act in reliance upon Section 3(c)(5)(c) thereof. Accordingly, investors will not receive the protections afforded by the Investment Company Act to investors in a registered investment company. Section 3(c)(5)(c) requires that the Company have at least 55 percent of its portfolio invested in qualifying assets (which in general must consist of mortgage loans, mortgage backed securities that represent the entire ownership in a pool of mortgage loans and other liens on and interests in real estate) and another 25 percent of its portfolio invested in other real estate-related assets. The Company classifies its investments in mortgage loans that are collaterally assigned to it by WMIF as qualifying assets as long as the loans are "fully secured" by an interest in real estate. That is, if the loan-to-value ratio of the loan is equal to or less than 100 percent, then we consider the loan to be a qualifying asset. We do not consider loans with loan-to-value ratios in excess of 100 percent to be qualifying assets that come within the 55 percent basket, but only real estate-related assets that come within the 25 percent basket.

In connection with any subscription for, or proposed transfer of, Units, the Manager is authorized to ask for and obtain such information from the prospective Investor or the proposed transferor and transferee, as applicable, in order that it may be able to determine whether the proposed subscription or transfer, as applicable, would allow the Company to retain its exclusion from registration as an "investment company."

[*Remainder of page left intentionally blank*]

## CERTAIN US FEDERAL INCOME TAX CONSIDERATIONS

The following is a summary of certain US federal income tax considerations to Investors who hold Units in the Company ("Unitholders") who are US persons (as defined below) who purchase Units in the Offering. The discussion is based upon the Code, US Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect as of the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. The discussion does not address all tax consequences that may be relevant to a particular Unitholder or to Unitholders subject to special treatment under US federal income tax laws, such as insurance companies, regulated investment companies, Unitholders who are liable for the alternative minimum tax, and US persons whose functional currency is not the US dollar. This discussion is limited to Unitholders who hold their Units as capital assets. No ruling has been or will be sought from the IRS regarding any matter discussed herein. Counsel to the Company has not rendered any legal opinion regarding any tax consequences relating to the Company or an investment in the Company. No assurance can be given that the IRS would not assert, or that a court would not sustain, a position contrary to any of the tax aspects set forth below.

**Prospective Investors must consult with their own tax advisors as to the US federal income tax consequences of acquiring, holding and disposing of the Units, as well as the effects of state, local and non-US tax laws.**

For purposes of this discussion, a "US person" means a beneficial owner of Units that is, for US federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity treated as a corporation) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate, the income of which is subject to US federal income tax, regardless of its source; or

- a trust, (i) if a US court can exercise primary supervision over the administration of the trust and one or more US persons (within the meaning of the Code) can control all substantial trust decisions, or, (ii) if the trust was in existence on August 20, 1996 and has validly elected to continue to be treated as a US person (within the meaning of the Code).

If a partnership, including for this purpose any entity treated as a partnership for US federal income tax purposes, is a Unitholder, the US federal income tax treatment of a partner in such partnership will generally depend upon the status of such partner and the activities of the partnership. A Unitholder that is a partnership and partners in such partnership should consult with their tax advisors to determine the US federal income tax consequences of acquiring, holding and disposing of the Units.

### US Federal Income Tax Status of the Company

The Company generally intends to conduct its affairs such that it will be treated as a partnership and not as an association or a publicly traded partnership or a "taxable mortgage pool" within the meaning of Section 7701(i) of the Code subject to tax as a corporation for US federal income tax purposes. No assurance can be given that the IRS will not challenge such classification of the Company or that a court will not sustain any such challenge.

If the Company were to be classified as an association taxable as a corporation (or a publicly traded partnership or taxable mortgage pool taxable as a corporation) for US federal income tax purposes, then capital gains and losses and other income and deductions recognized by the Company would generally not be passed through to the Unitholders and the Company's taxable income would be subject to tax at regular corporate tax rates. The Operating Agreement contains certain representations and transfer restrictions (including with respect to redemptions by Unitholders) such that the Company does not expect to be characterized as a publicly traded partnership. The remainder of this discussion assumes that for US federal income tax purposes, the Company will be treated as a partnership and not as an association, publicly traded partnership or taxable mortgage pool that is subject to tax as a corporation.

**Taxation of Unitholders on Company's Profits and Losses**

As a partnership for US federal income tax purposes, the Company will not itself be subject to US federal income tax. Rather, each Unitholder, in computing its US federal income tax liability for a taxable year, will be required to take into account its allocable share of all items of Company income, gain, loss, deduction, and credit for the taxable year of the Company ending with or within such Unitholder's taxable year, regardless of whether such Unitholder has received any distributions from the Company. In most circumstances, the characterization of an item of profit or loss for a Unitholder will be determined at the Company (rather than at the Unitholder) level.  It is possible that a Unitholder's US federal income tax liability with respect to its allocable share of Company earnings in a particular taxable year could exceed the cash distributions to the Unitholder for the year, thus giving rise to an out-of-pocket payment by the Unitholder.

For US federal income tax purposes, a Unitholder's allocable share of Company tax items will be determined by the provisions of the Operating Agreement if such allocations have or are deemed to have "substantial economic effect" or are determined to be in accordance with the Unitholders' interests in the Company. If, however, the IRS successfully challenged the Company's allocations of income, gain, loss, deduction and expense, the redetermination of the allocations to a particular Unitholder for US federal income tax purposes may be less favorable than the allocations set forth in the Operating Agreement.

**Adjusted Tax Basis Rules for a Unitholder's Unit in the Company**

For US federal income tax purposes, a Unitholder's adjusted tax basis in its Units generally will be equal to the amount of its initial capital contribution and will be increased by (i) any additional capital contributions made by such Unitholder and (ii) such Unitholder's allocable share of (a) items of Company taxable income and gain and (b) nonrecourse indebtedness of the Company (as defined for US federal income tax purposes and generally allocated among the Unitholders in accordance with their share of the Company's profits). Such adjusted tax basis generally will be decreased, but not below zero, by such Unitholder's allocable share of (i) items of Company taxable deduction, expense and loss and (ii) distributions by the Company and any constructive distributions resulting from a reduction in such Unitholder's share of nonrecourse indebtedness of the Company (as defined for US federal income tax purposes). For this purpose, a reduction in a Unitholder's share of the Company's nonrecourse indebtedness, including in the event a new Unitholder is admitted to the Company, will result in a deemed cash distribution to the Unitholder in an amount equal to the reduction.

If the recognition of a Unitholder's distributive share of losses would otherwise reduce its adjusted tax basis for its Units below zero, the recognition of such losses by the Unitholder would be deferred until such time as the recognition of such losses would not reduce the Unitholder's tax basis below zero. To the extent that the Company's distributions (or constructive distributions, as described above) would reduce a Unitholder's adjusted tax basis for its Units below zero, such distributions would generally constitute taxable income to the Unitholder and would be treated as gain from the sale or exchange of a capital asset except as described below.

In the event that a Unitholder sells, exchanges, or otherwise disposes of Units, such Unitholder generally will recognize gain or loss in an amount equal to the difference between the amount of sales proceeds and the Unitholder's adjusted tax basis for such Units. In the event that all or a portion of the Units held by a Unitholder are redeemed, the amount of cash or property distributed to the Unitholder generally will be a non-taxable distribution to the Unitholder to the extent of the Unitholder's adjusted tax basis in such redeemed Units (and the adjusted tax basis in the Unitholder's remaining Units will be reduced by such amount) and any distribution in excess of its adjusted tax basis will be recognized gain or loss. In each such event, such Unitholder's adjusted tax basis will be adjusted for this purpose by its allocable share of the Company's income or loss for the year of the sale or distribution. Any gain or loss recognized with respect to such a sale or redemption generally will be treated as capital gain or loss. However, to the extent the proceeds of the sale are attributable to such Unitholder's allocable share of the Company's "unrealized receivables" or "substantially appreciated inventory," each as defined in Section 751 of the Code, the difference between such allocable share and the portion of the Unitholder's basis in its Units that is allocable to such receivables or inventory will be ordinary gain or loss to such Unitholder.

**Nature of the Company's Investments**

Certain of the Company's investment practices are subject to special and complex US federal income tax provisions, including by reason of the fact that the Company will engage in transactions with an affiliated entity, that may, among other things, (i) disallow, suspend or otherwise limit the allowance of certain losses or deductions; (ii) convert an ordinary loss or deduction into a capital loss (the deductibility of which is more limited); (iii) cause the Company to recognize income or gain without the corresponding receipt of cash; and (iv) adversely affect the timing as to when a transaction is deemed to occur. Such transactions may result in gain, loss or other items of income or deduction to the Company at various times, with the result that the Company may recognize gain or other income prior to a time at which it is able to make distributions to the Unitholders to satisfy their resulting tax liability.

**Limitations on Deductibility of Company Items**

(a)     <u>At-Risk Rules</u>

The Code restricts individuals, certain non-corporate taxpayers and certain closely held corporations from taking into account for US federal income tax purposes any Company net loss in excess of the amounts for which such Unitholder is "at risk" with respect to its Units in the Company as of the end of the Company's taxable year in which such loss occurred. The amount for which a Unitholder is "at risk" with respect to its Units in the Company generally is equal to such Unitholder's adjusted tax basis for such interest, less (a) any amounts borrowed (i) in connection with its acquisition of Units for which such Unitholder is not personally liable and for which it has pledged no property other than its Units, (ii) from persons who have a proprietary interest in the Company and from certain persons related to such person and (iii) for which such Unitholder is protected against loss through nonrecourse financing, guarantees and similar arrangements and (b) such Unitholder's allocable share of indebtedness of the Company included in the Unitholder's adjusted tax basis for its Units in the Company.

(b)     <u>Limitation on the Deductibility of Passive Losses</u>

The Code places several restrictions on the ability of individuals, certain non-corporate taxpayers and certain closely held corporations to use trade or business losses sustained by businesses in which the taxpayer does not materially participate to offset income from other sources (which are known as the "passive activity loss rules").

The Company's investment activities are generally not expected to constitute a passive activity for purposes of the passive activity loss rules. Therefore, the passive activity loss rules generally should not apply to limit the ability of a Unitholder to deduct it allocable share of losses sustained by the Company. A Unitholder will not be able to use losses from its interests in passive activities to offset its share of income and capital gain from the Company that is not "passive activity income."

(c)     <u>Limitation on Deductibility of Investment Interest</u>

Individuals and other non-corporate taxpayers are allowed to deduct interest paid or accrued by the Company on its indebtedness (so-called "investment interest") only to the extent of such Unitholder's net investment income for the taxable year. A Unitholder's net investment income generally is the excess, if any, of the Unitholder's investment income from all sources (which is gross income from property held for investment) over investment expenses from all sources (which are deductions allowed that are directly connected with the production of investment income). Investment income excludes net capital gain attributable to the disposition of property held for investment (and thus would not include any Company gain on the sale of its investments), unless the Unitholder elects to pay tax on such gain at ordinary income rates.

To the extent that a Unitholder's allocable share of Company investment interest is not allowed as a deduction because the Unitholder has insufficient net investment income, such disallowed investment interest may be carried over by the Unitholder to subsequent taxable years and will be allowed if and to the extent of the Unitholder's net investment income in subsequent years. If a Unitholder borrows to finance the purchase of Units, any interest paid or accrued on the borrowing could be investment interest that is subject to these limitations. Since the amount of a Unitholder's allocable share of Company investment interest that is subject to this limitation will depend on the Member's aggregate investment interest and net investment income from all sources for any taxable year, the extent,

if any, to which Company investment interest will be disallowed under this rule will depend upon each Unitholder's particular circumstances each year.

(d)    Limited Deduction for Certain Expenses

A Unitholder who is an individual, estate or trust may deduct so-called "miscellaneous itemized deductions," which may include such Unitholder's allocable share of certain expenses of the Company, only to the extent that such deductions exceed 2 percent of the adjusted gross income of the Unitholder. The amount of such Unitholder's allocable share of such expenses subject to this 2 percent floor will depend upon the Unitholder's aggregate miscellaneous itemized deductions from all sources and adjusted gross income for any taxable year. Unitholders who are corporations (other than S corporations) are not affected by the 2 percent floor. Thus, the extent, if any, to which such expenses will be subject to disallowance will depend upon each Unitholder's particular circumstances each year.

Organizational expenses of the Company are not currently deductible, but may, at the election of the Company, be organized ratably over a period of not less than 60 months. Syndication expenses of the Company (i.e., expenditures made in connection with the marketing and issuance of Units, including placement fees) are neither deductible nor amortizable.

**State and Local Taxes**

A Unitholder may be subject to tax return filing obligations and income, franchise and other taxes in state or local jurisdictions in which the Company operates or is deemed to operate, as well as in such Unitholder's own state or locality of residence or domicile. In addition, the Company itself may be subject to tax liability in certain jurisdictions in which it operates or is deemed to operate and a Unitholder may be subject to tax treatment in such Unitholder's own state or locality of residence or domicile different than that described above with respect to its Units in the Company.

**Reportable Transactions**

Treasury Regulations require that each taxpayer participating in a "reportable transaction" must disclose such participation to the IRS. The scope and application of these rules is not completely clear. An investment in the Company may be considered participation in a "reportable transaction" if, for example, the Company recognizes certain significant losses in the future of if it is determined that certain book-tax differences exist. If an investment in the Company constitutes participation in a "reportable transaction," the Company and each Unitholder may be required to file IRS Form 8886 with the IRS, including attaching it to their US federal income tax returns, thereby disclosing certain information relating to the Company to the IRS. In addition, the Company and its advisors may be required to maintain a list of Unitholders and to furnish this list and certain other information to the IRS upon its written request. Prospective investors are urged to consult with their own tax advisors regarding the applicability of these rules to an investment in the Company.

**Tax Elections**

The Code provides for several optional tax accounting and reporting elections. For example, the Code permits adjustments to the basis of Company property upon distributions of Company property to a Unitholder and transfers of Units, including transfers by reason of death, provided a Company election has been made pursuant to Section 754 of the Code. The Manager will have sole discretion with respect to all such elections. The Manager has not yet decided which optional elections, if any, it will make. It is possible that the Manager's elections could result in a materially adverse outcome for the Company and the Unitholders, and certain elections may be irrevocable.

**Tax Audits**

The IRS may audit Company information tax returns at the Company level in a unified entity proceeding. The Manager would represent the Company at any such audit as the so-called tax matters partner and has considerable authority to make decisions affecting the tax treatment and procedural rights of the Unitholders. The Manager may also generally enter into settlement agreements with the IRS that bind the Unitholders and consent on behalf of the

Company to extend the statute of limitations for assessing a deficiency with respect to a Company item. Successful adjustments by the IRS of Company items of income, gain, loss, deduction or expense could change a Unitholder's federal income tax liabilities.

**Certain Considerations for Tax-Exempt Investors**

An investment in the Company will generate unrelated business taxable income for US federal income tax purposes (and may have other adverse tax consequences) for pension funds, Keogh plans, individual retirement accounts, tax-exempt institutions and other tax-exempt investors. Accordingly, such prospective Investors are urged to consult with their own tax advisors concerning the possible federal, state, local and non-US tax consequences from an investment in the Company.

[*Remainder of page left intentionally blank*]

## ERISA CONSIDERATIONS

The following section discusses certain consequences under ERISA and the Code, which the fiduciary of an "employee benefit plan" as defined in, and subject to, ERISA, or of a "plan" as defined in Section 4975 of the Code, who has investment discretion should consider before deciding to invest the plan's assets in the Company (such "employee benefit plans" and "plans" being referred to herein as "Plans," and such fiduciaries with investment discretion being referred to herein as "Plan Fiduciaries").

The following summary is not intended to be complete, but only addresses certain material questions under ERISA and the Code which should be considered by the Plan Fiduciary's own counsel.

Plan Fiduciaries must give appropriate consideration to, among other things, the role that an investment in the Company plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan and the distribution requirements of, and the tax withholding requirements applicable to, the Plan, valuation reporting requirements that may be applicable to the Plan, the projected return of the total portfolio relative to the Plan's objectives and the limited right of investors to withdraw all or any part of their capital accounts or to transfer their interests in the Company.

The fiduciaries of each Plan proposing to invest in the Company will be required to represent that they have been informed of the foregoing characteristics and factors relating to investment by such Plan in the Company, and that the decision to invest in the Company is consistent with the provisions of ERISA and the Code that require diversification and prudent investment of Plan assets and impose fiduciary responsibilities.

The Department of Labor has issued regulations under ERISA (the "Plan Asset Regulations") which provide generally that when a Plan invests in an entity such as the Company, the Plan's assets include both the limited liability company interest and an undivided interest in each of the underlying assets of the Company. If the underlying assets of the Company were to be considered "plan assets" of the ERISA plan investor, the Manager would be an ERISA fiduciary of the Plan, and the Company would be subject to substantial ERISA requirements with which the Company generally cannot comply.

The Plan Asset Regulations contain certain general exceptions to this rule, including exceptions applying in circumstances in which there is no "significant investment" by "benefit plan investors" and other exemptions for Plan investments in entities which are "operating companies." "Benefit plan investors" include (i) employee benefit plans subject to ERISA, (ii) any "plan" to which Section 4975 of the Code applies, and (iii) other entities whose assets are deemed to be plan assets by reason of a Plan's investment in the entity.

An entity is considered to have no significant investment by benefit plan investors if, immediately after the most recent acquisition of an equity interest, the equity participation by benefit plan investors is less than 25 percent of the value of any class of equity interests in the entity. In applying this last exception to the Company, the value of any equity interest held by a person who has discretionary authority or control with respect to the assets of the Company (including the Manager and certain members, managers, officers, and employees of the Manager) or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or an affiliate of any such person, is to be disregarded in determining whether the equity participation by benefit plan investors is less than 25 percent of any class of equity interest. In the event that benefit plan investors represent less than 25 percent of the interests of the Unitholders in the Company (as determined under the Plan Asset Regulations), the investments of the Company will not be subject to the ERISA fiduciary requirements and the underlying assets of the Company will not be deemed "plan assets" of any ERISA plan investor. The Company intends to limit subscriptions from benefit plan investors so that benefit plan investors will not own more than 25 percent of the value of the Company.

Units may not be purchased with the assets of a Plan if the Manager, any selling agent, finder, any of their respective affiliates, or any of their respective employees: (i) has investment discretion with respect to the investment of such plan assets; (ii) has authority or responsibility to give or regularly gives investment advice with respect to such

plan assets for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such plan assets, and that such advice will be based on the particular investment needs of the Plan; or (iii) is an employer maintaining or contributing to such Plan. A party that is described in clause (i) or (ii) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

Accordingly, fiduciaries of a Plan will be required to represent that the decision to participate in the Company was made by them as fiduciaries who are independent of the Manager (or any affiliated entity), and who are duly authorized to make such investment decision and who have not relied on any individualized advice or recommendation of the Manager (or any affiliated entity) as a primary basis for the decision to invest in the Company.

Each Plan Fiduciary considering whether to purchase Units on behalf of a Plan should consult with its counsel regarding the application of the prohibited transaction and fiduciary responsibility provisions of ERISA and the Code to such investment. In addition, such fiduciary must independently determine that the investment is prudent under ERISA and is consistent with the diversification requirements of ERISA. Except as otherwise set forth, the foregoing statements regarding the consequences under ERISA and the Code of an investment in the Company are based on the provisions of ERISA and the Code as currently in effect and the existing administrative and judicial interpretations thereunder. No assurance can be given that administrative, judicial, or legislative changes that would make the foregoing statements incorrect or incomplete will not occur. Acceptance of subscriptions on behalf of Plans is in no respect a representation by the Company, the Manager, or any other party that this investment meets all relevant legal requirements with respect to investments by any particular Plan.

The person with investment discretion should consult with its attorney and financial advisors as to the propriety of such an investment in light of the circumstances of the particular Plan and current tax law. The Plan Fiduciary, by investing in the Company, signifies its informed consent to the risks involved in doing so and to the business terms of the Company.

[*Remainder of page left intentionally blank*]

## ADDITIONAL INFORMATION

Prior to the consummation of the Offering, the Company will provide to each prospective Investor and such Investors' representatives and advisers, if any, the opportunity to ask questions and receive answers concerning the terms and conditions of this Offering and to obtain any additional information which the Company may possess or can obtain without unreasonable effort or expense that is necessary to verify the accuracy of the information furnished to such prospective Investor.

No other persons have been authorized to give information or to make any representations concerning this offering, and if given or made, such other information or representations must not be relied upon as having been authorized by the Company.

# SAMPLE COMMERCIAL REAL ESTATE TRANSACTIONS

This section contains sample commercial real estate investment transactions exemplifying the experience of the Company's key management personnel.

THE FOLLOWING LOANS AND PROPERTIES IDENTIFIED IN THIS SECTION WERE ORIGINATED, SERVICED, AND/OR ACQUIRED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 1, LLC, WOODBRIDGE MORTGAGE INVESTMENT FUND 2, LLC, OR WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC, AND ARE DEPICTED AND DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES AND COMMERCIAL BORROWERS WHICH THE COMPANY AND ITS AFFILIATES ATTRACT.

*UNDER NO CIRCUMSTANCE ARE ANY OF THE FOLLOWING LOANS OR PROPERTIES IN THIS SECTION TO BE CONSIDERED OR CONSTRUED TO BE OWNED, CONTROLLED, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY THE COMPANY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC*




**96TH STREET**
**NEW YORK, NEW YORK**

**The Loan.** The "96th Street Loan" is secured by a first mortgage encumbering cooperative residential property located in New York City. The 96th Street Loan was originated August 27, 2014, and has a principal balance of $1.95 million. It matured on August 26, 2015.

**The Property.** The mortgaged property is an approximately 108,666 square foot building constructed in 1929 in New York City. It is comprised of 15 stories of cooperative residential space with 61 individual units.

THIS LOAN WAS ORIGINATED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC, AND IS DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES WHICH THE COMPANY ATTRACTS. UNDER NO CIRCUMSTANCE IS THIS LOAN OR THIS PROPERTY TO BE CONSIDERED OR CONSTRUED TO BE CURRENTLY OWNED BY, CONTROLLED BY, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC.

 

**The Loan.** The "Cowen Bundle Loan" is secured by a first mortgage on retail and office properties located in Carbondale, Colorado. The Cowen Bundle Loan was originated on July 25, 2014, with a principal balance of $1.4 million. It fully performed during its original term and an additional 12 month renewal matures on July 25, 2016.

**The Property.** The mortgaged property consists of a total of two lots consisting of 0.678 and 0.91 acres, respectively. Both lots consist of multi-tenant retail, office, and storage space developments. These lots are collectively known as "Gateway Plaza". The buildings are located in Carbondale, Colorado.

THIS LOAN WAS ORIGINATED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC, AND IS DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES WHICH THE COMPANY ATTRACTS. UNDER NO CIRCUMSTANCE IS THIS LOAN OR THIS PROPERTY TO BE CONSIDERED OR CONSTRUED TO BE CURRENTLY OWNED BY, CONTROLLED BY, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC.




**MAIN STREET CARBONDALE, COLORADO**

**The Loan.** The "Main Street Loan" is secured by a first mortgage encumbering commercial and office units in the Spruce Professional Building, located in Carbondale, Colorado. The Main Street Loan was originated on September 25, 2014, with an original principal balance of $525,000. It fully performed during its original term and an additional 12 month renewal matures on September 25, 2016.

**The Property.** The mortgaged property consists of a total of three units as follows: one unit on each of the building's three floors, with each such unit occupying 5,565, 6,161, and 5,522 square feet respectively. A central interior stairway as well as an elevator provide access to all levels. The building is located in Carbondale, Colorado.

THIS LOAN WAS ORIGINATED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC, AND IS DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES WHICH THE COMPANY ATTRACTS. UNDER NO CIRCUMSTANCE IS THIS LOAN OR THIS PROPERTY TO BE CONSIDERED OR CONSTRUED TO BE CURRENTLY OWNED BY, CONTROLLED BY, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC.





**BUGGY CIRCLE**
**CARBONDALE, COLORADO**

**The Loan.** The "Buggy Circle Loan" is secured by a first mortgage lien on a commercial warehouse and office building in Carbondale, Colorado. The Buggy Circle Loan was originated on May 18, 2014, and has a principal balance of $675,000. It has a remaining term of 7 months, maturing on May 17, 2016.

**The Property.** The mortgaged property is an approximately 15,200 square foot building constructed in 1995 in Carbondale, Colorado. It has two levels, the lower features 2 warehouse units and the upper contains 7 office and residential units.

THIS LOAN WAS ORIGINATED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC, AND IS DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES WHICH THE COMPANY ATTRACTS. UNDER NO CIRCUMSTANCE IS THIS LOAN OR THIS PROPERTY TO BE CONSIDERED OR CONSTRUED TO BE CURRENTLY OWNED BY, CONTROLLED BY, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC.




**The Loan.** The "831 Grand Avenue Loan" is secured by a first mortgage encumbering commercial property in Glenwood Springs, Colorado. The 831 Grand Avenue Loan was originated on September 4, 2014, and has a principal balance of $840,000. It fully performed during its original term and an additional 12 month renewal matures on September 4, 2016.

**The Property.** The mortgaged property is a fully renovated 30,000 square foot building that was constructed in 1913. The property is located in Glenwood Springs, Colorado and is currently occupied by Colorado Mountain College.

THIS LOAN WAS ORIGINATED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 2, LLC, AND IS DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES WHICH THE COMPANY ATTRACTS. UNDER NO CIRCUMSTANCE IS THIS LOAN OR THIS PROPERTY TO BE CONSIDERED OR CONSTRUED TO BE CURRENTLY OWNED BY, CONTROLLED BY, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC.




**809 GRAND AVENUE**
**GLENWOOD SPRINGS, CO.**

**The Loan.** The "809 Grand Avenue Loan" is secured by a first mortgage lien on retail property in Glenwood Springs, Colorado. The 809 Grand Avenue Loan was originated on July 25, 2014, and has a principal balance of $560,000. It fully performed during its original term and an additional 12 month renewal matures on July 25, 2016.

**The Property.** The mortgaged property is an approximately 8,500 square foot building constructed in 1979 in Glenwood Springs, Colorado. It is comprised of four retail units, including a lower level with appealing patio areas which are sheltered from traffic.

THIS LOAN WAS ORIGINATED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC, AND IS DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES WHICH THE COMPANY ATTRACTS. UNDER NO CIRCUMSTANCE IS THIS LOAN OR THIS PROPERTY TO BE CONSIDERED OR CONSTRUED TO BE CURRENTLY OWNED BY, CONTROLLED BY, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC.




**WILLITS BUNDLE**
**BASALT, COLORADO**

**The Loan.** The "Willits Bundle Loan" is secured by a first mortgage encumbering multiple properties in Basalt, Colorado. The Willits Loan was originated on December 10, 2014, with an original principal balance of $4.025 million. It has a remaining term of 13 months and matures on December 9, 2016.

**The Property.** The mortgaged properties securing the Willits Bundle Loan consist of the following: (i) the entire third floor (17,426 square feet) of the Market Street Crossings building constructed in 2014; and (ii) two street-level units of the Triangle Park Lofts building constructed in 2006. Both of the mortgaged properties are situated in Willits Town Center, Basalt, Colorado.

THIS LOAN WAS ORIGINATED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC, AND IS DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES WHICH THE COMPANY ATTRACTS. UNDER NO CIRCUMSTANCE IS THIS LOAN OR THIS PROPERTY TO BE CONSIDERED OR CONSTRUED TO BE CURRENTLY OWNED BY, CONTROLLED BY, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC.

 

**THROOP AVENUE**
**BROOKLYN, NEW YORK**

**The Loan.** The "Throop Avenue Loan" was secured by a first mortgage encumbering commercial property located in Brooklyn, New York. The Throop Avenue Loan had a principal balance of $6 million and was recently paid off in full.

**The Property.** The mortgaged property is an approximately 33,288 square foot office building located in Brooklyn, New York. It consists of one five-story and one partial two-story building, both with a basement and an elevator. The property also includes a built-in garage with access to bus and rail public transportation.

THIS LOAN WAS ORIGINATED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC, AND IS DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES WHICH THE COMPANY ATTRACTS. UNDER NO CIRCUMSTANCE IS THIS LOAN OR THIS PROPERTY TO BE CONSIDERED OR CONSTRUED TO BE CURRENTLY OWNED BY, CONTROLLED BY, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC.





**U STREET NW**
**WASHINGTON, D.C.**

**The Loan.** The "U Street Loan" was secured by a first mortgage encumbering commercial property in Washington, DC. The U Street Loan was a 1-year loan that was originated on July 23, 2013, with a principal balance of $2.6 million. It has since been repaid fully.

**The Property.** The mortgaged property is an approximately 6,300 square foot building constructed in 1905 in Washington, DC. The commercial use building includes a roof top bar. The property is located in the heart of a busy retail/restaurant corridor.

THIS LOAN WAS ORIGINATED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 2, LLC, AND IS DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES WHICH THE COMPANY ATTRACTS. UNDER NO CIRCUMSTANCE IS THIS LOAN OR THIS PROPERTY TO BE CONSIDERED OR CONSTRUED TO BE CURRENTLY OWNED BY, CONTROLLED BY, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC.





NORTHBOROUGH DRIVE
HOUSTON, TEXAS

**The Loan.** The "Northborough Loan" was secured by a first mortgage encumbering multi-use commercial and office property in Houston, Texas. It was a 1-year loan that originated on November 13, 2013, and had a principal balance of $1.5 million. The Northborough Loan has been paid back in full.

**The Property.** The mortgaged property is a 119,346 square foot building located in Houston, Texas, comprised of multi-tenant office space and a multi-level parking garage with 142,614 square feet of parking space, all situated on 3.66 acres. The property also includes an adjacent tract of 4.56 acres of undeveloped space.

THIS LOAN WAS ORIGINATED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 2, LLC, AND IS DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES WHICH THE COMPANY ATTRACTS. UNDER NO CIRCUMSTANCE IS THIS LOAN OR THIS PROPERTY TO BE CONSIDERED OR CONSTRUED TO BE CURRENTLY OWNED BY, CONTROLLED BY, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC.





**BOREAL WATER**
**KIAMESHA LAKE, NEW YORK**

**The Loan.** The "Kiamesha Loan" was originated August 27, 2013, and a principal balance of $900,000. The Kiamesha Loan is secured by a first mortgage on commercial and industrial property in North Kiamesha, New York. The Kiamesha Loan fully performed throughout its original term, and an additional 8 month renewal of the loan matured on August 26, 2015.

**The Property.** The mortgaged property is comprised of several buildings situated on an approximate total of 4.68 acres located in Kiamesha, New York. The mortgaged property consists of an industrial building containing 68,000 square feet, a single family residence with 1,875 square feet, and a 2,030 square foot garage. The industrial building is used as a bottling facility. It has nine loading docks and three levels of warehouse and manufacturing space.

THIS LOAN WAS ORIGINATED BY WOODBRIDGE MORTGAGE INVESTMENT FUND 1, LLC, AND IS DESCRIBED HEREIN TO DEMONSTRATE SOLELY THE COMPANY'S COMMERCIAL LENDING AND MARKET EXPERIENCE, INCLUDING THE NATURE, QUALITY, AND RANGE OF PROPERTIES WHICH THE COMPANY ATTRACTS. UNDER NO CIRCUMSTANCE IS THIS LOAN OR THIS PROPERTY TO BE CONSIDERED OR CONSTRUED TO BE CURRENTLY OWNED BY, CONTROLLED BY, AN ASSET OF, INCLUDED IN, OFFERED BY, OR ANTICIPATED TO BE OFFERED BY, WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC.

# CONFIDENTIAL OFFERING MEMORANDUM

## *of*

# WOOBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC

## $100 Million Offering for 1,000 Preferred Incentive Units

---

## <u>Exhibit I</u>

## Subscription Agreement

# SUBSCRIPTION AGREEMENT

## *for*

## Preferred Incentive Units

## *of*

## WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC

## Dated: October 30, 2015



**SUBSCRIPTION AGREEMENT**

Ladies and Gentlemen:

The undersigned (the "Subscriber") understands that Woodbridge Mortgage Investment Fund 3A, LLC, a Delaware limited liability company (the "Company"), may issue or sell interests in the Company (the "Units"), all on the terms and conditions set forth below and Subscriber desires to purchase the number of Units specified below.

Accordingly, Subscriber and the Company hereby agree as follows:

1        Subscription. Subscriber hereby subscribes for and agrees to purchase the number of Units from the Company indicated next to Subscriber's signature below. The purchase price (the "Purchase Price") for the Units to be purchased hereunder by Subscriber is indicated next to Subscriber's signature below ($100,000 per Unit). **Subscriber understands that the Company will review this Subscription Agreement, and the Company reserves the unrestricted right to reject or limit any subscription and to close the Offering at any time.**

2        Purchase Procedure.

2.1        Subscriber acknowledges that, in order to subscribe for the Units, he/she/it must, and does hereby, deliver to the Company:

2.1.1    A completed and executed counterpart of this Agreement, the Accredited Investor Representation Letter attached hereto as Exhibit A, along with all required supporting documentation specified therein, and the Joinder Agreement attached as part of the Operating Agreement attached as Exhibit B hereto; and

2.1.2    A certified check, subject to collection, in an amount equal to the Purchase Price, made payable to the order of the Company, or a wire transfer in such amount to such bank account as shall be designated by the Company.

2.2        Subject to the Company's unconditional right to accept or reject the subscription contained herein, upon receipt of the foregoing, if the Company accepts the subscription, the Company shall deliver to the Subscriber: (i) an executed counterpart of this Agreement, and (ii) notification that the Subscriber is the registered holder of the relevant Units. If the Company rejects the subscription, payment will be returned to Subscriber in full without deduction or interest.

3        Representations of Subscriber. By executing this Agreement, Subscriber represents, warrants, acknowledges and agrees as follows:

3.1        Subscriber is an "accredited investor" (as that term is defined under Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended), and has such knowledge and experience in financial and business matters generally that Subscriber is capable of evaluating the merits and risks of an investment in the Company.

3.2        Subscriber understands that (i) the Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or any applicable state securities laws, or the laws of any foreign jurisdiction; (ii) Subscriber cannot sell or transfer the Units unless they are registered under the Securities Act and any applicable state securities laws or unless exemptions from such registration requirements are available; (iii) a legend will be placed on any certificate evidencing the Units, stating that they have not been registered under the Securities Act and setting forth or referring to the restrictions on transferability and sales thereof; (iv) the Company may place stop transfer instructions against the Units to restrict the transfer thereof; and (v) the Company has no obligations to register the Units or assist Subscriber in

obtaining an exemption from the various registration requirements. Subscriber agrees not to resell the Units without compliance with the terms of this Agreement, that certain Operating Agreement of Woodbridge Mortgage Investment Fund 3A, LLC dated as of July 27, 2015, and any applicable state or foreign securities laws.

3.3     Subscriber is aware that there is no active trading market for the Units and that there can be no assurance that a market for the Units will develop or be maintained. Therefore, Subscriber may have to hold the Units indefinitely. Subscriber has no need for liquidity in the investment contemplated hereby and has adequate means of providing for Subscriber's current needs and personal and family contingencies (as applicable).

3.4     Subscriber (i) is acquiring the Units for his/her/its own account for investment purposes only and not with a view toward resale or distribution, either in whole or in part; and (ii) has no contract, undertaking, agreement or other arrangement, in existence or contemplated, to sell, pledge, assign or otherwise transfer the Units to any other person.

3.5     Subscriber's investment in the Company is reasonable in relation to Subscriber's net worth and financial needs and Subscriber is able to bear the economic risk of losing such Subscriber's entire investment in the Units. Subscriber is familiar with the nature and extent of the risks inherent in investments in unregistered securities and has determined, either personally or in consultation with Subscriber's attorney, that an investment in the Company is consistent with Subscriber's investment objectives and income prospects. Subscriber understands that the Company may need to obtain additional capital through debt and/or equity financing to implement its business plan and that there can be no assurance that such financing will be obtained, or will be obtained on terms that are acceptable to the Company.

3.6     Subscriber acknowledges that Subscriber and his/her/its advisors (if any) have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Units and from the Company concerning the business, properties, prospects and financial condition of the Company.

3.7     Subscriber understands that an investment in the Units involves substantial risks and Subscriber recognizes and understands the risks relating to the purchase of the Units, including that Subscriber could lose the entire amount of his/her/its investment in the Units. Subscriber expressly acknowledges and understands that, there can be no assurance that the Company will be able to operate profitably in the future.

3.8     Subscriber understands that (i) the offering contemplated hereby has not been reviewed by any federal, state or other governmental body or agency; (ii) if required by the laws or regulations of said state(s) the offering contemplated hereby will be submitted to the appropriate authorities of such state(s) for registration or exemption therefrom; and (iii) documents used in connection with this offering have not been reviewed or approved by any regulatory agency or government department, nor has any such agency or government department made any finding or determination as to the fairness of the Units for investment.

3.9     All information which Subscriber has provided the Company concerning his/her/its financial position and knowledge of financial and business matters, is correct and complete as of the date hereof, and if there should be any change in such information, Subscriber will immediately provide the Company with such new information. Subscriber and the Company agree that financial and other information concerning Subscriber may be disclosed by the Company to any persons or entities that may enter into a transaction with the Company with the prior written consent of Subscriber, which consent shall not be unreasonably withheld, provided however, that the Company may disclose such financial and other information concerning the Subscriber without the prior written consent of the Subscriber to any person or

entity who has expressed a bona fide interest in investing in the Company (a "Potential Investor"), provided further, that such Potential Investor agrees in writing to keep such information confidential.

3.10    Subscriber acknowledges that the Company has the unconditional right to accept or reject the subscription contained herein, in whole or in part. The Company will notify Subscriber whether the subscription contained herein is accepted or rejected. If such subscription is rejected, payment will be returned to Subscriber in full without deduction or interest.

3.11    Subscriber acknowledges and understands that, the Purchase Price was determined arbitrarily by the Company, does not bear any relationship to the assets, book value, results of operations, net worth, or other objective criteria of value applicable to the Company and should not be considered an indication of the actual value of the Company. Subscriber acknowledges and understands that, the Company has not retained any independent professionals to review or comment on this offering on behalf of, or to otherwise protect the interests of, Subscriber hereunder. Although the Company has retained its own counsel, neither such counsel nor any other counsel has made, on behalf of Subscriber, any independent examination of any factual matters represented by management herein or in the documents provided herewith, and Subscriber should not rely on the counsel retained by the Company with respect to any matters herein described.

3.12    Subscriber acknowledges and understands that, the Company has not paid any cash dividends on its membership interests or Units since its inception and, by reason of its present financial status and its contemplated financial requirements, does not contemplate or anticipate paying any dividends upon its membership interest or Units in the foreseeable future.

3.13    Subscriber expressly acknowledges and understands that, in connection with the offer and sale of the Units to Subscriber, the Company is relying upon Subscriber's representations and warranties as contained in this Agreement.

3.14    Subscriber has not employed any broker, finder or similar agent and no person or entity with which he has had any dealings or communications of any kind is entitled to any brokerage, finder's or placement fee or any similar compensation in connection with the purchase and sale of the Units.

4    Representations of Company. The Company hereby represents and warrants to Subscriber as follows:

4.1    The Company is a corporation duly organized, existing and in good standing under the laws of the State of Delaware and has the corporate power to conduct the business which it conducts and proposes to conduct.

4.2    The execution, delivery and performance of this Agreement by the Company has been duly approved by the Managing Member of the Company and all other actions required to authorize and effect the offer and sale of the Units has been duly taken and approved.

4.3    The Units have been duly and validly authorized and when issued to Subscriber in accordance with the terms hereof, the Units will be duly and validly issued, fully paid and non-assessable.

4.4    The Company has all licenses from each applicable federal, state and local governmental authority necessary to conduct its businesses as presently conducted.

4.5    Except for any securities related filings required by any federal, state or local governmental authority, no consent, approval, order or authorization of, or filing with, any federal, state or local

governmental authority on the part of the Company which has not been obtained or expressly waived, is required in connection with the execution, delivery and performance of this Agreement.

4.6     The execution and delivery of, and the performance by the Company of its obligations in this Agreement do not (i) breach, or result in a default or acceleration under, any material provision of any instrument, mortgage, deed of trust, contract or other agreement to which the Company is a party, or (ii) breach or otherwise violate any existing obligation of the Company under a court order, judgment or decree by which the Company is bound.

5     Indemnification. Subscriber hereby agrees to indemnify and hold harmless the Company and the Company's officers, members, employees, agents, counsel and affiliates from and against any and all damages, losses, costs, liabilities and expenses (including, without limitation, reasonable attorneys' fees) which they, or any of them, may incur by reason of such Subscriber's failure to fulfill any of the terms and conditions of this Agreement or by reason of Subscriber's breach of any of his representations and warranties contained herein. This Agreement and the representations and warranties contained herein shall be binding upon Subscriber's heirs, executors, administrators, representatives, successors and assigns.

6     Applicable Law. This Agreement shall be construed in accordance with and governed in accordance with the laws applicable to contracts made and wholly performed in the State of Delaware (without regard to its principles of conflict of laws). In any such action or proceeding, each of the Company and the Subscriber hereby absolutely and irrevocably (i) waives personal service of any summons, complaint, declaration or other process and (ii) agrees that service thereof may be made by certified or registered first-class mail directed to such other party, as the case may be, at their respective addresses set forth herein.

7     Counterparts. This Agreement may be executed in one or more counterparts, all of which together shall constitute one agreement binding on all parties hereto notwithstanding that all the parties may not have signed the same counterpart.

8     Persons Bound. This Agreement shall, except as otherwise provided herein, inure to the benefit of and be binding on the Company and its successors and permitted assigns and on Subscriber and Subscriber's respective heirs, executors, administrators, successors and permitted assigns.

9     Entire Agreement. This Agreement, when accepted by the Company, will constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained. This Agreement may not be modified, changed, waived or terminated other than by a writing executed by all the parties hereto. No course of conduct or dealing shall be construed to modify, amend or otherwise affect any of the provisions hereof.

10     Assignability. Each of the parties hereto agrees that he, she or it may not assign any of his, her or its respective rights or obligations hereunder without the prior written consent of the other party hereto.

11     Notices. Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, telegraphed, telexed, sent by facsimile transmission, sent by certified, registered or express mail, postage prepaid, or by overnight courier to the address of each party set forth herein. Any such notice shall be deemed given when delivered personally, telegraphed, telexed or sent by facsimile transmission or, if mailed, three days after the date of deposit in the United States mail.

12     Interpretation.

12.1     When the context in which words are used in this Agreement indicates that such is the intent, singular words shall include the plural, and vice versa, and masculine words shall include the feminine and neuter genders, and vice versa.

12.2     Captions are inserted for convenience only, are not a part of this Agreement, and shall not be used in the interpretation of this Agreement.

**SUBSCRIBER:**                                          Dated:_____

_____            _____
Signature                                       Number of Units for which
Name:_____           Subscriber subscribed
Title:_____

Address:                                        _____
_____            Aggregate Purchase Price
_____
_____

_____
Tax Identification or Social Security Number

The foregoing subscription is accepted and the Company hereby agrees to be bound by its terms.


                                                **WOODBRIDGE MORTGAGE
                                                INVESTMENT FUND 3A, LLC**

                                                By: **WMF Management, LLC, its Manager**


Dated: _____, 2015                    By: _____
                                                     Robert Shapiro, Duly Authorized

## **Exhibit A**

## **Accredited Investor Representation Letter**

**WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**

**To:** Prospective purchasers of Units (the "<u>Securities</u>") offered by Woodbridge Mortgage Investment Fund 3A, LLC (the "<u>Company</u>")

**Re:** *Requirement to Submit an Accredited Investor Representation Letter*

The Securities are being sold only to "accredited investors" ("<u>Accredited Investors</u>") as defined in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"). The purpose of the attached Accredited Investor Representation Letter (the "<u>Letter</u>") is to collect information from you to determine whether you are an Accredited Investor and otherwise meet the suitability criteria established by the Company for investing in the Securities.

All of your statements in the Letter (collectively, the "<u>Investor Information</u>") will be treated confidentially. However, you understand and agree that, upon giving prior notice to you, the Company may present the Investor Information to such parties as it deems appropriate to establish that the issuance and sale of the Securities (a) is exempt from the registration requirements of the Securities Act or (b) meets the requirements of applicable state securities laws; provided, however, that the Company need not give prior notice before presenting the Investor Information to its legal, accounting, and financial advisors.

You understand that the Company will rely on your representations and other statements included in the Investor Information in determining your status as an Accredited Investor, your suitability for investing in the Securities and whether to accept your subscription for the Securities.

The Company may refuse to accept your request for investment in the Securities for any reason or for no reason.

**[*Remainder of this page left intentionally blank*]**

## ACCREDITED INVESTOR REPRESENTATION LETTER

WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC
14225 Ventura Boulevard
Suite 100
Sherman Oaks, California 91423

Dear Issuer:

I am submitting this Accredited Investor Representation Letter (this "Letter") in connection with the offering of Units (the "Securities") of Woodbridge Mortgage Investment Fund 3A, LLC, a Delaware limited liability company (the "Company"). I understand that the Securities are being sold only to accredited investors ("Accredited Investors") as defined in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (the "Securities Act").

I hereby represent and warrant to the Company that I qualify as an Accredited Investor on the basis that:

(You must choose Part A or B below and check the applicable boxes.)

A.      I am a **NATURAL PERSON** and:

(*An investor using this Part A must check box (1), (2), or (3).*)

[ ]      **(1)**      **Income Test:** My individual income exceeded $200,000 in each of the two most recent years or my joint income together with my spouse exceeded $300,000 in each of those years;

**and**

I reasonably expect to earn individual income of at least $200,000 this year or joint income with my spouse of at least $300,000 this year.

[ ]      **(2)**      **Net Worth Test:** My individual net worth, or my joint net worth together with my spouse, exceeds $1,000,000.

For these purposes, "**net worth**" means the excess of:

my total assets at fair market value (including all personal and real property, but excluding the estimated fair market value of my primary residence)

**minus**

my total liabilities. For these purposes, "**liabilities**": exclude any mortgage or other debt secured by my primary residence in an amount of up to the estimated fair market value of that residence; but

include any mortgage or other debt secured by my primary residence in an amount in excess of the estimated fair market value of that residence.

I confirm that my total individual liabilities, or my total joint liabilities together with my spouse, do not exceed $_____. I represent that all liabilities necessary to determine my individual net worth, or my joint net worth together with my spouse, for the purpose of determining my status as an Accredited Investor are reflected in the dollar amount in the preceding sentence.

In addition, I confirm that I have not incurred any incremental mortgage or other debt secured by my primary residence in the ninety (90) days preceding the date of this Letter, and I will not incur any incremental mortgage or other debt secured by my primary residence prior to the date of the closing for the sale of the Securities. I agree to promptly notify the Company if, between the date of this Letter and the date of the closing for the sale of the Securities, I incur any incremental mortgage or other debt secured by my primary residence. (NOTE: If the representation in the first sentence of this paragraph is untrue or becomes untrue prior to the date of the closing for the sale of the Securities,

you may still be able to invest in the Securities. However, you must first contact the Company for additional instructions on how to calculate your net worth for purposes of this offering.)

[ ]     **(3)**     **Company Insider:** I am a manager or executive officer of the Company.

B.     I am a **LEGAL ENTITY** that is:

(*An investor using this Part B **must** check at least one box below.*)

[ ]     **(1)**     A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

[ ]     **(2)**     A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

[ ]     **(3)**     An insurance company as defined in the Securities Act.

[ ]     **(4)**     An investment company registered under the Investment Company Act of 1940 (the "Investment Company Act").

[ ]     **(5)**     A business development company as defined in Section 2(a)(48) of the Investment Company Act.

[ ]     **(6)**     A private business development company as defined in the Investment Advisors Act of 1940.

[ ]     **(7)**     A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or 301(d) of the Small Business Investment Act of 1958.

[ ]     **(8)**     An organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Securities, with total assets in excess of $5,000,000.

[ ]     **(9)**     A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

[ ]     **(10)**     An employee benefit plan within the meaning of Title I of the Employment Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in such Act, which is either a bank, savings and loan association, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000, or if a self-directed plan, the investment decisions are made solely by persons that are accredited investors.

[ ]     **(11)**     A trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Securities, whose purchase is directed by a "sophisticated" person.

[ ]     **(12)**     An entity in which all of the equity owners are Accredited Investors.

(***NOTE:*** *If box (12) is checked, each equity owner of the entity must individually complete and submit to the Company its own copy of this Letter*.)

## RELIANCE ON REPRESENTATIONS; INDEMNITY

I understand that the Company and its counsel are relying upon my representations in the Letter and upon the supporting documentation to be delivered by me or on my behalf in connection with the Letter (collectively, the "Investor Information"). I agree to indemnify and hold harmless the Company, its directors, officers, members, managers, representatives and agents, and any person who controls any of the foregoing, against any and all loss, liability, claim, damage and expense (including reasonable attorneys' fees) arising out of or based upon any misstatement or omission in the Investor Information or any failure by me to comply with any covenant or agreement made by me in the Investor Information.

**SHARING OF INVESTOR INFORMATION**

I understand and agree that, upon giving prior notice to me, the Company may present the Investor Information to such parties as it deems appropriate to establish that the issuance and sale of the Securities (a) is exempt from the registration requirements of the Securities Act or (b) meets the requirements of applicable state securities laws; provided, however, that the Company need not give prior notice before presenting the Investor Information to its legal, accounting and financial advisors.

**INVESTOR'S SIGNATURE AND CONTACT INFORMATION**

Name of Investor: _____

Signature: _____

Name of Signatory: _____

Title (if Investor
is an entity): _____

Date: _____

Email address: _____

Mailing address: _____

_____

_____

Telephone number: _____

**SPOUSE'S SIGNATURE AND CONTACT INFORMATION**

(*NOTE: The investor's spouse need only sign this letter if the investor is a natural person proving its accredited investor status based on **joint income** or **joint net worth** with the spouse under Part A(1)(a) or Part A(2)(a). A spouse who signs this letter makes all representations set out in this letter, including those relating to joint income or joint net worth, as applicable*.)

Signature: _____

Name: _____

Date: _____

Email address: _____

Mailing address: _____

_____

_____

Telephone number: _____

## **Exhibit B**

## **Operating Agreement of the Company**

## OPERATING AGREEMENT OF

## WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC

### A Delaware Limited Liability Company

THE MEMBERSHIP INTERESTS, ECONOMIC INTERESTS, AND OTHER SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE, IN RELIANCE UPON EXEMPTION UNDER THOSE ACTS. THE SALE, TRANSFER, EXCHANGE, OR OTHER DISPOSITION OF THE COMPANY'S SECURITIES IS RESTRICTED, AS STATED IN THIS AGREEMENT AND IN ANY EVENT IS PROHIBITED UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO COUNSEL TO THE COMPANY THAT SUCH SALE, TRANSFER, EXCHANGE, OR OTHER DISPOSITION CAN BE MADE WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES LAWS OF DELAWARE OR ANOTHER RELEVANT STATE AND OTHER APPLICABLE STATUTES.

**THIS OPERATING AGREEMENT** (the "Agreement") of **WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC** (the "Company") is made and entered into as of the 30th day of October, 2015, by and among WMF MANAGEMENT, LLC, a Delaware limited liability company, and those persons or entities whose names are set forth on Exhibit A-1 attached hereto as it may be amended from time to time (collectively the "Members" and each individually a "Member"), and those persons or entities whose names are set forth on Exhibit A-2 attached hereto as it may be amended from time to time (collectively the "Unitholders" and each individually a "Unitholder").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I. Organization

1.1      Formation. The Company has been organized as a Delaware limited liability company by delivering to the Delaware Secretary of State for filing Articles of Organization under and pursuant to the Delaware Limited Liability Company Act and any successor statute thereto, as may be amended from time to time (the "Act"). The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different, by reason of any provision of this Agreement, than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

1.2      Intent. It is the intent of the parties hereto that the Company be operated in a manner consistent with its treatment as a "partnership" for federal and state income tax purposes. No party hereto shall take any action inconsistent with the express intent of the parties hereto as set forth herein. Upon formation, the Company shall be deemed for tax purposes (and only for tax purposes) to be a partnership in accordance with applicable federal income tax principles. The Manager shall establish and maintain separate capital accounts for each Member in accordance with the rules of Treasury Regulations Section

1.704-1(b)(2) of the Internal Revenue Code of 1986, as amended (the "Code") and the regulations promulgated thereunder, and this Agreement shall be interpreted and applied in a manner consistent therewith. All assets of the Company shall be owned by the Company as an entity.

## ARTICLE II. General Provisions

2.1     Name. The name of the Company shall be: **WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**, or such other name as the Members from time to time shall select.

2.2     Principal Office and Place of Business. The Principal office and place of business of the Company shall be located at 14225 Ventura Boulevard, Suite 100, Sherman Oaks, California 91423, or such other place as the Members from time to time shall determine.

2.3     Company Purposes. The purpose of the Company is to transact any business or to promote any purpose which may lawfully be carried on by a limited liability company formed under the Act and which is determined by the Manager to be in the best interest of the Company. In furtherance of such purpose and business, the Company shall have the authority to: (a) negotiate, execute, deliver, perform, modify, supplement, amend and terminate contracts, agreements, instruments, documents and other writings, including but not limited to purchase and sale agreements, marketing agreements, re-seller agreements, license agreements, leases, employment agreements, consulting agreements, loan agreements, promissory notes, mortgages, security agreements, and financing statements, (b) borrow money, guarantee the debts of others, and pledge assets to secure such borrowings and guarantees, (c) hire and compensate agents, contractors, subcontractors, officers, employees, managers, accountants, attorneys, consultants and others, (d) establish and maintain bank and other accounts and draw checks or other orders or expenditures from such accounts, (e) apply for, obtain and hold patents, copyrights, trademarks, service marks, trade names, licenses and other rights, permissions and approvals, (f) purchase, acquire, finance, hold, market and sell assets, (g) apply for and obtain insurance, and (h) do any and all other things that are ancillary or incidental to any of the foregoing.

2.4     Term. The term of the Company shall commence upon filing of the Articles of Organization and will continue until dissolved, wound-up and terminated in accordance with Section 10.1 hereof.

2.5     Agent for Service of Process. The Agent for Service of Process for the Company shall be A REGISTERED AGENT, INC., 1521 Concord Pike, Suite 303, Wilmington, Delaware 19803, or such other person as the Members shall appoint from time to time.

2.6     Members. Each current Member is listed on Exhibit A-1 attached hereto, along with such Member's address, Percentage Interests in the Company, and Capital Contribution to the Company. Any reference in this Agreement to Exhibit A-1 shall be deemed to be a reference to Exhibit A-1 as amended and in effect from time to time.

2.7     Unitholders. Each current Unitholder is listed on Exhibit A-2 attached hereto, along with

2

such Unitholder's address, number of Units owned, Capital Contribution paid for such Units and date of purchase of such Units. Each Unit of the Company purchased by a Unitholder shall require a Capital Contribution to the Company from that Unitholder of One Hundred Thousand and 00/100 Dollars ($100,000.00) per Unit. Partial Units of the Company may be purchased for a corresponding pro rata amount. Any reference in this Agreement to Exhibit A-2 shall be deemed to be a reference to Exhibit A-2 as amended and in effect from time to time.

2.8     Admission Requirements. Each new additional Member or Unitholder shall execute a Joinder Agreement in the form of that attached hereto as Exhibit C and agree to be bound by all provisions hereof, and shall execute any other documents that the Manager may deem necessary or appropriate to effect the admission of the person as an additional Member or Unitholder.

**ARTICLE III. Capital Contributions**

3.1     Initial Capital Contributions. The Capital Contributions of the Initial Members and the Unitholders are set forth on Exhibit A-1 or Exhibit A-2 to this Agreement, respectively.

3.2     Additional Capital Contributions. No Member or Unitholder shall be required to contribute any additional capital for the Company; provided, however, that the Manager may raise additional capital through the sale of additional Units in accordance with this Agreement.

**ARTICLE IV. Distributions**

4.1     Amount of and Time of Distributions. The revenues received by the Company shall be applied to the expenses and liabilities of the Company in such manner as the Manager shall determine. The Manager shall be entitled to establish reserves for future expenses and liabilities as it determines in its sole discretion.  The balance, if any, shall be distributed to the parties hereto as set forth in Section 4.2 hereof. The Manager may suspend or postpone any distribution or redemption as it determines in its sole discretion, including for the reason that such redemption could jeopardize the Company's status as a partnership for US federal income tax purposes.

4.2     Distributions. All available proceeds, as determined under Section 4.1 hereof, shall be distributed by the Company to the parties hereto in the following order and priority:

(a) *First*, distributions shall be made to each Unitholder pro rata, based on the number of Units held by each Unitholder, until each such Unitholder has received distributions pursuant to this Section 4.2(a) in current and previous fiscal years equal to ten percent (10%) of the Unitholder's Capital Contribution per annum.

(b) *Second*, distributions shall be made to each Member pro rata, based on the Capital Contributions made by each Member, until each such Member has received distributions pursuant to this Section 4.2(b) in current and previous fiscal years equal to his, her or its Capital Contribution.

3

Confidential - Do Not Distribute

(c) *Third*, on or after the date which is five (5) years after the date of purchase of each corresponding Unit listed for each Unitholder on Exhibit A-2, unless the Manager in its sole discretion elects an earlier date, distributions shall be made to each such Unitholder, based on the number of units held by each Unitholder, until each such Unitholder has received distributions pursuant to this Section 4.2(c) equal to the lesser of (i) his, her or its Capital Contribution, or (ii) an amount equal to his, her or its entire Capital Account balance and such redemption shall result in the Unitholder's withdrawal from the Company.

(d) *Fourth*, on or after the date which is five (5) years after the date of purchase of each corresponding Unit listed for each Unitholder on Exhibit A-2, if and only if the Unitholder continues to hold each such Unit on such date, and unless the Manager in its sole discretion elects an earlier date, distributions shall be made to each such Unitholder pro rata, based on the number of units held by each Unitholder, until each such Unitholder has received distributions pursuant to this Section 4.2(d) in current and previous fiscal years equal to an additional two percent (2%) of the Unitholder's Capital Contribution per annum, solely to the extent of available profits.

(e)  *Fifth*, on or after the date which is five (5) years after the date of purchase of each corresponding Unit listed for each Unitholder on Exhibit A-2, unless the Managing Member in its sole discretion elects an earlier date, distributions shall be made to each Unitholder, based on the number of units or partial units held by each Unitholder and the length of time each such Unit has been held, until each such Unitholder has received distributions pursuant to this Section 4.2(e) in current and previous fiscal years equal to such Unitholder's pro rata share of fifty percent (50%) of the cumulative profits of the Company, which fifty percent (50%) has been specifically earmarked for all of the Unitholders to participate in on a pro rata basis, solely to the extent of available profits.

(f) *Sixth*, on or after the date which is five (5) years after the date of purchase of each corresponding Unit listed for each Unitholder on Exhibit A-2, unless the Manager in its sole discretion elects an earlier date, distributions shall be made to the Members, pro rata in accordance with their Percentage Interests listed on Exhibit A-1, until the Members have received distributions pursuant to this Section 4.2(f) in current and previous fiscal years equal to their respective pro rata share of fifty percent (50%) of the cumulative profits of the Company, which fifty percent (50%) has been specifically earmarked for all of the Members to participate in on a pro rata basis, solely to the extent of available profits.

4.3     Distribution Upon Withdrawal. No withdrawing Member shall be entitled to receive any

4

distribution or the value of such Member's interest in the Company as a result of withdrawal from the Company prior to the liquidation of the Company in accordance with Section 10.2 hereof, except as specifically provided in this Agreement.

4.4     Certain Special Allocations and Offsets; Minimum Gain Chargeback; Nonrecourse Debt.

(a) *Loss Allocation Limitation; Qualified Income Offset.*

(i) Notwithstanding the provisions of Article IV and Article V hereof, the amount of net loss for any fiscal year that would otherwise be allocated to a party hereto shall not cause or increase a deficit balance in such party's capital account, as adjusted in accordance with Regulation Section 1.704-1(b)(2)(ii)(d) under Code Section 704, in excess of the amount of exposure of such party, if any, with respect to debt or other obligations or liabilities of the Company (and, for this purpose, a party hereto shall be considered to have exposure with respect to any loans made by such party to the Company), plus such party's share of "partnership minimum gain" or (but without double-counting the amount of exposure of such party with respect to debt or other obligations or liabilities of the Company) "partner nonrecourse debt minimum gain," as such terms are defined in Regulation Section 1.704-2 under Code Section 704, as of the last day of such fiscal year. To the extent the net loss for the fiscal year cannot be allocated to any party hereto owing to the restriction in the foregoing sentence, that amount of net loss shall be allocated equally among the parties hereto.

(ii) Notwithstanding the provisions of Article IV and Article V hereof, if, as of the end of any taxable year of the Company, any party hereto who is not obligated to restore the entire deficit balance in his, her or its capital account to the Company unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Regulation Section 1.704-l(b)(2)(ii)(d) under Code Section 704 which causes or increases a deficit balance in such party's capital account in excess of the amount of exposure of such party, if any, with respect to debt or other obligations or liabilities of the Company (and, for this purpose, a party hereto shall be considered to have exposure with respect to any loans made by such party to the Company), plus such party's share of "partnership minimum gain" and (but without double-counting the amount of exposure of such party with respect to debt or other obligations or liabilities of the Company) "partner nonrecourse debt minimum gain," as such terms are defined in Regulation Section 1.704-2 under Code Section 704, then such party shall be allocated items of income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year), in an amount and manner

5

sufficient to eliminate such deficit balance as quickly as possible.

(b) *Minimum Gain Chargeback*. Notwithstanding the provisions of Article IV and Article V hereof, if there is a net decrease in "partnership minimum gain," as defined in Paragraph (b)(2) of Regulation Section 1.704-2 under Code Section 704 and as computed in the manner required under said Regulation Section 1.704-2, during any taxable year of the Company, then each party hereto shall be allocated, before any other allocation is made for such taxable year, items of income and gain for such year (and, if necessary, subsequent years) equal in amount to such party's share of any net decrease in partnership minimum gain as determined under Regulation Section 1.704-2(g)(2) under Code Section 704, except to the extent, if at all, that (i) such party's share of any such net decrease is caused by a guarantee, refinancing, or other change in the debt instrument causing it to become partially or wholly recourse debt or "partner recourse debt" as defined in Paragraph (b)(2) of said Regulation Section 1.704-2, and the party hereto bears the economic risk of loss (within the meaning of Regulation Section 1.752-2 under Code Section 752) for such converted or refinanced debt; or (ii) the party hereto contributes capital to the Company that is used to repay the nonrecourse liability or is used to increase the basis of property of the Company that is subject to such liability, and the party's share of the net decrease in partnership minimum gain results from such repayment or such basis increase. The allocations provided for in this Paragraph (b) shall be made in accordance with the requirements of Paragraph (j) of said Regulation § 1.704-2.

(c) *Nonrecourse Debt*. Notwithstanding the provisions of Article IV and Article V hereof, any "partner nonrecourse deductions," as defined in Paragraph (i) of Regulation § 1.704-2 under Code Section 704, attributable to a "partner nonrecourse liability," as defined in Paragraph (b)(4) of said Regulation Section 1.704-2, and as computed in the manner required under said Regulation Section 1.704-2, shall be allocated to the party hereto, or to and among the parties hereto, that bear the economic risk of loss for such liability and in the proportions required by Paragraph (i)(1) of said Regulation Section 1.704-2; and (bb) if, during any taxable year of the Company, there is a net decrease in "partner nonrecourse debt minimum gain," as defined in Paragraph (i)(2) of Regulation Section 1.704-2 under Code Section 704 and as computed in the manner required under said Regulation Section 1.704-2, any party hereto with a share, as determined under Paragraph (i)(5) of said Regulation Section 1.704-2, of that partner nonrecourse debt minimum gain, as of the beginning of the year, shall be allocated items of income and gain for the year (and, if necessary, for succeeding years) equal in amount to such party's share of such net decrease

6

as determined in a manner consistent with the requirements of Paragraph (g)(2) of said Regulation Section 1.704-2, to the extent (if at all) that such allocation is required under Paragraph (i)(4) of said Regulation Section 1.704-2. The allocations provided for in this Paragraph (c) shall be made in accordance with the requirements of Paragraphs (j)(1)(i), (j)(1)(iii), (j)(2)(ii) and (j)(2)(iii) of said Regulation 1.704-2, as appropriate.

## ARTICLE V. Allocations of Profits and Losses

5.1     Allocations of Net Profits and Net Losses. Except as may be required by Subsection 704(c) of the Code, net profits, net losses, and other items of income, gain, loss, deduction and credit shall be apportioned among the Members in proportion to their Percentage Interests listed on Exhibit A-1.

5.2     Restoration of Negative Capital Accounts. In the event that a Member's capital account shall be reduced below zero then future profits shall be credited to his, her or its capital account until such time as said capital account exceeds zero.

5.3     Application. The Manager shall apply the provisions of Section 5.1 with such modifications, or shall make such special allocations, as it determines are necessary (i) to ensure that the Members' Adjusted Capital Account Balances as of the time immediately before the final liquidating distributions are made pursuant to Article X equal the amounts of such distributions to be made to them and/or (ii) to comply with the provisions of Sections 704 and 706 of the Code and the regulations hereunder. The term "Adjusted Capital Account Balance" means, with respect to any Member as of any time of determination, the balance in such Member's capital account adjusted by adding thereto (x) the amount of any additional cash contributions made by such Member, (y) the fair market value at the time contributed of any property (other than cash) contributed to the Company by such Member (net of liabilities to which the property is subject), and (z) allocations to such Member of income and gain (including income exempt from tax); and subtracting therefrom (i) the amount of any cash distributions made to such Member, (ii) the fair market value at the time distributed of any property distributed to such Member (net of any liabilities to which the property is subject), (iii) allocations to such Member of loss or deductions, and (iv) any allocations to such Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code.

5.4     Allocations. For any accounting period beginning upon formation of the Company and while there exists more than one (1) Member, tax allocations shall be made consistent with the allocations of book items pursuant to Section 5.1 for such period, except that, solely for tax purposes, (i) items of income, gain, loss and deduction with respect to Company assets reflected hereunder in the capital accounts and on the books of the Company at values that differ from the Company's adjusted tax basis in such assets shall be allocated among the holders of the outstanding membership interests so as to take account of those differences in such manner, and using such method or methods (including, without limitation, the "traditional" method described in Section 1.704-3(b) of the regulations under Section 704(b) of the Code),

7

Confidential - Do Not Distribute

as the Manager determines to be appropriate and in compliance with Section 704(c) of the Code and Section 1.704-3 of the regulations, and (ii) items of gain recognized by the Company that are subject to the depreciation recapture provisions of Sections 1245 and 1250 of the Code shall be allocated among the Members in such manner as is necessary to comply with Sections 704, 1245, and 1250 of the Code and any applicable regulations thereunder.

### ARTICLE VI. Management

6.1      <u>Manager</u>. As provided in its articles of organization, the Company will be managed by a Manager. The designation and removal of the Manager shall be made by a fifty-one percent (51%) vote of the Members by value. Managers may be entities as well as individuals and need not be Members. The initial Manager shall be WMF MANAGEMENT, LLC.

6.2      <u>Rights and Powers of the Manager</u>. Except as provided in Section 6.4 hereof, the Manager shall have full, exclusive and complete power to manage and control the business and affairs of the Company and shall have all of the rights and powers provided to a Manager of a limited liability company by law, including the power to execute instrument and documents, to mortgage or dispose of any real property held in the name of the Company, and to take any other actions on behalf of the Company. Notwithstanding the foregoing, any Major Decision shall require the approval of the Members.

6.3.     <u>Duties and Responsibilities of the Manager</u>.

(a) *Major Decisions*. The Manager is responsible for causing to be implemented all Major Decisions, as defined in Section 6.4 hereof, as approved by the Members.

(b) *Performance of Duties*. The Manager shall devote to the Company such time as may be necessary for the proper performance of such Manager's duties hereunder, but shall not be required to devote such Manager's full time to the performance of such duties. The Manager is presently, and may be in the future, engaged in businesses or ventures which are competitive with that of the Company and each Member hereto agrees and consents to such activities, even though there are conflicts of interest inherent therein and they may not be invited to participate in such other businesses or ventures.

6.4      <u>Actions Requiring a Vote</u>. The Manager shall not undertake any of the following acts (each a "<u>Major Decision</u>") without the consent of a majority in interest of the Members: (a) Acquire or commence any business; (b) Appoint a new Manager; (c) Make loans on the Company's behalf or cause the Company to guarantee the obligations of others; (d) Take any other action which this Agreement specifically requires to be agreed upon by the Members; or (e) Merge or combine the Company with any other limited liability company or other entity.

6.5      <u>Consents and Approvals</u>. Any request for consent or approval, or refusal to consent or approve shall be in writing. The Manager shall provide timely written notice to each Member of each

8

proposed action requiring the consent or approval of the Members.

6.6     <u>Filing of Documents</u>. The Manager shall cause to be filed all certificates or documents as may be determined by such Manager to be necessary or appropriate for the formation, continuation, qualification and operation of the Company in the State of Delaware and any other state in which the Company may elect to do business. To the extent that the Manager determines an action to be necessary or appropriate, such Manager shall do all things to maintain the Company as a limited liability company under the laws of the State of Delaware and any other state in which the Company may elect to do business.

6.7     <u>Indemnification of Members</u>. The Company, its receiver or trustee shall, to the maximum extent provided by law, indemnify, defend and hold harmless each Member to the extent of the Company's assets, for, from and against any liability, damage, cost, expense, loss, claim or judgment incurred by the Member in any proceeding in which the Member is a party because such party was a Member or a Manager, arising out of any claim based upon acts performed or omitted to be performed by the Member in connection with the business of the Company, including without limitation, attorneys' fees and costs incurred by the Member in settlement or defense of such claims. Amounts incurred by any Member in connection with any action or suit arising out of or in connection with Company affairs shall be reimbursed by the Company.

6.8     <u>Liability</u>. No Member shall be personally liable for failure of the Company to make distributions as set forth in this Agreement or shall be liable, responsible, accountable for monetary damages or otherwise to the Company or the Members for any act or omission performed or omitted by such Member in connection with the Company or its business. Notwithstanding the foregoing, any Member shall in all instances be liable for acts or omissions in breach of this Agreement.

6.9     <u>Compensation of Manager</u>.

    (a)  *Fees*. The Company will pay the Manager the fees and other compensation for its services as determined by and in the sole discretion of a majority in interest of the Members.

    (b)  *Reimbursable Expenses*. The Company will reimburse the Manager for out-of-pocket third-party expenses incurred by her in connection with the carrying out of the duties set forth in this Agreement and the management of the Company.

6.10     <u>Ownership Certificates</u>. The Manager may issue ownership certificates to each Member or Unitholder as evidence of each party's respective interest in the Company.

6.11     <u>Officers</u>. The Manager may elect officers of the Company, including a President, one or more Vice Presidents, a Treasurer, a Secretary and such other officers as it may determine. An officer may, but need not, be a Member or affiliate of a Member. The Manager may use descriptive words or phrases to designate the standing, seniority or area of special competence of any officer. A person may hold more than one office. An officer of the Company shall have such authority and duties as the Manager may from time to time determine (but in no event shall have greater authority in any respect than the Manager). The

9

Manager may from time to time create or eliminate offices of the Company and establish, increase, reduce or otherwise modify the responsibilities of any officer, in each case as it determines to be appropriate. Each officer shall serve until his or her successor is duly elected or, if earlier, until his or her death, resignation or removal. A vacancy in any office may be filled only by the Manager. An officer may resign at any time by notifying the Manager in writing. Any resignation of an officer shall be effective upon the receipt of such notice by the Manager or on such later date as is specified therein. An officer may be removed by the Manager at any time with or without cause.

6.12    Sale of Additional Units. The Manager shall have the right to cause the Company to issue or sell to any person (including Unitholders, Members and Affiliates): (a) additional Units or other interests in the Company (including other classes or series thereof having different rights), (b) obligations, evidences of indebtedness, or other securities or interests convertible or exchangeable into Units or other interests in the Company, and (c) warrants, options, or other rights to purchase or otherwise acquire Units or other interests in the Company. Subject to the provisions of this Agreement, the Manager shall determine the terms and conditions governing the issuance of such additional securities, including the number and designation thereof, the preference (with respect to distributions, liquidations or otherwise) over any other Units or Member interests and any required contributions in connection therewith. Any person who acquires newly issued Units or Member interests shall be admitted to the Company by the Manager.

### ARTICLE VII. The Members and Unitholders

7.1    Meetings of the Members. The Members shall not be entitled to participate in the day-to-day affairs and management of the Company, but instead, the Members' right to participate with respect to matters relating to the Company shall be limited to those matters as to which the express terms of the Act, the Articles of Organization, or this Agreement vest in the Members the right to so participate. Meetings of the Members shall be held on the call of any Member; provided that at least thirty (30) days' notice shall be given to all Members with respect to any meeting, including an annual meeting; and further provided that any Member may require that such meeting be held by telephone. A waiver of any required notice shall be equivalent to the giving of such notice if such waiver is in writing and signed by the person entitled to such notice, whether before, at or after the time stated therein. The Members may act without a meeting if the action taken is reduced to writing (either prior to or thereafter) and approved and signed by the vote of Members in accordance with the other voting provisions of this Agreement.

7.2    Voting of the Members. Unless the specific language herein requires a different percentage, all votes, actions, approvals, elections and consents required in this Agreement to be made "by the Members" or "of the Members" shall be effective if approved by a majority-in-interest of the Members. For determining the interests of Members, reference shall be made to the Members' Percentage Interests shown on Exhibit A-1 attached hereto.

10

7.3     Transaction With Members. Any transactions between the Company and Members not specified in this Agreement shall require the approval of the Manager.

7.4     Rights and Obligations of Members.

(a) *Limitation of Liability*. Each Member's liability for the debts and obligations of the Company shall be limited as set forth in the Act.

(b) *List of Members*. Upon written request of any Member, the Manager shall provide a list showing the names, last known addresses and interests of all Members of the Company.

(c) *Company Records*. Upon written request, each Member has the right, during ordinary business hours, to inspect and copy the Company records required to be maintained by the Manager at the Company's principal office as set forth in Section 8.1 hereof.

7.5     Unitholders. Unitholders shall not be considered Members of the Company, and Members shall not be considered Unitholders of the Company; however, a party may be both a Member and a Unitholder, if such party has purchased both Member's Percentage Interests described in Exhibit A-1 attached hereto and Units described in Exhibit A-2 hereto. Unitholders shall not be entitled to participate in the day-to-day affairs and management of the Company, but instead, the Unitholders' right to participate with respect to matters relating to the Company shall be limited to those matters as to which the express terms of the Act, the Certificate of Formation, or this Agreement vest in the Unitholders the right to so participate. Unitholders shall not need to hold meetings. Unitholders shall not vote on any matter relating to the Company, its Members or the Manager, except as specifically required by the Act. Each Unitholder's liability for the debts and obligations of the Company shall be limited as set forth in the Act. Unitholders shall only have the rights ascribed to them pursuant to this Agreement.

7.6     Removal. In the event that the Manager determines that the continued participation in the Company of a Member or Unitholder will jeopardize the Company's partnership tax status, the Company's exemption from the Investment Company Act of 1940, as amended, or the Company's exemption from the registration requirements of the Securities Act of 1933, as amended, such Member or Unitholder shall be forced to forfeit such person's membership interest or Units in exchange for such person's original Capital Contribution, to be paid by the Company within one hundred and twenty (120) days of the effective date of removal. A removed party shall have no right, either before or after the effective date of removal, to challenge the propriety of the removal in court. Upon becoming a Member or Unitholder, each party hereto is deemed to have acknowledged the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the parties hereto. Upon the removal of a party hereto pursuant to this Section 7.6, the relevant Exhibit hereto shall be amended by the Manager to reflect such removal, as soon as practicable.

7.7     Personal Services.

11

Confidential - Do Not Distribute

(a) Unless otherwise provided herein, no Member shall be required to perform services for the Company or be entitled to compensation for services performed for the Company solely by virtue of being a Member.

(b) No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

(c) Any Member who takes any action or binds the Company in violation of this Section 7.6 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

7.8     Power of Attorney.

(a) Each Member constitutes and appoints the Managing Manager as that person's true and lawful attorney-in-fact ("Attorney-in-Fact") to make, execute, sign, acknowledge, and file:

(i)   Any amendment to the Certificate of Formation of the Company which has been duly approved;

(ii)  All documents that the Attorney-in-Fact deems appropriate, to reflect any amendment, change, or modification of this Agreement (including, without limitation, to the Exhibits hereto) which has been approved as herein provided;

(iii) Any and all other certificates or other instruments required to be filed by the Company under the laws of the state of Delaware or of any other state or jurisdiction, including, without limitation, any certificate or other instruments necessary in order for the Company to continue to qualify as a limited liability company under the laws of the state of Delaware;

(iv) One or more fictitious or trade name certificates; and

(v)  All documents that may be required to dissolve and terminate the Company and to cancel its Certificate of Formation upon the dissolution of the Company in accordance with this Agreement.

(b) The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the dissolution, death or disability of the person having provided the same. It also shall survive the transfer of securities of the Company by the holders thereof. Each person providing this power of attorney shall be bound by any representations made by the Attorney-in-Fact, acting in good faith, pursuant to this power of attorney, and each such person hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

12

**ARTICLE VIII. Books, Records, Reports and Accounting**

8.1     <u>Records</u>. The Manager shall keep or cause to be kept at the principal office of the Company the following: (a) a current list of the full name and last known business, residence or mailing address of each Member, and a similar list for with respect to all former Members, (b) a copy of the initial Certificate of Formation and all amendments thereto, (c) copies of all written operating agreements and all amendments to the agreements, including any prior written operating agreements no longer in effect, (d) copies of any written and signed promises by Members to make Capital Contributions to the Company, and (e) copies of the information and statements provided to the Members to enable them to prepare their federal, state and local tax returns for the three most recent years.

8.2     <u>Fiscal Year.</u> The fiscal year of the Company shall be the calendar year.

8.3     <u>Accounting</u>. All decisions as to other accounting matters, except as specifically provided to the contrary herein, shall be made by the Manager.

8.4     <u>Preparation of Tax Returns</u>. The Manager shall arrange for the preparation and timely filing of all returns of Company income, gains, deductions, losses and other items necessary for federal and state income tax purposes and shall cause to be furnished to the Members the tax information reasonably required to enable them to prepare their federal, state and local tax returns. The classification, realization and recognition of income, gain, losses and deductions and other items, for federal income tax purposes, shall be on that method of accounting as Manager shall determine in its reasonable discretion, taking into account the best interests of all Members. The Members recognize that the Company may be required to use the accrual method of accounting for federal income tax purposes.

8.5     <u>Tax Elections.</u> The Manager may, in its reasonable discretion, determine whether to make any available elections pursuant to the Code.

8.6     <u>Tax Controversies.</u> Subject to the provisions hereof, the parties shall designate a Tax Matters Member, who is authorized and required to represent the Company (at the Company's expense) with regard to all federal income tax matters. The Manager shall also serve as the Tax Matters Member.

**ARTICLE IX. Sale, Option, Death, Transfers, Withdrawals, Determination of Interest**

9.1.    <u>Transfers</u>.

(a) *Sale*. In the event that a Member or legal representative thereof desires to sell his, her or its interest in the Company, he, she or it shall first offer to sell his, her or its interest to the remaining Members. The Members agree to exercise good faith efforts in arriving at a purchase price. In the event the Members cannot agree on a purchase price the remaining Members shall have the right to have the purchase price determined pursuant to Section 9.3 hereinafter set forth and to purchase said interest in accordance therewith. In the event the remaining Members do not elect to purchase said interest the selling Member shall be

13

free to sell his, her or its interest, free and clear of this encumbrance, subject only to the right of first refusal in Section 9.1(b) hereinafter set forth, and the terms and conditions of Sections 9.1(c) and 9.1(d) hereinafter set forth. The terms and conditions of this paragraph shall be binding on a sale by the estate of any deceased Member.

(b) *First Refusal*. In the event that a Member received a bona fide offer for his, her or its interest which he, she or it is willing to accept, said selling Member shall give written notice, by registered mail, return receipt requested, of said offer together with the name and address of the purchaser, the price and terms of sale, and the amount of any brokerage or sale fee (with name and address of the brokerage or agent), if any, to the remaining Members. The remaining Members shall have the right, privilege and option to purchase said interest upon the same terms and conditions as the offer less any broker or sale fee. The remaining Members must give notice of their intent to exercise said option within ten (10) days after said notice has been post-marked. Closing of title shall be within thirty (30) days after exercise of said option. In the event the remaining Members do not desire to purchase the interest of the selling Member, then the selling Member shall be free to sell his, her or its interest, free and clear of this encumbrance and right, but remaining subject to the terms and conditions set forth in Sections 9.1(c) and 9.1(d) as hereinafter set forth.

(c) *Restriction Regarding Substitution*. A Member shall not make any direct or indirect transfer of all or any portion of its complete interest (meaning Manager or voting interest as well as economic interest) to a transferee who does not become a substitute Member of the Company. This section is not intended in any way to limit transfers or limited to a Member's right to profits, losses or distributions.

(d) *Requirements for Transferee Becoming a Substituted Member*. No transferee shall become a substitute Member in the Company unless the following conditions precedent are satisfied: (i) a majority of the remaining Members, in their sole discretion, shall have consented in writing to the transferee becoming a Member; (ii) the transferee shall have assumed any and all of the obligations under this Agreement with respect to the interest to which the transfer relates; (iii) all reasonable expenses required in connection with the transfer shall have been paid by or for the account of the transferee; and (iv) all agreements, articles, minutes, written consents and all other necessary documents and instruments shall have been executed and filed and all other acts shall have been performed which the Manager deems necessary to make the transferee a substitute Member of the Company and to preserve the status of the Company as a limited liability company. Upon satisfaction of the above conditions, a transferee shall become a substitute Member on the later of the date

14

provided in the documents of transfer, if any, or the date that the last condition is satisfied.

(e) *Withdrawal of a Member*. The Members agree not to withdraw from the Company. Upon a withdrawal by a Member from the Company in violation of this Agreement, the withdrawn Member shall only be entitled to receive the lesser of the fair market value of such withdrawn Member's Interest or the balance in such Member's Capital Account as such balance existed on the date of withdrawal. Any amounts payable to the withdrawn Member shall not be required to be paid by the Company until the final dissolution, liquidation and termination of the Company.

9.2. Death of a Member. Upon the death of a Member, the transferee of the deceased Member's interest shall be entitled to receive the fair market value of that interest upon the dissolution, liquidation and termination of the Company. If the remaining Members elect to continue the Company, the holder of the deceased Member's interest shall be treated as a transferee of the deceased Member, but shall have no Member rights other than the right to continuing distributions; and the right to transfer such interest pursuant to the terms and conditions of Section 9.1 hereof, unless such transferee is admitted as a Member pursuant to Section 9.1 (d) hereof.

9.3. Determination of Value of Interest. In the event it becomes necessary to determine the value of a Member's interest for the purpose of purchasing an interest as set forth in Section 9.l (a) hereof, unless an agreed value can be arrived at, the Members agree to a determination and purchase procedure as follows: The Members desiring to purchase a selling Member's interest shall give written notice, by registered mail, return receipt requested, of their intention to the selling Member. The selling Member and remaining Members collectively shall each appoint an appraiser within fourteen (14) days after said notice is postmarked, and the two (2) appraisers shall choose a third (3rd) appraiser within five (5) days thereafter. The three (3) appraisers shall then fix the fair market value each Member's net interest in the Company and make written return to the Members within twenty-one (21) days after appointment of the third (3rd) appraiser. In the event the selling Member shall refuse or fail to appoint an appraiser, the appraiser appointed by the remaining Members shall fix the fair market value of the property and each Member's net interest within twenty-one (21) days after such refusal or failure to act. The remaining Members shall have the option to purchase the interest of the selling Member at the value of his, her or its net interest as determined by the appraisers (minus any deficiency in the selling Member's capital and expense account). The purchase price shall be paid in up to three (3) equal annual installments together with interest thereon at the rate of five (5%) percent per annum on the unpaid principal balance commencing from date of sale and shall be evidenced by an unsecured promissory note. Closing of title shall be within forty-five (45) days after return of the appraisers. Each party shall pay for and be liable for the costs, disbursements and fees of the appraiser of his, her or its choice. The selling Member and remaining Members shall be liable equally for the costs,

15

Confidential - Do Not Distribute                                                              66

disbursements and fees of the third (3rd) appraiser. Net interest of a Member shall mean fair market value minus his, her or its proportion of debt and accrued accounts payable.

9.4.    Breach of the Agreement. If a Member purports to transfer its interest in breach of this Agreement, that purported transfer shall be void and of no effect.

9.5    Restrictions on Transfer.

(a)    The member interests issued to persons listed on Exhibit A-1 shall have been issued by the Company in reliance on exemptions from the registration provisions of applicable federal and state securities laws and cannot be transferred unless they are registered under such laws or an exemption from registration is available and confirmed by opinion of counsel.

(b)    Except as otherwise provided in this Agreement or the Act, no Member of the Company may transfer all, or any portion of, any member interests without the prior written consent of the Manager. Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the parties hereto.

(c)    The transfer of any member interest or security of the Company by the holder thereof in violation of the prohibition contained in this section shall be deemed invalid, null and void ab initio, and of no force or effect. Any person to whom any member interest is attempted to be transferred in violation of this section shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, receive distributions from the Company or have any other rights in or as a Member or as an assignee of any member interests.

## ARTICLE X. Liquidation and Winding Up

10.1    Dissolution. The Company shall dissolve at (i) the time that there are no remaining Members of the Company unless the business of the Company is continued in accordance with the Act, (ii) the election of the Manager to dissolve the Company, or (iii) the time of the judicial dissolution of the Company under the Act.

10.2    Liquidation. Upon dissolution of the Company, the business and affairs of the Company shall be wound up and liquidated as rapidly as business circumstances permit, the Manager shall act as the liquidating trustee, and the assets of the Company shall be liquidated and the proceeds thereof shall be paid (to the extent permitted by applicable law) in the following order:

(a)    *First*, to creditors, including Members that are creditors, in the order of priority as required by applicable law;

(b)    *Second*, to a reserve for contingent liabilities to be distributed at the time and in the manner as the liquidating trustee determines in its discretion; and

(c)    *Thereafter*, to the Members as set forth in Articles IV and V provided that no amount is

16

paid to the account of a withdrawn or deceased Member except as set forth in §§ 9.1(e) or 9.2 hereof.

10.3    Deficit Capital Account. Upon liquidation, each Member and/or Unitholder shall look solely to the assets of the Company for the return of its Capital Contribution. No Member shall be liable personally for a deficit Capital Account balance of that Member, it being expressly understood that the distribution of liquidation proceeds shall be made solely from existing Company assets.

## ARTICLE XI. Miscellaneous

11.1    Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws and regulations of the State of Delaware without regard to principles of conflicts of law. In the event of a conflict between any provision of this Agreement and any non-mandatory provision of the Act, the provisions of this Agreement shall control and take precedence.

11.2    Severability. Each provision of this Agreement shall be considered separable, and if for any reason any provision or provisions of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid or unenforceable in any jurisdiction, such provision or provisions shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without invalidating the remaining provisions hereof, or the application of the affected provision to persons or circumstances other than those to which it was held invalid or unenforceable, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.3    No Third Party Rights. This Agreement is intended to create enforceable rights between the parties hereto only, and creates no rights in, or obligations to, any other persons whatsoever.

11.4    Further Assurances. The parties hereto shall execute all further instruments and perform all acts necessary to effectuate and to carry on the business contemplated by this Agreement.

11.5    Schedules/Exhibits; Incorporation by Reference. Each of the Schedule and/or Exhibits referred to in this Agreement is hereby incorporated by reference in this Agreement as if such Schedules and/or Exhibits were set out in full in the text of this Agreement.

11.6    Amendments. In addition to any amendments otherwise permitted by this Agreement, this Agreement may be amended and/or restated from time to time by one or more written agreements executed by the Manager and a majority of the Members; however, the Manager shall be permitted in its sole discretion to amend Exhibit A-1 without the further consent of the Members in order to reflect any new Members, and any updates of or changes to the information contained therein, including the persons or their respective holdings in the various classes of member interests and other securities of the Company that may from time to time exist, as well as their Member status.

11.7    Successors. The covenants and agreements contained herein are binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto, and no other

17

person shall have any rights or benefits hereunder except as expressly provided by applicable law.

11.8    No Waiver. The failure of any person to seek redress for a violation, or to insist on strict performance, of any covenant or condition of this Agreement shall neither (a) prevent a subsequent act which would have constituted a violation from having the effect of an original violation, nor (b) excuse strict performance of such covenant or condition in any subsequent case.

11.9    Entire Agreement. This Agreement (together with any exhibits, schedules or agreements expressly referred to herein, which are hereby incorporated herein by reference) constitutes the entire agreement among the parties governing the relationship established hereby. This Agreement (together with such exhibits, schedules and other agreements) supersedes any prior agreement or understanding among the parties and may not be modified or amended in any manner other than as set forth herein or therein.

11.10    Counterparts. This Agreement may be executed in several counterparts, all of which together shall constitute one agreement binding on all parties hereto notwithstanding that all the parties have not signed the same counterpart.

11.11    Conflicts of Interest; Affiliated Transactions.

(a)    This Agreement shall not (i) require the Manager, Members, or any affiliates thereof, to offer the Company any investment opportunity unless such investment was presented to such person in their capacity as a Manager, Member or affiliate thereof; or (ii) otherwise limit or restrict, other than as provided in this Section 11.11 any of such persons from engaging in business with, having investment responsibilities for, rendering management or advisory services to, performing other services for or collecting fees from any person.

(b)    The parties hereto hereby acknowledge and agree that any Member or Manager shall be free to make investments in and loans to and to serve as directors of companies that compete with the Company, directly or indirectly.

11.12    Consideration of Separate Circumstances. The parties to this Agreement recognize that the differing financial, regulatory income tax and other status and circumstances of such parties may give rise to conflicts of interest among them with regard to disposition of assets, making of tax elections or other Company matters. The Manager shall not be required to take into consideration the separate status or circumstances of any such party or group of such parties when making decisions or taking action with respect to the Company or its business.

11.13    Section Titles. The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

11.14    Gender and Number. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person may in the context require. Use of the singular number shall be deemed to include reference to the plural number and vice versa when

18

the context so requires.

11.15    Rights and Remedies Cumulative. The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

11.16    Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company.

**IN WITNESS WHEREOF**, the parties have executed, or caused this Agreement to be executed, as of the date set forth herein above.

**MEMBER:**

**WMF MANAGEMENT, LLC**

Date: October 30, 2015                    By:_____
                                                 Robert Shapiro, Duly Authorized

19

**EXHIBIT A-1**

**LIST OF MEMBERS**

| Member Name and Address | Percentage Interests | Capital Contribution |
|---|---|---|
| WMF MANAGEMENT, LLC<br>14225 Ventura Boulevard<br>Suite 100<br>Sherman Oaks, California 91423 | 100% | $1,000 and Services Rendered |

20

**EXHIBIT A-2**

**LIST OF UNITHOLDERS**

| Unitholder Name and Address | Number of Units | Capital Contribution | Date of Purchase |
|---|---|---|---|
|  |  |  |  |

21

**EXHIBIT B**

**COPY OF CERTIFICATE OF FORMATION**

22

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:28 PM 07/28/2015
FILED 02:23 PM 07/28/2015
SRV 151102435 - 5792954 FILE

# STATE *of* DELAWARE
# LIMITED LIABILITY COMPANY
# CERTIFICATE *of* FORMATION

## FIRST
## Name

The name of the limited liability company is:
Woodbridge Mortgage Investment Fund 3A, LLC

## SECOND
## Registered Agent

The address of its registered office in the State of Delaware is
1521 Concord Pike, Suite 303 in the City of Wilmington. Zip code 19803.

The name of its registered agent at such address is
A Registered Agent Inc.

## THIRD
## Duration

The duration of the limited liability company shall be perpetual.

## FOURTH
## Purpose

The purpose for which the company is organized is to conduct any and all
lawful business for which Limited Liability Companies can be organized
pursuant to Delaware statute.

**In Witness Whereof,** the undersigned have executed this Certificate of
Formation this 28th day of July, 2015.

By: _____
Authorized Person

Name:  Patrick Brickhouse

Confidential - Do Not Distribute

**EXHIBIT C**

**FORM OF JOINDER AGREEMENT**

23

## JOINDER AGREEMENT

WHEREAS, the undersigned is becoming the holder of a membership interest or a Unit (all or individually an "Interest") in **Woodbridge Mortgage Investment Fund 3A, LLC** (the "Company") simultaneously with the execution hereof; and

WHEREAS, as a condition to the acquisition of such Interest, the undersigned has agreed to execute this Joinder Agreement (this "Agreement") to become a party to the Operating Agreement of the Company dated as of October 30, 2015, as the same may have been amended (the "Operating Agreement"); and

WHEREAS, the undersigned understands that execution of this Agreement is a condition precedent to the undersigned's becoming the holder of such Interest.

NOW, THEREFORE, to satisfy this precondition and in consideration of the benefits of the Operating Agreement available to the holder of such an Interest, the undersigned agrees as follows:

1. The undersigned hereby agrees that upon delivery of this Joinder Agreement the undersigned will become, without any further documentation or action on the part of the undersigned, or any other person or entity, a party to the Operating Agreement and will be bound by the terms, conditions and representations applicable to the holders of whatever Interests are held by the undersigned contained in the Operating Agreement as of the date this Agreement is signed, once any other preconditions to the transfer of such Interest have been satisfied to the satisfaction of the Company as indicated by its acceptance of this Agreement below. The undersigned will be bound by the Operating Agreement as though the undersigned was an original party thereto.

2. The undersigned hereby further agrees that this Joinder Agreement shall be construed to be an executed and delivered signature page to the Operating Agreement and that, as such, may be used by the Company to evidence that the undersigned is a party to the Operating Agreement.

3. All capitalized terms used in this Joinder Agreement which are not defined herein shall have the meaning given to them in the Operating Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement this _____ day of _____, 2015.

_____
Name:

Accepted:

**WOODBRIDGE MORTGAGE
INVESTMENT FUND 3A, LLC**

By:_____
    Robert Shapiro, Duly Authorized

24

**<u>Exhibit D</u>**

**Representative Unit**

# CONFIDENTIAL OFFERING MEMORANDUM

*of*

# WOOBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC

## $100 Million Offering for 1,000 Preferred Incentive Units

---

## Exhibit I

## Subscription Agreement

# SUBSCRIPTION AGREEMENT

*for*

**Preferred Incentive Units**

*of*

**WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**

**Dated: October 30, 2015**



**SUBSCRIPTION AGREEMENT**

Ladies and Gentlemen:

The undersigned (the "Subscriber") understands that Woodbridge Mortgage Investment Fund 3A, LLC, a Delaware limited liability company (the "Company"), may issue or sell interests in the Company (the "Units"), all on the terms and conditions set forth below and Subscriber desires to purchase the number of Units specified below.

Accordingly, Subscriber and the Company hereby agree as follows:

1        Subscription. Subscriber hereby subscribes for and agrees to purchase the number of Units from the Company indicated next to Subscriber's signature below. The purchase price (the "Purchase Price") for the Units to be purchased hereunder by Subscriber is indicated next to Subscriber's signature below ($100,000 per Unit). **Subscriber understands that the Company will review this Subscription Agreement, and the Company reserves the unrestricted right to reject or limit any subscription and to close the Offering at any time.**

2        Purchase Procedure.

2.1        Subscriber acknowledges that, in order to subscribe for the Units, he/she/it must, and does hereby, deliver to the Company:

2.1.1        A completed and executed counterpart of this Agreement, the Accredited Investor Representation Letter attached hereto as Exhibit A, along with all required supporting documentation specified therein, and the Joinder Agreement attached as part of the Operating Agreement attached as Exhibit B hereto; and

2.1.2        A certified check, subject to collection, in an amount equal to the Purchase Price, made payable to the order of the Company, or a wire transfer in such amount to such bank account as shall be designated by the Company.

2.2        Subject to the Company's unconditional right to accept or reject the subscription contained herein, upon receipt of the foregoing, if the Company accepts the subscription, the Company shall deliver to the Subscriber: (i) an executed counterpart of this Agreement, and (ii) notification that the Subscriber is the registered holder of the relevant Units. If the Company rejects the subscription, payment will be returned to Subscriber in full without deduction or interest.

3        Representations of Subscriber. By executing this Agreement, Subscriber represents, warrants, acknowledges and agrees as follows:

3.1        Subscriber is an "accredited investor" (as that term is defined under Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended), and has such knowledge and experience in financial and business matters generally that Subscriber is capable of evaluating the merits and risks of an investment in the Company.

3.2        Subscriber understands that (i) the Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or any applicable state securities laws, or the laws of any foreign jurisdiction; (ii) Subscriber cannot sell or transfer the Units unless they are registered under the Securities Act and any applicable state securities laws or unless exemptions from such registration requirements are available; (iii) a legend will be placed on any certificate evidencing the Units, stating that they have not been registered under the Securities Act and setting forth or referring to the restrictions on transferability and sales thereof; (iv) the Company may place stop transfer instructions against the Units to restrict the transfer thereof; and (v) the Company has no obligations to register the Units or assist Subscriber in

obtaining an exemption from the various registration requirements. Subscriber agrees not to resell the Units without compliance with the terms of this Agreement, that certain Operating Agreement of Woodbridge Mortgage Investment Fund 3A, LLC dated as of July 27, 2015, and any applicable state or foreign securities laws.

3.3     Subscriber is aware that there is no active trading market for the Units and that there can be no assurance that a market for the Units will develop or be maintained. Therefore, Subscriber may have to hold the Units indefinitely. Subscriber has no need for liquidity in the investment contemplated hereby and has adequate means of providing for Subscriber's current needs and personal and family contingencies (as applicable).

3.4     Subscriber (i) is acquiring the Units for his/her/its own account for investment purposes only and not with a view toward resale or distribution, either in whole or in part; and (ii) has no contract, undertaking, agreement or other arrangement, in existence or contemplated, to sell, pledge, assign or otherwise transfer the Units to any other person.

3.5     Subscriber's investment in the Company is reasonable in relation to Subscriber's net worth and financial needs and Subscriber is able to bear the economic risk of losing such Subscriber's entire investment in the Units. Subscriber is familiar with the nature and extent of the risks inherent in investments in unregistered securities and has determined, either personally or in consultation with Subscriber's attorney, that an investment in the Company is consistent with Subscriber's investment objectives and income prospects. Subscriber understands that the Company may need to obtain additional capital through debt and/or equity financing to implement its business plan and that there can be no assurance that such financing will be obtained, or will be obtained on terms that are acceptable to the Company.

3.6     Subscriber acknowledges that Subscriber and his/her/its advisors (if any) have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Units and from the Company concerning the business, properties, prospects and financial condition of the Company.

3.7     Subscriber understands that an investment in the Units involves substantial risks and Subscriber recognizes and understands the risks relating to the purchase of the Units, including that Subscriber could lose the entire amount of his/her/its investment in the Units. Subscriber expressly acknowledges and understands that, there can be no assurance that the Company will be able to operate profitably in the future.

3.8     Subscriber understands that (i) the offering contemplated hereby has not been reviewed by any federal, state or other governmental body or agency; (ii) if required by the laws or regulations of said state(s) the offering contemplated hereby will be submitted to the appropriate authorities of such state(s) for registration or exemption therefrom; and (iii) documents used in connection with this offering have not been reviewed or approved by any regulatory agency or government department, nor has any such agency or government department made any finding or determination as to the fairness of the Units for investment.

3.9     All information which Subscriber has provided the Company concerning his/her/its financial position and knowledge of financial and business matters, is correct and complete as of the date hereof, and if there should be any change in such information, Subscriber will immediately provide the Company with such new information. Subscriber and the Company agree that financial and other information concerning Subscriber may be disclosed by the Company to any persons or entities that may enter into a transaction with the Company with the prior written consent of Subscriber, which consent shall not be unreasonably withheld, <u>provided however</u>, that the Company may disclose such financial and other information concerning the Subscriber without the prior written consent of the Subscriber to any person or

entity who has expressed a bona fide interest in investing in the Company (a "Potential Investor"), provided further, that such Potential Investor agrees in writing to keep such information confidential.

3.10    Subscriber acknowledges that the Company has the unconditional right to accept or reject the subscription contained herein, in whole or in part. The Company will notify Subscriber whether the subscription contained herein is accepted or rejected. If such subscription is rejected, payment will be returned to Subscriber in full without deduction or interest.

3.11    Subscriber acknowledges and understands that, the Purchase Price was determined arbitrarily by the Company, does not bear any relationship to the assets, book value, results of operations, net worth, or other objective criteria of value applicable to the Company and should not be considered an indication of the actual value of the Company. Subscriber acknowledges and understands that, the Company has not retained any independent professionals to review or comment on this offering on behalf of, or to otherwise protect the interests of, Subscriber hereunder. Although the Company has retained its own counsel, neither such counsel nor any other counsel has made, on behalf of Subscriber, any independent examination of any factual matters represented by management herein or in the documents provided herewith, and Subscriber should not rely on the counsel retained by the Company with respect to any matters herein described.

3.12    Subscriber acknowledges and understands that, the Company has not paid any cash dividends on its membership interests or Units since its inception and, by reason of its present financial status and its contemplated financial requirements, does not contemplate or anticipate paying any dividends upon its membership interest or Units in the foreseeable future.

3.13    Subscriber expressly acknowledges and understands that, in connection with the offer and sale of the Units to Subscriber, the Company is relying upon Subscriber's representations and warranties as contained in this Agreement.

3.14    Subscriber has not employed any broker, finder or similar agent and no person or entity with which he has had any dealings or communications of any kind is entitled to any brokerage, finder's or placement fee or any similar compensation in connection with the purchase and sale of the Units.

4    Representations of Company. The Company hereby represents and warrants to Subscriber as follows:

4.1    The Company is a corporation duly organized, existing and in good standing under the laws of the State of Delaware and has the corporate power to conduct the business which it conducts and proposes to conduct.

4.2    The execution, delivery and performance of this Agreement by the Company has been duly approved by the Managing Member of the Company and all other actions required to authorize and effect the offer and sale of the Units has been duly taken and approved.

4.3    The Units have been duly and validly authorized and when issued to Subscriber in accordance with the terms hereof, the Units will be duly and validly issued, fully paid and non-assessable.

4.4    The Company has all licenses from each applicable federal, state and local governmental authority necessary to conduct its businesses as presently conducted.

4.5    Except for any securities related filings required by any federal, state or local governmental authority, no consent, approval, order or authorization of, or filing with, any federal, state or local

governmental authority on the part of the Company which has not been obtained or expressly waived, is required in connection with the execution, delivery and performance of this Agreement.

4.6     The execution and delivery of, and the performance by the Company of its obligations in this Agreement do not (i) breach, or result in a default or acceleration under, any material provision of any instrument, mortgage, deed of trust, contract or other agreement to which the Company is a party, or (ii) breach or otherwise violate any existing obligation of the Company under a court order, judgment or decree by which the Company is bound.

5       Indemnification. Subscriber hereby agrees to indemnify and hold harmless the Company and the Company's officers, members, employees, agents, counsel and affiliates from and against any and all damages, losses, costs, liabilities and expenses (including, without limitation, reasonable attorneys' fees) which they, or any of them, may incur by reason of such Subscriber's failure to fulfill any of the terms and conditions of this Agreement or by reason of Subscriber's breach of any of his representations and warranties contained herein. This Agreement and the representations and warranties contained herein shall be binding upon Subscriber's heirs, executors, administrators, representatives, successors and assigns.

6       Applicable Law. This Agreement shall be construed in accordance with and governed in accordance with the laws applicable to contracts made and wholly performed in the State of Delaware (without regard to its principles of conflict of laws). In any such action or proceeding, each of the Company and the Subscriber hereby absolutely and irrevocably (i) waives personal service of any summons, complaint, declaration or other process and (ii) agrees that service thereof may be made by certified or registered first-class mail directed to such other party, as the case may be, at their respective addresses set forth herein.

7       Counterparts. This Agreement may be executed in one or more counterparts, all of which together shall constitute one agreement binding on all parties hereto notwithstanding that all the parties may not have signed the same counterpart.

8       Persons Bound. This Agreement shall, except as otherwise provided herein, inure to the benefit of and be binding on the Company and its successors and permitted assigns and on Subscriber and Subscriber's respective heirs, executors, administrators, successors and permitted assigns.

9       Entire Agreement. This Agreement, when accepted by the Company, will constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained. This Agreement may not be modified, changed, waived or terminated other than by a writing executed by all the parties hereto. No course of conduct or dealing shall be construed to modify, amend or otherwise affect any of the provisions hereof.

10      Assignability. Each of the parties hereto agrees that he, she or it may not assign any of his, her or its respective rights or obligations hereunder without the prior written consent of the other party hereto.

11      Notices. Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, telegraphed, telexed, sent by facsimile transmission, sent by certified, registered or express mail, postage prepaid, or by overnight courier to the address of each party set forth herein. Any such notice shall be deemed given when delivered personally, telegraphed, telexed or sent by facsimile transmission or, if mailed, three days after the date of deposit in the United States mail.

12      Interpretation.

12.1     When the context in which words are used in this Agreement indicates that such is the intent, singular words shall include the plural, and vice versa, and masculine words shall include the feminine and neuter genders, and vice versa.

12.2     Captions are inserted for convenience only, are not a part of this Agreement, and shall not be used in the interpretation of this Agreement.

**SUBSCRIBER:**                                     Dated: March 31, 2016

<br>

| | |
|---|---|
| Signature | 0.50 |
| Name: JOE AROCHA | Number of Units for which |
| Title: Subscriber | Subscriber subscribed |

Address:                                                   $50,000.00
234 Southway Drive                              Aggregate Purchase Price
San Antonio, Texas 78225

█████-2202
Tax Identification or Social Security Number

The foregoing subscription is accepted and the Company hereby agrees to be bound by its terms.

**WOODBRIDGE MORTGAGE
INVESTMENT FUND 3A, LLC**

By: **WMF Management, LLC, its Manager**

Dated:                              , 2016          By:

                                                             Robert Shapiro, Duly Authorized

**WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**

**To:** Prospective purchasers of Units (the "<u>Securities</u>") offered by Woodbridge Mortgage Investment Fund 3A, LLC (the "<u>Company</u>")

**Re:** *Requirement to Submit an Accredited Investor Representation Letter*

The Securities are being sold only to "accredited investors" ("<u>Accredited Investors</u>") as defined in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"). The purpose of the attached Accredited Investor Representation Letter (the "<u>Letter</u>") is to collect information from you to determine whether you are an Accredited Investor and otherwise meet the suitability criteria established by the Company for investing in the Securities.

All of your statements in the Letter (collectively, the "<u>Investor Information</u>") will be treated confidentially. However, you understand and agree that, upon giving prior notice to you, the Company may present the Investor Information to such parties as it deems appropriate to establish that the issuance and sale of the Securities (a) is exempt from the registration requirements of the Securities Act or (b) meets the requirements of applicable state securities laws; provided, however, that the Company need not give prior notice before presenting the Investor Information to its legal, accounting, and financial advisors.

You understand that the Company will rely on your representations and other statements included in the Investor Information in determining your status as an Accredited Investor, your suitability for investing in the Securities and whether to accept your subscription for the Securities.

The Company may refuse to accept your request for investment in the Securities for any reason or for no reason.

**[*Remainder of this page left intentionally blank*]**

## ACCREDITED INVESTOR REPRESENTATION LETTER

WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC
14225 Ventura Boulevard
Suite 100
Sherman Oaks, California 91423

Dear Issuer:

I am submitting this Accredited Investor Representation Letter (this "Letter") in connection with the offering of Units (the "Securities") of Woodbridge Mortgage Investment Fund 3A, LLC, a Delaware limited liability company (the "Company"). I understand that the Securities are being sold only to accredited investors ("Accredited Investors") as defined in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (the "Securities Act").

I hereby represent and warrant to the Company that I qualify as an Accredited Investor on the basis that:

(You must choose Part A or B below and check the applicable boxes.)

A.       I am a **NATURAL PERSON** and:

(*An investor using this Part A must check box (1), (2), or (3).*)

**[ ]**       **(1)**       **Income Test:** My individual income exceeded $200,000 in each of the two most recent years or my joint income together with my spouse exceeded $300,000 in each of those years;

**and**

I reasonably expect to earn individual income of at least $200,000 this year or joint income with my spouse of at least $300,000 this year.

**[ ]**       **(2)**       **Net Worth Test:** My individual net worth, or my joint net worth together with my spouse, exceeds $1,000,000.

For these purposes, "**net worth**" means the excess of:

my total assets at fair market value (including all personal and real property, but excluding the estimated fair market value of my primary residence)

**minus**

my total liabilities. For these purposes, "**liabilities**": exclude any mortgage or other debt secured by my primary residence in an amount of up to the estimated fair market value of that residence; but

include any mortgage or other debt secured by my primary residence in an amount in excess of the estimated fair market value of that residence.

I confirm that my total individual liabilities, or my total joint liabilities together with my spouse, do not exceed $_____. I represent that all liabilities necessary to determine my individual net worth, or my joint net worth together with my spouse, for the purpose of determining my status as an Accredited Investor are reflected in the dollar amount in the preceding sentence.

In addition, I confirm that I have not incurred any incremental mortgage or other debt secured by my primary residence in the ninety (90) days preceding the date of this Letter, and I will not incur any incremental mortgage or other debt secured by my primary residence prior to the date of the closing for the sale of the Securities. I agree to promptly notify the Company if, between the date of this Letter and the date of the closing for the sale of the Securities, I incur any incremental mortgage or other debt secured by my primary residence. (NOTE: If the representation in the first sentence of this paragraph is untrue or becomes untrue prior to the date of the closing for the sale of the Securities,

you may still be able to invest in the Securities. However, you must first contact the Company for additional instructions on how to calculate your net worth for purposes of this offering.)

[ ]        **(3)**        **Company Insider:** I am a manager or executive officer of the Company.

B.        I am a **LEGAL ENTITY** that is:

(*An investor using this Part B must check at least one box below.*)

[ ]        **(1)**        A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

[ ]        **(2)**        A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

[ ]        **(3)**        An insurance company as defined in the Securities Act.

[ ]        **(4)**        An investment company registered under the Investment Company Act of 1940 (the "Investment Company Act").

[ ]        **(5)**        A business development company as defined in Section 2(a)(48) of the Investment Company Act.

[ ]        **(6)**        A private business development company as defined in the Investment Advisors Act of 1940.

[ ]        **(7)**        A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or 301(d) of the Small Business Investment Act of 1958.

[ ]        **(8)**        An organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Securities, with total assets in excess of $5,000,000.

[ ]        **(9)**        A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

[ ]        **(10)**        An employee benefit plan within the meaning of Title I of the Employment Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in such Act, which is either a bank, savings and loan association, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000, or if a self-directed plan, the investment decisions are made solely by persons that are accredited investors.

[ ]        **(11)**        A trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Securities, whose purchase is directed by a "sophisticated" person.

[ ]        **(12)**        An entity in which all of the equity owners are Accredited Investors.

(***NOTE:*** *If box (12) is checked, each equity owner of the entity must individually complete and submit to the Company its own copy of this Letter.*)

**RELIANCE ON REPRESENTATIONS; INDEMNITY**

I understand that the Company and its counsel are relying upon my representations in the Letter and upon the supporting documentation to be delivered by me or on my behalf in connection with the Letter (collectively, the "Investor Information"). I agree to indemnify and hold harmless the Company, its directors, officers, members, managers, representatives and agents, and any person who controls any of the foregoing, against any and all loss, liability, claim, damage and expense (including reasonable attorneys' fees) arising out of or based upon any misstatement or omission in the Investor Information or any failure by me to comply with any covenant or agreement made by me in the Investor Information.

**SHARING OF INVESTOR INFORMATION**

I understand and agree that, upon giving prior notice to me, the Company may present the Investor Information to such parties as it deems appropriate to establish that the issuance and sale of the Securities (a) is exempt from the registration requirements of the Securities Act or (b) meets the requirements of applicable state securities laws; provided, however, that the Company need not give prior notice before presenting the Investor Information to its legal, accounting and financial advisors.

**INVESTOR'S SIGNATURE AND CONTACT INFORMATION**

Name of Investor: JOE AROCHA

Signature:

Name of Signatory: JOE AROCHA

Title (if Investor is an entity):

Date: March 31, 2016

Email address: n/a

Mailing address: 234 Southway Drive

San Antonio, Texas 78225

Telephone number: 210-355-3932

**SPOUSE'S SIGNATURE AND CONTACT INFORMATION**

(*NOTE: The investor's spouse need only sign this letter if the investor is a natural person proving its accredited investor status based on **joint income** or **joint net worth** with the spouse under Part A(1)(a) or Part A(2)(a). A spouse who signs this letter makes all representations set out in this letter, including those relating to joint income or joint net worth, as applicable*.)

Signature:

Name:

Date:

Email address:

Mailing address:

Telephone number:

## JOINDER AGREEMENT

WHEREAS, the undersigned is becoming the holder of a membership interest or a Unit (all or individually an "Interest") in **Woodbridge Mortgage Investment Fund 3A, LLC** (the "Company") simultaneously with the execution hereof; and

WHEREAS, as a condition to the acquisition of such Interest, the undersigned has agreed to execute this Joinder Agreement (this "Agreement") to become a party to the Operating Agreement of the Company dated as of October 30, 2015, as the same may have been amended (the "Operating Agreement"); and

WHEREAS, the undersigned understands that execution of this Agreement is a condition precedent to the undersigned's becoming the holder of such Interest.

NOW, THEREFORE, to satisfy this precondition and in consideration of the benefits of the Operating Agreement available to the holder of such an Interest, the undersigned agrees as follows:

1.    The undersigned hereby agrees that upon delivery of this Joinder Agreement the undersigned will become, without any further documentation or action on the part of the undersigned, or any other person or entity, a party to the Operating Agreement and will be bound by the terms, conditions and representations applicable to the holders of whatever Interests are held by the undersigned contained in the Operating Agreement as of the date this Agreement is signed, once any other preconditions to the transfer of such Interest have been satisfied to the satisfaction of the Company as indicated by its acceptance of this Agreement below. The undersigned will be bound by the Operating Agreement as though the undersigned was an original party thereto.

2.    The undersigned hereby further agrees that this Joinder Agreement shall be construed to be an executed and delivered signature page to the Operating Agreement and that, as such, may be used by the Company to evidence that the undersigned is a party to the Operating Agreement.

3.    All capitalized terms used in this Joinder Agreement which are not defined herein shall have the meaning given to them in the Operating Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement this 31st day of March, 2016.


Purchased By:                                              Accepted:

                                                          **WOODBRIDGE MORTGAGE**
                                                          **INVESTMENT FUND 3A, LLC**


                                                          By: _____
JOE AROCHA                                                Robert Shapiro, Duly Authorized