# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO. 19-cr-20178-CMA**

**UNITED STATES OF AMERICA,**          Miami, Florida

      **Plaintiff,**          October 15, 2019

  **vs.**          8:52 a.m. to 12:01 p.m.

**ROBERT SHAPIRO,**          Courtroom 12-2

     **Defendant.**          (Pages 1 to 138)

_____

**SENTENCING**
**BEFORE THE HONORABLE CECILIA M. ALTONAGA,**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

**FOR THE GOVERNMENT:**   ROGER CRUZ, ESQ.
LISA H. MILLER, ESQ.
Assistant United States Attorney
99 Northeast 4th Street
Miami, FL 33132
(305) 961-9001
roger.cruz@usdoj.gov
lisa.miller@usdoj.gov

**FOR THE DEFENDANT:**   RYAN D. O'QUINN, ESQ.
ELAN A. GERSHONI, ESQ.
JORDAN A. ZIEGLER, ESQ.
DLA Piper, LLP
200 South Biscayne Blvd., Suite 2500
Miami, Fl 33131-5341
(305) 423-8553
ryan.oquinn@dlapiper.com

**Also Present:**   Syreta Gould, USPO
Austin Steelman, FBI
James Mis, FBI
Lavderim Hysa, Forensic Accountant
Chris Perham, IRS

2

**APPEARANCES CONTINUED:**

**REPORTED BY:**          STEPHANIE A. McCARN, RPR
                          Official Court Reporter
                          400 North Miami Avenue
                          Twelfth Floor
                          Miami, Florida 33128
                          (305) 523-5518
                          Stephanie_McCarn@flsd.uscourts.gov

<u>**I N D E X**</u>

<u>**WITNESSES**</u>

<u>**WITNESSES FOR THE GOVERNMENT**</u>:                        <u>**Page**</u>

**Thomas Jeremiassen**
  Direct Exam on Qualifications by Mr. Cruz      **12**
  Direct Examination by Mr. Cruz                **16**
  Cross-Examination by Mr. O'Quinn              **53**
  Redirect Examination by Mr. Cruz              **58**



<u>**WITNESSES FOR THE DEFENDANT**</u>:                        <u>**Page**</u>
                                                          --

| <u>**EXHIBITS IN EVIDENCE**</u> | <u>**PRE**</u> | <u>**MARKED**</u> | <u>**ADMITTED**</u> |
|---|---|---|---|
| **Government's Exhibit No. 1** | -- | 51 | 51 |
| **Defendant's Exhibit No.** | -- | -- | -- |

<u>**MISCELLANEOUS**</u>

                                                          <u>**Page**</u>
**Proceedings**........................................    **4**
**Court Reporter's Certificate**.....................    **118**

(The following proceedings were held at 8:52 a.m.)

COURT SECURITY OFFICER:  All rise.  United States Southern District Court is now is session, the Honorable Cecilia A. Altonaga presiding.

THE COURT:  Good morning.  Please be seated.

Please state your appearances.

MR. CRUZ:  Your Honor, good morning.  Roger Cruz for the United States.  Judge, we have a number of people here at counsel table.  You've seen nearly all if not all of them.  Let me start first with my trial partner Lisa Miller.

MS. MILLER:  Good morning.

THE COURT:  Good morning.

MR. CRUZ:  Behind me we have the asset forfeiture attorney assigned to the matter.  Her name is Alison Lehr. Judge, you have met the case agents from the FBI.  We have two case agents.  First we have Austin Steelman.

MR. STEELMAN:  Good morning.

MR. CRUZ:  And in the audience we have James Miss. After that, Your Honor, we have the forensic accountant, and he's got a different name, it's unique that I will do my best to not butcher, Lavderim Hysa.

THE GALLERY:  Good morning, Your Honor.

THE COURT:  All right.

MR. CRUZ:  Finally, Judge, you met Agent Perham.  He's with the IRS.  He's special agent over there.  Again, good

morning.

THE COURT:  Good morning.

MR. O'QUINN:  Good morning, Your Honor.  I'm Ryan O'Quinn.  I'm joined at counsel table by Cocounsel Elan Gershoni and Jordan Ziegler.  We represent Robert Shapiro, who is present before the Court, Your Honor.

THE COURT:  Good morning.

And from Probation.

PROBATION OFFICER:  Good morning, Your Honor.  Syreta Gould on behalf of U.S. Probation.

THE COURT:  Mr. Shapiro, we are here for your sentencing hearing.  There have been a number of documents filed.  Have you had occasion to review them all:  the Presentence Investigation Report, your sentencing memorandum and objections and the Government's response and sentencing memorandum and the victim statements and the victim videos?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Why don't we begin by addressing the Government's position first.

MR. CRUZ:  Your Honor, I am happy to report, and if you will allow me, I have a brief outline for Your Honor's consideration on how to conduct the hearing with, of course, Your Honor's -- at your direction, we will proceed.  But I am happy to report that the Government and the Defense have resolved the large majority, if not all, of the objections to

the Presentence Investigation Report.  We can go for posterity purposes through each of those and make sure that the record is clear that we've resolved those for Your Honor's consideration before we proceed.

After that, Judge, I would suggest that the Government be allowed, with Your Honor's permission, to call its first and only fact witness.  Now, that witness will address certain items that were raised on the objections.  Again, we are fairly confident that, as a matter of substance, they will be addressed but, again, argument will stem from that testimony.  His name a Tom Jeremiassen.  He is the forensic accountant of the -- from the bankruptcy estate.

After that, Your Honor, if you'll allow us, we have a number of victim witnesses that would like to personally address Your Honor, who have traveled here and would like to, again, address Your Honor as far as victim impact.  We also have just a couple of those videos that Your Honor mentioned previously on the record that we'd like to play.  After that, if you'll allow it, we'd then proceed to the 3553(a) and application thereof.

Again, that's my suggested outline, Judge.  If you adopt that, great.  If not we're --

THE COURT:  That's acceptable, of course.  You may proceed.

MR. CRUZ:  Thank you, Judge.

THE COURT:  You may proceed.

MR. CRUZ:  Mr. O'Quinn, did you want to add anything to what I said?

MR. O'QUINN:  You know, I guess, just for clarity of the record, Your Honor, most of our objections and the issues that we raised by them, we felt that we needed to raise as a duty, most of them are either an issue with the usage of a particular term or nonfactual legal-based issues that I don't believe bear on testimony that witnesses would give.  We certainly understand that the Government can call a witness and that that witness may offer testimony related to the value either of the real estate portfolio incrementally or as a whole.  We have merely objected to the use of that form of an estimate for two purposes:  One, it doesn't actually matter because it doesn't change the sentencing guideline calculation, and we felt that it was unnecessarily speculative when there was a mutual agreement on a gain number that was not inconsistent with that potential loss once it's identified by the actual sale of property but has the same sentencing guideline calculation associated with it.

In short, we believe that many of the properties that are in this portfolio are special properties that are very difficult to value by estimate and will ultimately be sold and determined by the market what the value is.  And we recognize that Mr. Shapiro as a result of his criminal conduct is

responsible for that loss, we just think that at this point estimating that loss would be too speculative and could be detrimental to the sale process that will go forward with those properties.

And going back, that brings me back to the first point that I raised which was one of the specific terms that we have an issue with is the use of the term "Ponzi scheme."  In my experience a Ponzi scheme has a very specific meaning and connotation.  I think in common parlance and the white collar world, it has come to be used in every single offering fraud, and I think that the difference between this set of circumstances and a true Ponzi scheme could have a detrimental effect on the value of the very real real estate portfolio that's in possession of the bankruptcy estate and that we hope will be sold for the highest amount possible for the benefit of the victims of this.

So it doesn't go to the criminality of the conduct of the Defendant, it's just an unnecessary use of a confusing term that evokes something different than what we had in this offering fraud.  It, again, would not impact sentencing guideline calculation but was an important distinction that we felt important to raise both to protect the record and also to protect the real estate portfolio.

MR. CRUZ:  Brief reply, Judge.  The only issue I have with that, as I'm sure Your Honor knows this, but I will repeat

it for purposes of the record.  Under 2B1.1 controlling Eleventh Circuit case law, the sentencing guidelines Supreme Court law, Your Honor must adequately within reason either calculate or through an agreement apply a loss figure.  Under the guidelines there is a loss figure of over $250 million.  We have witnesses in the court that we flew in that can and provide -- will provide testimony to Your Honor that will substantiate that figure over $250 million loss.  If the Defense is in a position to accept that, then I do believe it will obviate the need to call a valuation expert which is, for the record, his name a Fred Chin, C-H-I-N.

Now if what I am hearing from Mr. O'Quinn it's speculative and it's maybe not that, then I think I'll be compelled to call that witness.  We are trying to, I believe, streamline the sentencing hearing a bit, and if Mr. O'Quinn wants to talk to his client, maybe Your Honor can give him a few minutes or we can decide now on the record.

MR. O'QUINN:  Your Honor, it's my intention -- what I am saying is I would stipulate that that would be the testimony of the witness.  And if the Court were to accept that testimony as presented with a witness testifying that that was their estimate, then we can proceed in that manner.  I was merely raising to the Court that using the gain calculation, which would be a more conservative approach to the Court's job of calculating the sentencing guidelines, you would actually not

result in a different sentencing guideline in the end.  You would still be at a 43.

So the going through the process of trying to identify whether or not the Court is going to accept an estimate on the value of real estate that is, I think by all accounts, unique real estate.  We had one property that, I think, was acquired for $90 million that belonged to Sonny and Cher.  I'm not exactly sure how you comp that out.  And so what I'm suggesting is that the Court, whether you were to accept that testimony or go with our stipulated amount that he received 25 million in gains, you would end up with the same sentencing guideline in the end, and we would avoid having to have a discussion about the value of that specific portfolio.

I am very confident to the extent that the Court needs to identify a loss figure for the purpose of restitution at the restitution hearing, I am 100 percent confident that we would be able to stipulate to that amount for the purpose of restitution and move forward.  I don't think that we need to go through this process to determine a restitution number, and I think the guidelines do allow you, in the event that there is a speculative aspect to the calculation of loss, to proceed with a gain number instead, and that's why we offered that to the Court.

THE COURT:  I thought the parties had made some agreements to streamline this morning's sentencing.  That

doesn't appear to be the case.  I'll allow the Government to proceed how it wishes.

MR. CRUZ:  Thank you, Your Honor.

The Government calls Thomas Jeremiassen to the stand.

THE COURT:  Please raise your right hand.

(Time 9:02 a.m.)

THOMAS JEREMIASSEN,

a witness for Government testified as follows:

THE WITNESS:  I do.

THE COURT:  Please be seated.

MR. O'QUINN:  Your Honor, I'm sorry.  I don't mean to keep jumping up and down, but I've talked to my client.  Again, I don't believe this will have an effect, and I don't want to waste the Court's time and resources, so we would stipulate to the number that the Government is offering, Your Honor.

THE COURT:  All right.  There is a stipulation now, I believe.  Do we -- and what is that number that the parties are now stipulating to?

MR. O'QUINN:  I believe it's the $485 million number offered by the Government.

MR. CRUZ:  Here's the problem, Your Honor.  I want to make sure that the record is clear that Your Honor's satisfied based on the evidence as well as the parties' stipulation that the loss figure is, in fact, what this witness and the other valuation witness will say is approximately $470 million.  This

Case 19-50965-JKS Doc 75-2 Filed 10/31/24 Page 13 of 139

Direct Examination on Qualifications - Thomas Jeremiassen
October 15, 2019
United States of America v. Robert Shapiro, 19-cr-20178-CMA

12

witness will substantiate that prong as well as other aspects of what I would like to extract from him for purposes of this hearing 3553(a).

But, again, I have a valuation witness, Fred Chin who is in the audience, who will just testify about the value of the estate, simple arithmetic. Jeremiassen is the forensic accountant. He takes the total raise minus distributions in the fraud scheme, money back to investors, other arithmetic, and then we subtract ultimately what Mr. Chin would have testified to, which is approximately 410. This witness, I am confident, will testify to Your Honor that the approximate loss as today, the 15th of October 2019 is $470 million.

Now, I think because we keep going back on this uncertain shaky ground, it's better if I lay a foundation. I will do it efficiently.

THE COURT: Very well.

MR. CRUZ: Thank you, Judge. And then Mr. O'Quinn can cross if he'd like.

DIRECT EXAMINATION

ON QUALIFICATIONS

BY MR. CRUZ:

Q. Sir, can you tell us your name, please.

A. Yes, it's Thomas Jeremiassen.

Q. Can you spell that last name for us.

A. Yes. J-E-R-E-M-I-A-S-S-E-N.

Q.   Where are you from originally?

A.   Originally, I am from Minnesota.

Q.   Where do you live now?

A.   Los Angeles area.

Q.   Do you have a degree in higher education?

A.   I do.

Q.   Where from?

A.   Pepperdine University.

Q.   What in?

A.   A bachelor of science in accounting.

Q.   Do you have any professional licenses?

A.   I do.  I'm a certified public accountant, certified in
financial forensics, and I'm a certified insolvency and
restructuring advisor.

Q.   How long have you been practicing as a forensic accountant?

A.   Over 23 years.

Q.   Briefly, do you have any memorable cases that you've worked
on?  Does the name Adelphia come to mind?

A.   It does.

Q.   What did you do on the Adelphia matter?

A.   Originally, my firm was engaged to act as forensic
accountants for the official committee of unsecured creditors
in the Adelphia bankruptcy.  We did that for several years
preconfirmation of a bankruptcy plan, assisted, supported
litigation against a consortium of banks in that case, and now

Case 19-50965-JKS  Doc 75-2  Filed 10/31/24  Page 15 of 139
Direct Examination on Qualifications - Thomas Jeremiassen
October 15, 2019
United States of America v. Robert Shapiro, 19-cr-20178-CMA

14

actually I serve as the plan administrator for the Adelphia
estate.

Q.   What is a forensic accountant?

A.   Forensic accountant is a -- an accountant that practices in
areas of litigation disputes.

Q.   What do you do in your duties and obligations as a forensic
accountant on a historical matter that's in litigation?

A.   Typically, it involves the reconstruction of financial
transactions, the sources and uses of those transactions, of
those transactions for purposes of, typically, litigation.

Q.   You look at bank records?

A.   I do.

Q.   Do you look at accounting software?

A.   I do.

Q.   Do you interview individuals that historically had contact
and analyzed books and records tied to a particular business?

A.   Yes.

Q.   Have you been qualified as an expert by other court of law?

A.   I have.

Q.   Approximately how many occasion have you been qualified as
a forensic accountant expert?

A.   Qualified as an expert?

Q.   Yes, sir.

A.   Half a dozen.

Q.   All right.  In this case were you, in fact, retained for

Case 19-50965-JKS   Doc 75-2   Filed 10/31/24   Page 16 of 139

Direct Examination on Qualifications - Thomas Jeremiassen
October 15, 2019
United States of America v. Robert Shapiro, 19-cr-20178-CMA

15

your forensic accountant services?

A. Yes.

Q. Did you become involved in the forensic analysis of the Woodbridge estate sometime in 2018?

A. Yes.

Q. And from 2018 until today, have you had a chance to spend hours analyzing the books and records of Woodbridge through bank records as well as interviewing of individuals to come up with a forensic analysis?

A. Yes.

Q. The forensic analysis, is it based on your training and experience?

A. It is.

Q. And do you have opinions as to your reflection on those books and records as well as interviews and other work that you and others have performed regarding the Woodbridge estate?

A. Yes.

Q. Do you have an opinion that is tied to your expertise in forensic accounting?

A. Yes.

MR. CRUZ: Your Honor, under Federal Rule of Evidence 702, we tender Mr. Jeremiassen as a qualified expert in the field of forensic accounting.

MR. O'QUINN: No objection.

THE COURT: You may proceed.

**DIRECT EXAMINATION**

**BY MR. CRUZ:**

Q.   What were your duties and obligations once you started working on Woodbridge?

A.   Primarily, in particular at the outset, my duties involved the analysis, the reconstruction and analysis of the pre-bankruptcy financial transactions from approximately the middle of 2012 up to the bankruptcy filing.

Q.   Give us a time frame.  2012 until when, sir?

A.   July 1, 2012, through December 4, 2017, when the bankruptcies were filed.

Q.   Let's start with the bank records.  Approximately, how many different separate bank accounts were there that you and your team looked at?

A.   Primarily nine accounts.  Those were the two operating accounts of Woodbridge, Woodbridge Structured Funding, LLC, Woodbridge Group of Companies, LLC, were the two operating entities, and the seven different investment funds.

Q.   Did you develop an understanding as to who controlled the actual movement of money in the Woodbridge matter?

A.   Yes.

Q.   Who?

A.   Robert Shapiro.

Q.   Who had signing authority on all of those accounts?

A.   Robert Shapiro.

Q.   Did you as a forensic accountant have the opportunity to calculate the total amount raised in the Woodbridge matter?

A.   I did.

Q.   And when I say Woodbridge matter, do you have a general understanding based on your experience and training that is specific to Woodbridge, in other words, do you have an understanding of what the business, the purported business model was at Woodbridge?

A.   I do.

Q.   Do you know what the types of the investments that were sold there?

A.   Yes.

Q.   And do you have a general understanding of the advertising and some of the marketing materials that were given to investors there?

A.   I do.

Q.   Did you have an understanding as to the two main types of investment products offered?

A.   Yes.

Q.   Could you tell the Court what they were, please?

A.   Yes.  The two -- excuse me.  The primary products were first position notes.  These were typically 12-month notes investors would -- would invest in secured, allegedly secured, purportedly secured by real property.  The other form of investments was what was referred to as "units," and these were

equity positions in the various investment funds.

Q.   I would like to focus your attention on those two types of investments because were there, in fact, other products that you came across in your forensic analysis that were offered at Woodbridge?

A.   Yes.

Q.   Are you familiar with the allegations in the indictment in this matter?

A.   Yes.

Q.   Is it true that the indictment focuses mainly on two products, the notes that you just mentioned as well as the units?

A.   Yes.

Q.   Did there come a point in time in which you, within a reasonable degree of certainty, calculated the total funds raised at Woodbridge for that time period tied to those two products?

A.   Yes.

Q.   Please tell Her Honor approximately how much money was raised during that scope?

A.   Approximately, 1.3 billion.

Q.   Out of the $1.3 billion raised, what was the primary source of those funds?

A.   Investors, individual investors about -- over the course of the five and a half years, about 10,000 investors.

Q. The $1.3 billion, did you then assess and within a degree of certainty calculate the amount of money sent back to investors during the Woodbridge offering?

A. I did.

Q. Approximately, how much money was sent back to investors as what's referenced on the checks and drafts and wires as interest payments?

A. The interest payments?

Q. Yes, sir.

A. Approximately $123 million.

Q. Approximately, how much was sent back as principal to the investors that you've testified about now?

A. Approximately, 300 million.

Q. If you do the subtraction, can you give us an estimate of the approximate total claims made at the end of the Woodbridge matter by those two types of investors?

A. Sure. Do you want me to break it down by investor type?

Q. You can give us just the total number.

A. Sure.

Q. As I asked for, the total number of claims for those two types of investors for the Judge.

A. Right. The total outstanding -- excuse me. The total outstanding principal at the time of the bankruptcy was approximately a billion dollars held by about 8,000 investors.

Q. You said the bankruptcy, I want to be clear. The beginning

of this Woodbridge offering was sometime in 2012; is that right?

A.   Correct.

Q.   Why did you end in -- some time in December of 2018, your analysis?

A.   December of 2017.

Q.   2017, excuse me.

A.   Yeah.

Q.   Why did you end there?

A.   That's when the bankruptcies were filed.

Q.   Do you remember who caused the bankruptcy?

A.   Yes.

Q.   Who?

A.   Mr. Shapiro.

Q.   Now, if we have the approximate $1 billion in claims at the bankruptcy, do you have next an assessment of any payments made back to the victim investors as interest distributions that you could subtract from that one -- approximately 1 billion?

A.   Yes.

Q.   What's that figure?

A.   It's approximately $115 million for those that were -- for the payment of interest that went to the current investors that were outstanding as of the bankruptcy filings.

Q.   Do you have a conservative number of net funds owed to the several thousand victims, investors as of today?

A.   Subtracting the interest payments?

Q.   Yes, sir.

A.   Yes.

Q.   What is that figure?

A.   Approximately, 880, $885 million.

Q.   And in the spirit of streamlining, as you heard me attempt to promise the Court, do you know who Fred Chin is?

A.   I do.

Q.   Who is he?

A.   He is the CEO of the Woodbridge wind-down entity, and he was involved during the Chapter 11 cases as well as the CEO.

Q.   Does he have any expertise?

A.   Yes.

Q.   Name the main expertise that comes to mind when you --

A.   Certainly.  He is a real estate valuation expert.

Q.   Has he run several developments also in California and in Nevada of multi-dwelling homes?

A.   Yes.

Q.   On the evaluation side -- and, again, I'll be brief -- does he have approximately 40 years of experience in valuation?

A.   That is my understanding, yes.

Q.   Have you worked with Fred Chin to assess the portfolio of properties that remained in the bankruptcy estate from the time that it was filed until today?

A.   Yes.

Q.   Approximately how many real properties were contained in that portfolio that Mr. Fred Chin was obligated to supervise, and for the benefit of the actual debtor in possession, approximately how many real properties were part of that portfolio?

A.   Over 200 properties.

Q.   As of today, were a large number of those properties sold?

A.   Yes.

Q.   Approximately how many of those 220 properties, as of today, have already been sold?

A.   Dozens.

Q.   All right.  Are there, in fact, 44 remaining properties in that portfolio of 220, approximately, Mr. Jeremiassen?

A.   That sounds about right.

Q.   And, again, are you familiar with these because as your job as a forensic accountant, you're also aware of the current state of the finances in a general sense of what's left in the bankruptcy estate?

A.   Yes.

Q.   Based on the historical data you're aware of coupled with the current estimate of the remaining properties, did Mr. Chin as -- in his expert opinion come up with an approximate figure of what those properties were valued at?

A.   Yes.

Q.   What was that figure?

A.   Approximately 410 to $412 million.

Q.   If you subtract that net money owed to the investors, subtract that Fred Chin figure, do you have an approximate total loss caused by the Woodbridge fraud scheme?

A.   Yes.

Q.   What is that total fraud number?

A.   Approximately $470 million.

Q.   The $470 million, would you say that's a conservative figure, or is that something that you are taking license with?

A.   I would say it's conservative.

Q.   In other words, are you making sure to give the benefit, erring on side of caution and keeping it at a lower approximation?

A.   Yes.

Q.   The -- by the way, are you aware of Mr. Chin's prior designation as an expert in the field of appraisal?

A.   Yes.

Q.   Are you aware that he's been qualified as an expert witness by several courts in valuation of real property?

A.   Yes.

Q.   So based on your assessment of the forensics as well as Mr. Chin's hard work analyzing these properties, is it a reasonable approximation and is it your testimony, sir, that the total loss in this fraud scheme was approximately $470 million?

A.   Yes.

Q.   When -- a couple of other subjects and then I'll tender the witness for cross-examination.

Mr. Jeremiassen, in your work as an expert witness in forensics, have you ever come across the word "Ponzi"?

A.   I have.

Q.   In a general nature, what is your definition of a Ponzi?

A.   A Ponzi is an investment scheme --

MR. O'QUINN:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  A Ponzi is an investment scheme in which people are led to believe that they are investing in a business capable of generating profits sufficient to pay a high rate of return on those investments.  However, in reality, the returns on those investments are not from profits generated by business activities but rather from funds invested by other investors.

BY MR. CRUZ:

Q.   Before your involvement in the Woodbridge matter, have you had the occasion to see the signs of a Ponzi scheme in other fraud schemes?

A.   I have.

Q.   And did you use your deductive reasoning skills, your -- and analytical skills in looking at the bank records as well as the payments to purported investors?

A.   Yes.

Q.   Do you focus on the use of investor funds as the main source of income that's the lifeblood of a given fraud scheme in order to designate it as a Ponzi?

A.   Yes.

Q.   Are their other factors that you look at in order to decide, in your expert opinion, a given matter qualifies as a Ponzi?

A.   Yes.

Q.   In this case, did you also look at the internal QuickBooks to assist in developing an opinion on whether or not the Woodbridge fraud scheme involved Ponzi elements?

A.   Yes.

Q.   Did you interview bookkeepers and other members of the Woodbridge staff that either stayed on or you had contact with in order to assess whether or not this matter had the indicia of a Ponzi scheme?

A.   I did.

Q.   And, sir, in your expert opinion, based on the hours of your work, the interviews, your assessment of the books and records and all the other things you have already testified about, do you have an opinion on whether or not the Woodbridge fraud scheme involved a Ponzi scheme?

A.   Yes.

Q.   What is that opinion?

A.   It is my opinion that Woodbridge operated as a Ponzi

scheme.

Q.  What is that based on?

A.  That is based on my and my team's analysis of the financial transactions since the inception of the first Woodbridge mortgage investment fund in July of 2012.  This involved examining over 300 -- about 350,000 transactions accounting for approximately three and a half billion dollars of receipts and disbursements.  We looked at the -- like you mentioned, we looked at the QuickBooks.  We looked at the bank records.  We talked to the employees.  We -- every one of those transactions was coded and categorized.  That's essentially it.

Q.  Sir, before you testified here today, did I ask you to put together a demonstrative aid to help us understand your assessment of the books and records of Woodbridge given a snapshot on the time line?

A.  Yes.

Q.  Did you, in fact, put together a two-page document that we attached to Docket Entry 167 as Exhibit 10 on this docket that is a two-page document titled Woodbridge Group of Companies, et al., summary of cash activity for the period of July 2012 to December 2017?

MR. O'QUINN:  Your Honor, we have no objection to this -- this document.

THE WITNESS:  Yes.

BY MR. CRUZ:

Q.   Is the second page a page that's made up of a -- two bar graphs with two colors demonstrating certain factors and statistical -- strike that.

   Historical data taken from the bank records?

A.   Yes.

Q.   Is this a fair and accurate assessment of your expert opinion on what those books and records as well as bank records demonstrated in your assessment of the Woodbridge matter?

A.   Yes.

         MR. CRUZ:   Judge, I would like to use Exhibit 167-10 for purposes of Mr. Jeremiassen's testimony.

         THE COURT:   You may.

         MR. CRUZ:   Thank you, Judge.

BY MR. CRUZ:

Q.   On the screen, Mr. Jeremiassen, can you tell us what is the first page of this document?

A.   Yes.  So this is a summary.  I mentioned earlier how we categorized and coded each of the transactions during this period from 2012 to 2017.  This is broken down by year into those various categories that we used.

Q.   Sir, are there, in fact, six different columns demonstrating years of your analysis of the Woodbridge matter?

A.   There are.

Q.   So is it from 2012 to 2017 similar to what you've

previously testified about your time frame?

A.   Yes.

Q.   And when I say your time frame, I mean the time frame of your analysis.

A.   Yes.

Q.   Are there others, on the left-hand side, data points that you included on this chart?

A.   Yes.

Q.   And I would like you to first focus on what information the numbers demonstrate over the course of the time line.

A.   Sure.  So we start with the net principal from investors. This is moneys invested by the investors, netted by the moneys that were returned -- or the principal returned back to the investors.

Q.   You are labelling it --  let me stop you there.

A.   Sure.

Q.   I'm sorry to apologize -- I --

A.   Sure.

Q.   Hold on.  We can't talk over each other.  Only one at a time.  I apologize.

     So you label this net principal from investors.

A.   Yes.

Q.   Is this money derived from individuals to Woodbridge?

A.   Correct.

Q.   Is this money given by individuals for a given year

depending on the table?

A.   Correct.

Q.   Table -- the table for 2012 says net principal for -- from investors and it has a dollar -- one dollar with a dollar sign. Do you see that?

A.   Yes.

Q.   Are these numbers in the millions?

A.   Correct.

Q.   So based on your table here in 2012, did investors provide Woodbridge, as far as those two unit and the other investment we talked about, the note holders, provide approximately a million dollars to Woodbridge?

A.   Approximately a million dollars, yes.

Q.   Now, from 2012 to 2017, what do you see as far as the money derived from that source?

A.   So you see it escalating over time during 2012, that's approximately six-month period when Woodbridge Mortgage Investment Fund I came on.

Q.   You are fading out on us, Mr. Jeremiassen.

A.   I'm sorry.

Q.   It's okay.  If you can just speak into the microphone.

A.   Yep.

Q.   Slowly and clearly, it will help us all.  So what did you just say?

A.   Yes.  So for -- this is by year, so for 2012 that's a

six-month period, approximately, when Woodbridge Investment Mortgage Fund I came on.  Slow start in terms of raising money from investors, only a million dollars for those first six months.  And then as you see as time goes on in 2013 through 2017, you see more and more money being raised by investors.

Q.   Based on your forensic analysis, are the total funds raised from investors regarding the note holders and the units approximately $1 billion?

A.   On a net basis, yes.

Q.   What is the next column, "descriptive term net investments by Woodbridge"?  Explain that to us, please.

A.   Yes.  So these were the -- a couple different things that Woodbridge would do with the investor money.  In terms of investing, they would invest in real property acquisitions, development and construction of those real properties, as well as some mortgage lending to third-party borrowers.

Q.   I don't want to put words in your mouth, Mr. Jeremiassen, but is this money that Woodbridge used that was essentially demonstrated here on this column?

A.   Yes.

Q.   In other words, net investments are we talking about real property construction and actual use of the funds?

A.   Yes.

Q.   Is that accurate?

A.   Yes.

Q. All right. So from 2012 you have 4 million and so on, 2015, 151, and the total over the course is approximately 673 million used in the purchase of real property mainly; is that accurate?

A. Mainly real property acquisitions.

Q. "Distributions to investors," what is that?

A. These are the monthly -- largely the monthly interest payments to the investors.

Q. You already testified that you added up those interest payments or at least money back to the investors at least designated as interest payments, and you added that over these years to 123; is that true?

A. That's correct.

Q. I would like you to focus now on mortgage lending income.

A. Yes.

Q. Can you explain to us what that is, please.

A. Yes.

Q. And why is that significant to your analysis?

A. Some of the investments made by Woodbridge that you see on that second row were to third party, true third-party borrowers and mortgages lent to them. This -- what this represents is mortgage lending income are the monthly interest payments made by those borrowers to Woodbridge as well as some other income such as points and fees and things of that nature.

Q. So when you said true third-party borrowers, do you know

the term "hard money lending" is?

A.   Yes.

Q.   Is it your understanding that Woodbridge's purported, advertised business model was to do hard money lending to people that and businesses that owned real property?

A.   Yes.

THE COURT REPORTER:   I'm sorry.   Could you repeat that, please?

BY MR. CRUZ:

Q.   Is it your understanding that the purported or alleged business model that was provided to investors was this hard money lending through Woodbridge?

A.   Correct.

Q.   And did you in your forensic analysis look for what appeared to be legitimate third-party lending made by Woodbridge and any interest payments from those third parties?

A.   Yes.

Q.   Can you give us an example of what a third-party lending situation would be?

A.   Sure.   So there would be a -- potentially a developer that needed capital.

Q.   And what does this developer hold in his or her possession at the time that they need money?

A.   It could -- they could own land; they could own real estate.

Q. All right.

A. And they want to construct a housing development or a house or a commercial building, would be an example, and they need funds; they need to borrow funds to complete that development.

Q. So a developer outside of Woodbridge needs money, and they have real property, and they go to Woodbridge to ask for money?

A. Correct.

Q. What happens next?

A. What happens next is Woodbridge raises money from investors through the notes and units and negotiates a loan with that third-party borrower.

Q. And then the third-party borrower agrees to pay back interest to Woodbridge?

A. Correct.

Q. Sir, is that what you're looking for in your forensic analysis on this exhibit, how much interest you were able to discern for a given year was brought in to support Woodbridge's claimed business model?

A. Interest and other income from the -- related to those third-party loans.

Q. And did you, in fact, within a reasonable degree of certainty identify for all those transactions that you looked at the total sum of money brought in as interest payments from these third-party lenders?

A. Yes.

Q.   And over the course of the fraud scheme from 2012 all the way to 2017, were you able to on this chart track the actual money brought in as interest payments from what you called legitimate third-party lending?

A.   Interest and other income, yes.

Q.   In 2012 was there zero interest and other income from these third-party lenders?

A.   There might have been a little more than zero but less than a million, certainly; less than half a million, certainly.

Q.   Approximately four million of interest payments from legitimate third-party lenders, according to your testimony, for 2013?

A.   Yes.

Q.   Four million, 2014?

A.   Yes.

Q.   And so on, a total of $18 million based on your assessment of money coming in over these years from the actual third-party mortgage lending; is that true?

A.   Approximately 18 million, yes.

Q.   Was that the only revenue source tied to third-party lending and related similar activity that you were able to find in your forensic analysis?

A.   Yes.

Q.   Next, we'll talk about the last one, two, three, four, five, activities on the left-hand side of your chart, okay?

A.   Yep.

Q.   Is it accurate to say that there is another source of -- of activity that you accounted for in your forensic accounting?

A.   Yes.

Q.   The structured settlement activity, you reference that here on your chart, correct?

A.   Yes.

Q.   Did you discount this or leave it out of your loss figure calculations that you have already testified about?

A.   Did I leave -- I'm sorry, Mr. Cruz, could you --

Q.   Did you take this into consideration when you gave us those figures earlier of the approximate $470 million?  In other words, is this relevant and related to your testimony?

A.   No.

Q.   Okay.  So you just included this here to show us what other source of revenue; is that accurate?

A.   That's correct, yes.

Q.   And the structured settlement for all of these years was approximately 37 million; is that true?

A.   Yes.

Q.   Okay.

A.   On a net basis, yes.

Q.   Other lender net activity.  What is that?

A.   There were other loans that were made by individuals to Woodbridge Group of Companies or Woodbridge Structured Funding

prior to the formation of Group.  These were outside of the notes and units that were raised by investors, just different types of loans.

Q.  So, again, more income not tied to your testimony today as to the notes and the unit holders, correct?

A.  Correct.

Q.  And still that was approximately what?  How much do you have here total?

A.  On a net basis, $3 million was disbursed for that activity.

Q.  All right.  Finally, the last information that I would like to focus on this chart before we turn the page is the operations.  What is operations?

A.  Those are the business expenses of Woodbridge, the overhead.  That includes -- the biggest thing is probably commissions to brokers that raised money from investors.

Q.  Were you able to identify commission payments made from the Robert Shapiro controlled accounts out to individuals in the form of commissions for money raised for the notes and the -- and the actual other investments that -- the unit holders that you mentioned?

A.  Yes.

Q.  And this operation expense, even though you designate as operating expense, you included over the years the commission payments as a source of money going out; is that true?

A.  Yes, that's part of that number.

Q.   So the operations over the -- from 2012 to 2017, is that approximately $184 million going out?

A.   Yes.

Q.   The net insider transactions, when you said "insider," are there individuals that you have in mind as far as who you designated as an insider?

A.   Yes.

Q.   Who are those?

A.   Robert and Jeri Shapiro.

Q.   And did you, in fact, keep track of, as best you could within a degree of certainty, the insider transactions tied to Robert and Jeri Shapiro from the years 2012 all the way to 2017?

A.   Yes.

Q.   And over the course of those years, what was the approximate money out to them, either personally or to companies controlled by them?

A.   Approximately, $32 million.

Q.   32 or 37?

A.   32.

Q.   Is that a typo?

A.   No.

          THE COURT:  You are on the wrong one.

          MR. CRUZ:  Oh, I'm on the wrong one.  Thanks, Judge.

BY MR. CRUZ:

Q. 32, okay. We have one left. What is net intercompany transactions?

A. Yes, these are transfers on the net basis to the -- to or from the other related entities in the Woodbridge enterprise.

Q. The last question on this sheet, then I'll move on. Sir, based on your understanding of the business model that was advertised and pitched to the investors, what was the primary claimed source of revenue for the Woodbridge product on this exhibit, Page 1?

A. That would be the mortgage lending income.

Q. The mortgage lending income that I'm circling here, was that, in fact, the cornerstone of the actual claimed investment products to the note holder and unit holder investors?

A. Yes.

Q. And based on your expert opinion, was it any way possible for the Woodbridge business model, purported business model, to have been maintained by $18 million of income from third-party lenders?

A. Mr. Cruz, I'm sorry. The -- what was your question, the first part of your question?

Q. The Woodbridge --

A. Could you repeat the question. I'm sorry.

Q. The claimed Woodbridge business model, sir.

A. Yes.

Q.  Is there any way that it could be maintained solely by the $18 million that was raised by a legitimate third-party lending?

A.  No.

Q.  Based on your expert opinion, what was necessary for this claimed business model to, in fact, operate?

A.  My opinion, the only way to sustain these operations was to raise additional money from investors.

Q.  Did you, in fact, analyze on this next page the money raised, compare it to other data points that you put together?

A.  Yes.

Q.  What do we have on this page?  Two graphs; is that right?

A.  That's correct.

Q.  What does this first one tell us as far as investor principal balance and cumulative net investments by Woodbridge?

A.  Yes.  So what this illustrates is over this five and a half year period, it tracks the cumulative investor -- the cumulative moneys raised by investors -- from investors, excuse me, by Woodbridge and then compares it to the cumulative net investments that were made by Woodbridge for the mortgage lending and -- but primarily the property acquisitions and development of those properties.

Q.  In layman's terms, sir, what does this first graph show us, please?

A.  In layman's terms what this shows is over time you see an

increasing disparity between the amounts raised from investors and the actual investments made by Woodbridge.

Q. Why is that important?

A. This is what you would typically see in a Ponzi scheme over time that more money is needed to sustain the operations and to be able to make the obligations on the increasing amount of investors -- amounts owed to investors.

Q. The acquisition of these properties, would they have been able to have occurred without the increase in investor revenue?

A. No.

Q. Based on your expert opinion, how does the operating costs, including commissions as well as the insider transactions and other payments to Jeri Shapiro and Robert Shapiro, affect your opinion on whether or not this was a Ponzi?

A. It supports it.

Q. How?

A. Their -- the only way that those payments could be made, the only way that the operations could -- the only way that Woodbridge could sustain those operations and sustain the payments for the benefit of Mr. and Mrs. Shapiro was to raise investor money because the income generated from the investments made was not sufficient to support those payments.

Q. Finally, as far as this exhibit's concerned, what does the second graph tell us?

A. Yes. So this is a chart that illustrates the cumulative

distributions made to investors, primarily the monthly interest payments over time, over this five and a half year period compared with the income that was generated from the investments made by Woodbridge.

Q.  So when you say the investments made by Woodbridge, is that all investments and any type of revenue that could have been generated other than the investor money?

A.  Correct.

Q.  And is that demonstrated by this relatively flat line?

A.  It is.

Q.  The flat line, when you compare it to the blue line, what does that show us?

A.  It shows a, again, increase in disparity between those amounts.

Q.  Between what, sir?

A.  Between the amounts paid to investments and the amounts -- the income generated from the investors that were made.

Q.  Based on your opinion, sir, your analysis, the bank records, the other items that you've testified about, approximately when did the Ponzi nature of this fraud scheme begin?

A.  Pretty early on.  Probably late 2012, early 2013.

Q.  In other words, did this have fraud scheme have the indicia of a Ponzi toward the beginning of the fraud scheme?

A.  Yes.

Q.   And did the nature of this scheme only exponentially grow in losses and number of victims?

A.   Yes.

Q.   I would like to finish up with a couple of other items. Are you -- I think you already testified that you are familiar with some of the offering documents and maybe some of the offering materials provided to investors in this matter.

A.   Yes.

Q.   Have you seen any video material offered to investors as a way in which to describe to them the units and the note holder securities?

A.   Yes.

Q.   Have you had now an opportunity to compare this video that we are about to show as well as other advertisements with your forensic analysis?

A.   Yes.

Q.   Have you ever been able to compare the advertised products with the reality of this scheme when comparing it to Exhibit 167-10?

A.   Yes.

Q.   So then I'll ask to cue up the video with Your Honor's permission so that -- excuse me?

        MS. MILLER:   Madam Court Reporter, if we could switch to the computer, please.   Thank you.

BY MR. CRUZ:

Q. Before we begin, what is it that we are about to see here?

A. This is a video produced by Woodbridge for the purpose of selling the notes and unit investments.

MR. CRUZ: Could we start it from the beginning.

BY MR. CRUZ:

Q. So is this something that financial planners on behalf of Woodbridge would show to potential investors.

A. That is my understanding, yes.

Q. It's something that the investors relied upon in deciding whether or not to invest with Woodbridge?

A. In part, yes.

Q. The beginning of this video, is it, in fact, one of the financial planners, one of the many I believe was hundreds; is that right?

A. Yes.

Q. And, again, just playing a video to, for lack of a better word, "dumb down" the purported or claimed business model of Woodbridge?

A. Yes.

MR. CRUZ: I will ask that you go ahead and start the video, and I'll ask you to pause it from time to time. Thank you.

(Pause in proceedings.)

MR. CRUZ: Your Honor, the very beginning.

Audio.  Could we have audio, please.

(Audio/video exhibit played.)

MR. CRUZ:  Can you pause it.

BY MR. CRUZ:

Q.  So is this Larry fellow similar to the example that you gave earlier in your direct examination of an actual person that owns real property needing a loan?

A.  Yes.

Q.  And is that the type of third-party lending you attempted and did identify as what you called legitimate third-party lending?

A.  Yes.

Q.  Go right ahead.

(Audio/video exhibit played.)

BY MR. CRUZ:

Q.  So Larry, we have talked about Larry, the example of the third-party lender, right?

A.  Yep.

Q.  In your analysis, did you, in fact, try to find as many real Larry third-party lenders as you could?

A.  Yes.

Q.  And, according to your analysis, approximately how many real Larrys were found that were third-party lenders over the course of the analysis?

A.  I don't recall how many third-party borrowers there

actually were, but in terms of the total dollar amount of the investments made, it was a small fraction.

Q.   In fact, did you have a chance to learn who owned the majority of the real property involved in this matter?

A.   Yes.

Q.   Who was the individual that owned 90-plus percent of all these properties?

A.   Robert Shapiro.

Q.   So in this video if Robert Shapiro was the owner of most of the properties, would Robert Shapiro be the Larry in the video?

A.   Yes.

Q.   But instead of Larry, it says some third party outside person that has real property and is using that real property as collateral; is that accurate?

A.   Yes.

Q.   And according to the video and I believe you testified that certain investors were paid back their principal; is that true?

A.   It is.

Q.   And in this video it says that after a year if they wanted their money back, they would be able to, the investors, receive their principal back in full; is that true?

A.   Yes.

Q.   Based on your forensic analysis, is there any way, shape or form that after 2013, after a given year, if an investor wanted his or her money back, there was enough money to cover all of

those investors' money back?

A.   No.

Q.   Is it, in fact, a mathematical impossibility for these investors to receive their money back after a year?

A.   Without the raising of additional investor moneys, no.

Q.   Without the new money coming in to pay those obligations, had they called for them, it was -- it was impossible mathematically to pay for those obligations; is that accurate?

A.   I think -- yes, that's accurate.  Yes.

Q.   And even though -- and I will leave you with this -- on the video it claims that Woodbridge will keep paying you interest payments, isn't it true, sir, that based on your forensic analysis, the only way Woodbridge would be able to pay you, Mr. or Ms. Investor, your interest payments back was if they used a new investor's money to pay that obligation?

A.   That's correct.

Q.   Based on your understanding of the products that were sold by Woodbridge, how important was the first-party lien position to the investors?

A.   How important was the -- oh, very important.  It was an important part of the --

Q.   Did you --

A.   -- sale.

Q.   Sorry to interrupt you.  Did you participate in analyzing some of the actual liens that were purportedly put together to

secure that first -- first-party commercial note?

A.   Yes.

Q.   In other words, are you familiar with the type of pitch and how important the first position was to the investors for that first position commercial mortgage?

A.   Yes.

Q.   And the first position on these properties was, in fact, part of that Larry video that you saw; is that true?

A.   Yes.

Q.   In other words, the first position, not only is it in the name of the product, it's something that these investors relied upon as part of the security; is that accurate?

A.   I believe so.

Q.   When the bankruptcy occurred and right before you became involved as a professional, did the name Lawrence Perkins come across your desk?

A.   Yes.

Q.   Can you tell the Judge who Lawrence Perkins was involved -- and how he was involved in the bankruptcy in Delaware for the Woodbridge group of companies?

A.   Yes.  Lawrence Perkins was retained as the chief restructuring officer of Woodbridge, the Woodbridge entities.

Q.   What was his role, essentially?

A.   His role was to guide the Woodbridge debtors through the bankruptcy.  That's essentially it.

Q. Who hired him?

A. My understanding is Mr. Shapiro.

Q. And according to his -- Perkins' being hired by Shapiro, did Perkins agree to pay Shapiro a certain amount of money each month for Shapiro's claimed consulting fees after bankruptcy?

A. Yes.

Q. What was that figure, Mr. Jeremiassen, that after the bankruptcy happened in December of 2017 Mr. Shapiro bargained for on a monthly basis, his consulting fee as to the Woodbridge bankruptcy?

A. $175,000 per month.

Q. This $175,000, was that, in fact, a sum that you were able to identify not only through the contract that he and Mr. Perkins on behalf of the bankruptcy estate agreed to, were you able to look at forensically any drafts or wires in the amount $175,000 to Shapiro for his consulting work after the bankruptcy?

A. Yes.

Q. And are you familiar with the declaration of Mr. Perkins that's in support of the debtor's Chapter 11 petition filed in the bankruptcy matter as well as the SEC's civil matter 17-12560 criminal Cooke?

A. Yes.

Q. Actually, no, that's the -- yeah, that's accurate.

Sir, have you had a chance to look at a particular

footnote 9 on that declaration?

MR. CRUZ: If we can switch it over to the ELMO, please. I'd appreciate that. Thank you.

BY MR. CRUZ:

Q. So on the screen is the declaration. You said are you familiar with it, right?

A. Yes.

Q. Now, I would like to just ask you one question more about this. In regards to the notes that's secured and perfected the security interest as to the large majority of the victims in this case, you recall what Perkins told the bankruptcy court how -- what he intended to do with those notes?

A. Yes.

Q. What did he tell the court?

A. He told the court that the note holders had not properly perfected their security interests in the properties and that they would seek, you know, during the Chapter 11 case to avoid those security interests through adversary proceedings.

Q. Did Perkins on behalf of the bankruptcy tell the bankruptcy court that he, in fact, planned to avoid all of these investors' securities because they, the victims, didn't go through the UCC filing. Is that accurate, sir?

A. That's accurate.

Q. Finally, my last exhibit. Are you familiar with any correspondence sent by the bankruptcy estate at the very

beginning of the bankruptcy to investors?

A. Yes.

Q. And, by the way, just for posterity, Mr. Perkins was subsequently removed by the bankruptcy court and other members of the bankruptcy estate and was no longer part of the estate early on in the bankruptcy; is that accurate?

A. Yes.

Q. He was no longer part of the administration, and he didn't hire you, did he?

A. No.

Q. Perkins was removed and then individuals like Mr. Chin, you already testified to, Michael Goldberg and other professionals were either nominated or appointed to then run the bankruptcy; is that true?

A. That's correct.

Q. But before Goldberg and Fred Chin and others became involved in the administration of the liquidation and things of that matter, do you recall --

MR. O'QUINN: No objection, Your Honor.

BY MR. CRUZ:

Q. Do you recall a letter on December 5, 2017, addressed to "dear valued Woodbridge investors"?

A. I do.

Q. And was it not signed and said "regards, Woodbridge management"?

A.  Yes.

MR. CRUZ:  Move Government's Exhibit 1 into evidence, Your Honor.

THE COURT:  Admitted.

(Government's Exhibit No. 1 was marked and admitted into evidence.)

BY MR. CRUZ:

Q.  On the screen, do you see a copy of that correspondence?

A.  I do.

Q.  And in that correspondence, is there some type of explanation as to why Woodbridge was forced into the bankruptcy?

A.  Yes.

Q.  And based on your deductive reasoning skills, do you think Mr. Perkins and his team was behind this letter because he was, in fact, in charge of the bankruptcy shortly after it the filing?

A.  Yes.

Q.  But Mr. Perkins after being hired by Mr. Shapiro wrote -- can you read to us what's highlighted there?

A.  Sure.

Q.  Starting with the top, December 5, 2017.

A.  Dear -- just the highlighted portions?

Q.  "Dear valued Woodbridge investors," go ahead.

A.  "This combination of rising costs and regulatory pressure

led to a loss of liquidity, resulting in an inability to make

our regularly scheduled one-year notes payment due December 1,

2017.  So you understand this unpaid obligation incurred by

Woodbridge prior to December 4, 2017, is now frozen and will be

considered as general unsecured claims in the restructuring

proceedings."

Q.  Based on your forensic accounting skills, did you have a

chance to determine whether or not the bankruptcy was in any

way caused by rising costs?

A.  I don't believe so.

Q.  The rising costs had nothing to do with the bankruptcy

filing or collapse of the Woodbridge matter; is that accurate?

A.  That's accurate.

Q.  And is it accurate to say that the collapse of the

Woodbridge offering resulted more from the Ponzi and the taking

of investor funds?

A.  I believe so.

        MR. CRUZ:  May I have a moment, Your Honor?

        THE COURT:  You may.

    (Pause in proceedings.)

        MR. CRUZ:  Your Honor, we tender the witness for

cross-examination.

        MR. O'QUINN:  I will be very brief, Your Honor.

**CROSS-EXAMINATION**

**BY MR. O'QUINN:**

Q. Good morning.

A. Good morning.

Q. I just want to make sure I understand a few specific points of your testimony, and then we'll be done.

A. Sure.

Q. I would just like to direct your attention back to the table that was referenced by Counsel a moment ago that's previously made part of the docket as attachment 10 to Docket Entry 167. I just want to draw your attention here to where you see the number 673 million. Do you see that?

A. Yes.

Q. So that is the amount of money that was invested by Woodbridge in a real estate portfolio or other aspects of that portfolio?

A. That's correct.

Q. And dozens of real property, parcels, are still within the bankruptcy estate today; is that right?

A. Correct.

Q. And the value of that real estate portfolio directly impacts the loss figure that you have offered to this Court, correct?

A. Correct.

Q. So if a house is sold for a dollar more than you have

estimated, that would reduce the loss by one dollar directly, correct?

A.   Correct.

Q.   And some of those houses are unique properties, right?

A.   Yes.

Q.   Some of them are worth more than $10 million, right?

A.   Certainly.

Q.   At least one of them is worth close to a $100 million right?

A.   We hope, yes.

Q.   But you don't know, do you?

A.   I don't know.  That's not my --that's not my area of expertise, but it could be.

Q.   And yet those special properties that are subject to sale right now; is that correct?

A.   Yes.

Q.   When they sell, they will have a direct affect on the loss estimate that you are providing to this Court today; is that right?

A.   Yes.

Q.   The testimony that you provided talked about distributions to investors.  Do you remember that testimony?

A.   I do.

Q.   That did not include the money that's been paid out to professionals in connection with the bankruptcy under the

management that was identified by Mr. Cruz.  Isn't that right?

A.   That's correct.

Q.   And that management was chosen after a settlement with the Securities and Exchange Commission between the bankruptcy and the SEC.  Isn't that right?

A.   Yes.

Q.   And the SEC actually directed the bankruptcy who to put into management and who to take out, didn't they?

A.   Could you repeat that.

Q.   The SEC played a role in determining who should be in management of the bankruptcy, didn't they?

A.   That -- that may be true.

Q.   And attorneys representing the unsecured creditors also played a role in getting to pick who would be in management in connection with that global resolution of that dispute.  Isn't that right?

A.   I believe that's true.

Q.   You don't know whether or not Mr. Shapiro new Larry Perkins before the bankruptcy, do you?

A.   I do not know.

Q.   You don't know whether he had a personal relationship with him or had just met him, do you?

A.   I don't know.

Q.   The 200 -- excuse me, the $175,000 a month payment, is that the amount?  Did I get that right?

A.   Yes.

Q.   That payment was always going to be subject to Court approval, wasn't it?

A.   I believe so.

Q.   So in the bankruptcy and when Mr. Shapiro negotiated that, it was expressly understood that that would be under court supervision.  Isn't that right?

A.   I believe that's true.

Q.   In fact, when -- and you testified that it was Mr. Shapiro that put the estate into bankruptcy, right?

A.   Yes.

Q.   And when they did that process, they formally put those assets under court supervision, didn't they?

A.   Yes.

Q.   And that's where they remain today, right, subject to sale?

A.   Yes.

Q.   And that bankruptcy is managed under court supervision for the benefit of the victims of Mr. Shapiro's criminal conduct, right?

A.   Correct.

Q.   And you testified briefly about the discussion about the security interest that was represented to investors.  Do you remember that discussion?

A.   I do.

Q.   And Mr. Cruz referenced the fact that by filing a

bankruptcy by operation of law that security interest was avoided, right?

A.   I don't know that the bankruptcy filings impacted the legitimacy of those security interests.

Q.   So you don't know whether or not the security interest was impacted by the lack of perfection upon filing of the bankruptcy is what you are saying.  You don't know that?

A.   I know that it was alleged that the security interests were not properly perfected.

Q.   Do you know what that means?

A.   Generally, yes.

Q.   What does that mean to you?

A.   It means that UCC-1 statements were not filed, filings were not done.  The investors were not in possession of the notes.

Q.   So the interest that was purchased by the investors was in fact secured, right?

A.   Yes.

Q.   It just was not -- that security interest was not perfected, right?

A.   As to the investors?

Q.   Correct.

A.   Correct.

Q.   And then upon filing of the bankruptcy, the bankruptcy estate under Larry Perkins determined that they would proceed by avoiding those interests.  Isn't that right?

Case 19-50965-JKS  Doc 75-2  Filed 10/31/24  Page 59 of 139

Redirect Examination - Thomas Jeremiassen
October 15, 2019
58
United States of America v. Robert Shapiro, 19-cr-20178-CMA

A.   Yes, I believe that's true.

Q.   And that was done after Robert Shapiro had resigned from the company, right?

A.   Yes.

        MR. O'QUINN:  No further questions, Your Honor.

        MR. CRUZ:  A couple questions, Your Honor.  If I may.

                    REDIRECT EXAMINATION

BY MR. CRUZ:

Q.   Mr. Jeremiassen, Mr. O'Quinn asked you about whether the $175,000 a month was approved.  Do you remember that question?

A.   Yes.

Q.   Was the $175,000 that was actually cashed by Mr. Shapiro approved by the bankruptcy court?

A.   I don't recall.

Q.   Do you know if that happened right before he filed?  Do you know?

A.   Right before he filed?

Q.   The bankruptcy, yes.

A.   I don't know.

Q.   All right.

A.   I don't believe so.  I don't believe it was.

Q.   You've worked on other bankruptcy matters, and you have been a receiver yourself; is that true?

A.   A trustee and receiver, yes.

Q.   And based on your forensic analysis, the individual that

spearheaded the fraud scheme was who, sir?

A.   Mr. Shapiro.

Q.   And in your work as a bankruptcy trustee, as a receiver, would you, sir, in your professional opinion have approved a payment in that sum or any sum to the individual that caused the bankruptcy in a fraud scheme?

A.   I would not.

Q.   Finally, Mr. O'Quinn asked you about the security of what was being offered the investors.  Do you remember that question?

A.   I do.

Q.   Tell us one more time how much money was actually derived from legitimate third-party lenders that could have been acted as a backstop to secure those investments?

A.   How much income was generated?

Q.   Yes, sir.

A.   Approximately, $18 million.

Q.   And, again, how much was the loss to these victims?

A.   Approximately, $880 million.

Q.   No further questions.  Thank you.

          THE COURT:  Thank you.  You may step down.

          THE WITNESS:  Thank you.

          MR. CRUZ:  Your Honor, may I proceed?

          THE COURT:  You may.

          MR. CRUZ:  We have now put forward evidence for Your

Honor's consideration as to the objection that in my eyes feel is lodged as to the loss.  There are other objections that do not affect the guideline that we can, of course, address, but we would like a ruling or at least some direction from Your Honor as to the fraud loss.  We feel a Government has met its burden under the preponderance standard, and we would ask that Your Honor, in fact, overrule the fraud loss objection and tailor a loss in this matter that's over the $250 million threshold under 2B1.1(d)(10).

THE COURT:  And I believe Mr. O'Quinn had stipulated to that figure prior to the testimony that we've received.  Is that correct, Mr. O'Quinn?

MR. O'QUINN:  Yes, Your Honor.

THE COURT:  All right.  I do make a finding that the Government has met its burden to show by a preponderance of the evidence that the fraud loss is over the $250 million threshold as noted in the Presentence Investigation Report and as supported, of course, by the expert's testimony.

MR. CRUZ:  Thank you, Your Honor.

How would you like to proceed as to the remaining objection, or are you comfortable that there has been a resolution to those pending objections?

THE COURT:  I'll let you proceed.

MR. CRUZ:  Mr. O'Quinn?

MR. O'QUINN:  No objection, Your Honor.

MR. CRUZ:  So I believe that even if those objections were not withdrawn or --

THE COURT:  I think there was the objection to the reference to the Ponzi scheme.  There is clearly evidence supporting that what transpired is in the nature of a Ponzi scheme.  Is there any other specific objection you need me to address?

MR. CRUZ:  Judge, we briefly addressed the objection as to the whether or not the home that Mr. Shapiro was arrested in was, in fact, his home.  We attached an e-mail correspondence.  We made arguments in our lengthy -- well, not too lengthy, 19-page sentencing memo, which I know Your Honor has reviewed.  We attached photographs.  Again, we would ask that Your Honor support a finding that the home that we alleged was, in fact, Mr. Shapiro's be, in fact, classified as his.

MR. O'QUINN:  Your Honor, our main issue with that is, again, a technical one.  That house was owned in exactly the same manner as the other properties that were held by Woodbridge.  Woodbridge was structured -- I will proffer to the Court, Woodbridge is structured in a manner that involved a loan between a lender and a borrower, and there was a advice given that the lender and the borrower couldn't be the same person; so the properties were held in a trust.  While Mr. Shapiro did live in the home, get the personal benefit of living in the home, our main issue is that unlike many fraud

schemes where the home is held and owned by the perpetrator of the fraud, here the home was actually held in the same manner as the other homes, and when the bankruptcy was created that home was conveyed into the bankruptcy.

He did have a lease that allowed him to continue to live in the home for a period of time after the filing of the bankruptcy, but that was a lease with a term.  He did not own the property, and it's merely, we think, inconsistent to treat all of the properties differently because he happened to live in this one.  We are not contesting the fact that he enjoyed the benefit that the home was -- provided for his use as a result of his criminal conduct, it just was not actually something -- he didn't take the millions of dollars and put it into his own name as is normally done in these cases, and when the bankruptcy happened, title to the home shifted over to the bankruptcy.  You know, it was a process but it moved over through that process and not something that he held in a separate manner and, therefore, should be treated differently.

THE COURT:  Well, why is there a need to make a finding with regard to that issue?

MR. O'QUINN:  Your Honor, I think it is already handled by the loss calculation.  I think it just merely goes into a -- if you went with a gain analysis, I think that there would have been theoretically a discussion as to whether that was gain to him or not, but because you are not proceeding

under gain, you are proceeding under loss, I don't believe that that objection has any value at this point.

THE COURT:  All right.  So let's move on.

MR. O'QUINN:  Yes, Your Honor, I will withdraw it.

MS. MILLER:  Your Honor, at this point in time, we would like to call several victims who are in the gallery starting with Mr. James McAllister.

MR. CRUZ:  Before we do that, did you warrant to address the calculations of the guidelines, or does it matter?

THE COURT:  I believe the guidelines are correctly calculated.

MR. CRUZ:  I just wanted to make sure, Judge.

THE COURT:  Yes.

MR. CRUZ:  Yes, Your Honor.

THE COURT:  To be clear, the guidelines place Mr. Shapiro at an Offense Level 43, Criminal History Category 1.  Are we all in agreement?

MR. CRUZ:  Yes, Your Honor.

THE COURT:  Mr. O'Quinn, are you in agreement with the guidelines?

MR. O'QUINN:  Yes, Your Honor.

THE COURT:  All right.

MS. MILLER:  Your Honor, as noted we have James McAllister.  He has travelled here from New Mexico.  He has prepared a written statement that he would like to read.

THE COURT:  Good morning, Mr. McAllister.

WITNESS MR. MCALLISTER:  Good morning to you.  Hello, Your Honor.  Thank you for allowing me to speak today.  My name is James McAllister, and I am 56 years old.  I started a business in 1978 when I was a junior in high school.  I also met my wife Dixie that year, and we created a successful business together.  We went through some very hard times.  We worked almost 38 years, 80 hours a week.  We worked two lifetimes for our money we earned.  When we sold our company for 300,000, we retired.  We had saved an additional 300,000 through those years.

We heard an advertisement on the radio for local financial advisor that said there were safe investment opportunities that would yield 5 percent return.  They were as safe as CDs he told us.  We got references and researched Michael Trujillo that had the investment firm.  We also researched Robert Shapiro.  We did our due diligence into not only them but the first position mortgages as well.  We wrote three separate checks to Woodbridge for $600,000 over a period of less than a year for three different investments.  We thought we were protected by the three legal notarized documents.

We had three different locations of real estate to back up those investments.  The documents stated we were in the first position on the mortgage, and we were told that if

anything went wrong, the property would be sold, and we would recoup our funds.  When the 5 percent interest payments stopped, we were informed Woodbridge was filing Chapter 11, that it was a reorganization and the interest payments would resume shortly.

It became clear that this was a lie and that our life savings had been stolen by Robert Shapiro.  Unbelievable.  We could not believe after Bernie Madoff's famous Ponzi scheme that something like this could be allowed to happen again. There were no red flags, no warnings at all.

Suddenly our income went down to rental income we have.  Then we were informed that because it was a Ponzi scheme that the interest we thought we had collected monthly was not interest at all, but it was determined to be return of capital. We had already paid the federal Government and state taxes on it.  Having new tax problems was a whole other nightmare to deal with.

Our CPA charged us $350 just to discuss our options. $350 after you lost 600,000 was a lot of money back then for us.  We found out there are approximately 8,000 victims in this case, and we don't think that includes all the contractors and so on, people.  Our personal opinion is that his actions probably affected at least 50,000 people, children's college funds, a down payment on a home for a grandchild.  How many people lost their homes?

If we had not paid off our mortgage on our house prior to this mess, we would have lost it.  We have a vehicle payment that we struggle to pay.  My wife and I have budgeted our limited funds for us now just to exist.  Our happy retirement and life as we know it is over.  We have been married for 34 years and never argued much even working all those years and hours side by side.  Since this has happened, we have had more hurt feelings, depression and anger between us than in all those years.

We have gone through and continued to deal with this hurt, and it has affected our marriage and wounded us deeply.  We have been sentenced to life.  We do not deserve this.  Because of what this man did to us, I hope you sentence this man to the fullest extent of the law.  We didn't deserve this sentence.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. McAllister.

MS. MILLER:  We now call Mrs. Dixie McAllister.

WITNESS MS. MCALLISTER:  First I want to say I get emotional; so if I lose it, I apologize.

THE COURT:  All right.

THE WITNESS:  Hello, Your Honor.

THE COURT:  Good morning.

THE WITNESS:  Thank you for allowing me to speak today.  My name is Dixie McAllister, and I am 55 years old.  My

husband has told the story of how we came to this point.  I want to tell you the things that changed in our lives because of Robert Shapiro's actions.

When we had money, we were very happy.  Now we are sad and depressed.  We fight and we cry.  The long hours we worked on concrete floors and heavy lifting caused our bodies to age badly.  Trying to get a job without a college education was not an option.  Because we are younger than most involved in this case, we do not get Social Security or Medicare.

When we had our business, my husband and I worked very hard to treat people with respect and never cheat anyone.  We used to be the ones that paid for family dinners and activities.  When we played golf, we played at beautiful courses.  I cashed out a small amount of stocks I had to buy a year pass at our municipal golf course.  We walk because we can't afford the riding carts anymore.  We do it so we have something to do to keep us from going crazy.  Golf is an amazing psychiatrist.  You can picture someone's face on that ball and take out your frustrations that way.  When this pass expires, we don't have the money to buy it again; so we don't know what we are going to do with ourselves.

We've never been to Europe and now never will.  We wanted to travel the world and go on lots of cruises.  Instead we bought a salvaged title pull trailer cheap and can only go on a few day trips.  We eat all meals in the trailer instead of

going out.  Our cell phone service was Verizon, the best.  Now it's Consumer Cellular, the worst.  We had 250 channel DISH satellite TV.  Now we have NetFlix.  I used to shop at TJ Maxx and Marshals, now it's clothes off of eBay.  I actually just got a cheap sewing machines so I could repair our clothes instead of buying any.  When you take away shopping from a lady, you are taking away a lot.

I used to cook gourmet, now I can't afford the ingredients.  We bought cheap meat, and it's so tough a Crock Pot is the only thing that can save it.  We don't go to the movies anymore.  We can't even donate to good causes.  I haven't had any body work done.  Used to go to the chiropractor every three weeks.  Haven't been since December of 2017.

We have a Christian share plan which is for major medical only for our healthcare because we can't afford the normal insurance.  The deductible is a thousand dollars per year before it pays for anything.  My hormones are flipped out, and I can't afford a test or to get treatment.  We both have plantar fasciatus and can't get the orthotics.  Neither of us have had a colonoscopy.  Found out they are $1550.

We used to pay cash for a new vehicle every couple of years.  We had to buy a used one on a loan and are struggling to make that monthly payment.  We used to spend a lot of money in our community.  Now we just buy groceries.  We scrimp to cover our monthly utilities, vehicle insurance and property

tax.  We just had to buy a car battery for $180.  It doesn't sound like much, but to us it was like a kick in the teeth.

We worry about having a major appliance go out or, God forbid, any real health issues.  We no longer have a nest egg to protect us.  Our rental income places us just over poverty level so we don't qualify for any assistance.  Because we were hardworking proud Americans, we wouldn't have wanted to accept it even if we had qualified.  Sorry.

When we found out the things Robert Shapiro and his wife spent all the victims' money on, it was sickening.  We have quickly figured out that the only ones coming out ahead in this bankruptcy are all the lawyers involved.  As the real estate is sold off, the lawyers and trust people are getting paid immediately while the rest of us sit here watching the money dry up.  The bankruptcy is to go on through 2022, and some of the properties are worth so much that they may never sell and be liquidated for pennies on the dollar at the time.

The victims have been informed that the percentage that we may receive keeps going down.  We worked so hard all those years and missed out on so much family time.  This is supposed to be our time to enjoy life.  Our lives have been ruined by this man.  Making this trip three quarters of the way across the country to represent all of those who could not be here is so important to us that we are away from Jim's mom right now who is on hospice.

Robert Shapiro preyed on mostly old people.  That in my opinion is only one step above a child molester.  I don't know how he slept at night having hurt this many people.  My husband and I both grew up poor.  We worked our fingers to the bone to attain a good life.  This monster stole that from us.

I know he didn't kill anybody, but he did cause a lot of suffering to a ridiculous amount of people.  Because we worked such long hours at our business, we never had any children to help take care of us as we get old.  We do not have long-term care insurance.  God only knows what our future holds.

Robert Shapiro has made it hell on earth for us.  This has been a deeply disturbing, anxiety causing, humiliating, take away my hope in life hurt that cannot be expressed by words.  They say money cannot buy happiness, but lack thereof can and does buy misery.  There isn't a day that goes by that what that man did to us does not affect every decision of every day.

Please do justice for all of his victims, I beg of you, by sentencing him to as long as you are able.  I thank you, Your Honor.

THE COURT:  Thank you, Mrs. McAllister.

MS. MILLER:  The United States calls Mr. Jim Webre.

WITNESS WEBRE:  Thank you, Your Honor.

THE COURT:  Good morning.

THE WITNESS:  Good morning.  I had the privilege to work for 45 years.  I saved as much money as I possibly could, most of it was Government time.  I spent 20 years in the military away from family sacrificing.  It was hard on them. It was hard on me.  But I saved as much as I could.  After I left the 45 years, I looked at -- I went to over 20 seminars of investment because I was looking for something that was secure. Out of 20 seminars, I had three people recommend Woodbridge Investments.  There were brochures and agents stated that the investment would be secured by a first position high-end property, which would guarantee a nominal rate.  I wasn't looking for making a lot of money.  I was working -- looking for security.

I was assured that the investment was extremely safe. The seller, the agents were blinded by hefty commissions enough that they didn't do their due diligence.  They were greedy. But what I didn't realize along with other investors and victims was that this was all a scam from the beginning. Robert Shapiro was investing, and I've learned today that most of the properties were for himself and his family that would benefit from the expense and all of our investors.

Unbeknownst to me, this whole thing was a Ponzi scheme from the beginning.  I lost a hundred percent of my life savings, everything that we ever had, 800,000.  And so did thousands of others, the same position I'm in.  Older people,

people that thought they were investing in something safe.

Money scammed by Robert Shapiro went to his private homes, luxury properties, vehicles, airplanes, you name it.  He was living a life of Hollywood.  He didn't care who he harmed. He made sure that these properties were secure, that his properties were secure while others were defaulted.

He thought he could get away with it.  These were supposed to be low-risk, short-term investments.  Unfortunately the elderly and retirees like myself trusted their life savings into his investment.  They are going to be lost forever.

I honestly believe he is so evil that he has hidden money and assets in trusts or other equity products that we may never find them.  May never find them.  He needs to spend the maximum amount of time in jail so he will never be able to do this to others.

There will be no trips, no money, no money for retirement, no money to leave my kids, grand kids.  I may have to sell my house or do a reverse mortgage in order to provide for my family.  I thank God for Medicare and Social Security, or I'd probably -- we'd probably be on the street.

Your Honor, please give him the maximum sentence.  I would hate to see this scumbag walk away with so many innocent retirees' money as we all fall on hard times.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Webre.

MS. MILLER:  Our next witness, Your Honor, is Ms. Grace Lamontagne.

THE COURT:  Ms. Miller, if you want to lower the podium.

MS. MILLER:  Your Honor, I am actually not so good at lowering these things.

THE COURT:  Thank you, Raul.

MS. MILLER:  Thank you.

THE COURT:  Good morning, Ms. Lamontagne.

WITNESS LAMONTAGNE:  Good morning.  I am just here -- I'm sorry, but I don't think I'm going to be able to do a better job than the people before me because all of our stories are exactly the same.  We're all suffering in our own individual way.  I never thought this could ever happen to me.  I thought I was smarter.  I thought I could take care of myself.  Well, I have been shown that that's not true.  Anybody can be taken advantage of in this way and many other ways.

I moved here about 13 years ago.  When we arrived my husband found out he had pancreatic cancer, so we went on one trip, and he passed away five months after that.  Since then, I have been through a lot.  We have sold our business.  I did not invest every cent I had, thank God for that.  Although, I can't say it's much better because even though I have rentals, my husband and I earned sweat equity, but now I can't do the work that's required in my rentals, so I have to pay for it.

Proceedings
October 15, 2019
United States of America v. Robert Shapiro, 19-cr-20178-CMA

There's no money for that.  I can see that it's eating into -- I have to go into my savings account every month and -- to meet bills.

And I can see that this just is not going to work long-term for me.  So I have been sentenced to have to work my entire life when I should have had a really nice retirement. I -- I don't want to work, but there is no choice.  That's all I really have to say.

I can just reiterate everything that you have already heard.  Each month I think what am I going to cut out now.  I have long-term care insurance that I have had for probably 20 years or longer, and I'm considering dropping that, the most stupid thing I can do, but I don't know what to do.  I'm like everybody else just looking for a way to make it work today.

I am just going to leave it at that.  I'm sorry.  I can't go on.

THE COURT:  Thank you, Ms. Lamontagne.

MS. MILLER:  Your Honor, we also have some videos to submit as part of our presentation from witnesses who could not travel here to be here in person.

THE COURT:  I have viewed those.

MS. MILLER:  Okay.

THE COURT:  And I believe Mr. Shapiro has as well.  I asked him if he had seen them.

MS. MILLER:  And so, Your Honor, just for the record,

many of those individuals were here in Florida who are on the video, whereas Mr. Macalister and Mrs. McAllister that you just heard from, they came from New Mexico, and Mr. Webre came from California, and finally Grace Lamontagne came from Sebastian Florida.

MR. CRUZ:  Your Honor, that concludes the victim witnesses that asked to address Your Honor directly.  And as Your Honor already stated, you have had a chance to look at the video vignette of those individuals that because of either health or other concerns could not arrive.  So that concludes our presentation of victim witnesses.  We have no other witness as far as anything else.

So, Judge, we can -- if Your Honor would like, we can now move on to 3553(a) and however else Your Honor would like to proceed.

THE COURT:  All right.  Why don't we move on to that and give everybody a five-minute recess.

MR. CRUZ:  Yes, Your Honor.

THE COURT:  And then we will continue.

COURT SECURITY OFFICER:  All rise.

(A recess was taken from 10:37 a.m. to 10:46 a.m.)

COURT SECURITY OFFICER:  All rise.  Court is back in session.

THE COURT:  Please be seated.

MR. CRUZ:  May I proceed, Your Honor?

THE COURT:  You may.

MR. CRUZ:  Judge, I was premature, there are two more victim witnesses that I should have asked the audience if they wanted to address Your Honor.  One was a bit late, but she did want to speak, and the other did have some prepared remarks. So with Your Honor's permission?

THE COURT:  Very well.

MR. CRUZ:  Thank you, Judge.  We'll call first Zoila Warich, W-A-R-I-C-H, common spelling.

Go ahead, Ms. Warich, you wanted to address the Court.

WITNESS WARICH:  Good morning, Your Honor.

THE COURT:  Good morning.

WITNESS WARICH:  My husband and me, we're married for 27 years.

THE COURT:  Could you state your name, please?

WITNESS WARICH:  Zoila Warich.

THE COURT:  Last name?

WITNESS WARICH:  Warich, W-A-R-I-C-H.

THE COURT:  Thank you.

THE WITNESS:  We are married for 27 years, and I work as an interpreter, and my husband was a chef.  We save a lot of money.  He retire, and we were trying to pay college.  And part of this savings that we sold our house, you know, most of the savings went to the investment with Mr. Shapiro's company.  And I remember clearly that when I went with him and to the company

in Boca Raton, they were targeting a lot of older people.  A lot.  Somehow the way -- when they look at me, they were like, oh, no, you don't belong here.  No, that's not for you, you know.  And they were calling him to go alone to talk to them.

THE COURT:  Oh, your husband.

THE WITNESS:  Yes.  So finally we get back and we invest and we lost it.  March 17, 2018, my husband had a heart failure.  And like the other couple says, we fighting.  We are arguing about it.  Nothing we can do.  We don't get to get the money back.  It just a shame of him, you know, that never thought about other people's lives, you know, and acting responsibly.  I just want you do the right thing and sentence him what he deserves.  That's all.

THE COURT:  Thank you, ma'am.

MR. CRUZ:  Before I go with calling Roberta Gertman, is there anybody else that I neglected -- there is.

MS. MILLER:  This is Mr. John O'Neill who has raised his hand as well.

MR. CRUZ:  Mr. O'Neill wants to speak?

THE GALLERY:  Yes.  Please.

MR. CRUZ:  Absolutely, sir.  Anybody else?

Judge, the Government calls Roberta Gertman, G-E-R-T-M-A-N.

WITNESS GERTMAN:  Good morning, Your Honor.

THE COURT:  Good morning.

WITNESS GERTMAN:  I'm going try to do this.  Okay.  First, I have noticed Robert Shapiro has not even looked at his victims as they are pouring their hearts out with the devastation that they've endured.

MR. CRUZ:  Tell us your name, please.

WITNESS GERTMAN:  My name is Roberta, Roberta Gertman.  This is not a position I ever saw myself in literally and figuratively.  Forgive me for no eye contact.

THE COURT:  That's all right.

WITNESS GERTMAN:  I am here today to express how the criminal act of this Ponzi scheme has impacted my life, my health, my family, my retirement dreams and the devastation of my 37-year marriage.

I have socially withdrawn from life as I knew it.  We cannot afford to travel to family events as we once did.  I cannot afford my $50,000 dental work, that is required, that I was in the middle of.  Vacations have be eliminated from our lives.  The money stolen was our padding for your emergencies that would have arised.  We no longer have that security.

I have been in -- I have been forced to delay the draw of my social security benefit at 65 and retire as planned.  I'm almost 66.  This has caused me to continue to work and my husband to come out of retirement and be forced back to work.  Due to the shame of his financial embarrassment, I have not informed our children.  It is inexplicable how this major and

stressful burden has affected our lives.  These last two years have been a nightmare, and the repercussions of this so-called investment opportunity are just incomprehensible.

Let me tell you something about my husband.  Mike is a -- was a hardworking FedEx courier for 27 years, each day driving a FedEx large truck delivering and picking up up to 150 stops per day in the Florida weather of heat, rain and humidity, under the pressure of being held accountable to achieve his daily goals.  The job took a tremendous toll on his aging body.  He retired age 62 and decided to retrieve his social security benefit because he could afford it.  We were in good financial shape.

However, my husband made a life altering and terrible mistake.  He was persuaded to invest in what he believed and trusted was safe guaranteed investment in real estate. However, on the contrary, he fell victim and was preyed upon by the deceitful investment group known as the Woodbridge Group.

We have been hardworking people all of our life. Nothing came easy to us.  We built a comfortable life, contributed to our 401(k)s and felt we were in good financial position.  Actually, we were just getting to the stage in our life where we could afford to pay off of our home.

MR. CRUZ:  You need to slow down.

WITNESS GERTMAN:  Oh, I'm sorry.  Okay.  We were actually getting ready to pay off our mortgage and had the

means to afford our daughter's upcoming wedding.  Now it is impossible to get a loan due to the lack of the equity.

When this transpired, I had developed a severe case of anxiety.  I began with heart palpitations and couldn't catch my breath.  My doctor performed a special blood test for my heart. It came back that I developed inflammation and need to take medication the rest of my life and to avoid stress at all costs.

I don't expect Robert Shapiro to grasp what he has done to our lives because he has live a life of narcissism, greed and entitlement.  He has no clue how many lives he has destroyed or even cares.  He extorted $1.2 billion from others to support his extravagant lifestyle.

Since being notified of the Ponzi scheme and bankruptcy, we had to hire a lawyer to guide us as to what we could do to recover our hundreds of thousands of dollars, excuse me, that was stolen from us.  We also had to hire a CPA to help us with our taxes.  These were two professionals that charge hundreds of dollars by the hour that we could not afford and had to borrow the money to get the legal help we needed. This put us deeper in financial despair.

I was very surprised that he was not charged with elder abuse by targeting the elderly and exploiting them.  I have also done some research on the federal point system, which describes what his sentence should be based on how many people

he scammed and how much money he extorted.  I only hope he is not given a chance to repeat this criminal act to other hardworking and elderly people.  I want to make clear that he began his Ponzi scheme with criminal intent.  That should be taken into consideration when sentenced.

One would think after the Bernie Madoff Ponzi scheme the laws and penalties would scare off people intending to rip off hardworking people's retirement savings only to leave them as paupers, which is a disgrace and he should not only pay monetarily but be given the maximum time in prison.

My husband -- I only hope that the assets that were obtained by his lavish lifestyle will be sold off, and I pray we will recover some of the money through the restitution that we desperately need.

My husband was not able to attend this hearing because he was forced back to work.  I am here today to plead to you, Judge, you will decide his prison time and please I ask you, I beg you for the maximum allowed my law.  The barbarous act of bilking retirees, military personnel and other hardworking people for financial gain is beyond comprehension.  And I stand before you, Your Honor, to request that he spends the maximum sentence for his egregious actions.  Thank you.

THE COURT:  Thank you, ma'am.

WITNESS GERTMAN:  Thank you.

MR. CRUZ:  Can you tell the Court your name, please.

WITNESS O'Neill:  Yes.  Good morning, Your Honor.

THE COURT:  Good morning.

WITNESS O'Neill:  John J. O'Neill, originally from New York.  Drove 900 miles down from Richmond, Virginia.  And one of the things I'd like to explain what happen to me is I'm a member of the Elks Club, and at the Elks Club there was this fraud scheme going on by Al Klager who originally asked me if I had -- and I didn't know him until then, he came up to me.  He said J do you have any money that you can investment.  I said, well, I have got my life savings of $440,000.  And he said okay, so we invested in that.  And then about a year later I get a phone call, J. Do you have any more money?  I can get you 7 percent on your money.  And I said, Well, I gave you all my money, but I could borrow.  I could borrow a quarter of a million dollars from my stocks, my IRA.

Well, after December 5, '17, that money is gone.  And the real problem is the con artists Al Klager, I don't know Shapiro, but if he's -- I think Klager was his top salesman or one of the top salesman.  And now I have a dilemma.  Recently my daughter was diagnosed with a very, very rare form of leukemia.  She is being treated now.  I don't --  I don't know how much this is going to cost our family, but we're going to do anything we can do.  And I heard someone mention Goodwill.  Well, this suit is a $5 suit from Goodwill, and that's about all I can afford thanks to Mr. Shapiro and Mr. Klager, and I

thank you for your time.

THE COURT:  Thank you very much.

MR. CRUZ:  If you would allow me to ask, Judge, is there anyone else that wishes to speak and address the Court? Okay.

Judge, we are pretty confident that that does it as far as the victims that wanted to specifically address Your Honor.

May I now --

THE COURT:  Yes, please.

MR. CRUZ:  Thank you, Judge.

Your Honor, you have now heard directly from just a small portion of those that were not only adversely affected but most importantly specifically targeted in this fraud scheme.  As you know, the Government does seek the maximum term of imprisonment that Your Honor is allowed to imprison Mr. Shapiro, and that is 300 months.  We feel that 25 years of imprisonment does serve the interest that Your Honor needs to consider in adequately addressing his criminal misconduct.

I think Ms. Gertman said it best when she said that he began this Ponzi scheme with criminal intent.  The reason why we chose to call the forensic accountant is because even though Mr. Shapiro in his Presentence Investigation Report and perhaps even today, but I do know in his report claimed that he didn't intend to target, he didn't intend to defraud from the

Proceedings
October 15, 2019
United States of America v. Robert Shapiro, 19-cr-20178-CMA

beginning.  Our forensic accountant through his diligent work and his team demonstrated beyond a doubt that the numbers simply don't lie, that in 2012 shortly thereafter, as he testified, this Ponzi scheme was hatched.  There was no way to support this thing without bringing in the new investor funds.  And most importantly, as you saw with that video that we showed you, the pitch was something completely different than what the truth was.  There was no outside third-party lender that needed money because after a short period of time, Shapiro and the rest of them couldn't find anyone that they could lend money to.  In other words, Shapiro switched -- on a dime, he switched his plans and said, well, let me just start buying properties and not tell anyone and see how long this lasts.  And as we know, a billion dollars later, it lasted quite a while.

Judge, the second reason, other than the fact that he hatched this from the inception that, you should sentence him to those 300 years.

THE COURT:  Months.

MR. CRUZ:  300 months, excuse me, not years.  300 months, Judge, is because the history and characteristics of this Defendant show that he has had a long-standing propensity to commit fraud, specifically towards the United States of America via the IRS.  Although Count 1 is by far the important and most compelling reason why he should receive over 20 years' imprisonment, we want to make sure that you take into account

that he went into this fraud scheme after two decades' worth of avoiding and defrauding the IRS.

Simply put, again, as agreed to in the PSI without objection, Mr. Shapiro and his factual proffer show that he's defrauded the United States by avoiding taxes for several years.

Finally, Judge, you have, again, the benefit of live testimony and through the letters and the videos to appreciate the significant physical, psychological and, yes, monetary damage that Shapiro has caused to thousands and thousands of elderly victims.

Simply put, Judge, we feel that based on those factors that my trial partner will now briefly go over under 18 United States Code, 3553(a), Judge, a sentence of 300 months' imprisonment for the two counts, Count 1 the conspiracy to defraud over 8,000 individuals out of multiple millions of dollars for the benefit of himself, his family and his other loved ones as well as the defrauding of the IRS, we ask that Your Honor hold him accountable for not a month less than 300.

With that, Judge, I turn it over to Ms. Miller who will apply those factors and, again, synthesize what we put together in our sentencing memo.  Thank you, Judge.

THE COURT:  Thank you.

Ms. Miller.

MS. MILLER:  Thank you, Your Honor, Mr. Cruz.  As the

Court is aware, this crime is among the most serious crimes a person in our society can commit.  Not just in terms of financial crimes but in terms of all federal crimes, and the guidelines and the statutes speak to that.  It was serious in its execution.  There are more than 270 shell companies created as part of the RS trust umbrella as well as the JS trust.  And e-mails from investigations show every step of the way there was not a company created without Mr. Shapiro's blessing.  They were even named after streets he had lived on.  It couldn't be more of an extension of him.  More than ten of those entities were in his wife's name.  And there weren't just the nine bank accounts that Mr. Jeremiassen spoke of.  There were, in fact, hundreds of bank accounts to unravel, and it took the SEC partners we have as well as law enforcement in the bankruptcy estate well over a year to even unravel the fraud scheme because it was so complex and sophisticated.

Bank accounts were created into the last year of the scheme even, 2017, in order to continue to evade the IRS, to continue to evade the SEC and all along, of course, to continue to fool the investors.  Some of the investors you heard from the victims today in this courtroom, invested in January, February, March 2017.  And it is uncontested in the Presentence Investigation Report in Paragraph 60, $52 million were taken in those final months leading up to bankruptcy.

So, certainly, it is serious in execution.  Certainly,

it's serious in financial volume.  As Your Honor heard, the 1.3 billion dollars taken in on the back of approximately 10,000 and an ultimate loss of approximately 470 million.

In terms of the scope of victims, 2,600 victims were retirees.  And as they told you themselves in this courtroom along with Paragraph 69 of the PSR, there were elderly victims targeted because they wanted their scheme to succeed.  That's why they did it.

Mr. Shapiro knew this.  That's what Paragraph 69 of the PSR speaks to.  He was told that by Dane Roseman his coconspirator that retirees were spending their nest eggs.  He knew this, and it was by design.  So it's serious in scope in terms of victims.  It's serious, certainly, in impact, as you've heard.  And it's serious in duration, as Mr. Cruz just mentioned.  And I want the expand on that because I think the serious duration really also speaks to the need to promote respect for the law.

So there were roadblocks along the way, and that's going to Paragraphs 85 through 89 of the PSR.  Starting in 2015 in the State of Texas and other states, there were cease and desist orders issued.  And the choice made at that point by the Defendant was not, of course, to disclose that to investors.  It was not even to seize operating business.  As set forth in Paragraph 90 of the PSR, the choice instead made was to offer an under-the-table payment of gold to a Coconspirator who would

continue to market these securities.  And they were securities, although that's not part of our allegations.  They were securities.  That was part of the deception too.  To continue to market them.  Why?  Again, for personal enrichment.  And so there were five states.  You know, it's not just an isolated incident.  There are five states with a cease and desist from 2015 to 2017.  And as I mentioned the money kept on coming in.  And it wasn't just that there was the cease and desist going on.  Ultimately, even in the bankruptcy, as Your Honor heard, the representations made during the bankruptcy were such that Woodbridge tried to disclaim its entire business model.  You know, whether Mr. Perkins did that on his own or not, Your Honor doesn't need the facts about that because it's clear who that was benefitting.  Again, it was Mr. Shapiro.

In addition to the $175,000 a month consulting fee arrangement he got, witness statements obtained during the investigation showed that he moved the money around that came from Woodbridge investor victims to pay a $20,000 per month rent at 4030 Longridge where he was living.  That's why he was allowed to continue living there after the bankruptcy because ultimately they would have had to litigate to keep him out of the house, among other reasons.  And so he structured it by design so that he could lease back his own house where he was living for $20,000 a month, again, paid for by investors.

I know the Court has seen it, but I'm going to review

briefly chart 7, which is document 167-7 on the docket.  This chart shows at the top, Your Honor, of course, the incoming fund, the 1.3 billion coming in from the investors.  Then we see in the time period of just January 2016 through the end of December, there is approximately $642 million then put into a separate Woodbridge account.  And the dates here are critical.

From April 2017 through November 2017, $4.6 million goes to In Trend Staging, a shell company set up for the Defendant's wife.  Around the same time, going from July 2016 to November 2016, we have on top of that $2.7 million going to Schwartz Media Buying.  Again, another shell company set up in the Defendant's wife's name.

Immediately prior to the bankruptcy and the SEC asset freeze, for that matter, November 2017, $700,000 going to yet another Jeri Shapiro account.  And then what happens in December?  December bankruptcy is declared.  December there is an SEC asset freeze naming the Defendant personally.  And yet after that, we see in 2018 in two separate payments from two separate sources held in his wife's name but all, of course, traceable to the victim investor funds, we see more than $1.3 million from two separate payments here and here in April and May going to a new company called Commercial Bridge Loan, which Robert Shapiro created, again, in the name of others even after the SEC freeze and bankruptcy.  The witness interviews indicated that some of the same employees who worked at

Woodbridge were solicited to work there to try to keep things going and spin it off further.

Even after that, Your Honor, in September 2018, $174,000 on top of that diverted to a further Capital One account for Jeri Shapiro.  And these accounts weren't only used but opened after the asset freeze.

And it didn't end there.  More recently as mentioned in our memo, just to add a little bit more color, as the Court is aware the Defendant was required to disclose assets to the Government as part of a plea agreement.  To his credit, Defendant's Counsel disclosed to the Government there was a storage facility in California.  The FBI went to search that storage facility, but they also served a subpoena on the storage facility to determine the access record and when it was first obtained.  That investigation revealed that Jeri Shapiro, the Defendant's wife, first obtained this unit and accessed it in May of 2019, that was after the Defendants arrest in April -- which was approximately April 11, 2019.  And what they found inside of the unit when they searched it, was a Marc Chagall painting and some gold coins.

And I will quickly refer back as well to what was already filed in the docket at Docket 167-2, which shows just some of the art expenditures and tracings, including four paintings such as the Chagall painting.  Again, we see from the 1.3 billion in, hundreds of millions are funneled to other

Woodbridge accounts.  Then we have about $30 million sent to Jeri Shapiro to her credit card and her personal account and the personal account, and then we see purchases of paintings, paintings by the masters.  And, again, I won't go through every page because the Court has it, but this shows the November 2014, after the Ponzi had already started, we see, basically, a quarter of a million dollars being spent at Christy's, and that was for the Chagall painting.

There are also tracing analysis done of gold and the tracing of the gold showed that more than $900,000 in gold was purchased with investor money.  And this is 167-5 on the docket.  Again, similar flows that between July 2012 and June 2016, approximately $920,199 of gold was purchased.  What was found in the storage unit was only approximately $250,000 worth of gold, leaving much of the gold unaccounted for.

Now we do know that because there were offers made to pay certain people under the table in gold to keep the scheme going despite the cease and desist orders, that may explain where some of the gold went.  But there are only a limited universe of items in that storage facility when it was searched begging the question of what the rest of the money went to.

Of course, the Defendant is obligated under his plea agreement to disgorge himself of everything, and we are not contending that he has failed to do that at this point.  I am just pointing out that our position as the United States is

that the evidence shows it is strongly likely and, in fact, proven essentially that asset shielding continued even after the Defendant's arrest by virtue of his wife having the storage facility with gold and paintings in May 2019 after his arrest.

And this is the other piece, Your Honor, with how the Defendant evaded the IRS for two decades, as Mr. Cruz mentioned.  For two decades he avoided payment to the IRS.  And it wasn't just that he did it quietly and that he just didn't file his taxes, he actually litigated it.  He spent money affirmatively on tax litigation, which is fine to do.  It's everyone's right.  But it's notable that the way in which he litigated the taxes in 2011 immediately proceeded the start of the Ponzi scheme in 2012.

I am going to show now on the screen a pleading, and ultimately these pleadings concluded with an affirmance of a summary judgment order from the United States Tax Court in April 2011, and that's the first page here in what's captioned Robert Shapiro v. Commissioner of Internal Revenue, Docket 19807-1-0L.

In a filing made on Mr. Shapiro's behalf to contest the amount of money.  And at this point in time the amount of money owed was about $6 million.  To contest the money, through his attorney Mr. Shapiro stated, among other things, that the commissioner erred in assessing penalties and taxes because as set forth in Paragraph F, it would be unreasonable to require

production of 10 general ledgers, 10 separate bank statements and checks involving accounting information.

Paragraph G, also it stated that it would be unreasonable because the collection philosophy of the Internal Revenue Service was to restrict allowable expenses to approximately $3,000 per month.  And it is stated that this would be unreasonable for a high-level corporate representative.

Finally in Paragraph H it stated that Mr. Shapiro is approximately 54 at this point in time and he is just recovering from Hodgkin's Lymphoma.  While the condition is curable, it also recurs on a regular basis.  And based on his medical condition and the current depressed economy, he represented through his attorney that there would be no possibility that a full payment of the assessed liability could be made given the current income and his current assets.

These same tax records reveal a Bates number ending Shapiro Tax 202 that some of the issues the IRS identified through the power of attorney hired by Mr. Shapiro is that Shapiro's issue was with turning over financial information about his businesses.  He said he didn't want to submit the requested information, and there was an acknowledgment of a long history with the IRS.  And so instead Shapiro offered to make a voluntary payment, which the IRS rejected because they viewed it as a sign appropriately he may be shielding assets,

and if he wasn't going report his true assets or sign things under penalty of perjury, they certainly wouldn't agree to the settlement he proposed.

And, Your Honor, that is the backdrop against which ten more years of tax evasion when the Ponzi scheme started. There was already evasion of payments in affirmative efforts to avoid financial disclosures to the federal Government to pay taxes as all Americans owe.  That was already ongoing for years before the inception of the Ponzi scheme.  And to this day in addition to the 3 million owed for more recent tax years, it is estimated the Defendant owes $11 million in total to the IRS.

Now I just want to touch on the need for specific and general deterrence and the need to avoid disparity with -- unwarranted disparities with others similarly situated.  For specific and general deterrence it is plain, Your Honor, and I will put back chart No. 1 from Docket Entry 167.  It is plain the whole point of this scheme was for personal benefit.  And you can see at the entities at the bottom of the page, and these are laid out in further sub-charts the Government submitted that you have this house at 4030 Longridge that was $6.5 million with an added $1.8 million of renovations. $3.3 million in travel, $1.3 million to the Defendant 's ex-wife.  $1.3 million to the Defendant's stepson.  For cars approximately $672,973.  $645,499 in country club fees.

More in jewelry and loans.  In the middle category,

these entities for Jeri Shapiro, and you can see they're all
LLCs.  These were then used for personal benefit of the
Shapiros again.  Vast majority, again, for further personal
expenses.  In Trend Staging, for example, at the top was the
entity we saw on Chart 7 that was used to funnel money around
after the asset freeze in bankruptcy, just an example.

And then finally we see the credit cards.  It's
notable that Mr. Shapiro didn't even have a bank account in his
name, and the plain purpose of putting everything through LLCs
and his wife was to evade the IRS and also to try to hide the
income and hide the scheme he was running.  But he didn't even
have a single credit card in his name because he had plenty in
the name of his wife, and those cards were used for their
benefit.  A lot of these expenses have already been covered in
our pleadings, so I won't go over them, but you can see them
there.  They are separate and apart from the bank accounts for
the shell companies and the other expenditures.

I'm sure Your Honor is familiar with Exhibit 9, the
composite of photos of the house where Defendant lived, but I
will put a few on the screen.  There is the house there on the
first page, the second page as well.  They had a custom turtle
pond in the front, a swimming pool in the back, a renovated
kitchen with custom cabinets, a dining room, priceless works of
art throughout the home, memorabilia and photos of the
Defendant himself.  That actually, I think, is a Joe Montana or

some such of signature.

More paintings.  And of course shoes, jewelry, watches, designer handbags, that's what the investors' money went to, and it certainly wasn't advertised it would go there.

There is a need for specific and general deterrence. The factors I just went through for evading cease and desist orders, the bankruptcy court, the SEC, that speaks to a need to specifically deter a person who had seen every sign that something was wrong, was told probably not only by his gut that was wrong but was told by multiple courts it was wrong and yet continued his course of action.  That this was a crime that not just Mr. Shapiro but any investor fraudster commits because of one reason, and that is greed.  And the greed here is substantial.  $36 million.  And so that's another reason to sentence to the maximum term of 25 years.

This Defendant was all over how the scheme operated. There are e-mails showing direction to have a Fiat car purchased for his wife.  There are e-mails showing that Mr. Shapiro was the one directing his bookkeeper to mark things as interest payments just to make them up out of thin air.  It was all him.  So the idea that he would be removed from the books or not know about this and yet somehow make these lavish expenditures is one the Court can easily discard.

Now, as to the need to avoid disparities with other similarly situated offenders, the Government has cataloged

numerous cases, which the Government contends for the reasons in the memo are more similar to this case than the cases cited by the Defendant.  In addition to those cases, I neglected to cite the *Rothstein* case that I am sure the Court is aware of in which the defendant was sentenced to 50 years' imprisonment for an approximate $1.2 billion scheme.  Now, that was a bit different, involved structured settlements and a person who was an attorney, so that is a bit different but has a 50-year sentence for something that does not have a dissimilar scope to this, Your Honor.  And that's significant to consider in addition to the cases cited by the Government.

But ultimately, Your Honor, this case is about this man, Robert Shapiro.  And he has to be sentenced for the individual that he is.  This is a painting that was found in his office at his home 4030 Longridge.  It's about the conscious choices that he made day in, day out for years.  And the only limiting factor to his scheme was his own creativity. He saw himself as magnanimous, as a donor, as a generous person, but it was all a lie, and it was funded on the backs of the people you heard from in this court.

A maximum sentence is warranted because of the people you heard from and others who couldn't make it here themselves, who didn't have the wealth to attend and they're having doubts themselves about the will to go on.  Their sentences -- their life sentences have been taken out of their hands, so the

Government asks an appropriate punishment that's not greater than necessary but, in fact, warranted by the totality of the circumstances be imposed and that it's 25 years because of the victims and because of the scope and duration and extreme seriousness of this offense.  Thank you.

THE COURT:  Thank you very much.

Mr. O'Quinn?

MR. O'QUINN:  Thank you, Your Honor.  If it's all right with the Court, before I make my presentation I believe that Mr. Shapiro would like to address the Court.

THE COURT:  Very well.

THE DEFENDANT:  Your Honor, I am here because I am guilty of these crimes, and by pleading guilty I accept responsibility.  I had a very tough childhood which hurt me in a lot of ways, but I acknowledge I had free will, so I blame no one but myself.  I acknowledge the damages and losses that people have suffered, and I live with the remorse and suffer every day in pain at what I did.

I apologize to my victims today, including anyone that's here.  I also apologize to the Government and the Court for having to waste all the time and resources in this matter.

MR. O'QUINN:  Good morning, Judge.

THE COURT:  Good morning.

MR. O'QUINN:  I sat and I have watched as the Court has and as my client has some of the heartfelt things that were

said by victims today.  And I want to be careful in the way that I address these situations and to be clear on our position today.  I on behalf of Robert and Robert through me take no position today that is inconsistent with his having committed an extraordinarily serious offense, actually two of them.

There is nothing about this presentation that I am making to you that denies the fact that he evaded taxes and that he fraudulently offered investments to investors.  It is a difficult task to stand before the Court while someone has instructed you to help them to take responsibility for what they have done in a complex situation like this and to draw distinctions between this case and other cases that this Court is aware of that happened in this district and in other districts to try to make a legal argument about sentencing.

So I want to be clear, it is our position and nothing that I am saying today is inconsistent with Mr. Shapiro's standing before the Court and admitting to you and to all of his victims that he committed a tax offense and that he committed a conspiracy to commit wire and mail fraud.

I have been in this district for some time, Your Honor, and I have personal experience with cases that were referenced by the Government, the *Rothstein* case.  *Mutual Benefit* is probably the best example of a large scale financial fraud and the others that have happened in this district, and it is difficult not to want to rearrange the deck chairs on the

Proceedings
October 15, 2019
United States of America v. Robert Shapiro, 19-cr-20178-CMA

Titanic to draw distinctions between those two cases. There are significant distinctions, important ones, but those distinctions mean nothing to the victims who have lost their money and spoke today, and I am going to do everything I can, Your Honor, to try to limit what I'm presenting to you to things that matter for your sentencing.

I'm not asking you to vary based on the facts of this case. I am not asking you to find within the facts of this case a reason to do something other than bring a sentence that is consistent with those that have been asked by victims and by the Government. But I do believe that there is a public policy that is important for you to take into account, and I recognize that that makes your job harder than it normally would be.

You see, Your Honor, there has to be a difference between a person who finds themself by their own doing in the middle of a massive financial fraud and they make a decision to go the route of acceptance of responsibility rather than fighting to the end. I recognize that you could look at specific decisions along the way, for instance, the request for additional compensation to assist the bankruptcy or particular financial transactions at a given time, but I ask the Court to understand the human element that actually happens at that moment.

It is a big undertaking for a person who has made themselves believe that they are a successful business person

and that they have built a business that has some level of value to come to terms with the fact that their criminal decisions eviscerate all of that value.  But in this case, different than every other case that you will hear about, Mr. Shapiro has acted differently, and there has to be some credit given for that change.

Mr. Shapiro defrauded these people.  He took away their retirement.  But he also hired a CRO and resigned from the company.  He caused the company to file a bankruptcy that put hundreds of millions of dollars of fragile assets under court supervision.  It may have been a rough filing, and there may have been turf wars between the SEC and the bankruptcy community as there often are.  I'm sure the Court has had the opportunity to see that, and there were in this case.

But the fact is simple, that in the middle of the hailstorm and at a moment when many people choose to do something else, whether it's hurt them self or run, he put hundreds of millions of dollars into court supervision.  The SEC was investigating.  He resolved with the SEC as soon as the SEC would let him.

I was involved in that case, Your Honor.  And I will tell you, we were calling the SEC -- it was my old branch at the SEC, calling and saying, Please allow us to resolve.  And they'd said, Well, you won't resolve for what we want.  Try me.  Try me.  We want to resolve.  It was May of 2018 when we

Proceedings
October 15, 2019
United States of America v. Robert Shapiro, 19-cr-20178-CMA

reached out to the U.S. Attorney's office, and we repeatedly reached out and contacted the U.S. Attorney's office throughout 2018, not seeking to tell them there is nothing to see here, but saying We want to come in.  We want to talk to you. Acknowledging exposure, wanting to have a good faith discussion.

And finally in October of 2018, we were told to stop calling, that they would get their arms around the case, do their independent investigation and then they would give us an opportunity to come in and talk with them.  Before they did anything, I remember the call.  I ended with saying, Well, I just to want to make sure you don't go pick my guy up at 5 o'clock in the morning.  That's why we keep calling.  And they said, No, don't worry.  We'll give you an opportunity to come in.  Then I got a call at 5 o'clock in the morning California time that Mr. Shapiro had been arrested.  From that point we have consistently tried to resolve this case with the U.S. Government.

We couldn't.  It takes two sides to resolve a case. It wasn't until we refused to waive speedy trial saying, you know what, it's not getting any better, let's bring this forward that we had an opportunity to enter into the plea negotiations with the Government, and we resolved this case in a very significant risk to my client, a 25-year deal is not much of deal.  Now, it's true that his wife got a *nolle pros.*

It's true.  But it's also true that his wife had largely no idea what he was doing at work.  There are checks attached in here signed by his wife that are in his handwriting.  So, again, I am not telling you that the facts of this case are not egregious, but there has to be a distinction, a disparity between a case like *Mutual Benefits* that I brought the TRO asset freeze and receivership at the Securities Exchange Commission in May of 2005 and was still going on when I left the office in April of 2011, and a case where somebody causes the company to file bankruptcy, maybe they do it in a way that is easy to go back and identify rough spots and places they could have done better, but it puts the assets into a court supervision.  It resolves with the SEC for total disgorgement. At that time we gave them every dollar that they wanted in disgorgement.

They used the same financial advisor that's used by the bankruptcy estate and gave them all the disgorgement that they asked for and a $100 million penalty.  We then reach out and resolved this case and stand before you today.  General deterrence is really the driving force in sentencing these cases.  You can talk about specific deterrence all you want, but the reality is under any sentence that you are going to give him, a 62-year-old man who is a non-Hodgkin's Lymphoma survivor is going to leave him incarcerated for the vast majority of the rest of his days.

So what is left for the Court to do to say to other people out there in the same way you send a general deterrent message and you say if you do this, serious consequence happen. You will be torn out of your home at 5 o'clock in the morning. You will spend the rest of your life in prison, which he deserved to happen to him, but there has to be something that lawyers in this community can sit down with their client and say that something other than, well, I guess we just try to push this out as far as we can. We try to file every motion that we can. We try to drag this out and cost the taxpayers as much money as we can so that hardworking prosecutors are prosecuting this case instead of the countless of other one that aren't being prosecuted while they are stuck sitting here. There has to be something that this Court can say as a public policy to the world that says you may have done something horrible, but if you make decisions from this point forward, your treatment will be different.

Now, he's down to 25 years, so you can't sentence him to 50 years. But there's no difference to a 62-year-old person whether they get a 50-year sentence or a 25-year sentence or a 300-year sentence. It's no different. You know, the classic joke that defense attorneys note is it after a life sentence, they still get three years of supervised release. I guess it's not reporting. You know, this -- at some point, you will use up every day that he has on this earth with your sentence. And

sentencing him something beyond that and having him die in prison sends the message out there to other people they are going to find themselves in this position next year and the year after the message that there is no reason to plead guilty and take responsibility.

There is no reason not to get on a plane and fly away and forget those assets and let them collapse, like Scott Rothstein did.  And this case is different than Scott Rothstein.  We have hundreds of millions of dollars of dirt, mutual benefits.  The only assets were insurance policies, and their value was fraudulently created through false doctor's statements.  In Madoff, no assets.  There is a difference in this case that talking about that difference undermines the loss of the victims and doesn't serve the purpose.

So, Judge, my presentation to you today is one of policy, not one related to this, and it is why your job is hard.  Is that hearing these victims say out loud what should happen to him and they are being right.  You have to balance with that the public policy associated with the way we do this.  We negotiated this plea in the middle of the Jeff Epstein nightmare.  And it was a nightmare for the victims, but it was also a nightmare for anyone who was trying to negotiate any kind of a settlement because the idea that any settlement ten years later could come back to haunt you left you with no settlement.

We are here today because of judicial discretion. Would could not ask for prosecutorial discretion because it was not available for us.  But we are asking you today to, please, exercise your discretion and define something that is a severe sentence that deprives him of his experiences with his grandchildren and his children and his family and all of the other horrors that come with being in prison.

THE COURT:  I don't believe he has grandchildren, Mr. O'Quinn.  He has no children.

MR. O'QUINN:  No -- he has stepchildren, Your Honor.

THE COURT:  Oh, all right.

MR. O'QUINN:  He -- and he certainly has a family. And we've submitted letters to you.  We've not drawn this process out with the sobbing show that often happens with family members.  We have had them commit to you their thoughts, and we filed them in letters that you have in the record.  And I would ask you to take a look at those and understand he has support.  He has people that would help him when he comes out, and he will be an elderly man then.

So we hope that you will exercise your discretion to treat him in some way differently than someone like a Stephen Steiner who had three indictments and a billion dollar fraud and went to trial and was sentenced to 15 years by Judge Scola. There has to be -- there must be some difference for a person who accepts responsibility.

Thank you, Your Honor.

THE COURT:  Let me ask you, Mr. O'Quinn, the indictment, Mr. Shapiro is here on a plea deal.

MR. O'QUINN:  Yes, Your Honor.

THE COURT:  And the deal was to two counts of an indictment that contains six counts; is that right?

MR. O'QUINN:  Yes, Your Honor.

THE COURT:  So what was the maximum sentence he was facing under the indictment?

MR. O'QUINN:  It would have been 180 years, I believe, Your Honor, something in that range, maybe 185; I don't remember exactly but long after he would be dead, Your Honor.

THE COURT:  Right.  So when we talk about policy don't we need consider that as well, that instead of the 180 years that he was conceivably facing had he taken the case to trial and been convicted on all counts, he negotiated a favorable plea agreement with the Government that capped his exposure to the statutory maximum, which is actually less than the guideline range recommends and that also saved his wife from the prospects of any criminal prosecution.

MR. O'QUINN:  Yes, Your Honor, that's absolutely true. However, as we have described more fully in our sentencing memorandum, I believe that the sentencing guidelines demonstrate flaws when you get to high-loss fraud cases.  They create sentencing constructs that are -- are so high that they

make it difficult to deal with a case in an ordinary course.

I don't -- I would submit to the Court that there is not a significant difference between having a 180-year sentence and 120-year sentence or an 80-year sentence when you are a 62-year-old person.  So once you have sentenced a person for more than anyone can reasonably believe that that person will live, that sentence, the excess amount of that sentence really the only purpose it serves is the general deterrence of getting an announcement in a newspaper somewhere that frankly, Your Honor, I don't believe has an actual deterrent effect.

I'm not sure that there is anyone out there that's contemplating a Ponzi scheme and they say, you know what, I would have done it at 15 to 20 years, but now that I see that I'm subject to 300 years, I'm not going to do it.  I just don't believe as an actual pragmatic policy and as somebody that practices in this area that that's going to have that effect to protect anyone other than to have a greater voice, perhaps, to the sentence in the sense that a newspaper might more likely cover it.

THE COURT:  Well, if we follow your policy theme, then a sentence here significantly below the advisory guideline's range, which the 300 months already are because his guideline's range is life, but a sentence significantly lower than that would be to encourage folks to engage in Ponzi schemes later in life because if they get caught in their 60s, they are not

going to receive a sentence that the 40 year old would receive, right, because you are older and have a shorter life expectancy in prison?

MR. O'QUINN:  No, Your Honor.  Respectfully, I don't believe as an actual pragmatic matter that people are more likely to commit, to wait until they are older and then commit a Ponzi scheme because they're familiar with whether or not a federal judge would take into account the age of the defendant at the time of sentencing and discount it.

I think that the truth is when you -- when you experience what federal prison is like and you see it for the substantial remainder of your days, that that is a great deterrent.  The problem is that people who are contemplating or committing a Ponzi scheme, whether through narcissim or some other personality flaw, they don't understand the consequences of their actions and how they will be visited on themself and their family.  I don't think that they anticipate that that is going to happen.

So I'm not sure by you making that statement that your statement has the same level of import and effect than a statement would have to say to a person who is facing prosecution for a Ponzi scheme that their course of action is most appropriate to accept responsibility, offer to go visit with the Government.  We've invited the liquidating trustee for the bankruptcy to come and meet with Mr. Shapiro.

Proceedings
October 15, 2019
United States of America v. Robert Shapiro, 19-cr-20178-CMA

The only -- cooperation has to be offered.  We can't compel a Rule 35, as you well know.  So when they don't want to talk to you, you can't force it.  We have no other outlet than your discretion on this sentence.  This is not a situation where the Government has been open to cooperation and where there might be an opportunity in the future of you to reflect that cooperation at a later time.  I think that in some ways the question before the Court is very similar to the public policy behind a 5K or Rule 35, which says, yes, we credit the horrific nature of your crime, but your conduct after the fact also will be taken into account as a public policy.

THE COURT:  Thank you.

MR. O'QUINN:  Thank you, Your Honor.

Did the Government want to respond to this public policy argument?

MR. CRUZ:  Your Honor, we feel that we have adequately addressed that argument in our paper, and we defer to Your Honor knowing that you have already shot down that argument based on the logical nature.  We feel that he is a similarly situated individual, and he should be treated to those that are similarly situated fraudsters at his level as well as at his age.  And, again, I think we have adequately addressed it in our papers.

THE COURT:  Mr. O'Quinn, anything additional.

MR. O'QUINN:  No, Your Honor, thank you for the

generosity of your time.

THE COURT:  Thank you.

I have reviewed copious amounts of information over the weekend in preparation for this morning's sentencing hearing, and as I indicated earlier, had occasion this morning to view those videos that were delivered late on Friday.  And I believe two of -- well, one of folks on the video testified here as well and one of the victims who submitted a letter, she testified here as well.

The -- the Presentence Investigation Report notes at Paragraph 188 that under our advisory guidelines the recommended sentence is a sentence of life imprisonment for the offenses that bring Mr. Shapiro before the Court today.  As I have already noted and I believe the parties have addressed, the parties negotiated a plea agreement, however those negotiations were realized.  And under the plea agreement, the maximum sentence that I can impose is 300 months' imprisonment, and so that is the recommended sentence under the Presentence Investigation Report.

I have to commend you, Mr. O'Quinn, for a very creative argument to get me to come to something less than the 300 months, a sentence that is below the advisory guideline's range even, and it's an interesting argument.  And you have pointed out certain actions that Mr. Shapiro took, and he took them early on in any presence and much to the frustration, I

think, of all of us in insisting upon that speedy trial and having me sever.  I know we have counsel for the Codefendants who are set to go to trial next year, getting me to sever Mr. Shapiro's case from their case and reaching this resolution.

And so the question is, should the sentence be the 300 months, the statutory maximum, or should it be something less, and why should it be anything less?  And your policy argument is that if I -- if I reward Mr. Shapiro by imposing a sentence that's something less, then I will be encouraging others and rewarding him for being proactive, for recognizing the error of his ways, for voluntarily going into bankruptcy and making assets available for the many victims and in seeking to resolve the criminal charges early and not putting the Government to its burden, a burden that in this case the Government is still undergoing because, as I said, they are preparing for trial for next year.

But what I look at is the 3553 factors.  And when I look at and consider those 3553 factors, the only sentence that is sufficient and not greater than necessary to achieve those is that 300-month sentence.  When I look at the history and characteristics of Mr. Shapiro and I examine those, of course, he didn't have an easy childhood.  There are errors his mother made that affected him psychologically but not really deprived. I know he was sent away to boarding school and so forth but not

deprived.  And he engages in this course of conduct, as Ms. Miller outlined, early on.  The tax evasion has gone on for a really long time, and the criminal conduct that we're addressing here today took place over a fairly long time.  It was very extensive.  It has destroyed, destroyed thousands of lives of elderly folks and retired military who were specifically targeted, these unwitting victims.  I mean, if we looked at the number of victims and the number of months, I don't believe Mr. Shapiro would even be serving a month per victim.

When I look at the need to promote respect for the law, the need for the sentence to reflect just how serious, how serious this conduct was and when I, of course, look at deterrence, and we can all wonder, are future Ponzi schemers looking at this case and considering it before they embark on a similar path?  We don't know.  We don't know to what extent this sentence will have that deterrent effect, but I think we need to punish it severely because the harm done is so severe.  So while, of course, imprisonment, federal imprisonment is a terrible fate, having read the victim letters, having viewed the victim videos, having listened to the victims here in open court, I can't help but wonder, what is the worse fate of the two?  What's worse?  Waking up every morning and going to bed every night with a nightmare probably not sleeping well either, reliving that over and over and over again and -- or moving on

Proceedings
October 15, 2019
United States of America v. Robert Shapiro, 19-cr-20178-CMA

at the Bureau of Prisons and getting some gain time and having some time to reflect and moving on and taking the punishment for these horrendous acts.

So I have thought very carefully about your policy argument, and I think it's probably the only argument you could make, and you have made it well.  But all things considered, I think in this case, under these facts, this statutory maximum sentence is the only appropriate sentence to give.  And, therefore, it is the judgment of the Court, Mr. Shapiro, that you are committed to the Bureau of Prisons to be imprisoned for 300 months.  That term consists of 240 months as to Count 1 and 60 months as to Count 10 of the indictment to run consecutively.  I find that you are not able to pay a fine, therefore no fine is imposed.

Do I need to set the case for a restitution hearing?

MR. CRUZ:  Yes, Your Honor, but as Mr. O'Quinn said, we have a high likelihood of, perhaps, a stipulation, but we will ask the Court to go ahead and set that at a future date unless Mr. O'Quinn has a different opinion.

THE COURT:  Mr. Shapiro, you will pay restitution jointly and severally with your Codefendants.  During incarceration if you earn wages in a Federal Prison Industries job, you must pay 50 percent of wages earned toward the financial obligations imposed.  If you do not work in a Federal Prison Industries job, you must pay $50 per quarter toward the

financial obligations imposed.

Upon release from incarceration, you will pay restitution at the rate of 15 percent of your monthly gross earnings until such time as the Court alters that payment schedule in the interest of justice.  The U.S. Bureau of Prisons, U.S. Probation Office and U.S. Attorney's Office will monitor the payment of restitution and report to the Court any material change in the Defendant's ability to pay.  These payments do not preclude the Government and U.S. Probation from using any other anticipated or unexpected financial gains, assets or income of yours to satisfy restitution.  Restitution is to be made payable to the Clerk of the United States Courts and in turn is to be forwarded to the victims.

Upon release from imprisonment, the Defendant will be on supervised release for three years as to Counts 1 and 10 to be served concurrently.  Within 72 hours of release, the Defendant will report in person to the probation office in the district to which he is released.

While on supervised release, the Defendant will comply with the mandatory and standard conditions of supervision. Those include:  not committing any crimes, being prohibited from possessing a firearm or other dangerous device, not unlawfully possessing a controlled substance and cooperating in the collection of DNA.  The Defendant will also comply with the following special conditions:  no new debt restriction, special

assessment of $100 as to Counts 1 and 10 for a total of $200, cooperation with the IRS which was detailed in Part F of the Presentence Investigation Report for the payment of past due taxes.

Now that the sentence has been imposed, does the Defendant or his attorney object to the Court's findings or the manner in which the sentence was announced?

MR. O'QUINN:  Your Honor, we do not.  I would ask that the Court include a recommendation for the lowest facility close to Los Angeles.  And we have submitted among the letters several medical diagnoses, including a diagnosis related to his ADD and drug and alcohol abuse.  I would ask for an RDAP recommendation.  We would also ask based on his history of cancer, that he receive regular cancer screenings.

THE COURT:  I will include the recommendation that he be placed as near to Los Angeles as possible and leave the rest in the discretion of the Bureau of Prisons.

Is there a need for forfeiture order?

MR. CRUZ:  Yes, Your Honor.  Ms. Miller will address the forfeiture.

MS. MILLER:  Yes, Your Honor.  We have submitted a proposed order at Docket Entry 165-1.  It would need slight modification to be in accordance with the plea agreement of the parties where the Defendant had agreed to a forfeiture money judgment of at least $100 million, but in any event not less

than the amount found -- the amount of loss found by the Court, which would be $470 million.  I can submit a revised proposed order for you shortly after this hearing.

THE COURT:  Very good.

MS. MILLER:  And we ask that forfeiture be entered.

THE COURT:  I will do that.  Thank you.

I will set the case, I am reminded the order was entered this morning, Docket Entry 170, while we were here.  I will set the case for restitution hearing on Friday, January 17 at 9:30.

Mr. Shapiro, you have a right to appeal the sentence. Any notice of appeal must be filed within 14 days after entry of the judgment.  If you are unable to pay for the cost of an appeal, you may apply for leave to appeal *in forma pauperis*.

And does the Government seek dismissal of the remaining counts of the indictment?

MR. CRUZ:  Yes, Your Honor.

THE COURT:  Those counts are dismissed.

MR. CRUZ:  But --

THE COURT:  Yes.

MR. CRUZ:  Judge, in terms of the plea agreement, we move to dismiss the remaining counts as to this Defendant only.

THE COURT:  Those counts are dismissed.

MR. CRUZ:  Thank you.

THE COURT:  Good luck to you, Mr. Shapiro.

And you all have a good day.

COURT SECURITY OFFICER:  All rise.  Court's in recess.

(The proceedings adjourned at 12:01 p.m.)

**C E R T I F I C A T E**

I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.

_10/22/19__
   DATE                  STEPHANIE A. McCARN, RPR
                         Official United States Court Reporter
                         400 North Miami Avenue, Twelfth Floor
                         Miami, Florida 33128
                         (305) 523-5518

## $

**$10** [1] - 54:1
**$100** [4] - 54:3, 103:13, 115:21, 116:20
**$11** [1] - 94:6
**$115** [1] - 20:21
**$123** [1] - 19:10
**$1550** [1] - 68:15
**$174,000** [1] - 89:24
**$175,000** [7] - 48:8, 48:9, 48:13, 55:19, 58:5, 58:7, 88:10
**$18** [4] - 34:15, 38:16, 38:25, 59:12
**$180** [1] - 68:21
**$184** [1] - 37:1
**$20,000** [2] - 88:13, 88:19
**$200** [1] - 115:21
**$250** [4] - 9:5, 9:8, 60:3, 60:11
**$250,000** [1] - 91:9
**$3,000** [1] - 93:1
**$30** [1] - 90:21
**$32** [1] - 37:17
**$350** [2] - 65:13, 65:14
**$36** [1] - 96:9
**$412** [1] - 23:1
**$440,000** [1] - 82:5
**$470** [7] - 11:25, 12:12, 23:7, 23:8, 23:25, 35:11, 116:22
**$485** [1] - 11:19
**$50** [1] - 114:20
**$50,000** [1] - 78:11
**$52** [1] - 86:18
**$600,000** [1] - 64:14
**$642** [1] - 88:25
**$645,499** [1] - 94:19
**$672,973** [1] - 94:19
**$700,000** [1] - 89:9
**$880** [1] - 59:14
**$885** [1] - 21:5
**$90** [1] - 10:7
**$900,000** [1] - 91:5
**$920,199** [1] - 91:8

## '

**'17** [1] - 82:11

## 1

**1** [17] - 1:8, 3:12, 16:10, 20:15, 20:18, 30:7, 38:8, 50:24, 51:2, 51:24, 63:12, 84:18, 85:10, 94:11,
114:6, 115:10, 115:21
**1.2** [2] - 80:7, 97:1
**1.3** [9] - 18:21, 18:22, 19:1, 86:22, 88:23, 89:16, 90:20, 94:17, 94:18
**1.8** [1] - 94:16
**10** [7] - 26:18, 53:5, 92:21, 114:7, 115:10, 115:21
**10,000** [2] - 18:25, 86:23
**10/22/19** [1] - 118:7
**100** [1] - 10:16
**10:37** [1] - 75:16
**10:46** [1] - 75:16
**11** [5] - 21:11, 48:17, 49:14, 64:23, 90:13
**118** [2] - 1:8, 3:21
**12** [1] - 3:5
**12-2** [1] - 1:7
**12-month** [1] - 17:22
**120-year** [1] - 107:24
**123** [1] - 31:11
**12:01** [2] - 1:6, 117:23
**13** [1] - 73:13
**14** [1] - 117:7
**15** [4] - 1:5, 106:18, 108:8, 114:23
**150** [1] - 79:1
**151** [1] - 31:1
**15th** [1] - 12:12
**16** [1] - 3:5
**165-1** [1] - 116:17
**167** [3] - 26:18, 53:6, 94:11
**167-10** [2] - 27:10, 42:17
**167-2** [1] - 90:17
**167-5** [1] - 91:6
**167-7** [1] - 88:21
**17** [2] - 77:2, 117:4
**17-12560** [1] - 48:19
**170** [1] - 117:3
**18** [2] - 34:18, 85:8
**180** [2] - 107:5, 107:9
**180-year** [1] - 107:23
**185** [1] - 107:6
**188** [1] - 111:6
**19-cr-20178-CMA** [1] - 1:2
**19-page** [1] - 61:7
**1978** [1] - 63:25
**19807-1-0L** [1] - 92:14

## 2

**2,600** [1] - 86:24

**2.7** [1] - 89:5
**20** [6] - 70:23, 71:1, 71:3, 74:7, 84:19, 108:8
**200** [3] - 1:19, 22:6, 55:19
**2005** [1] - 103:3
**2011** [3] - 92:7, 92:12, 103:4
**2012** [22] - 16:8, 16:9, 16:10, 20:1, 26:5, 26:20, 27:19, 27:24, 29:2, 29:8, 29:13, 29:15, 29:24, 30:25, 33:25, 34:5, 36:25, 37:11, 41:20, 83:23, 91:7, 92:8
**2013** [4] - 30:3, 34:11, 41:20, 45:21
**2014** [2] - 34:13, 91:1
**2015** [3] - 31:1, 87:14, 88:2
**2016** [4] - 88:24, 89:4, 89:5, 91:8
**2017** [23] - 16:10, 20:6, 20:7, 26:21, 27:19, 27:24, 29:13, 30:4, 34:1, 36:25, 37:12, 48:5, 50:18, 51:19, 51:25, 52:1, 68:8, 86:13, 86:17, 88:2, 89:2, 89:9
**2018** [9] - 15:4, 15:6, 20:4, 77:2, 89:13, 89:23, 101:20, 101:23, 102:2
**2019** [5] - 1:5, 12:12, 90:12, 90:13, 91:24
**202** [1] - 93:13
**2022** [1] - 69:10
**220** [2] - 22:9, 22:13
**23** [1] - 13:16
**240** [1] - 114:6
**25** [5] - 10:10, 83:12, 96:10, 97:23, 104:13
**25-year** [2] - 102:19, 104:15
**250** [1] - 67:22
**2500** [1] - 1:19
**27** [3] - 76:9, 76:15, 78:25
**270** [1] - 85:25
**2B1.1** [1] - 9:1
**2B1.1(d)(10)** [1] - 60:4

## 3

**3** [2] - 36:8, 94:5
**3.3** [1] - 94:17
**300** [14] - 19:13, 26:6,
83:12, 84:12, 84:14, 85:9, 85:14, 108:9, 108:17, 111:12, 111:17, 112:1, 114:6
**300,000** [2] - 64:5
**300-month** [1] - 112:16
**300-year** [1] - 104:16
**305** [4] - 1:15, 1:20, 2:4, 118:9
**32** [3] - 37:18, 37:19, 37:25
**33128** [2] - 2:4, 118:9
**33131-5341** [1] - 1:19
**33132** [1] - 1:14
**34** [1] - 65:25
**35** [2] - 109:22, 110:4
**350,000** [1] - 26:6
**3553** [2] - 112:13, 112:14
**3553(a** [3] - 6:19, 75:9, 85:9
**3553(a)** [1] - 12:3
**37** [2] - 35:18, 37:18
**37-year** [1] - 78:8
**38** [1] - 64:3

## 4

**4** [4] - 3:20, 16:10, 30:25, 52:1
**4.6** [1] - 89:2
**40** [2] - 21:20, 108:21
**400** [2] - 2:3, 118:8
**401(k)s** [1] - 79:15
**4030** [3] - 88:14, 94:15, 97:10
**410** [2] - 12:10, 23:1
**423-8553** [1] - 1:20
**43** [2] - 10:2, 63:11
**44** [1] - 22:12
**45** [2] - 70:22, 71:1
**470** [1] - 86:23
**4th** [1] - 1:14

## 5

**5** [9] - 50:18, 51:19, 64:9, 64:22, 82:11, 82:19, 102:8, 102:10, 103:24
**50** [3] - 96:25, 104:14, 114:18
**50,000** [1] - 65:18
**50-year** [2] - 97:3, 104:15
**51** [2] - 3:12
**52** [1] - 3:6
**523-5518** [2] - 2:4, 118:9

**54** [1] - 93:5
**55** [1] - 66:20
**56** [1] - 63:24
**58** [1] - 3:6
**5K** [1] - 110:4

## 6

**6** [1] - 92:17
**6.5** [1] - 94:16
**60** [2] - 86:18, 114:7
**600,000** [1] - 65:14
**60s** [1] - 108:20
**62** [1] - 79:5
**62-year-old** [3] - 103:18, 104:14, 107:25
**65** [1] - 78:16
**66** [1] - 78:17
**673** [2] - 31:2, 53:7
**69** [2] - 87:1, 87:4

## 7

**7** [3] - 82:8, 88:21, 94:25
**702** [1] - 15:22
**72** [1] - 115:11

## 8

**8,000** [3] - 19:24, 65:15, 85:11
**80** [1] - 64:3
**80-year** [1] - 107:24
**800,000** [1] - 71:19
**85** [1] - 87:14
**880** [1] - 21:5
**89** [1] - 87:14
**8:52** [2] - 1:6, 4:1

## 9

**9** [2] - 48:23, 95:13
**90** [1] - 87:19
**90-plus** [1] - 45:3
**900** [1] - 81:24
**961-9001** [1] - 1:15
**99** [1] - 1:14
**9:02** [1] - 11:6
**9:30** [1] - 117:5

## A

**a.m** [5] - 1:6, 4:1, 11:6, 75:16
**ability** [1] - 115:3
**able** [17] - 10:17, 33:15, 34:1, 34:20, 36:15, 40:4, 40:7,

42:15, 45:17, 46:10, 48:9, 48:12, 70:15, 72:9, 73:6, 81:10, 114:8

**above-entitled** [1] - 118:4

**absolutely** [2] - 77:16, 107:16

**abuse** [2] - 80:18, 116:7

**accept** [7] - 9:9, 9:20, 10:4, 10:9, 69:2, 98:8, 109:18

**acceptable** [1] - 6:23

**acceptance** [1] - 100:12

**accepts** [1] - 106:20

**access** [1] - 90:9

**accessed** [1] - 90:11

**accordance** [1] - 116:18

**according** [4] - 34:10, 44:19, 45:13, 47:25

**account** [11] - 73:22, 84:20, 89:1, 89:10, 89:25, 90:22, 90:23, 95:3, 100:7, 109:3, 110:6

**accountable** [2] - 79:3, 85:14

**Accountant** [1] - 1:23

**accountant** [15] - 4:19, 6:11, 12:7, 13:12, 13:15, 14:3, 14:4, 14:7, 14:21, 15:1, 17:1, 22:16, 83:17, 83:21

**accountants** [1] - 13:22

**accounted** [1] - 35:2

**accounting** [8] - 13:10, 14:13, 15:19, 15:23, 26:6, 35:2, 52:4, 92:22

**accounts** [12] - 10:5, 16:13, 16:15, 16:16, 16:24, 36:16, 86:7, 86:8, 86:12, 89:25, 90:21, 95:11

**accurate** [17] - 27:6, 30:23, 31:3, 35:1, 35:15, 45:11, 46:5, 46:6, 47:9, 48:21, 49:19, 49:20, 50:3, 52:9, 52:10, 52:11, 118:3

**achieve** [2] - 79:4, 112:15

**acknowledge** [2] - 98:10, 98:11

**acknowledging** [1] - 101:25

**acknowledgment** [1] - 93:17

**acquired** [1] - 10:6

**acquisition** [1] - 40:6

**acquisitions** [3] - 30:13, 31:4, 39:19

**act** [4] - 13:21, 78:6, 80:22, 81:13

**acted** [2] - 59:8, 100:25

**acting** [1] - 77:6

**action** [2] - 96:6, 109:17

**actions** [5] - 65:17, 66:23, 81:17, 109:11, 111:19

**activities** [3] - 24:16, 34:24, 67:8

**activity** [6] - 26:20, 34:20, 35:2, 35:4, 35:22, 36:8

**acts** [1] - 113:23

**actual** [14] - 7:19, 16:20, 22:3, 30:21, 34:1, 34:16, 36:18, 38:11, 39:25, 44:3, 46:22, 108:5, 108:10, 108:25

**add** [2] - 7:2, 90:3

**ADD** [1] - 116:7

**added** [3] - 31:8, 31:10, 94:16

**addition** [4] - 88:10, 94:5, 96:23, 97:6

**additional** [5] - 39:6, 46:2, 64:5, 100:15, 110:19

**address** [14] - 6:7, 6:15, 6:16, 59:23, 61:2, 63:4, 75:2, 75:24, 76:5, 82:24, 83:2, 98:5, 98:22, 116:14

**addressed** [6] - 6:10, 50:18, 61:3, 110:12, 110:17, 111:9

**addressing** [3] - 5:19, 83:14, 112:24

**Adelphia** [4] - 13:18, 13:20, 13:23, 14:1

**adequately** [4] - 9:3, 83:14, 110:11, 110:17

**adjourned** [1] - 117:23

**administration** [2] - 50:5, 50:14

**administrator** [1] - 14:1

**admitted** [2] - 51:1, 51:2

**ADMITTED** [1] - 3:11

**admitting** [1] - 99:12

**adopt** [1] - 6:22

**advantage** [1] - 73:12

**adversary** [1] - 49:15

**adversely** [1] - 83:8

**advertised** [4] - 32:3, 38:6, 42:15, 95:24

**advertisement** [1] - 64:7

**advertisements** [1] - 42:12

**advertising** [1] - 17:13

**advice** [1] - 61:16

**advisor** [3] - 13:14, 64:8, 103:11

**advisory** [3] - 108:16, 111:6, 111:17

**affect** [4] - 40:11, 54:12, 59:23, 70:12

**affected** [5] - 65:18, 66:6, 78:21, 83:8, 112:19

**affirmance** [1] - 92:10

**affirmatively** [1] - 92:5

**afford** [11] - 67:11, 68:3, 68:10, 68:13, 78:10, 78:11, 79:6, 79:17, 79:21, 80:14, 82:20

**age** [4] - 67:1, 79:5, 109:3, 110:17

**Agent** [1] - 4:24

**agent** [1] - 4:25

**agents** [4] - 4:15, 4:16, 71:4, 71:10

**aging** [1] - 79:5

**ago** [2] - 53:4, 73:13

**agree** [2] - 48:1, 93:22

**agreed** [3] - 48:11, 84:23, 116:19

**agreement** [11] - 7:17, 9:4, 63:12, 63:14, 90:5, 91:18, 107:12, 111:10, 111:11, 116:18, 117:16

**agreements** [1] - 10:25

**agrees** [1] - 33:11

**ahead** [6] - 43:18, 44:10, 51:21, 69:6, 76:5, 114:13

**aid** [1] - 26:13

**air** [1] - 96:15

**airplanes** [1] - 71:23

**al** [1] - 26:20

**AI** [2] - 82:2, 82:12

**alcohol** [1] - 116:7

**Alison** [1] - 4:14

**allegations** [2] - 18:7, 87:22

**alleged** [3] - 32:9, 57:3, 61:9

**allegedly** [1] - 17:23

**allow** [7] - 5:21, 6:13, 6:19, 10:20, 11:1, 82:23, 101:18

**allowable** [1] - 92:25

**allowed** [6] - 6:6, 61:25, 65:4, 81:13, 83:11, 88:15

**allowing** [2] - 63:23, 66:19

**almost** [2] - 64:3, 78:17

**alone** [1] - 76:24

**altering** [1] - 79:8

**alters** [1] - 114:24

**Altonaga** [1] - 4:4

**ALTONAGA** [1] - 1:10

**amazing** [1] - 67:13

**AMERICA** [1] - 1:4

**America** [1] - 84:18

**Americans** [2] - 69:2, 94:3

**amount** [19] - 8:15, 10:10, 10:17, 17:2, 19:2, 40:4, 44:23, 48:1, 48:13, 53:9, 55:20, 67:9, 70:2, 72:9, 92:16, 108:2, 116:21

**amounts** [6] - 39:24, 40:5, 41:12, 41:14, 110:23

**analysis** [25] - 15:3, 15:9, 15:11, 16:6, 18:4, 20:5, 26:3, 27:22, 28:3, 30:5, 31:17, 32:13, 33:15, 34:21, 41:16, 42:13, 44:16, 44:19, 44:21, 45:20, 46:10, 58:20, 62:18, 91:4

**analytical** [1] - 24:23

**analyze** [1] - 39:7

**analyzed** [1] - 14:16

**analyzing** [3] - 15:7, 23:22, 46:21

**Angeles** [3] - 13:4, 116:5, 116:11

**anger** [1] - 66:3

**announced** [1] - 116:2

**announcement** [1] - 108:4

**anticipate** [1] - 109:12

**anticipated** [1] - 115:5

**anxiety** [2] - 70:8, 79:24

**apart** [1] - 95:11

**apologize** [5] - 28:16, 28:19, 66:15, 98:14, 98:15

**appeal** [4] - 117:6, 117:7, 117:9

**appear** [1] - 11:1

**appearances** [1] - 4:6

**APPEARANCES** [2] - 1:11, 2:1

**appeared** [1] - 32:14

**appliance** [1] - 68:23

**application** [1] - 6:20

**apply** [3] - 9:4, 85:16, 117:9

**appointed** [1] - 50:10

**appraisal** [1] - 23:16

**appreciate** [2] - 48:25, 85:3

**approach** [1] - 9:24

**appropriate** [3] - 97:21, 109:18, 114:3

**appropriately** [1] - 93:20

**approval** [1] - 55:23

**approved** [3] - 58:5, 58:8, 58:24

**approximate** [8] - 12:11, 19:15, 20:15, 22:22, 23:3, 35:11, 37:15, 97:1

**approximation** [2] - 23:13, 23:23

**April** [6] - 89:2, 89:16, 90:13, 92:12, 103:4

**area** [3] - 13:4, 54:7, 108:11

**areas** [1] - 14:5

**argued** [1] - 66:1

**arguing** [1] - 77:4

**argument** [10] - 6:10, 99:9, 110:10, 110:12, 110:13, 111:16, 111:18, 112:3, 113:25

**arguments** [1] - 61:6

**arised** [1] - 78:14

**arithmetic** [2] - 12:6, 12:8

**arms** [1] - 102:3

**arrangement** [1] - 88:11

**arrest** [3] - 90:12, 91:23, 91:24

**arrested** [2] - 61:4, 102:11

**arrive** [1] - 75:5

**arrived** [1] - 73:13

**art** [2] - 90:18, 95:19

**artists** [1] - 82:12
**aspect** [1] - 10:21
**aspects** [2] - 12:1, 53:10
**assess** [3] - 19:1, 21:22, 25:15
**assessed** [1] - 93:10
**assessing** [1] - 92:19
**assessment** [8] - 20:16, 23:21, 25:19, 26:14, 27:6, 27:8, 34:15, 115:21
**asset** [7] - 4:13, 89:8, 89:12, 90:1, 91:22, 95:1, 103:2
**assets** [14] - 56:8, 72:7, 81:6, 90:4, 93:11, 93:20, 93:21, 101:5, 103:7, 105:2, 105:5, 105:7, 112:8, 115:6
**assigned** [1] - 4:14
**assist** [2] - 25:10, 100:15
**assistance** [1] - 69:1
**Assistant** [1] - 1:13
**assisted** [1] - 13:24
**associated** [2] - 7:20, 105:14
**assured** [1] - 71:9
**attached** [4] - 26:18, 61:5, 61:8, 102:22
**attachment** [1] - 53:5
**attempt** [1] - 21:6
**attempted** [1] - 44:6
**attend** [2] - 81:10, 97:18
**attention** [3] - 18:2, 53:3, 53:6
**Attorney** [1] - 1:13
**attorney** [6] - 4:14, 92:18, 93:9, 93:14, 97:3, 116:1
**Attorney's** [3] - 101:21, 101:22, 115:1
**attorneys** [2] - 55:8, 104:17
**audience** [3] - 4:18, 12:5, 75:23
**audio** [2] - 43:23
**audio/video** [2] - 43:24, 44:11
**Austin** [2] - 1:22, 4:16
**authority** [1] - 16:24
**available** [2] - 105:23, 112:8
**Avenue** [2] - 2:3, 118:8
**avoid** [7] - 10:12,

49:14, 49:17, 80:2, 94:2, 94:8, 96:19
**avoided** [2] - 56:22, 92:2
**avoiding** [3] - 57:20, 84:22, 84:25
**aware** [8] - 22:16, 22:20, 23:15, 23:18, 85:21, 90:4, 96:24, 99:8

## B

**bachelor** [1] - 13:10
**backdrop** [1] - 93:24
**backs** [1] - 97:14
**backstop** [1] - 59:9
**badly** [1] - 67:2
**balance** [2] - 39:13, 105:13
**ball** [1] - 67:14
**bank** [15] - 14:11, 15:8, 16:12, 16:13, 24:23, 26:9, 27:4, 27:7, 41:16, 86:6, 86:8, 86:12, 92:21, 95:3, 95:11
**bankruptcies** [2] - 16:11, 20:10
**bankruptcy** [79] - 6:12, 8:14, 13:23, 13:24, 16:7, 16:8, 19:23, 19:25, 20:11, 20:16, 20:23, 21:23, 22:18, 47:11, 47:16, 47:22, 48:2, 48:5, 48:7, 48:11, 48:14, 48:18, 49:8, 49:16, 49:22, 49:23, 50:1, 50:2, 50:3, 50:10, 51:9, 51:13, 52:5, 52:8, 53:14, 54:20, 54:24, 55:2, 55:6, 55:14, 55:25, 56:5, 56:12, 56:21, 56:23, 57:2, 57:18, 58:8, 58:13, 58:17, 58:23, 59:1, 61:23, 61:24, 62:2, 62:10, 62:11, 69:7, 69:10, 80:10, 86:9, 86:19, 88:4, 88:5, 88:15, 89:8, 89:11, 89:19, 95:1, 96:2, 100:15, 101:4, 101:7, 103:5, 103:12, 109:20, 112:7
**banks** [1] - 13:25
**bar** [1] - 27:1
**barbarous** [1] - 81:13

**bargained** [1] - 48:5
**based** [29] - 7:8, 11:23, 15:11, 17:5, 22:20, 23:21, 25:18, 26:2, 26:3, 29:8, 30:5, 34:15, 38:5, 38:14, 39:3, 40:9, 41:16, 45:20, 46:9, 46:14, 51:11, 52:4, 58:20, 80:20, 85:7, 93:7, 100:2, 110:14, 116:8
**basis** [6] - 30:8, 35:21, 36:8, 38:2, 48:6, 93:7
**Bates** [1] - 93:12
**battery** [1] - 68:21
**bear** [1] - 7:9
**beautiful** [1] - 67:8
**became** [3] - 47:11, 50:13, 65:1
**become** [1] - 15:3
**bed** [1] - 113:18
**BEFORE** [1] - 1:10
**beg** [2] - 70:14, 81:13
**began** [3] - 79:24, 80:24, 83:16
**begging** [1] - 91:16
**begin** [3] - 5:18, 41:19, 42:24
**beginning** [9] - 19:25, 41:22, 43:2, 43:10, 43:22, 49:23, 71:13, 71:18, 83:21
**behalf** [6] - 5:10, 43:4, 48:11, 49:16, 92:15, 98:23
**behind** [3] - 4:13, 51:12, 110:4
**belong** [1] - 76:23
**belonged** [1] - 10:7
**below** [2] - 108:16, 111:17
**Benefit** [1] - 99:18
**benefit** [15] - 8:15, 22:3, 23:11, 40:18, 56:13, 61:19, 62:6, 71:16, 78:16, 79:6, 85:2, 85:12, 94:12, 94:22, 95:9
**benefits** [1] - 105:5
**Benefits** [1] - 103:1
**benefitting** [1] - 88:9
**Bernie** [2] - 65:3, 81:1
**best** [5] - 4:20, 37:9, 67:21, 83:15, 99:18
**better** [6] - 12:14, 43:14, 73:7, 73:18, 102:16, 103:7
**between** [15] - 8:11,

39:24, 41:11, 41:13, 41:14, 54:24, 61:16, 66:3, 91:7, 99:7, 99:21, 100:10, 101:7, 103:1, 107:23
**beyond** [3] - 81:15, 83:22, 104:21
**big** [1] - 100:19
**biggest** [1] - 36:13
**bilking** [1] - 81:14
**billion** [15] - 18:21, 18:22, 19:1, 19:24, 20:15, 20:18, 26:7, 30:7, 80:7, 84:9, 86:22, 88:23, 90:20, 97:1, 106:17
**bills** [1] - 73:23
**Biscayne** [1] - 1:19
**bit** [5] - 9:15, 75:24, 90:3, 97:1, 97:3
**blame** [1] - 98:10
**blessing** [1] - 86:3
**blinded** [1] - 71:10
**blood** [1] - 79:25
**blue** [1] - 41:9
**Blvd** [1] - 1:19
**boarding** [1] - 112:20
**Boca** [1] - 76:21
**bodies** [1] - 67:1
**body** [2] - 68:7, 79:5
**bone** [1] - 69:25
**bookkeeper** [1] - 96:14
**bookkeepers** [1] - 25:13
**books** [7] - 14:16, 15:7, 15:15, 25:19, 26:14, 27:7, 96:17
**borrow** [4] - 33:3, 80:15, 82:9
**borrower** [4] - 33:10, 33:11, 61:16, 61:17
**borrowers** [5] - 30:15, 31:19, 31:22, 31:24, 44:22
**bottom** [1] - 94:13
**bought** [2] - 67:19, 68:4
**branch** [1] - 101:17
**break** [1] - 19:17
**breath** [1] - 79:25
**Bridge** [1] - 89:17
**brief** [4] - 5:21, 8:24, 21:19, 52:20
**briefly** [5] - 13:17, 56:16, 61:3, 85:8, 88:21
**bring** [3] - 100:4, 102:16, 111:8
**bringing** [1] - 83:25

**brings** [1] - 8:5
**brochures** [1] - 71:4
**broken** [1] - 27:19
**brokers** [1] - 36:14
**brought** [4] - 33:16, 33:22, 34:2, 103:1
**budgeted** [1] - 65:23
**building** [1] - 33:2
**built** [2] - 79:14, 100:21
**burden** [5] - 60:1, 60:10, 78:21, 112:10
**Bureau** [4] - 113:21, 114:5, 114:25, 116:12
**business** [24] - 14:16, 17:7, 24:12, 24:15, 32:3, 32:10, 33:17, 36:12, 38:5, 38:15, 38:22, 39:4, 43:15, 63:25, 64:2, 67:5, 70:3, 73:16, 87:18, 88:6, 100:20, 100:21
**businesses** [2] - 32:4, 93:16
**butcher** [1] - 4:21
**buy** [7] - 67:9, 67:15, 68:17, 68:19, 68:21, 70:10, 70:11
**buying** [2] - 68:1, 84:7
**Buying** [1] - 89:6
**BY** [17] - 2:2, 12:21, 16:2, 24:17, 26:25, 27:14, 32:8, 37:24, 42:23, 43:3, 44:1, 44:12, 49:1, 50:17, 51:4, 52:22, 58:3

## C

**C-H-I-N** [1] - 9:11
**cabinets** [1] - 95:18
**calculate** [3] - 9:4, 17:2, 19:2
**calculated** [2] - 18:15, 63:6
**calculating** [1] - 9:25
**calculation** [6] - 7:15, 7:20, 8:21, 9:23, 10:21, 62:17
**calculations** [2] - 35:8, 63:4
**California** [4] - 21:16, 74:24, 90:7, 102:11
**cancer** [3] - 73:14, 116:9
**cannot** [4] - 70:9, 70:10, 78:10, 78:11
**capable** [1] - 24:13
**capital** [2] - 32:20,

65:9
**Capital** [1] - 89:24
**capped** [1] - 107:12
**captioned** [1] - 92:12
**car** [2] - 68:21, 96:12
**card** [2] - 90:22, 95:7
**cards** [2] - 95:2, 95:8
**care** [5] - 70:4, 70:5, 71:24, 73:10, 74:6
**careful** [1] - 98:21
**carefully** [1] - 113:24
**cares** [1] - 80:7
**cars** [1] - 94:18
**carts** [1] - 67:11
**case** [44] - 4:15, 4:16, 9:2, 11:1, 13:25, 14:25, 25:9, 49:8, 49:14, 65:16, 67:4, 79:23, 96:22, 96:24, 97:7, 99:7, 99:17, 100:3, 100:4, 100:23, 100:24, 101:9, 101:16, 102:3, 102:12, 102:14, 102:18, 102:24, 103:1, 103:4, 103:14, 104:7, 105:3, 105:8, 107:10, 107:21, 111:24, 112:10, 113:10, 114:2, 114:10, 117:2, 117:4
**CASE** [1] - 1:2
**cases** [12] - 13:17, 21:11, 62:9, 96:21, 96:22, 96:23, 97:6, 99:7, 99:16, 99:21, 103:16, 107:19
**cash** [2] - 26:20, 68:16
**cashed** [2] - 58:7, 67:9
**cataloged** [1] - 96:20
**catch** [1] - 79:24
**categories** [1] - 27:20
**categorized** [2] - 26:11, 27:18
**category** [1] - 94:20
**Category** [1] - 63:12
**caught** [1] - 108:20
**caused** [8] - 20:11, 23:4, 52:6, 58:25, 67:1, 78:17, 85:5, 101:4
**causes** [2] - 68:6, 103:4
**causing** [1] - 70:8
**caution** [1] - 23:12
**CDs** [1] - 64:10
**cease** [5] - 87:15, 88:1, 88:3, 91:13, 96:1

**CECILIA** [1] - 1:10
**Cecilia** [1] - 4:4
**cell** [1] - 67:21
**Cellular** [1] - 67:22
**cent** [1] - 73:17
**CEO** [2] - 21:10, 21:11
**certain** [6] - 6:7, 27:2, 45:14, 48:1, 91:12, 111:19
**certainly** [11] - 7:10, 21:15, 34:8, 54:2, 86:20, 87:8, 93:22, 95:24, 106:7
**certainty** [4] - 18:15, 19:2, 33:21, 37:10
**Certificate................ ....** [1] - 3:21
**certified** [3] - 13:12, 13:13
**certify** [1] - 118:2
**Chagall** [3] - 90:15, 90:19, 91:3
**chairs** [1] - 99:20
**chance** [6] - 15:6, 44:25, 48:22, 52:5, 75:3, 80:22
**change** [3] - 7:15, 101:1, 115:3
**changed** [1] - 66:22
**channel** [1] - 67:22
**Chapter** [4] - 21:11, 48:17, 49:14, 64:23
**characteristics** [2] - 84:15, 112:17
**charge** [2] - 51:13, 80:14
**charged** [2] - 65:13, 80:17
**charges** [1] - 112:9
**chart** [9] - 28:6, 34:1, 34:24, 35:5, 36:10, 40:23, 88:21, 88:22, 94:11
**Chart** [1] - 94:25
**charts** [1] - 94:14
**cheap** [3] - 67:19, 67:25, 68:4
**cheat** [1] - 67:6
**checks** [4] - 19:6, 64:14, 92:22, 102:22
**chef** [1] - 76:16
**Cher** [1] - 10:7
**chief** [1] - 47:18
**child** [1] - 69:22
**childhood** [2] - 98:9, 112:18
**children** [4] - 70:4, 78:20, 106:1, 106:4
**children's** [1] - 65:18
**Chin** [7] - 9:11, 12:4,

21:7, 21:22, 22:2, 23:3, 50:13
**chin** [3] - 12:9, 22:21, 50:8
**chin's** [1] - 23:15
**Chin's** [1] - 23:22
**chiropractor** [1] - 68:7
**choice** [3] - 74:2, 87:16, 87:19
**choices** [1] - 97:11
**choose** [1] - 101:11
**chose** [1] - 83:17
**chosen** [1] - 54:23
**Chris** [1] - 1:24
**Christian** [1] - 68:9
**Christy's** [1] - 91:2
**circling** [1] - 38:10
**Circuit** [1] - 9:2
**circumstances** [2] - 8:12, 97:23
**cite** [1] - 96:24
**cited** [2] - 96:22, 97:6
**civil** [1] - 48:18
**claimed** [8] - 33:17, 38:7, 38:11, 38:22, 39:4, 43:15, 48:2, 83:19
**claims** [5] - 19:15, 19:20, 20:15, 46:8, 52:2
**clarity** [1] - 7:4
**classic** [1] - 104:16
**classified** [1] - 61:10
**clear** [9] - 6:3, 11:22, 19:25, 63:10, 65:1, 80:23, 88:8, 98:22, 99:10
**clearly** [3] - 29:22, 60:24, 76:20
**Clerk** [1] - 115:7
**client** [5] - 9:16, 11:12, 98:20, 102:19, 104:2
**close** [2] - 54:3, 116:5
**clothes** [2] - 67:24, 67:25
**club** [1] - 94:19
**Club** [2] - 82:1
**clue** [1] - 80:6
**coconspirator** [1] - 87:6
**Coconspirator** [1] - 87:20
**Cocounsel** [1] - 5:4
**Code** [1] - 85:9
**coded** [2] - 26:11, 27:18
**Codefendants** [2] - 111:22, 114:16
**coins** [1] - 90:15
**collapse** [3] - 52:9,

52:11, 105:2
**collar** [1] - 8:9
**collateral** [1] - 45:11
**collected** [1] - 65:8
**collection** [2] - 92:24, 115:19
**college** [3] - 65:18, 67:2, 76:17
**colonoscopy** [1] - 68:15
**color** [1] - 90:3
**colors** [1] - 27:2
**column** [2] - 30:9, 30:18
**columns** [1] - 27:21
**combination** [1] - 51:22
**comfortable** [2] - 60:16, 79:14
**coming** [5] - 34:16, 46:3, 69:6, 88:2, 88:23
**commend** [1] - 111:15
**Commercial** [1] - 89:17
**commercial** [3] - 33:2, 46:23, 47:2
**Commission** [2] - 54:24, 103:3
**commission** [2] - 36:15, 36:22
**Commissioner** [1] - 92:13
**commissioner** [1] - 92:19
**commissions** [4] - 36:14, 36:17, 40:10, 71:10
**commit** [6] - 84:17, 85:22, 99:14, 106:10, 109:1
**commits** [1] - 96:7
**committed** [4] - 98:24, 99:13, 99:14, 114:5
**committee** [1] - 13:22
**committing** [2] - 109:9, 115:16
**common** [2] - 8:9, 76:4
**community** [3] - 68:19, 101:8, 104:2
**comp** [1] - 10:8
**Companies** [3] - 16:17, 26:19, 35:24
**companies** [4] - 37:16, 47:17, 85:25, 95:12
**company** [11] - 57:23, 64:4, 76:19, 76:20, 86:3, 89:3, 89:6,

89:17, 101:4, 103:5
**compare** [4] - 39:8, 41:9, 42:11, 42:15
**compared** [1] - 41:1
**compares** [1] - 39:17
**comparing** [1] - 42:16
**compel** [1] - 109:22
**compelled** [1] - 9:14
**compelling** [1] - 84:19
**compensation** [1] - 100:15
**complete** [1] - 33:3
**completely** [1] - 84:2
**complex** [2] - 86:11, 99:6
**comply** [2] - 115:14, 115:19
**composite** [1] - 95:14
**comprehension** [1] - 81:15
**computer** [1] - 42:22
**con** [1] - 82:12
**conceivably** [1] - 107:10
**concerned** [1] - 40:21
**concerns** [1] - 75:5
**concluded** [1] - 92:10
**concludes** [2] - 75:1, 75:5
**concrete** [1] - 67:1
**concurrently** [1] - 115:11
**condition** [2] - 93:6, 93:8
**conditions** [2] - 115:15, 115:20
**conduct** [9] - 5:22, 7:25, 8:17, 56:13, 62:7, 110:5, 112:21, 112:23, 113:8
**confident** [5] - 6:9, 10:14, 10:16, 12:11, 83:1
**confusing** [1] - 8:18
**connection** [2] - 54:20, 55:10
**connotation** [1] - 8:9
**conscious** [1] - 97:11
**consecutively** [1] - 114:8
**consequence** [1] - 103:23
**consequences** [1] - 109:10
**conservative** [4] - 9:24, 20:24, 23:8, 23:10
**consider** [4] - 83:14, 97:5, 107:9, 112:14
**consideration** [5] -

5:22, 6:3, 35:10, 59:21, 80:25
**considered** [2] - 52:2, 114:1
**considering** [2] - 74:7, 113:10
**consistent** [1] - 100:5
**consistently** [1] - 102:12
**consists** [1] - 114:6
**consortium** [1] - 13:25
**conspiracy** [2] - 85:10, 99:14
**construct** [1] - 33:1
**construction** [2] - 30:14, 30:21
**constructs** [1] - 107:20
**consulting** [4] - 48:2, 48:6, 48:13, 88:10
**Consumer** [1] - 67:22
**contact** [3] - 14:15, 25:14, 78:3
**contacted** [1] - 101:22
**contained** [1] - 22:1
**contains** [1] - 107:1
**contemplating** [2] - 108:7, 109:8
**contending** [1] - 91:19
**contends** [1] - 96:21
**contest** [2] - 92:15, 92:17
**contesting** [1] - 62:5
**continue** [9] - 61:25, 75:14, 78:17, 86:13, 86:14, 87:21, 87:23, 88:15
**continued** [3] - 66:5, 91:22, 96:6
**CONTINUED** [1] - 2:1
**contract** [1] - 48:10
**contractors** [1] - 65:16
**contrary** [1] - 79:11
**contributed** [1] - 79:15
**controlled** [4] - 16:19, 36:16, 37:16, 115:18
**controlling** [1] - 9:1
**conveyed** [1] - 61:24
**convicted** [1] - 107:11
**cook** [1] - 68:3
**Cooke** [1] - 48:19
**cooperating** [1] - 115:18
**cooperation** [4] - 109:21, 109:25, 110:2, 115:22
**copious** [1] - 110:23

**copy** [1] - 51:5
**cornerstone** [1] - 38:11
**corporate** [1] - 93:2
**correct** [28] - 20:3, 28:23, 29:1, 29:7, 31:12, 32:12, 33:6, 33:13, 35:5, 35:16, 36:4, 36:5, 39:11, 41:6, 46:13, 50:12, 53:12, 53:15, 53:18, 53:19, 53:22, 53:23, 54:10, 54:22, 56:15, 57:16, 57:17, 60:7
**correctly** [1] - 63:5
**correspondence** [4] - 49:22, 51:5, 51:7, 61:6
**cost** [3] - 82:17, 104:5, 117:8
**costs** [5] - 40:9, 51:22, 52:6, 52:8, 80:3
**counsel** [3] - 4:9, 5:4, 111:22
**Counsel** [2] - 53:4, 90:6
**Count** [4] - 84:18, 85:10, 114:6, 114:7
**countless** [1] - 104:7
**country** [2] - 69:18, 94:19
**Counts** [2] - 115:10, 115:21
**counts** [8] - 85:10, 106:25, 107:1, 107:11, 117:11, 117:13, 117:17, 117:18
**couple** [7] - 6:17, 24:2, 30:11, 42:2, 58:1, 68:16, 77:3
**coupled** [1] - 22:20
**courier** [1] - 78:25
**course** [24] - 5:22, 6:23, 18:24, 28:9, 31:1, 33:25, 37:14, 44:21, 59:23, 60:13, 67:10, 86:14, 87:17, 88:22, 89:14, 91:17, 95:22, 96:6, 107:21, 109:17, 112:17, 112:21, 113:8, 113:14
**courses** [1] - 67:9
**Court** [49] - 2:2, 3:21, 4:3, 5:6, 9:3, 9:20, 9:23, 10:4, 10:9, 10:14, 10:23, 17:20, 21:7, 42:21, 53:17, 54:13, 55:22, 61:15,

76:5, 81:20, 82:24, 85:21, 88:20, 90:3, 90:25, 92:11, 96:18, 96:24, 98:4, 98:5, 98:15, 98:19, 99:4, 99:7, 99:12, 100:16, 101:8, 103:21, 104:9, 107:22, 110:3, 111:8, 114:4, 114:13, 114:24, 115:2, 116:4, 116:21, 118:8
**COURT** [92] - 1:1, 4:2, 4:5, 4:12, 4:23, 5:2, 5:7, 5:11, 5:18, 6:23, 7:1, 10:24, 11:5, 11:10, 11:16, 12:16, 15:25, 24:10, 27:12, 32:6, 37:22, 51:1, 52:16, 59:16, 59:19, 60:5, 60:9, 60:18, 60:23, 62:14, 62:23, 63:5, 63:8, 63:10, 63:14, 63:17, 63:21, 66:12, 66:16, 66:18, 70:17, 70:20, 72:20, 72:23, 73:2, 73:4, 74:12, 74:16, 74:18, 75:11, 75:14, 75:15, 75:17, 75:19, 75:21, 76:2, 76:7, 76:10, 76:12, 76:14, 76:25, 77:9, 77:20, 78:4, 81:18, 81:22, 82:22, 83:5, 84:13, 85:18, 98:1, 98:6, 98:18, 106:3, 106:6, 106:22, 106:25, 107:3, 107:8, 108:15, 110:7, 110:19, 110:22, 114:15, 116:10, 116:24, 117:1, 117:13, 117:15, 117:18, 117:20, 117:22
**court** [18] - 9:6, 14:18, 49:8, 49:11, 49:12, 49:17, 50:1, 56:1, 56:8, 56:12, 58:8, 75:17, 96:2, 97:15, 101:6, 101:13, 103:7, 113:17
**court's** [1] - 117:22
**Court's** [3] - 9:24, 11:14, 116:1
**courtroom** [2] - 86:16, 86:25
**Courtroom** [1] - 1:7
**Courts** [1] - 115:7

**courts** [2] - 23:19, 96:5
**cover** [3] - 45:22, 68:20, 108:14
**covered** [1] - 95:9
**CPA** [2] - 65:13, 80:12
**crazy** [1] - 67:12
**create** [1] - 107:20
**created** [7] - 61:23, 64:1, 85:25, 86:3, 86:12, 89:18, 105:6
**creative** [1] - 111:16
**creativity** [1] - 97:12
**credit** [6] - 90:5, 90:22, 95:2, 95:7, 101:1, 110:4
**creditors** [2] - 13:22, 55:8
**crime** [3] - 85:21, 96:6, 110:5
**crimes** [5] - 85:21, 85:23, 98:8, 115:16
**Criminal** [1] - 63:11
**criminal** [13] - 7:25, 48:19, 56:13, 62:7, 78:6, 80:22, 80:24, 83:14, 83:16, 100:22, 107:15, 112:9, 112:23
**criminality** [1] - 8:17
**critical** [1] - 89:1
**CRO** [1] - 101:3
**Crock** [1] - 68:4
**CROSS** [1] - 52:21
**Cross** [1] - 3:6
**cross** [3] - 12:18, 24:3, 52:19
**cross-examination** [2] - 24:3, 52:19
**CROSS-EXAMINATION** [1] - 52:21
**Cross-Examination** [1] - 3:6
**cruises** [1] - 67:18
**CRUZ** [71] - 1:12, 4:7, 4:13, 4:18, 4:24, 5:20, 6:25, 7:2, 8:24, 11:3, 11:21, 12:17, 12:21, 15:21, 16:2, 24:17, 26:25, 27:10, 27:13, 27:14, 32:8, 37:23, 37:24, 42:23, 43:2, 43:3, 43:18, 43:22, 43:25, 44:1, 44:12, 48:24, 49:1, 50:17, 50:24, 51:4, 52:15, 52:18, 58:1, 58:3, 59:18, 59:20, 60:14, 60:19, 60:21,

61:3, 63:3, 63:7, 63:9, 63:13, 75:1, 75:13, 75:20, 75:22, 76:3, 77:10, 77:14, 77:16, 77:25, 79:18, 81:20, 82:23, 83:6, 84:14, 110:11, 114:11, 116:14, 117:12, 117:14, 117:16, 117:19
**Cruz** [11] - 3:5, 3:5, 3:6, 4:7, 35:9, 38:18, 54:21, 56:20, 85:20, 87:9, 92:1
**cry** [1] - 66:25
**cue** [1] - 42:19
**cumulative** [5] - 39:13, 39:15, 39:16, 39:17, 40:23
**curable** [1] - 93:7
**current** [6] - 20:22, 22:16, 22:21, 93:8, 93:11
**custom** [2] - 95:16, 95:18
**cut** [1] - 74:5

## D

**daily** [1] - 79:4
**damage** [1] - 85:5
**damages** [1] - 98:11
**Dane** [1] - 87:5
**dangerous** [1] - 115:17
**data** [4] - 22:20, 27:4, 28:5, 39:8
**DATE** [1] - 118:7
**date** [1] - 114:13
**dates** [1] - 89:1
**daughter** [1] - 82:15
**daughter's** [1] - 79:21
**days** [3] - 103:20, 109:7, 117:7
**dead** [1] - 107:7
**deal** [7] - 65:12, 66:5, 102:19, 102:20, 106:23, 106:25, 107:21
**dear** [2] - 50:19, 51:21
**Dear** [1] - 51:20
**debt** [1] - 115:20
**debtor** [1] - 22:3
**debtor's** [1] - 48:17
**debtors** [1] - 47:21
**decades** [2] - 92:1, 92:2
**decades'** [1] - 84:21
**deceitful** [1] - 79:12
**December** [15] -

16:10, 20:4, 20:6, 26:21, 48:5, 50:18, 51:19, 51:24, 52:1, 68:8, 82:11, 88:25, 89:11
**deception** [1] - 87:23
**decide** [3] - 9:17, 25:6, 81:12
**decided** [1] - 79:5
**deciding** [1] - 43:7
**decision** [2] - 70:12, 100:11
**decisions** [3] - 100:14, 100:23, 104:11
**deck** [1] - 99:20
**declaration** [3] - 48:16, 48:23, 49:2
**declared** [1] - 89:11
**deductible** [1] - 68:11
**deductive** [2] - 24:22, 51:11
**deeper** [1] - 80:16
**deeply** [2] - 66:6, 70:8
**defaulted** [1] - 72:1
**defendant** [2] - 96:25, 109:3
**Defendant** [20] - 1:8, 8:18, 84:16, 87:17, 89:12, 90:4, 91:17, 92:1, 94:6, 95:14, 95:20, 96:11, 96:23, 115:9, 115:12, 115:14, 115:19, 116:1, 116:19, 117:17
**DEFENDANT** [4] - 1:17, 3:9, 5:17, 98:7
**Defendant's** [9] - 3:13, 89:4, 89:7, 90:6, 90:11, 91:23, 94:17, 94:18, 115:3
**Defendants** [1] - 90:12
**Defense** [2] - 5:24, 9:9
**defense** [1] - 104:17
**defer** [1] - 110:12
**define** [1] - 105:24
**definition** [1] - 24:7
**defraud** [2] - 83:20, 85:11
**defrauded** [2] - 84:25, 101:2
**defrauding** [2] - 84:22, 85:13
**degree** [5] - 13:5, 18:15, 19:1, 33:20, 37:10
**Delaware** [1] - 47:16
**delay** [1] - 78:15

**delivered** [1] - 111:1
**delivering** [1] - 79:1
**demonstrate** [2] - 28:9, 107:19
**demonstrated** [4] - 27:8, 30:18, 41:7, 83:22
**demonstrating** [2] - 27:2, 27:22
**demonstrative** [1] - 26:13
**denies** [1] - 99:2
**dental** [1] - 78:11
**depressed** [2] - 66:25, 93:8
**depression** [1] - 66:3
**deprived** [2] - 112:19, 112:21
**deprives** [1] - 105:25
**derived** [3] - 28:22, 29:14, 59:7
**describe** [1] - 42:8
**described** [1] - 107:17
**describes** [1] - 80:20
**descriptive** [1] - 30:9
**deserve** [2] - 66:7, 66:9
**deserved** [1] - 104:1
**deserves** [1] - 77:8
**design** [2] - 87:7, 88:18
**designate** [2] - 25:3, 36:21
**designated** [2] - 31:10, 37:5
**designation** [1] - 23:16
**designer** [1] - 95:23
**desist** [5] - 87:16, 88:1, 88:3, 91:13, 96:1
**desk** [1] - 47:13
**despair** [1] - 80:16
**desperately** [1] - 81:9
**despite** [1] - 91:13
**destroyed** [3] - 80:7, 112:25
**detailed** [1] - 115:22
**deter** [1] - 96:3
**determine** [3] - 10:19, 52:5, 90:9
**determined** [3] - 7:24, 57:19, 65:9
**determining** [1] - 55:5
**deterrence** [7] - 94:8, 94:10, 95:25, 103:15, 103:16, 108:3, 113:9
**deterrent** [4] - 103:22, 108:5, 109:8, 113:12

**detrimental** [2] - 8:3, 8:12
**devastation** [2] - 77:24, 78:7
**develop** [1] - 16:19
**developed** [2] - 79:23, 80:1
**developer** [3] - 32:19, 32:21, 33:4
**developing** [1] - 25:10
**development** [4] - 30:14, 33:1, 33:3, 39:20
**developments** [1] - 21:16
**device** [1] - 115:17
**diagnosed** [1] - 82:15
**diagnoses** [1] - 116:6
**diagnosis** [1] - 116:6
**die** [1] - 104:21
**difference** [7] - 8:11, 100:9, 104:14, 105:7, 105:8, 106:19, 107:23
**different** [18] - 4:20, 8:19, 10:1, 16:13, 16:18, 27:21, 30:11, 36:1, 64:15, 64:18, 84:2, 97:2, 97:3, 100:24, 104:12, 104:16, 105:3, 114:14
**differently** [4] - 62:4, 62:13, 100:25, 106:16
**difficult** [4] - 7:23, 99:4, 99:20, 107:21
**dilemma** [1] - 82:14
**diligence** [2] - 64:12, 71:11
**diligent** [1] - 83:21
**dime** [1] - 84:6
**dining** [1] - 95:18
**dinners** [1] - 67:7
**direct** [3] - 44:3, 53:3, 54:12
**Direct** [2] - 3:5, 3:5
**DIRECT** [2] - 12:19, 16:1
**directed** [1] - 55:2
**directing** [1] - 96:14
**direction** [3] - 5:23, 59:24, 96:12
**directly** [4] - 53:16, 53:21, 75:2, 83:7
**dirt** [1] - 105:4
**disbursed** [1] - 36:8
**disbursements** [1] - 26:8
**discard** [1] - 96:18

**discern** [1] - 33:16
**disclaim** [1] - 88:6
**disclose** [2] - 87:17, 90:4
**disclosed** [1] - 90:6
**disclosures** [1] - 94:2
**discount** [2] - 35:7, 109:4
**discretion** [6] - 105:21, 105:22, 105:24, 106:15, 109:24, 116:12
**discuss** [1] - 65:13
**discussion** [5] - 10:12, 56:16, 56:18, 62:19, 102:1
**disgorge** [1] - 91:18
**disgorgement** [3] - 103:8, 103:10, 103:12
**disgrace** [1] - 81:4
**DISH** [1] - 67:22
**dismiss** [1] - 117:17
**dismissal** [1] - 117:10
**dismissed** [2] - 117:13, 117:18
**disparities** [2] - 94:9, 96:19
**disparity** [4] - 39:24, 41:11, 94:8, 102:25
**dispute** [1] - 55:10
**disputes** [1] - 14:5
**dissimilar** [1] - 97:4
**distinction** [2] - 8:21, 102:25
**distinctions** [4] - 99:7, 99:21, 99:22, 99:23
**distributions** [5] - 12:7, 20:17, 31:5, 40:24, 54:16
**District** [1] - 4:3
**DISTRICT** [3] - 1:1, 1:1, 1:10
**district** [4] - 99:8, 99:15, 99:19, 115:13
**districts** [1] - 99:9
**disturbing** [1] - 70:8
**diverted** [1] - 89:24
**DIVISION** [1] - 1:2
**Dixie** [3] - 64:1, 66:13, 66:20
**DLA** [1] - 1:18
**DNA** [1] - 115:19
**Docket** [7] - 26:18, 53:5, 90:17, 92:13, 94:11, 116:17, 117:3
**docket** [5] - 26:18, 53:5, 88:21, 90:17, 91:7
**doctor** [1] - 79:25

**doctor's** [1] - 105:6
**document** [5] - 26:17, 26:19, 26:23, 27:16, 88:21
**documents** [4] - 5:12, 42:4, 64:17, 64:19
**dollar** [9] - 29:3, 44:23, 53:20, 53:21, 69:12, 103:9, 106:17
**dollars** [17] - 19:24, 26:7, 29:11, 29:12, 30:2, 62:8, 68:11, 80:11, 80:14, 82:10, 84:9, 85:12, 86:22, 91:2, 101:5, 101:13, 105:4
**donate** [1] - 68:6
**done** [13] - 53:1, 57:9, 57:22, 62:9, 68:7, 80:5, 80:19, 91:4, 99:6, 103:7, 104:10, 108:8, 113:13
**donor** [1] - 97:13
**doubt** [1] - 83:22
**doubts** [1] - 97:18
**down** [14] - 11:12, 19:17, 21:10, 27:19, 43:15, 59:16, 65:6, 65:19, 69:14, 79:18, 81:24, 104:2, 104:13, 110:13
**dozen** [1] - 14:24
**dozens** [2] - 22:11, 53:13
**drafts** [2] - 19:6, 48:12
**drag** [1] - 104:5
**draw** [4] - 53:6, 78:15, 99:6, 99:21
**drawn** [1] - 106:8
**dreams** [1] - 78:7
**driving** [2] - 79:1, 103:15
**dropping** [1] - 74:7
**drove** [1] - 81:24
**drug** [1] - 116:7
**dry** [1] - 69:10
**due** [6] - 51:24, 64:12, 71:11, 78:19, 79:22, 115:23
**dumb** [1] - 43:15
**duration** [3] - 87:9, 87:11, 97:24
**during** [9] - 18:20, 19:3, 21:11, 27:18, 29:15, 49:14, 88:5, 88:11, 114:16
**duties** [3] - 14:6, 16:3, 16:5
**duty** [1] - 7:7
**dwelling** [1] - 21:17

## E

**e-mail** [1] - 61:5
**e-mails** [3] - 86:2, 96:12, 96:13
**early** [6] - 41:20, 50:3, 111:20, 112:9, 112:22
**earn** [1] - 114:17
**earned** [3] - 64:4, 73:19, 114:18
**earnings** [1] - 114:24
**earth** [2] - 70:7, 104:20
**easily** [1] - 96:18
**easy** [3] - 79:14, 103:6, 112:18
**eat** [1] - 67:20
**eating** [1] - 73:21
**eBay** [1] - 67:24
**economy** [1] - 93:8
**education** [2] - 13:5, 67:2
**effect** [6] - 8:13, 11:13, 108:5, 108:11, 109:15, 113:12
**efficiently** [1] - 12:15
**efforts** [1] - 94:1
**egg** [1] - 68:24
**eggs** [1] - 87:6
**egregious** [2] - 81:17, 102:25
**either** [8] - 7:7, 7:12, 9:3, 25:14, 37:15, 50:10, 75:4, 113:19
**Elan** [1] - 5:4
**ELAN** [1] - 1:17
**elder** [1] - 80:18
**elderly** [7] - 72:4, 80:18, 80:23, 85:6, 87:1, 106:14, 113:1
**element** [1] - 100:17
**elements** [1] - 25:11
**Eleventh** [1] - 9:2
**eliminated** [1] - 78:12
**Elks** [2] - 82:1
**ELMO** [1] - 48:24
**embark** [1] - 113:10
**embarrassment** [1] - 78:19
**emergencies** [1] - 78:13
**emotional** [1] - 66:15
**employees** [2] - 26:10, 89:20
**encourage** [1] - 108:19
**encouraging** [1] -

112:5
**end** [10] - 10:1, 10:11, 10:12, 19:15, 20:4, 20:9, 71:5, 88:24, 90:2, 100:13
**ended** [1] - 102:6
**ending** [1] - 93:12
**endured** [1] - 77:24
**enforcement** [1] - 86:9
**engage** [1] - 108:19
**engaged** [1] - 13:21
**engages** [1] - 112:21
**enjoy** [1] - 69:16
**enjoyed** [1] - 62:5
**enrichment** [1] - 87:24
**enter** [1] - 102:17
**entered** [2] - 116:25, 117:3
**enterprise** [1] - 38:3
**entire** [2] - 74:1, 88:6
**entities** [6] - 16:18, 38:3, 47:19, 86:5, 94:13, 94:21
**entitled** [1] - 118:4
**entitlement** [1] - 80:6
**entity** [2] - 21:10, 94:25
**entry** [1] - 117:7
**Entry** [5] - 26:18, 53:6, 94:11, 116:17, 117:3
**Epstein** [1] - 105:15
**equity** [4] - 18:1, 72:7, 73:19, 79:22
**erred** [1] - 92:19
**erring** [1] - 23:12
**error** [1] - 112:6
**errors** [1] - 112:18
**escalating** [1] - 29:15
**ESQ** [5] - 1:12, 1:13, 1:17, 1:17, 1:18
**essentially** [5] - 26:11, 30:17, 47:20, 47:22, 91:22
**estate** [29] - 6:12, 7:12, 8:13, 8:14, 8:23, 10:5, 10:6, 12:6, 14:2, 15:4, 15:16, 21:15, 21:23, 22:18, 32:24, 48:11, 49:22, 50:2, 53:10, 53:14, 53:16, 56:5, 57:19, 64:18, 69:8, 79:10, 86:10, 103:12
**estimate** [7] - 7:14, 7:23, 9:22, 10:4, 19:14, 22:21, 54:13
**estimated** [2] - 53:21, 94:6
**estimating** [1] - 8:2
**et** [1] - 26:19

**Europe** [1] - 67:17
**evade** [3] - 86:13, 86:14, 95:5
**evaded** [2] - 92:1, 99:2
**evading** [1] - 96:1
**evaluation** [1] - 21:19
**evasion** [3] - 93:25, 94:1, 112:22
**event** [2] - 10:20, 116:20
**events** [1] - 78:10
**Evidence** [1] - 15:22
**EVIDENCE** [1] - 3:11
**evidence** [7] - 11:23, 50:24, 51:3, 59:20, 60:11, 60:24, 91:21
**evil** [1] - 72:6
**eviscerate** [1] - 100:23
**evokes** [1] - 8:19
**ex** [1] - 94:18
**ex-wife** [1] - 94:18
**exactly** [4] - 10:8, 61:12, 73:8, 107:7
**Exam** [1] - 3:5
**EXAMINATION** [4] - 12:19, 16:1, 52:21, 58:2
**examination** [3] - 24:3, 44:3, 52:19
**Examination** [3] - 3:5, 3:6, 3:6
**examine** [1] - 112:17
**examining** [1] - 26:6
**example** [7] - 32:17, 33:2, 44:2, 44:13, 94:24, 95:1, 99:18
**excess** [1] - 108:2
**Exchange** [2] - 54:24, 103:2
**excuse** [8] - 17:21, 19:22, 20:7, 39:16, 42:20, 55:19, 80:12, 84:14
**execution** [2] - 85:25, 86:20
**exercise** [2] - 105:24, 106:15
**Exhibit** [8] - 3:12, 3:13, 26:18, 27:10, 42:17, 50:24, 51:2, 95:13
**exhibit** [5] - 33:15, 38:8, 43:24, 44:11, 49:21
**exhibit's** [1] - 40:21
**EXHIBITS** [1] - 3:11
**exist** [1] - 65:24
**expand** [1] - 87:10
**expect** [1] - 80:4
**expectancy** [1] -

108:22
**expenditures** [3] - 90:18, 95:12, 96:18
**expense** [3] - 36:21, 36:22, 71:16
**expenses** [4] - 36:12, 92:25, 94:24, 95:9
**experience** [6] - 8:8, 15:12, 17:5, 21:20, 99:16, 109:6
**experiences** [1] - 105:25
**expert** [16] - 9:10, 14:18, 14:21, 14:22, 15:22, 21:15, 22:22, 23:16, 23:18, 24:4, 25:6, 25:18, 27:6, 38:14, 39:3, 40:9
**expert's** [1] - 60:13
**expertise** [4] - 15:18, 21:12, 21:14, 54:8
**expires** [1] - 67:15
**explain** [4] - 30:10, 31:15, 81:25, 91:13
**explanation** [1] - 51:8
**exploiting** [1] - 80:18
**exponentially** [1] - 41:24
**exposure** [2] - 101:25, 107:12
**express** [1] - 78:5
**expressed** [1] - 70:9
**expressly** [1] - 56:1
**extension** [1] - 86:5
**extensive** [1] - 112:25
**extent** [3] - 10:14, 66:9, 113:11
**extorted** [2] - 80:7, 80:21
**extract** [1] - 12:2
**extraordinarily** [1] - 98:25
**extravagant** [1] - 80:8
**extreme** [1] - 97:24
**extremely** [1] - 71:9
**eye** [1] - 78:3
**eyes** [1] - 59:21

## F

**face** [1] - 67:13
**facility** [6] - 90:7, 90:8, 90:9, 91:15, 91:24, 116:4
**facing** [3] - 107:4, 107:10, 109:16
**fact** [36] - 6:7, 11:24, 14:25, 18:3, 22:12, 26:17, 27:21, 33:20, 37:9, 38:11, 39:4,

39:7, 43:10, 44:16, 44:25, 45:25, 47:4, 48:9, 49:17, 51:13, 56:4, 56:20, 57:11, 60:2, 61:5, 61:10, 62:5, 84:10, 86:7, 91:21, 97:22, 99:2, 100:22, 101:10, 110:5
**factor** [1] - 97:12
**factors** [7] - 25:5, 27:2, 85:7, 85:16, 96:1, 112:13, 112:14
**facts** [5] - 88:8, 100:2, 100:3, 102:24, 114:2
**factual** [1] - 84:24
**fading** [1] - 29:18
**failed** [1] - 91:19
**failure** [1] - 77:3
**fair** [1] - 27:6
**fairly** [2] - 6:8, 112:24
**faith** [1] - 101:25
**fall** [1] - 72:18
**false** [1] - 105:6
**familiar** [9] - 18:7, 22:15, 42:3, 46:25, 48:16, 49:3, 49:21, 95:13, 109:2
**family** [13] - 67:7, 69:15, 70:24, 71:15, 72:14, 78:7, 78:10, 82:17, 85:12, 106:1, 106:7, 106:10, 109:12
**famous** [1] - 65:3
**far** [10] - 6:16, 29:9, 29:13, 37:4, 39:12, 40:21, 75:7, 83:2, 84:18, 104:4
**fasciatus** [1] - 68:14
**fate** [2] - 113:15, 113:17
**favorable** [1] - 107:11
**FBI** [4] - 1:22, 1:23, 4:15, 90:7
**February** [1] - 86:17
**Federal** [3] - 15:21, 114:17, 114:19
**federal** [7] - 65:10, 80:19, 85:23, 94:2, 109:3, 109:6, 113:14
**FedEx** [2] - 78:25, 79:1
**fee** [2] - 48:6, 88:10
**feelings** [1] - 66:3
**fees** [3] - 31:23, 48:2, 94:19
**fell** [1] - 79:11
**fellow** [1] - 44:2
**felt** [4] - 7:6, 7:16,

8:22, 79:15
**few** [4] - 9:17, 52:25, 67:20, 95:15
**Fiat** [1] - 96:12
**field** [2] - 15:23, 23:16
**fight** [1] - 66:25
**fighting** [2] - 77:3, 100:13
**figuratively** [1] - 78:3
**figure** [15] - 9:4, 9:5, 9:8, 10:15, 11:24, 20:20, 21:4, 22:22, 22:25, 23:3, 23:9, 35:7, 48:4, 53:17, 60:6
**figured** [1] - 69:6
**figures** [1] - 35:11
**file** [4] - 92:4, 101:4, 103:5, 104:4
**filed** [11] - 5:13, 16:11, 20:10, 21:24, 48:17, 57:8, 58:10, 58:12, 90:17, 106:11, 117:7
**filing** [11] - 16:8, 49:19, 51:14, 52:9, 56:20, 57:1, 57:18, 62:1, 64:23, 92:15, 101:6
**filings** [3] - 20:23, 56:23, 57:8
**final** [1] - 86:19
**finally** [11] - 4:24, 36:9, 40:21, 49:21, 59:3, 74:24, 77:1, 85:2, 93:4, 95:2, 102:2
**finances** [1] - 22:17
**financial** [23] - 13:13, 14:8, 16:7, 26:3, 43:4, 43:11, 64:8, 78:19, 79:7, 79:15, 80:16, 81:15, 85:23, 86:21, 93:15, 94:2, 99:18, 100:11, 100:16, 103:11, 114:19, 114:21, 115:5
**findings** [1] - 116:1
**fine** [3] - 92:5, 114:8, 114:9
**fingers** [1] - 69:24
**finish** [1] - 42:2
**firearm** [1] - 115:17
**firm** [2] - 13:21, 64:11
**first** [30] - 4:10, 4:16, 5:19, 6:6, 8:5, 17:22, 26:4, 27:16, 28:8, 30:2, 38:19, 39:12, 39:21, 46:15, 46:23, 47:1, 47:2, 47:4,

47:7, 64:13, 64:20, 66:14, 71:5, 76:3, 77:22, 90:10, 90:11, 92:12, 95:16
**first-party** [2] - 46:15, 46:23
**five** [8] - 18:25, 34:24, 39:14, 40:25, 73:15, 75:12, 87:25, 88:1
**five-minute** [1] - 75:12
**FI** [1] - 1:19
**FL** [1] - 1:14
**flags** [1] - 65:5
**flat** [2] - 41:7, 41:9
**flaw** [1] - 109:10
**flaws** [1] - 107:19
**flew** [1] - 9:6
**flipped** [1] - 68:12
**Floor** [2] - 2:3, 118:8
**floors** [1] - 67:1
**FLORIDA** [1] - 1:1
**Florida** [6] - 1:4, 2:4, 74:21, 74:25, 79:2, 118:9
**flows** [1] - 91:7
**fly** [1] - 105:1
**focus** [5] - 18:2, 25:1, 28:8, 31:13, 36:10
**focuses** [1] - 18:10
**folks** [3] - 108:19, 111:2, 113:1
**follow** [1] - 108:15
**following** [2] - 4:1, 115:20
**follows** [1] - 11:8
**fool** [1] - 86:15
**footnote** [1] - 48:23
**FOR** [4] - 1:12, 1:17, 3:3, 3:9
**forbid** [1] - 68:24
**force** [2] - 103:15, 109:23
**forced** [4] - 51:8, 78:15, 78:18, 81:11
**foregoing** [1] - 118:2
**forensic** [30] - 4:19, 6:11, 12:6, 13:15, 13:21, 14:3, 14:4, 14:6, 14:21, 15:1, 15:3, 15:9, 15:11, 15:19, 15:23, 17:1, 18:4, 22:16, 30:5, 32:13, 33:14, 34:21, 35:2, 42:13, 45:20, 46:9, 52:4, 58:20, 83:17, 83:21
**Forensic** [1] - 1:23
**forensically** [1] - 48:12
**forensics** [3] - 13:13,

23:21, 24:5
**forever** [1] - 72:5
**forfeiture** [5] - 4:13, 116:13, 116:15, 116:19, 116:25
**forget** [1] - 105:2
**forgive** [1] - 78:3
**form** [5] - 7:13, 17:24, 36:17, 45:21, 82:15
**forma** [1] - 117:9
**formally** [1] - 56:7
**formation** [1] - 35:25
**forth** [3] - 87:18, 92:20, 112:20
**forward** [5] - 8:3, 10:18, 59:20, 102:17, 104:11
**forwarded** [1] - 115:8
**foundation** [1] - 12:14
**four** [4] - 34:9, 34:13, 34:23, 90:18
**fraction** [1] - 44:24
**fragile** [1] - 101:5
**frame** [4] - 16:9, 27:25, 28:2
**frankly** [1] - 108:4
**fraud** [31] - 8:10, 8:20, 12:8, 23:4, 23:6, 23:24, 24:20, 25:2, 25:11, 25:22, 33:25, 41:18, 41:21, 41:22, 58:21, 59:1, 59:25, 60:2, 60:11, 61:20, 61:22, 82:2, 83:9, 84:17, 84:21, 86:10, 99:14, 99:19, 100:11, 106:17, 107:19
**fraudster** [1] - 96:7
**fraudsters** [1] - 110:16
**fraudulently** [2] - 99:3, 105:6
**Fred** [7] - 9:11, 12:4, 21:7, 21:22, 22:2, 23:3, 50:13
**free** [1] - 98:10
**freeze** [6] - 89:9, 89:12, 89:19, 90:1, 95:1, 103:2
**Friday** [2] - 111:1, 117:4
**front** [1] - 95:17
**frozen** [1] - 52:1
**frustration** [1] - 111:20
**frustrations** [1] - 67:14
**full** [2] - 45:18, 93:10
**fullest** [1] - 66:9
**fully** [1] - 107:17

**Fund** [2] - 29:17, 30:1
**fund** [2] - 26:5, 88:23
**funded** [1] - 97:14
**Funding** [2] - 16:16, 35:24
**funds** [17] - 16:18, 18:1, 18:15, 18:23, 20:24, 24:16, 25:1, 30:5, 30:21, 33:3, 52:13, 64:22, 65:19, 65:24, 83:25, 89:15
**funnel** [1] - 94:25
**funneled** [1] - 90:20
**future** [4] - 70:5, 110:1, 113:9, 114:13

## G

**G-E-R-T-M-A-N** [1] - 77:18
**gain** [8] - 7:17, 9:23, 10:22, 62:18, 62:20, 62:21, 81:15, 113:21
**gains** [2] - 10:11, 115:5
**gallery** [1] - 63:1
**GALLERY** [2] - 4:22, 77:15
**general** [12] - 17:4, 17:13, 22:17, 24:7, 52:2, 92:21, 94:8, 94:10, 95:25, 103:14, 103:22, 108:3
**generally** [1] - 57:6
**generated** [6] - 24:15, 40:19, 41:1, 41:5, 41:15, 59:10
**generating** [1] - 24:13
**generosity** [1] - 110:21
**generous** [1] - 97:13
**Gershoni** [1] - 5:5
**GERSHONI** [1] - 1:17
**Gertman** [4] - 77:10, 77:17, 78:1, 83:15
**GERTMAN** [6] - 77:19, 77:21, 78:1, 78:5, 79:19, 81:19
**given** [14] - 17:14, 25:2, 25:6, 26:14, 28:24, 33:16, 45:21, 61:17, 80:22, 81:5, 93:11, 100:16, 101:1
**global** [1] - 55:10
**goals** [1] - 79:4
**God** [4] - 68:23, 70:5, 72:14, 73:17
**gold** [11] - 87:20, 90:15, 91:4, 91:5,

91:8, 91:10, 91:12, 91:14, 91:24
**Goldberg** [2] - 50:9, 50:13
**golf** [3] - 67:8, 67:10, 67:12
**Goodwill** [2] - 82:18, 82:19
**Gould** [2] - 1:22, 5:10
**gourmet** [1] - 68:3
**GOVERNMENT** [2] - 1:12, 3:3
**Government** [35] - 5:24, 6:5, 7:10, 11:1, 11:4, 11:8, 11:15, 11:20, 59:25, 60:10, 65:10, 70:23, 77:17, 83:10, 90:5, 90:6, 94:2, 94:14, 96:20, 96:21, 97:6, 97:21, 98:15, 99:17, 100:6, 102:13, 102:18, 107:12, 109:19, 109:25, 110:9, 112:9, 112:10, 115:4, 117:10
**Government's** [5] - 3:12, 5:15, 5:19, 50:24, 51:2
**Grace** [2] - 72:22, 74:24
**grand** [1] - 72:12
**grandchild** [1] - 65:19
**grandchildren** [2] - 106:1, 106:3
**graph** [2] - 39:21, 40:22
**graphs** [2] - 27:2, 39:10
**grasp** [1] - 80:4
**great** [2] - 6:22, 109:7
**greater** [3] - 97:21, 108:12, 112:15
**greed** [3] - 80:6, 96:8
**greedy** [1] - 71:11
**grew** [1] - 69:24
**groceries** [1] - 68:19
**gross** [1] - 114:23
**ground** [1] - 12:14
**Group** [5] - 16:17, 26:19, 35:24, 35:25, 79:12
**group** [2] - 47:17, 79:12
**grow** [1] - 41:24
**guarantee** [1] - 71:6
**guaranteed** [1] - 79:10
**guess** [3] - 7:4, 104:3, 104:18
**guide** [2] - 47:21,

80:10
**guideline** [7] - 7:15, 7:20, 8:21, 10:1, 10:11, 59:23, 107:14
**guideline's** [3] - 108:16, 108:17, 111:17
**guidelines** [11] - 9:2, 9:5, 9:25, 10:20, 63:4, 63:5, 63:10, 63:15, 85:24, 107:18, 111:6
**guilty** [3] - 98:8, 104:24
**gut** [1] - 96:4
**guy** [1] - 102:7

## H

**hailstorm** [1] - 101:11
**half** [6] - 14:24, 18:25, 26:7, 34:8, 39:14, 40:25
**hand** [4] - 11:5, 28:5, 34:24, 77:13
**handbags** [1] - 95:23
**handled** [1] - 62:17
**hands** [1] - 97:20
**handwriting** [1] - 102:23
**happiness** [1] - 70:10
**happy** [4] - 5:20, 5:24, 65:24, 66:24
**hard** [11] - 23:22, 31:25, 32:3, 32:10, 64:2, 67:6, 69:14, 70:24, 70:25, 72:18, 105:12
**harder** [1] - 100:8
**hardworking** [7] - 69:2, 78:25, 79:13, 80:23, 81:3, 81:14, 104:6
**harm** [1] - 113:13
**harmed** [1] - 71:24
**hatched** [2] - 83:24, 84:11
**hate** [1] - 72:17
**haunt** [1] - 105:19
**health** [3] - 68:24, 75:5, 78:7
**healthcare** [1] - 68:10
**hear** [1] - 100:24
**heard** [12] - 21:6, 64:7, 74:5, 74:23, 82:18, 83:7, 86:15, 86:21, 87:9, 88:4, 97:15, 97:17
**hearing** [12] - 5:12, 5:22, 9:12, 9:15,

10:16, 12:3, 81:10, 105:12, 110:25, 114:10, 116:23, 117:4
**heart** [3] - 77:2, 79:24, 79:25
**heartfelt** [1] - 98:20
**hearts** [1] - 77:23
**heat** [1] - 79:2
**heavy** [1] - 67:1
**hefty** [1] - 71:10
**held** [9] - 4:1, 19:24, 61:13, 61:18, 61:21, 61:22, 62:12, 79:3, 89:14
**hell** [1] - 70:7
**hello** [2] - 63:22, 66:17
**help** [8] - 26:13, 29:22, 70:4, 80:13, 80:15, 99:5, 106:13, 113:17
**hereby** [1] - 118:2
**hidden** [1] - 72:6
**hide** [2] - 95:5, 95:6
**high** [7] - 24:13, 63:25, 71:5, 93:2, 107:19, 107:20, 114:12
**high-end** [1] - 71:5
**high-level** [1] - 93:2
**high-loss** [1] - 107:19
**higher** [1] - 13:5
**highest** [1] - 8:15
**highlighted** [2] - 51:17, 51:20
**himself** [5] - 71:15, 85:12, 91:18, 95:20, 97:13
**hire** [3] - 50:6, 80:10, 80:12
**hired** [5] - 47:23, 47:25, 51:16, 93:14, 101:3
**historical** [3] - 14:7, 22:20, 27:4
**historically** [1] - 14:15
**History** [1] - 63:11
**history** [4] - 84:15, 93:18, 112:16, 116:8
**Hodgkin's** [2] - 93:6, 103:18
**hold** [3] - 28:18, 32:21, 85:14
**holder** [3] - 38:12, 42:8
**holders** [5] - 29:10, 30:6, 36:4, 36:18, 49:12
**holds** [1] - 70:6
**Hollywood** [1] - 71:24
**home** [16] - 61:4, 61:5,

61:9, 61:19, 61:20, 61:21, 61:22, 61:24, 62:1, 62:6, 62:10, 65:19, 79:17, 95:19, 97:10, 103:24
**homes** [4] - 21:17, 61:23, 65:20, 71:23
**honestly** [1] - 72:6
**Honor** [114] - 4:7, 4:19, 4:22, 5:3, 5:6, 5:9, 5:17, 5:20, 6:13, 6:15, 6:16, 6:17, 7:5, 8:25, 9:3, 9:7, 9:16, 9:18, 11:3, 11:11, 11:15, 11:21, 12:11, 15:21, 18:19, 26:22, 43:22, 50:16, 50:25, 52:15, 52:18, 52:20, 57:25, 58:1, 59:18, 59:25, 60:2, 60:8, 60:14, 60:20, 61:7, 61:9, 61:11, 62:16, 62:24, 62:25, 63:9, 63:13, 63:16, 63:18, 63:23, 66:11, 66:17, 70:16, 70:19, 72:16, 72:19, 72:21, 72:25, 74:13, 74:20, 75:1, 75:2, 75:3, 75:8, 75:9, 75:13, 75:20, 75:24, 76:6, 77:19, 81:16, 81:21, 83:3, 83:7, 83:11, 83:13, 85:14, 85:20, 86:21, 88:4, 88:8, 88:22, 89:23, 91:25, 93:24, 94:10, 95:13, 97:5, 97:7, 98:3, 98:7, 99:16, 99:25, 100:9, 101:16, 106:5, 106:21, 106:24, 107:2, 107:6, 107:7, 107:16, 108:5, 108:24, 110:8, 110:11, 110:13, 110:20, 114:11, 116:3, 116:14, 116:16, 117:12
**Honor's** [8] - 5:21, 5:23, 6:3, 6:6, 11:22, 42:19, 59:21, 76:1
**Honorable** [1] - 4:3
**HONORABLE** [1] - 1:10
**hope** [7] - 8:14, 54:5, 66:8, 70:9, 80:21, 81:6, 106:15
**hormones** [1] - 68:12
**horrendous** [1] - 113:23

**horrible** [1] - 104:11
**horrific** [1] - 110:5
**horrors** [1] - 106:2
**hospice** [1] - 69:20
**hour** [1] - 80:14
**hours** [7] - 15:7, 25:18, 64:3, 66:2, 66:25, 70:3, 115:11
**house** [11] - 33:1, 53:20, 61:12, 65:21, 72:13, 76:18, 88:17, 88:18, 94:15, 95:14, 95:15
**houses** [1] - 53:24
**housing** [1] - 33:1
**human** [1] - 100:17
**humidity** [1] - 79:3
**humiliating** [1] - 70:8
**hundred** [1] - 71:18
**hundreds** [8] - 43:11, 80:11, 80:14, 86:8, 90:20, 101:5, 101:13, 105:4
**hurt** [6] - 66:3, 66:6, 69:23, 70:9, 98:9, 101:12
**husband** [14] - 66:21, 67:5, 69:24, 73:14, 73:19, 76:8, 76:16, 76:25, 77:2, 78:18, 78:24, 79:8, 81:6, 81:10
**Hysa** [2] - 1:23, 4:21

## I

**idea** [3] - 96:16, 102:22, 105:18
**identified** [3] - 7:18, 54:21, 93:13
**identify** [7] - 10:3, 10:15, 33:21, 36:15, 44:7, 48:10, 103:6
**illustrates** [2] - 39:14, 40:23
**immediately** [3] - 69:9, 89:8, 92:7
**impact** [3] - 6:16, 8:20, 87:8
**impacted** [3] - 56:23, 57:1, 78:6
**impacts** [1] - 53:17
**import** [1] - 109:15
**important** [12] - 8:21, 8:22, 40:1, 46:15, 46:17, 46:18, 47:1, 69:19, 84:18, 99:22, 100:7
**importantly** [2] - 83:9, 84:1

**impose** [1] - 111:12
**imposed** [5] - 97:23, 114:9, 114:19, 114:21, 115:25
**imposing** [1] - 112:4
**impossibility** [1] - 45:25
**impossible** [2] - 46:4, 79:22
**imprison** [1] - 83:11
**imprisoned** [1] - 114:5
**imprisonment** [10] - 83:11, 83:13, 84:20, 85:10, 96:25, 111:7, 111:12, 113:14, 115:9
**IN** [1] - 3:11
**inability** [1] - 51:23
**incarcerated** [1] - 103:19
**incarceration** [2] - 114:17, 114:22
**inception** [3] - 26:4, 84:11, 94:4
**incident** [1] - 88:1
**include** [4] - 54:19, 115:16, 116:4, 116:10
**included** [3] - 28:6, 35:14, 36:22
**includes** [2] - 36:13, 65:16
**including** [4] - 40:10, 90:18, 98:14, 116:6
**income** [21] - 25:2, 31:13, 31:21, 31:22, 33:18, 34:4, 34:5, 36:3, 38:9, 38:10, 38:16, 40:19, 41:1, 41:15, 59:10, 65:6, 68:25, 93:11, 95:6, 115:6
**incoming** [1] - 88:22
**incomprehensible** [1] - 78:23
**inconsistent** [4] - 7:18, 62:3, 98:24, 99:11
**increase** [2] - 40:7, 41:11
**increasing** [2] - 39:24, 40:4
**incrementally** [1] - 7:12
**incurred** [1] - 51:25
**independent** [1] - 102:4
**indicated** [2] - 89:20, 110:25
**indicia** [2] - 25:15,

41:21
**indictment** [7] - 18:7, 18:10, 106:23, 107:1, 107:4, 114:7, 117:11
**indictments** [1] - 106:17
**individual** [7] - 18:24, 45:3, 58:20, 58:25, 73:9, 97:9, 110:15
**individuals** [11] - 14:15, 15:8, 28:22, 28:24, 35:23, 36:16, 37:4, 50:8, 74:21, 75:4, 85:11
**Industries** [2] - 114:17, 114:20
**inexplicable** [1] - 78:20
**inflammation** [1] - 80:1
**information** [6] - 28:8, 36:9, 92:22, 93:15, 93:17, 110:23
**informed** [4] - 64:23, 65:7, 69:13, 78:20
**ingredients** [1] - 68:4
**innocent** [1] - 72:17
**inside** [1] - 90:14
**insider** [5] - 37:3, 37:5, 37:10, 40:10
**insisting** [1] - 111:21
**insolvency** [1] - 13:13
**instance** [1] - 100:14
**instead** [9] - 10:22, 45:9, 67:18, 67:20, 67:25, 87:19, 93:18, 104:7, 107:9
**instructed** [1] - 99:5
**insurance** [5] - 68:11, 68:20, 70:5, 74:6, 105:5
**intend** [2] - 83:20
**intended** [1] - 49:9
**intending** [1] - 81:2
**intent** [2] - 80:24, 83:16
**intention** [1] - 9:18
**intercompany** [1] - 37:25
**interest** [34] - 19:7, 19:8, 20:17, 20:22, 21:1, 31:6, 31:8, 31:10, 31:21, 32:15, 33:12, 33:15, 33:18, 33:22, 34:2, 34:4, 34:5, 34:9, 40:24, 46:8, 46:11, 49:7, 56:17, 56:21, 56:25, 57:10, 57:13, 64:22,

64:24, 65:8, 65:9, 83:13, 96:15, 114:25
**interesting** [1] - 111:18
**interests** [5] - 49:13, 49:15, 56:24, 57:3, 57:20
**Internal** [2] - 92:13, 92:24
**internal** [1] - 25:9
**interpreter** [1] - 76:16
**interrupt** [1] - 46:21
**interview** [2] - 14:15, 25:13
**interviewing** [1] - 15:8
**interviews** [3] - 15:15, 25:19, 89:19
**invest** [6] - 17:23, 30:13, 43:8, 73:17, 77:2, 79:9
**invested** [5] - 24:16, 28:11, 53:9, 82:6, 86:16
**investigating** [1] - 101:14
**Investigation** [8] - 5:14, 6:1, 60:12, 83:18, 86:18, 111:5, 111:14, 115:23
**investigation** [3] - 88:12, 90:10, 102:4
**investigations** [1] - 86:2
**investing** [4] - 24:12, 30:13, 71:14, 71:21
**Investment** [2] - 29:17, 29:25
**investment** [19] - 16:18, 17:18, 18:1, 24:8, 24:11, 26:5, 29:9, 38:11, 64:8, 64:11, 71:2, 71:5, 71:9, 72:5, 76:19, 78:23, 79:10, 79:12, 82:4
**Investments** [1] - 71:4
**investments** [24] - 17:10, 17:25, 18:3, 24:14, 24:15, 30:9, 30:20, 31:18, 36:18, 39:13, 39:18, 39:25, 40:20, 41:2, 41:3, 41:4, 41:14, 43:1, 44:24, 59:9, 64:15, 64:19, 72:3, 99:3
**investor** [17] - 19:17, 25:1, 30:12, 39:12, 39:15, 40:7, 40:19, 41:5, 45:21, 46:2, 46:11, 52:13, 83:25,

88:13, 89:15, 91:6, 96:7
**investor's** [1] - 46:12
**investors** [71] - 12:8, 17:15, 17:23, 18:24, 18:25, 19:3, 19:5, 19:12, 19:16, 19:21, 19:24, 20:17, 20:22, 20:25, 23:2, 24:16, 24:24, 28:10, 28:11, 28:13, 28:20, 29:3, 29:8, 30:2, 30:4, 30:6, 31:5, 31:7, 31:9, 32:10, 33:8, 36:1, 36:14, 38:6, 38:12, 39:6, 39:16, 39:24, 40:5, 40:24, 41:15, 42:5, 42:7, 43:5, 43:7, 45:14, 45:17, 46:1, 46:16, 47:1, 47:8, 49:23, 50:19, 51:21, 54:17, 56:17, 57:9, 57:10, 57:15, 59:4, 71:12, 71:16, 86:15, 87:17, 88:19, 88:23, 99:3
**investors'** [3] - 45:23, 49:18, 95:23
**invited** [1] - 109:19
**involved** [16] - 15:3, 16:5, 21:11, 25:11, 25:22, 26:5, 45:1, 47:12, 47:15, 47:16, 50:14, 61:15, 67:3, 69:7, 97:2, 101:16
**involvement** [1] - 24:18
**involves** [1] - 14:8
**involving** [1] - 92:22
**IRA** [1] - 82:10
**IRS** [14] - 1:24, 4:25, 84:18, 84:22, 85:13, 86:13, 92:1, 92:2, 93:13, 93:18, 93:19, 94:6, 95:5, 115:22
**isolated** [1] - 87:25
**issue** [7] - 7:7, 8:7, 8:24, 61:11, 61:20, 62:15, 93:15
**issued** [1] - 87:16
**issues** [4] - 7:5, 7:8, 68:24, 93:13
**items** [4] - 6:8, 41:17, 42:2, 91:15

## J

**J-E-R-E-M-I-A-S-S-E-N** [1] - 12:25
**jail** [1] - 72:9

**James** [5] - 1:23, 4:18, 63:2, 63:18, 63:24
**January** [3] - 86:16, 88:24, 117:4
**Jeff** [1] - 105:15
**Jeremiassen** [14] - 3:4, 6:11, 11:4, 12:6, 12:23, 15:22, 22:13, 24:4, 27:15, 29:18, 30:16, 48:4, 58:4, 86:7
**JEREMIASSEN** [1] - 11:7
**Jeremiassen's** [1] - 27:11
**Jeri** [8] - 37:8, 37:11, 40:11, 89:10, 89:25, 90:10, 90:22, 94:21
**jewelry** [2] - 94:20, 95:22
**Jim** [1] - 70:18
**Jim's** [1] - 69:19
**job** [9] - 9:24, 22:15, 67:2, 73:7, 79:4, 100:8, 105:11, 114:18, 114:20
**Joe** [1] - 95:20
**John** [2] - 77:12, 81:23
**joined** [1] - 5:4
**jointly** [1] - 114:16
**joke** [1] - 104:17
**Jordan** [1] - 5:5
**JORDAN** [1] - 1:18
**JS** [1] - 86:1
**JUDGE** [1] - 1:10
**Judge** [29] - 4:8, 4:24, 6:5, 6:21, 6:25, 8:24, 12:17, 19:21, 27:13, 37:23, 47:15, 63:7, 75:8, 75:22, 76:3, 81:12, 82:23, 83:1, 83:6, 84:15, 85:2, 85:7, 85:9, 85:15, 85:17, 98:17, 105:10, 106:18, 117:16
**judge** [6] - 4:15, 27:10, 61:3, 77:17, 84:10, 109:3
**judgment** [4] - 92:11, 114:4, 116:20, 117:8
**judicial** [1] - 105:21
**July** [5] - 16:10, 26:5, 26:20, 89:4, 91:7
**jumping** [1] - 11:12
**June** [1] - 91:7
**junior** [1] - 63:25
**justice** [2] - 70:14, 114:25

## K

**keep** [9] - 11:12, 12:13, 37:9, 46:8, 67:12, 88:16, 89:21, 91:12, 102:8
**keeping** [1] - 23:12
**keeps** [1] - 69:14
**kept** [1] - 88:2
**kick** [1] - 68:22
**kids** [2] - 72:12
**kill** [1] - 70:1
**kind** [1] - 105:18
**kitchen** [1] - 95:18
**Klager** [4] - 82:2, 82:12, 82:13, 82:20
**knowing** [1] - 110:13
**known** [1] - 79:12
**knows** [2] - 8:25, 70:5

## L

**label** [1] - 28:20
**labelling** [1] - 28:14
**lack** [4] - 43:14, 57:1, 70:10, 79:22
**lady** [1] - 68:1
**laid** [1] - 94:14
**Lamontagne** [4] - 72:22, 73:4, 74:12, 74:24
**LAMONTAGNE** [1] - 73:5
**land** [1] - 32:23
**large** [5] - 5:25, 22:7, 49:7, 79:1, 99:18
**largely** [2] - 31:6, 102:21
**Larry** [9] - 44:2, 44:13, 44:17, 45:7, 45:9, 47:5, 55:13, 57:19
**Larrys** [1] - 44:20
**last** [8] - 12:24, 34:23, 36:9, 38:4, 49:21, 76:12, 78:21, 86:12
**lasted** [1] - 84:9
**lasts** [1] - 84:8
**late** [3] - 41:20, 75:24, 111:1
**Lavderim** [2] - 1:23, 4:21
**lavish** [2] - 81:7, 96:17
**law** [9] - 9:2, 9:3, 14:18, 56:21, 66:9, 81:13, 86:9, 87:12, 113:7
**Lawrence** [3] - 47:12, 47:15, 47:18
**laws** [1] - 81:2
**lawyer** [1] - 80:10

**lawyers** [3] - 69:7, 69:8, 104:2
**lay** [1] - 12:14
**layman's** [2] - 39:21, 39:23
**leading** [1] - 86:19
**learn** [1] - 44:25
**learned** [1] - 71:14
**lease** [3] - 61:25, 62:2, 88:18
**least** [6] - 31:9, 54:3, 59:24, 65:18, 116:20
**leave** [9] - 35:7, 35:9, 46:7, 72:12, 74:10, 81:3, 103:19, 116:11, 117:9
**leaving** [1] - 91:10
**led** [2] - 24:12, 51:23
**ledgers** [1] - 92:21
**left** [8] - 22:17, 28:5, 34:24, 37:25, 71:1, 103:3, 103:21, 105:19
**left-hand** [2] - 28:5, 34:24
**legal** [4] - 7:8, 64:16, 80:15, 99:9
**legal-based** [1] - 7:8
**legitimacy** [1] - 56:24
**legitimate** [6] - 32:14, 34:3, 34:10, 38:25, 44:7, 59:8
**Lehr** [1] - 4:14
**lend** [1] - 84:5
**lender** [5] - 35:22, 44:14, 61:16, 61:17, 84:3
**lenders** [7] - 33:23, 34:6, 34:10, 38:17, 44:17, 44:20, 59:8
**lending** [17] - 30:15, 31:13, 31:21, 31:25, 32:3, 32:11, 32:14, 32:17, 34:3, 34:17, 34:20, 38:9, 38:10, 39:1, 39:19, 44:6, 44:8
**lengthy** [2] - 61:6, 61:7
**lent** [1] - 31:20
**less** [10] - 34:7, 34:8, 64:15, 85:14, 107:13, 111:16, 112:2, 112:3, 112:5, 116:20
**letter** [3] - 50:18, 51:12, 111:3
**letters** [5] - 85:3, 106:8, 106:11, 113:15, 116:5

**leukemia** [1] - 82:16
**Level** [1] - 63:11
**level** [5] - 69:1, 93:2, 100:21, 109:15, 110:16
**liability** [1] - 93:10
**license** [1] - 23:9
**licenses** [1] - 13:11
**lie** [3] - 65:1, 83:23, 97:14
**lien** [1] - 46:15
**liens** [1] - 46:22
**life** [26] - 65:1, 65:25, 66:7, 69:16, 69:25, 70:9, 71:18, 71:24, 72:4, 74:1, 78:6, 78:9, 79:8, 79:13, 79:14, 79:17, 80:2, 80:5, 82:5, 97:20, 103:25, 104:17, 108:18, 108:20, 108:22, 111:7
**lifeblood** [1] - 25:2
**lifestyle** [2] - 80:8, 81:7
**lifetimes** [1] - 64:4
**lifting** [1] - 67:1
**likelihood** [1] - 114:12
**likely** [3] - 91:21, 108:13, 109:1
**limit** [1] - 99:25
**limited** [2] - 65:24, 91:14
**limiting** [1] - 97:12
**line** [5] - 26:15, 28:9, 41:7, 41:9
**liquidated** [1] - 69:12
**liquidating** [1] - 109:19
**liquidation** [1] - 50:14
**liquidity** [1] - 51:23
**LISA** [1] - 1:13
**Lisa** [1] - 4:10
**lisa.miller@usdoj.gov** [1] - 1:16
**listened** [1] - 113:16
**literally** [1] - 78:2
**litigate** [1] - 88:16
**litigated** [2] - 92:4, 92:7
**litigation** [5] - 13:25, 14:5, 14:7, 14:10, 92:5
**live** [8] - 13:3, 61:19, 62:1, 62:4, 80:5, 85:2, 98:12, 108:2
**lived** [2] - 86:4, 95:14
**lives** [8] - 66:22, 69:16, 77:6, 78:13, 78:21, 80:5, 80:6,

113:1
**living** [5] - 61:20, 71:24, 88:14, 88:15, 88:19
**LLC** [2] - 16:16, 16:17
**LLCs** [2] - 94:22, 95:4
**LLP** [1] - 1:18
**loan** [5] - 33:9, 44:4, 61:16, 68:17, 79:22
**Loan** [1] - 89:17
**loans** [4] - 33:19, 35:23, 36:2, 94:20
**local** [1] - 64:7
**locations** [1] - 64:18
**lodged** [1] - 59:22
**logical** [1] - 110:14
**long-standing** [1] - 84:16
**long-term** [3] - 70:5, 73:25, 74:6
**Longridge** [3] - 88:14, 94:15, 97:10
**look** [16] - 14:11, 14:13, 25:5, 25:9, 32:13, 48:12, 48:22, 75:3, 76:22, 100:13, 106:12, 112:13, 112:14, 112:16, 113:6, 113:8
**looked** [8] - 16:14, 26:8, 26:9, 33:21, 71:1, 77:22, 113:3
**looking** [7] - 24:23, 33:14, 71:2, 71:7, 74:9, 113:10
**Los** [3] - 13:4, 116:5, 116:11
**lose** [1] - 66:15
**loss** [29] - 7:18, 8:1, 8:2, 9:4, 9:5, 9:8, 10:15, 10:21, 11:24, 12:11, 23:4, 23:24, 35:7, 51:23, 53:17, 53:21, 54:12, 59:13, 59:22, 59:25, 60:2, 60:3, 60:11, 62:17, 62:21, 86:23, 105:9, 107:19, 116:21
**losses** [2] - 41:25, 98:11
**lost** [7] - 65:14, 65:20, 65:22, 71:18, 72:5, 77:2, 99:23
**loud** [1] - 105:12
**loved** [1] - 85:13
**low** [1] - 72:3
**low-risk** [1] - 72:3
**lower** [3] - 23:12, 72:23, 108:18
**lowering** [1] - 73:1

**lowest** [1] - 116:4
**luck** [1] - 117:20
**luxury** [1] - 71:23
**Lymphoma** [2] - 93:6, 103:18

## M

**ma'am** [2] - 77:9, 81:18
**Macalister** [1] - 74:22
**machines** [1] - 67:25
**Madam** [1] - 42:21
**Madoff** [2] - 81:1, 105:7
**Madoff's** [1] - 65:3
**magnanimous** [1] - 97:13
**mail** [2] - 61:5, 99:14
**mails** [3] - 86:2, 96:12, 96:13
**main** [5] - 17:17, 21:14, 25:1, 61:11, 61:20
**maintained** [2] - 38:16, 38:24
**major** [3] - 68:9, 68:23, 78:20
**majority** [5] - 5:25, 45:1, 49:7, 94:23, 103:20
**man** [7] - 66:8, 66:9, 69:17, 70:12, 97:8, 103:18, 106:14
**managed** [1] - 56:12
**management** [6] - 50:22, 54:21, 54:23, 55:3, 55:6, 55:9
**mandatory** [1] - 115:15
**manner** [6] - 9:22, 61:13, 61:15, 61:22, 62:13, 116:2
**Marc** [1] - 90:14
**March** [2] - 77:2, 86:17
**mark** [1] - 96:14
**MARKED** [1] - 3:11
**marked** [1] - 51:2
**market** [3] - 7:24, 87:21, 87:24
**marketing** [1] - 17:14
**marriage** [2] - 66:6, 78:8
**married** [3] - 65:25, 76:8, 76:15
**Marshals** [1] - 67:24
**massive** [1] - 100:11
**masters** [1] - 90:24
**material** [2] - 42:7, 115:3

**materials** [2] - 17:14, 42:5
**mathematical** [1] - 45:25
**mathematically** [1] - 46:5
**matter** [28] - 4:14, 6:9, 7:14, 13:20, 14:7, 16:20, 17:2, 17:4, 18:8, 19:16, 24:18, 25:6, 25:15, 27:8, 27:22, 42:5, 45:1, 48:18, 50:15, 52:9, 60:3, 63:4, 89:9, 98:16, 100:1, 108:25, 118:4
**matters** [1] - 58:17
**maximum** [13] - 72:9, 72:16, 81:5, 81:13, 81:16, 83:10, 96:10, 97:16, 107:3, 107:13, 111:12, 112:2, 114:2
**Maxx** [1] - 67:23
**McAllister** [9] - 63:2, 63:19, 63:21, 63:24, 66:12, 66:13, 66:20, 70:17, 74:22
**MCALLISTER** [2] - 63:22, 66:14
**McCARN** [2] - 2:2, 118:7
**meals** [1] - 67:20
**mean** [5] - 11:11, 28:2, 57:7, 99:23, 113:2
**meaning** [1] - 8:8
**means** [3] - 57:5, 57:8, 79:21
**meat** [1] - 68:4
**Media** [1] - 89:6
**medical** [3] - 68:10, 93:8, 116:6
**Medicare** [2] - 67:4, 72:14
**medication** [1] - 80:2
**meet** [2] - 73:22, 109:20
**member** [1] - 82:1
**members** [3] - 25:13, 50:1, 106:10
**memo** [4] - 61:7, 85:17, 90:3, 96:22
**memorabilia** [1] - 95:19
**memorable** [1] - 13:17
**memorandum** [3] - 5:14, 5:16, 107:18
**mention** [1] - 82:18
**mentioned** [9] - 6:17, 18:11, 26:8, 27:17,

36:19, 87:10, 88:2, 90:2, 92:2
**merely** [4] - 7:13, 9:22, 62:3, 62:17
**mess** [1] - 65:22
**message** [3] - 103:23, 104:22, 104:24
**met** [6] - 4:15, 4:24, 55:17, 59:25, 60:10, 64:1
**Mexico** [2] - 63:19, 74:23
**MIAMI** [1] - 1:2
**Miami** [7] - 1:4, 1:14, 1:19, 2:3, 2:4, 118:8, 118:9
**Michael** [2] - 50:9, 64:11
**microphone** [1] - 29:20
**middle** [6] - 16:8, 78:12, 94:20, 100:11, 101:10, 105:15
**might** [3] - 34:7, 108:13, 110:1
**Mike** [1] - 78:24
**miles** [1] - 81:24
**military** [3] - 70:24, 81:14, 113:1
**MILLER** [17] - 1:13, 4:11, 42:21, 62:25, 63:18, 66:13, 70:18, 72:21, 72:25, 73:3, 74:13, 74:17, 74:20, 77:12, 85:20, 116:16, 116:25
**Miller** [6] - 4:10, 72:23, 85:15, 85:19, 112:22, 116:14
**million** [61] - 9:5, 9:8, 10:7, 10:10, 11:19, 11:25, 12:12, 19:10, 19:13, 20:21, 21:5, 23:1, 23:7, 23:8, 23:25, 29:11, 29:12, 30:2, 30:25, 31:2, 34:8, 34:9, 34:13, 34:15, 34:18, 35:11, 35:18, 36:8, 37:1, 37:17, 38:16, 38:25, 53:7, 54:1, 54:3, 59:12, 59:14, 60:3, 60:11, 82:10, 86:18, 86:23, 88:25, 89:2, 89:5, 89:16, 90:21, 91:2, 92:17, 94:5, 94:6, 94:16, 94:17, 94:18, 96:9, 103:13, 116:20, 116:22

**millions** [7] - 29:6, 62:8, 85:11, 90:20, 101:5, 101:13, 105:4
**mind** [3] - 13:18, 21:14, 37:4
**Minnesota** [1] - 13:2
**minus** [1] - 12:7
**minute** [1] - 75:12
**minutes** [1] - 9:17
**Mis** [1] - 1:23
**MISCELLANEOUS** [1] - 3:19
**misconduct** [1] - 83:14
**misery** [1] - 70:11
**Miss** [1] - 4:18
**missed** [1] - 69:15
**mistake** [1] - 79:9
**model** [11] - 17:8, 32:3, 32:10, 33:17, 38:5, 38:15, 38:22, 39:4, 43:15, 88:6
**modification** [1] - 116:18
**molester** [1] - 69:22
**mom** [1] - 69:19
**moment** [4] - 52:15, 53:4, 100:18, 101:11
**monetarily** [1] - 81:5
**monetary** [1] - 85:4
**money** [86] - 12:8, 16:20, 18:19, 19:2, 19:5, 23:2, 28:22, 28:24, 29:13, 30:1, 30:4, 30:12, 30:17, 31:9, 31:25, 32:3, 32:11, 32:22, 33:4, 33:5, 33:8, 33:22, 34:2, 34:16, 36:14, 36:17, 36:23, 37:15, 39:6, 39:7, 40:3, 40:19, 41:5, 45:17, 45:22, 45:23, 46:1, 46:3, 46:12, 48:1, 53:9, 54:19, 59:7, 64:4, 65:14, 66:24, 67:15, 68:18, 69:5, 70:10, 70:22, 71:7, 71:22, 72:7, 72:11, 72:12, 72:18, 73:21, 76:17, 77:5, 78:13, 80:15, 80:21, 81:8, 82:4, 82:7, 82:8, 82:9, 82:11, 84:4, 84:5, 88:2, 88:12, 91:6, 91:16, 92:4, 92:16, 92:17, 94:25, 95:23, 99:24, 104:6, 116:19
**moneys** [4] - 28:11,

39:16, 46:2
**monitor** [1] - 115:2
**monster** [1] - 69:25
**Montana** [1] - 95:20
**month** [14] - 29:16, 29:25, 48:2, 48:8, 55:19, 58:5, 73:22, 74:5, 85:14, 88:10, 88:13, 88:19, 93:1, 113:4
**monthly** [9] - 31:6, 31:21, 40:24, 48:6, 65:8, 68:18, 68:20, 114:23
**months** [14] - 30:3, 73:15, 83:12, 84:13, 84:14, 84:15, 86:19, 108:17, 111:17, 112:2, 113:3, 114:6, 114:7
**months'** [2] - 85:9, 111:12
**morning** [34] - 4:5, 4:7, 4:11, 4:12, 4:17, 4:22, 5:1, 5:2, 5:3, 5:7, 5:9, 52:23, 52:24, 63:21, 63:22, 66:18, 70:20, 70:21, 73:4, 73:5, 76:6, 76:7, 77:19, 77:20, 81:21, 81:22, 98:17, 98:18, 102:8, 102:10, 103:24, 110:25, 113:18, 117:3
**morning's** [2] - 10:25, 110:24
**Mortgage** [2] - 29:16, 30:1
**mortgage** [13] - 26:5, 30:15, 31:13, 31:21, 34:17, 38:9, 38:10, 39:18, 47:2, 64:20, 65:21, 72:13, 79:20
**mortgages** [2] - 31:20, 64:13
**most** [13] - 7:5, 7:7, 45:6, 67:3, 70:23, 71:14, 74:7, 76:18, 83:9, 84:1, 84:19, 85:21, 109:18
**mostly** [1] - 69:21
**mother** [1] - 112:18
**motion** [1] - 104:4
**mouth** [1] - 30:16
**move** [7] - 10:18, 38:4, 50:24, 62:23, 75:9, 75:11, 117:17
**moved** [3] - 62:11, 73:13, 88:12

**movement** [1] - 16:20
**movies** [1] - 68:6
**moving** [2] - 113:20, 113:22
**MR** [103] - 4:7, 4:13, 4:17, 4:18, 4:24, 5:3, 5:20, 6:25, 7:2, 7:4, 8:24, 9:18, 11:3, 11:11, 11:19, 11:21, 12:17, 12:21, 15:21, 15:24, 16:2, 24:9, 24:17, 26:22, 26:25, 27:10, 27:13, 27:14, 32:8, 37:23, 37:24, 42:23, 43:2, 43:3, 43:18, 43:22, 43:25, 44:1, 44:12, 48:24, 49:1, 50:16, 50:17, 50:24, 51:4, 52:15, 52:18, 52:20, 52:22, 57:25, 58:1, 58:3, 59:18, 59:20, 60:8, 60:14, 60:19, 60:20, 60:21, 61:3, 61:11, 62:16, 62:24, 63:3, 63:7, 63:9, 63:13, 63:16, 63:22, 75:1, 75:13, 75:20, 75:22, 76:3, 77:10, 77:14, 77:16, 77:25, 79:18, 81:20, 82:23, 83:6, 84:14, 98:3, 98:17, 98:19, 106:5, 106:7, 106:24, 107:2, 107:5, 107:16, 108:24, 110:8, 110:11, 110:20, 114:11, 116:3, 116:14, 117:12, 117:14, 117:16, 117:19
**MS** [17] - 4:11, 42:21, 62:25, 63:18, 66:13, 66:14, 70:18, 72:21, 72:25, 73:3, 74:13, 74:17, 74:20, 77:12, 85:20, 116:16, 116:25
**multi** [1] - 21:17
**multi-dwelling** [1] - 21:17
**multiple** [2] - 85:11, 96:5
**municipal** [1] - 67:10
**must** [5] - 9:3, 106:19, 114:18, 114:20, 117:7
**mutual** [2] - 7:17, 105:5
**Mutual** [2] - 99:17,

103:1

# N

**name** [26] - 4:14, 4:20, 6:11, 9:11, 12:22, 12:24, 13:18, 21:14, 47:8, 47:12, 62:9, 63:23, 66:20, 71:23, 76:10, 76:12, 77:25, 78:1, 81:20, 86:6, 89:7, 89:14, 89:18, 95:4, 95:7, 95:8
**named** [1] - 86:4
**naming** [1] - 89:12
**narcissim** [1] - 109:9
**narcissism** [1] - 80:5
**nature** [7] - 24:7, 31:23, 41:18, 41:24, 60:25, 110:5, 110:14
**near** [1] - 116:11
**nearly** [1] - 4:9
**necessary** [3] - 39:3, 97:22, 112:15
**need** [24] - 9:10, 10:18, 32:22, 33:2, 33:3, 61:1, 62:14, 79:18, 80:1, 81:9, 87:11, 88:8, 94:7, 94:8, 95:25, 96:2, 96:19, 107:9, 113:6, 113:7, 113:13, 114:10, 116:13, 116:17
**needed** [5] - 7:6, 32:20, 40:3, 80:15, 84:3
**needing** [1] - 44:4
**needs** [4] - 10:14, 33:4, 72:8, 83:13
**neglected** [2] - 77:11, 96:23
**negotiate** [1] - 105:17
**negotiated** [4] - 55:25, 105:15, 107:11, 111:10
**negotiates** [1] - 33:9
**negotiations** [2] - 102:18, 111:11
**nest** [2] - 68:24, 87:6
**net** [16] - 20:24, 23:2, 28:10, 28:20, 29:2, 30:8, 30:9, 30:20, 35:21, 35:22, 36:8, 37:3, 37:25, 38:2, 39:13, 39:17
**NetFlix** [1] - 67:23
**netted** [1] - 28:11
**Nevada** [1] - 21:17
**never** [11] - 66:1, 67:6,

67:17, 69:11, 70:3, 72:8, 72:9, 73:9, 77:5
**new** [8] - 46:3, 46:12, 55:13, 65:11, 68:16, 83:25, 89:17, 115:20
**New** [3] - 63:19, 74:23, 81:23
**newspaper** [2] - 108:4, 108:13
**next** [10] - 20:16, 30:9, 33:7, 33:8, 34:23, 39:7, 72:21, 104:23, 111:23, 112:12
**nice** [1] - 74:1
**night** [2] - 69:23, 113:19
**nightmare** [6] - 65:11, 78:22, 105:16, 105:17, 113:19
**nine** [2] - 16:15, 86:6
**NO** [1] - 1:2
**nolle** [1] - 102:20
**nominal** [1] - 71:6
**nominated** [1] - 50:10
**non** [1] - 103:18
**non-Hodgkin's** [1] - 103:18
**nonfactual** [1] - 7:8
**normal** [1] - 68:11
**normally** [2] - 62:9, 100:8
**North** [2] - 2:3, 118:8
**Northeast** [1] - 1:14
**notable** [2] - 92:6, 95:3
**notarized** [1] - 64:16
**note** [7] - 29:10, 30:6, 38:12, 42:8, 46:23, 49:12, 104:17
**noted** [3] - 60:12, 63:18, 111:9
**notes** [13] - 17:22, 18:11, 33:9, 36:1, 36:4, 36:17, 43:1, 49:6, 49:9, 51:24, 57:9, 111:5
**nothing** [7] - 52:8, 77:4, 79:14, 99:1, 99:10, 99:23, 101:23
**notice** [1] - 117:7
**noticed** [1] - 77:22
**notified** [1] - 80:9
**November** [4] - 89:2, 89:5, 89:9, 90:25
**number** [20] - 4:8, 5:12, 6:14, 7:17, 10:19, 10:22, 11:15, 11:17, 11:19, 19:18, 19:20, 20:24, 22:7,

23:6, 36:24, 41:25, 53:7, 93:12, 113:3
**numbers** [3] - 28:9, 29:6, 83:22
**numerous** [1] - 96:21

## O

**o'clock** [3] - 102:8, 102:10, 103:24
**O'Neill** [2] - 81:21, 81:23
**O'Neill** [2] - 77:14, 81:23
**O'Neill** [1] - 77:12
**O'QUINN** [32] - 1:17, 5:3, 7:4, 9:18, 11:11, 11:19, 15:24, 24:9, 26:22, 50:16, 52:20, 52:22, 57:25, 60:8, 60:20, 61:11, 62:16, 62:24, 63:16, 98:3, 98:17, 98:19, 106:5, 106:7, 106:24, 107:2, 107:5, 107:16, 108:24, 110:8, 110:20, 116:3
**O'Quinn** [19] - 3:6, 5:4, 7:2, 9:12, 9:15, 12:17, 58:4, 59:3, 60:5, 60:7, 60:19, 63:14, 98:2, 106:4, 106:22, 110:19, 111:15, 114:11, 114:14
**object** [1] - 116:1
**objected** [1] - 7:13
**objection** [13] - 15:24, 24:9, 26:22, 50:16, 59:21, 60:2, 60:16, 60:20, 60:23, 61:1, 61:3, 62:22, 84:24
**objections** [7] - 5:15, 5:25, 6:8, 7:5, 59:22, 60:17, 60:21
**obligated** [2] - 22:2, 91:17
**obligation** [2] - 46:12, 51:25
**obligations** [7] - 14:6, 16:3, 40:4, 46:3, 46:5, 114:19, 114:21
**obtain** [1] - 69:25
**obtained** [4] - 81:7, 88:11, 90:10, 90:11
**obviate** [1] - 9:10
**occasion** [4] - 5:13, 14:20, 24:19, 110:25
**occurred** [2] - 40:7, 47:11

**October** [3] - 1:5, 12:12, 102:2
**OF** [2] - 1:1, 1:4
**offenders** [1] - 96:20
**offense** [3] - 97:25, 98:25, 99:13
**Offense** [1] - 63:11
**offenses** [1] - 111:8
**offer** [3] - 7:11, 87:19, 109:18
**offered** [10] - 10:22, 11:20, 17:18, 18:4, 42:7, 53:17, 59:4, 93:18, 99:3, 109:21
**offering** [8] - 8:10, 8:20, 11:15, 19:3, 20:1, 42:4, 42:5, 52:12
**offers** [1] - 91:11
**office** [5] - 97:10, 101:21, 101:22, 103:4, 115:12
**Office** [2] - 115:1
**OFFICER** [5] - 4:2, 5:9, 75:15, 75:17, 117:22
**officer** [1] - 47:19
**Official** [1] - 118:8
**official** [2] - 2:2, 13:22
**often** [2] - 101:8, 106:9
**old** [6] - 63:24, 66:20, 69:21, 70:4, 101:17, 108:21
**older** [4] - 71:20, 76:21, 108:22, 109:1
**ON** [1] - 12:20
**once** [4] - 7:18, 16:3, 78:10, 107:25
**One** [1] - 89:24
**one** [37] - 7:14, 8:6, 10:6, 20:18, 26:10, 28:18, 29:3, 34:23, 37:22, 37:23, 37:25, 39:12, 43:10, 43:11, 49:5, 51:24, 53:21, 54:3, 59:7, 61:12, 62:5, 68:17, 69:22, 73:14, 75:24, 81:1, 81:24, 82:14, 96:8, 96:14, 96:18, 98:11, 104:7, 105:10, 105:11, 111:2, 111:3
**one-year** [1] - 51:24
**ones** [4] - 67:7, 69:6, 85:13, 99:22
**ongoing** [1] - 94:3
**open** [2] - 109:25, 113:16
**opened** [1] - 90:1

**operate** [1] - 39:4
**operated** [2] - 25:25, 96:11
**operating** [5] - 16:15, 16:17, 36:22, 40:9, 87:18
**operation** [2] - 36:21, 56:21
**operations** [7] - 36:11, 36:25, 39:5, 40:3, 40:16, 40:17
**opinion** [19] - 15:18, 22:22, 25:6, 25:10, 25:18, 25:21, 25:24, 25:25, 27:7, 38:14, 39:3, 39:5, 40:9, 40:12, 41:16, 58:24, 65:17, 69:22, 114:14
**opinions** [1] - 15:14
**opportunities** [1] - 64:9
**opportunity** [8] - 17:1, 42:11, 78:23, 101:9, 102:5, 102:9, 102:17, 110:1
**option** [1] - 67:3
**options** [1] - 65:13
**order** [10] - 25:3, 25:5, 25:15, 72:13, 86:13, 92:11, 116:13, 116:17, 116:23, 117:2
**orders** [3] - 87:16, 91:13, 96:2
**ordinary** [1] - 107:21
**originally** [5] - 13:1, 13:2, 13:21, 81:23, 82:2
**orthotics** [1] - 68:14
**ourselves** [1] - 67:16
**outlet** [1] - 109:23
**outline** [2] - 5:21, 6:21
**outlined** [1] - 112:22
**outset** [1] - 16:5
**outside** [4] - 33:4, 35:25, 45:9, 84:3
**outstanding** [3] - 19:22, 19:23, 20:23
**overhead** [1] - 36:13
**overrule** [1] - 60:2
**overruled** [1] - 24:10
**owe** [1] - 94:3
**owed** [5] - 20:24, 23:2, 40:5, 92:17, 94:5
**owes** [1] - 94:6
**own** [9] - 32:23, 62:2, 62:9, 73:8, 88:7, 88:18, 97:12, 100:10
**owned** [5] - 32:4, 44:25, 45:3, 61:12,

61:21
**owner** [1] - 45:6
**owns** [1] - 44:4

## P

**p.m** [2] - 1:6, 117:23
**padding** [1] - 78:13
**page** [13] - 26:17, 26:19, 27:1, 27:16, 36:10, 39:7, 39:10, 90:25, 92:12, 94:13, 95:16
**Page** [4] - 3:3, 3:9, 3:20, 38:8
**Pages** [1] - 1:8
**paid** [8] - 41:14, 45:14, 54:19, 65:10, 65:21, 67:7, 69:9, 88:19
**pain** [1] - 98:13
**painting** [4] - 90:15, 90:19, 91:3, 97:9
**paintings** [5] - 90:19, 90:23, 90:24, 91:24, 95:22
**palpitations** [1] - 79:24
**pancreatic** [1] - 73:14
**paper** [1] - 110:12
**papers** [1] - 110:18
**paragraph** [1] - 92:23
**Paragraph** [7] - 86:18, 87:1, 87:4, 87:19, 92:20, 93:4, 111:6
**Paragraphs** [1] - 87:14
**parcels** [1] - 53:13
**parlance** [1] - 8:9
**Part** [1] - 115:22
**part** [16] - 22:4, 36:24, 38:19, 43:9, 46:18, 47:5, 47:9, 50:2, 50:5, 53:5, 74:14, 76:17, 86:1, 87:22, 87:23, 90:5
**participate** [1] - 46:21
**particular** [5] - 7:8, 14:16, 16:5, 48:22, 100:15
**parties** [6] - 10:24, 11:17, 32:15, 111:9, 111:10, 116:19
**parties'** [1] - 11:23
**partner** [2] - 4:10, 85:8
**partners** [1] - 86:9
**party** [28] - 30:15, 31:19, 31:24, 32:14, 32:17, 33:10, 33:11, 33:19, 33:23, 34:3, 34:6, 34:10, 34:16,

34:19, 38:16, 38:25, 44:6, 44:7, 44:14, 44:17, 44:20, 44:22, 45:9, 46:15, 46:23, 59:8, 84:3
**pass** [2] - 67:10, 67:14
**passed** [1] - 73:15
**past** [1] - 115:23
**path** [1] - 113:11
**pauperis** [1] - 117:9
**paupers** [1] - 81:4
**pause** [2] - 43:19, 43:25
**Pause** [2] - 43:21, 52:17
**pay** [24] - 24:13, 33:11, 46:3, 46:5, 46:10, 46:12, 48:1, 65:23, 68:16, 73:20, 76:17, 79:17, 79:20, 81:4, 88:13, 91:12, 94:2, 114:8, 114:15, 114:18, 114:20, 114:22, 115:3, 117:8
**payable** [1] - 115:7
**paying** [1] - 46:8
**payment** [15] - 20:22, 51:24, 55:19, 55:22, 58:25, 65:19, 65:22, 68:18, 87:20, 92:2, 93:10, 93:19, 114:24, 115:2, 115:23
**payments** [29] - 19:7, 19:8, 20:16, 21:1, 24:24, 31:7, 31:9, 31:10, 31:21, 32:15, 33:22, 34:2, 34:9, 36:15, 36:23, 40:11, 40:15, 40:18, 40:20, 40:25, 46:9, 46:11, 64:22, 64:24, 89:13, 89:16, 94:1, 96:15, 115:4
**pays** [1] - 68:12
**penalties** [2] - 81:2, 92:19
**penalty** [2] - 93:22, 103:13
**pending** [1] - 60:17
**pennies** [1] - 69:12
**people** [32] - 4:8, 24:12, 32:4, 65:17, 65:18, 65:20, 67:6, 69:8, 69:21, 69:23, 70:2, 71:3, 71:20, 71:21, 73:7, 76:21, 79:13, 80:20, 80:23, 81:2, 81:15, 91:12, 97:15, 97:16, 98:12,

101:2, 101:11, 103:22, 104:22, 106:13, 108:25, 109:8
**people's** [2] - 77:6, 81:3
**pepperdine** [1] - 13:8
**per** [6] - 48:8, 79:2, 88:13, 93:1, 113:4, 114:20
**percent** [8] - 10:16, 45:3, 64:9, 64:22, 71:18, 82:8, 114:18, 114:23
**percentage** [1] - 69:13
**perfected** [4] - 49:6, 49:13, 57:4, 57:14
**perfection** [1] - 57:1
**performed** [2] - 15:16, 79:25
**Perham** [2] - 1:24, 4:24
**perhaps** [3] - 83:18, 108:12, 114:12
**period** [11] - 18:16, 26:20, 27:19, 29:16, 29:25, 39:15, 40:25, 62:1, 64:14, 84:4, 88:24
**perjury** [1] - 93:22
**Perkins** [15] - 47:12, 47:15, 47:18, 48:1, 48:11, 48:16, 49:8, 49:16, 49:25, 50:8, 51:12, 51:16, 55:13, 57:19, 88:7
**Perkins'** [1] - 47:25
**permission** [3] - 6:6, 42:20, 76:1
**perpetrator** [1] - 61:21
**person** [18] - 44:3, 45:10, 61:18, 74:15, 85:22, 96:3, 97:2, 97:14, 100:10, 100:19, 100:20, 104:14, 106:19, 107:25, 108:1, 109:16, 115:12
**personal** [10] - 55:16, 61:19, 65:17, 87:24, 90:22, 90:23, 94:12, 94:22, 94:23, 99:16
**personality** [1] - 109:10
**personally** [3] - 6:14, 37:15, 89:12
**personnel** [1] - 81:14
**persuaded** [1] - 79:9
**petition** [1] - 48:17
**philosophy** [1] - 92:24

**phone** [2] - 67:21, 82:7
**photographs** [1] - 61:8
**photos** [2] - 95:14, 95:19
**physical** [1] - 85:4
**pick** [2] - 55:9, 102:7
**picking** [1] - 79:1
**picture** [1] - 67:13
**piece** [1] - 91:25
**Piper** [1] - 1:18
**pitch** [2] - 46:25, 84:2
**pitched** [1] - 38:6
**place** [2] - 63:10, 112:24
**placed** [1] - 116:11
**places** [2] - 68:25, 103:6
**plain** [3] - 94:10, 94:11, 95:4
**Plaintiff** [1] - 1:5
**plan** [3] - 13:24, 14:1, 68:9
**plane** [1] - 105:1
**planned** [2] - 49:17, 78:16
**planners** [2] - 43:4, 43:11
**plans** [1] - 84:7
**plantar** [1] - 68:14
**play** [1] - 6:18
**played** [6] - 43:24, 44:11, 55:5, 55:9, 67:8
**playing** [1] - 43:14
**plea** [10] - 90:5, 91:17, 102:17, 105:15, 106:23, 107:12, 111:10, 111:11, 116:18, 117:16
**plead** [2] - 81:11, 104:24
**pleading** [2] - 92:9, 98:8
**pleadings** [2] - 92:10, 95:10
**plenty** [1] - 95:7
**podium** [1] - 72:24
**point** [15] - 8:1, 8:5, 18:14, 62:22, 62:25, 66:21, 80:19, 87:16, 91:19, 92:16, 93:5, 94:12, 102:12, 104:11, 104:19
**pointed** [1] - 111:19
**pointing** [1] - 91:20
**points** [4] - 28:5, 31:23, 39:8, 52:25
**policies** [1] - 105:5

**policy** [12] - 100:6, 104:10, 105:11, 105:14, 107:8, 108:10, 108:15, 110:4, 110:6, 110:10, 112:3, 113:24
**pond** [1] - 95:17
**Ponzi** [40] - 8:7, 8:8, 8:12, 24:5, 24:7, 24:8, 24:11, 24:19, 25:3, 25:7, 25:11, 25:16, 25:22, 25:25, 40:2, 40:12, 41:18, 41:22, 52:12, 60:24, 60:25, 65:3, 65:7, 71:17, 78:6, 80:9, 80:24, 81:1, 83:16, 83:24, 91:1, 92:8, 93:25, 94:4, 108:7, 108:19, 109:2, 109:9, 109:17, 113:9
**pool** [1] - 95:17
**poor** [1] - 69:24
**portfolio** [12] - 7:12, 7:22, 8:13, 8:23, 10:13, 21:22, 22:2, 22:5, 22:13, 53:10, 53:11, 53:16
**portion** [1] - 83:8
**portions** [1] - 51:20
**position** [19] - 5:19, 9:9, 17:22, 46:15, 47:1, 47:2, 47:4, 47:7, 64:13, 64:20, 71:5, 71:20, 78:2, 79:16, 91:20, 98:22, 98:24, 99:10, 104:23
**positions** [1] - 18:1
**possessing** [2] - 115:17, 115:18
**possession** [4] - 8:14, 22:3, 32:21, 57:9
**possibility** [1] - 93:10
**possible** [3] - 8:15, 38:14, 116:11
**possibly** [1] - 70:22
**posterity** [2] - 6:1, 49:25
**Pot** [1] - 68:5
**potential** [2] - 7:18, 43:5
**potentially** [1] - 32:19
**pouring** [1] - 77:23
**poverty** [1] - 68:25
**power** [1] - 93:14
**practices** [2] - 14:4, 108:11
**practicing** [1] - 13:15
**pragmatic** [2] -

108:10, 108:25
**pray** [1] - 81:7
**PRE** [1] - 3:11
**pre** [1] - 16:7
**pre-bankruptcy** [1] - 16:7
**preclude** [1] - 115:4
**preconfirmation** [1] - 13:24
**premature** [1] - 75:22
**preparation** [1] - 110:24
**prepared** [2] - 63:20, 75:25
**preparing** [1] - 112:11
**preponderance** [2] - 60:1, 60:10
**presence** [1] - 111:20
**present** [1] - 5:6
**Present** [1] - 1:22
**presentation** [5] - 74:14, 75:6, 98:4, 99:1, 105:10
**presented** [1] - 9:21
**Presentence** [8] - 5:14, 6:1, 60:12, 83:18, 86:17, 111:5, 111:13, 115:23
**presenting** [1] - 99:25
**presiding** [1] - 4:4
**pressure** [2] - 51:22, 79:3
**pretty** [2] - 41:20, 83:1
**previously** [3] - 6:18, 27:25, 53:5
**preyed** [2] - 69:21, 79:11
**priceless** [1] - 95:18
**primarily** [4] - 16:5, 16:15, 39:19, 40:24
**primary** [3] - 17:21, 18:22, 38:6
**principal** [9] - 19:11, 19:23, 28:10, 28:12, 28:20, 29:2, 39:13, 45:14, 45:18
**prison** [7] - 81:5, 81:12, 103:25, 104:22, 106:2, 108:23, 109:6
**Prison** [2] - 114:17, 114:20
**Prisons** [4] - 113:21, 114:5, 115:1, 116:12
**private** [1] - 71:22
**privilege** [1] - 70:21
**proactive** [1] - 112:6
**probation** [1] - 115:12
**Probation** [4] - 5:8, 5:10, 115:1, 115:4

**PROBATION** [1] - 5:9
**problem** [3] - 11:21, 82:12, 109:8
**problems** [1] - 65:11
**proceed** [15] - 5:23, 6:4, 6:19, 6:24, 7:1, 9:22, 10:21, 11:2, 15:25, 57:19, 59:18, 60:15, 60:18, 75:10, 75:20
**proceeded** [1] - 92:7
**proceeding** [2] - 62:20, 62:21
**proceedings** [7] - 4:1, 43:21, 49:15, 52:3, 52:17, 117:23, 118:3
**Proceedings.............
........................** [1] -
3:20
**process** [7] - 8:3, 10:3, 10:19, 56:7, 62:11, 62:12, 106:9
**produced** [1] - 42:25
**product** [2] - 38:7, 47:8
**production** [1] - 92:21
**products** [9] - 17:18, 17:21, 18:3, 18:11, 18:17, 38:12, 42:15, 46:14, 72:7
**professional** [3] - 13:11, 47:12, 58:24
**professionals** [3] - 50:9, 54:20, 80:13
**proffer** [2] - 61:14, 84:24
**profits** [2] - 24:13, 24:15
**prohibited** [1] - 115:16
**promise** [1] - 21:7
**promote** [2] - 87:11, 113:6
**prong** [1] - 12:1
**propensity** [1] - 84:16
**properly** [2] - 49:12, 57:4
**properties** [31] - 7:21, 7:22, 8:4, 21:23, 22:1, 22:4, 22:6, 22:7, 22:9, 22:12, 22:21, 22:23, 23:22, 30:14, 39:20, 40:6, 45:4, 45:7, 47:4, 49:13, 53:24, 54:9, 61:13, 61:18, 62:4, 69:11, 71:15, 71:23, 71:25, 72:1, 84:7
**property** [21] - 7:19, 10:6, 17:24, 23:19,

30:13, 30:21, 31:2, 31:4, 32:4, 33:5, 39:19, 44:4, 45:1, 45:10, 53:13, 62:3, 64:21, 68:20, 69:9, 71:6
**proposed** [3] - 93:23, 116:17, 116:22
**pros** [1] - 102:20
**prosecuted** [1] - 104:8
**prosecuting** [1] - 104:7
**prosecution** [2] - 107:15, 109:17
**prosecutorial** [1] - 105:22
**prosecutors** [1] - 104:6
**prospects** [1] - 107:15
**protect** [4] - 8:22, 8:23, 68:25, 108:12
**protected** [1] - 64:16
**proud** [1] - 69:2
**proven** [1] - 91:22
**provide** [5] - 9:7, 29:8, 29:10, 72:13
**provided** [4] - 32:10, 42:5, 54:16, 62:6
**providing** [1] - 54:13
**PSI** [1] - 84:23
**PSR** [4] - 87:1, 87:5, 87:14, 87:19
**psychiatrist** [1] - 67:13
**psychological** [1] - 85:4
**psychologically** [1] - 112:19
**public** [7] - 13:12, 100:6, 104:9, 105:14, 110:3, 110:6, 110:9
**pull** [1] - 67:19
**punish** [1] - 113:13
**punishment** [2] - 97:21, 113:22
**purchase** [1] - 31:2
**purchased** [4] - 57:10, 91:6, 91:8, 96:13
**purchases** [1] - 90:23
**purported** [6] - 17:7, 24:24, 32:2, 32:9, 38:15, 43:15
**purportedly** [2] - 17:24, 46:22
**purpose** [6] - 10:15, 10:17, 42:25, 95:4, 105:9, 108:3
**purposes** [6] - 6:2, 7:14, 9:1, 12:2,

14:10, 27:11
**push** [1] - 104:4
**put** [19] - 26:12, 26:17, 30:16, 39:8, 46:22, 55:2, 56:5, 56:7, 59:20, 62:8, 80:16, 84:23, 85:7, 85:16, 88:25, 94:11, 95:15, 101:5, 101:12
**puts** [1] - 103:7
**putting** [2] - 95:4, 112:9

## Q

**QUALIFICATIONS** [1]
- 12:20
**Qualifications** [1] - 3:5
**qualified** [6] - 14:18, 14:20, 14:22, 15:22, 23:18, 69:3
**qualifies** [1] - 25:6
**qualify** [1] - 69:1
**quarter** [3] - 82:9, 91:2, 114:20
**quarters** [1] - 69:17
**questions** [3] - 57:25, 58:1, 59:15
**QuickBooks** [2] - 25:9, 26:9
**quickly** [2] - 69:6, 90:16
**quietly** [1] - 92:3
**quite** [1] - 84:9

## R

**radio** [1] - 64:7
**rain** [1] - 79:2
**raise** [6] - 7:6, 8:22, 11:5, 12:7, 39:6, 40:18
**raised** [17] - 6:8, 7:6, 8:6, 17:2, 18:16, 18:20, 18:22, 30:4, 30:5, 36:1, 36:14, 36:17, 38:25, 39:8, 39:16, 39:24, 77:12
**raises** [1] - 33:8
**raising** [3] - 9:23, 30:1, 46:2
**range** [5] - 107:6, 107:14, 108:17, 108:18, 111:18
**rare** [1] - 82:15
**rate** [3] - 24:13, 71:6, 114:23
**rather** [2] - 24:16, 100:12

**Raton** [1] - 76:21
**Raul** [1] - 73:2
**RDAP** [1] - 116:7
**reach** [1] - 103:13
**reached** [2] - 101:21, 101:22
**reaching** [1] - 111:24
**read** [3] - 51:17, 63:20, 113:15
**ready** [1] - 79:20
**real** [33] - 7:12, 8:13, 8:23, 10:5, 10:6, 17:24, 21:15, 22:1, 22:4, 23:19, 30:13, 30:14, 30:20, 31:2, 31:4, 32:4, 32:23, 33:5, 44:4, 44:17, 44:20, 45:1, 45:10, 53:10, 53:13, 53:16, 64:18, 68:24, 69:7, 79:10, 82:12
**reality** [3] - 24:14, 42:16, 103:17
**realize** [1] - 71:12
**realized** [1] - 111:11
**really** [7] - 74:1, 74:3, 87:11, 103:15, 108:2, 112:19, 112:23
**rearrange** [1] - 99:20
**reason** [9] - 9:3, 83:16, 84:10, 84:19, 96:8, 96:9, 100:4, 104:24, 105:1
**reasonable** [3] - 18:15, 23:23, 33:20
**reasonably** [1] - 108:1
**reasoning** [2] - 24:22, 51:11
**reasons** [2] - 88:17, 96:21
**receipts** [1] - 26:7
**receive** [7] - 45:17, 46:1, 69:14, 84:19, 108:21, 116:9
**received** [2] - 10:10, 60:6
**receiver** [3] - 58:18, 58:19, 58:23
**receivership** [1] - 103:2
**recent** [1] - 94:5
**recently** [2] - 82:14, 90:2
**recess** [3] - 75:12, 75:16, 117:22
**recognize** [3] - 7:24, 100:7, 100:13
**recognizing** [1] - 112:6

**recommend** [1] - 71:3
**recommendation** [3] - 116:4, 116:8, 116:10
**recommended** [2] - 111:7, 111:13
**recommends** [1] - 107:14
**reconstruction** [2] - 14:8, 16:6
**record** [11] - 6:2, 6:18, 7:5, 8:22, 9:1, 9:11, 9:17, 11:22, 74:20, 90:9, 106:11
**records** [15] - 14:11, 14:16, 15:7, 15:8, 15:15, 16:12, 24:23, 25:20, 26:9, 26:14, 27:4, 27:7, 41:17, 93:12
**recoup** [1] - 64:22
**recover** [2] - 80:11, 81:8
**recovering** [1] - 93:6
**recurs** [1] - 93:7
**red** [1] - 65:5
**Redirect** [1] - 3:6
**REDIRECT** [1] - 58:2
**reduce** [1] - 53:21
**refer** [1] - 90:16
**reference** [2] - 35:4, 60:24
**referenced** [4] - 19:6, 53:4, 56:20, 99:17
**references** [1] - 64:10
**referred** [1] - 17:25
**reflect** [3] - 110:1, 113:7, 113:22
**reflection** [1] - 15:14
**refused** [1] - 102:15
**regard** [1] - 62:15
**regarding** [2] - 15:16, 30:6
**regards** [2] - 49:6, 50:21
**regular** [2] - 93:7, 116:9
**regularly** [1] - 51:24
**regulatory** [1] - 51:22
**reiterate** [1] - 74:4
**rejected** [1] - 93:19
**related** [7] - 7:11, 33:18, 34:20, 35:12, 38:3, 105:11, 116:6
**relationship** [1] - 55:16
**relatively** [1] - 41:7
**release** [6] - 104:18, 114:22, 115:9, 115:10, 115:11, 115:14

October 15, 2019

United States of America v. Robert Shapiro, 19-cr-20178-CMA

**released** [1] - 115:13
**relevance** [1] - 24:9
**relevant** [1] - 35:12
**relied** [2] - 43:7, 47:8
**reliving** [1] - 113:20
**remain** [1] - 56:10
**remainder** [1] - 109:7
**remained** [1] - 21:23
**remaining** [5] - 22:12, 22:21, 60:15, 117:11, 117:17
**remarks** [1] - 75:25
**remember** [8] - 20:11, 54:17, 56:18, 58:5, 59:4, 76:20, 102:6, 107:7
**reminded** [1] - 117:2
**remorse** [1] - 98:12
**removed** [3] - 50:1, 50:8, 96:16
**renovated** [1] - 95:17
**renovations** [1] - 94:16
**rent** [1] - 88:14
**rental** [2] - 65:6, 68:25
**rentals** [2] - 73:18, 73:20
**reorganization** [1] - 64:24
**repair** [1] - 67:25
**repeat** [5] - 8:25, 32:6, 38:21, 55:4, 80:22
**repeatedly** [1] - 101:21
**repercussions** [1] - 78:22
**reply** [1] - 8:24
**Report** [8] - 5:14, 6:1, 60:12, 83:18, 86:18, 111:5, 111:14, 115:23
**report** [6] - 5:20, 5:24, 83:19, 93:21, 115:2, 115:12
**REPORTED** [1] - 2:2
**REPORTER** [1] - 32:6
**Reporter** [3] - 2:2, 42:21, 118:8
**Reporter's** [1] - 3:21
**reporting** [1] - 104:19
**represent** [2] - 5:5, 69:18
**representations** [1] - 88:5
**representative** [1] - 93:3
**represented** [2] - 56:17, 93:9
**representing** [1] - 55:8

**represents** [1] - 31:20
**request** [2] - 81:16, 100:14
**requested** [1] - 93:17
**require** [1] - 92:20
**required** [3] - 73:20, 78:11, 90:4
**research** [1] - 80:19
**researched** [2] - 64:10, 64:12
**resigned** [2] - 57:22, 101:3
**resolution** [3] - 55:10, 60:17, 111:25
**resolve** [6] - 101:18, 101:19, 101:20, 102:12, 102:14, 112:8
**resolved** [5] - 5:25, 6:3, 101:14, 102:18, 103:14
**resolves** [1] - 103:8
**resources** [2] - 11:14, 98:16
**respect** [3] - 67:6, 87:12, 113:6
**respectfully** [1] - 108:24
**respond** [1] - 110:9
**response** [1] - 5:15
**responsibility** [6] - 98:9, 99:5, 100:12, 104:25, 106:20, 109:18
**responsible** [1] - 8:1
**responsibly** [1] - 77:7
**rest** [7] - 69:9, 80:2, 84:5, 91:16, 103:20, 103:25, 116:11
**restitution** [12] - 10:15, 10:16, 10:18, 10:19, 81:8, 114:10, 114:15, 114:23, 115:2, 115:6, 117:4
**restrict** [1] - 92:25
**restriction** [1] - 115:20
**restructuring** [3] - 13:14, 47:19, 52:2
**result** [3] - 7:25, 10:1, 62:7
**resulted** [1] - 52:12
**resulting** [1] - 51:23
**resume** [1] - 64:25
**retained** [2] - 14:25, 47:18
**retire** [2] - 76:17, 78:16
**retired** [3] - 64:5, 79:5, 113:1
**retirees** [4] - 72:4,

81:14, 86:25, 87:6
**retirees'** [1] - 72:18
**retirement** [7] - 65:24, 72:12, 74:1, 78:7, 78:18, 81:3, 101:3
**retrieve** [1] - 79:5
**return** [3] - 24:14, 64:9, 65:9
**returned** [2] - 28:12
**returns** [1] - 24:14
**reveal** [1] - 93:12
**revealed** [1] - 90:10
**Revenue** [2] - 92:13, 92:25
**revenue** [5] - 34:19, 35:15, 38:7, 40:7, 41:4
**reverse** [1] - 72:13
**review** [2] - 5:13, 88:20
**reviewed** [2] - 61:8, 110:23
**revised** [1] - 116:22
**reward** [1] - 112:4
**rewarding** [1] - 112:6
**Richmond** [1] - 81:24
**ridiculous** [1] - 70:2
**riding** [1] - 67:11
**rip** [1] - 81:2
**rise** [4] - 4:2, 75:15, 75:17, 117:22
**rising** [3] - 51:22, 52:6, 52:8
**risk** [2] - 72:3, 102:19
**roadblocks** [1] - 87:13
**ROBERT** [1] - 1:7
**Robert** [26] - 5:5, 16:23, 16:25, 36:16, 37:8, 37:11, 40:11, 45:5, 45:6, 45:7, 57:22, 64:12, 65:2, 66:23, 69:4, 69:21, 70:7, 71:14, 71:22, 77:22, 80:4, 89:18, 92:13, 97:8, 98:23
**Roberta** [4] - 77:10, 77:17, 78:1
**ROGER** [1] - 1:12
**Roger** [1] - 4:7
**roger.cruz@usdoj. gov** [1] - 1:15
**role** [4] - 47:20, 47:21, 55:5, 55:9
**room** [1] - 95:18
**Roseman** [1] - 87:5
**Rothstein** [4] - 96:24, 99:17, 105:3, 105:4
**rough** [2] - 101:6, 103:6
**route** [1] - 100:12

**row** [1] - 31:19
**RPR** [2] - 2:2, 118:7
**RS** [1] - 86:1
**ruined** [1] - 69:17
**Rule** [3] - 15:21, 109:22, 110:4
**ruling** [1] - 59:24
**run** [4] - 21:16, 50:10, 101:12, 114:7
**running** [1] - 95:6
**RYAN** [1] - 1:17
**Ryan** [1] - 5:3
**ryan.oquinn@ dlapiper.com** [1] - 1:20

## S

**sacrificing** [1] - 70:24
**sad** [1] - 66:24
**safe** [5] - 64:8, 64:10, 71:9, 71:21, 79:10
**sale** [5] - 7:19, 8:3, 46:20, 54:9, 56:10
**salesman** [2] - 82:13, 82:14
**salvaged** [1] - 67:19
**sat** [1] - 98:19
**satellite** [1] - 67:23
**satisfied** [1] - 11:22
**satisfy** [1] - 115:6
**save** [2] - 68:5, 76:16
**saved** [4] - 64:5, 70:22, 70:25, 107:14
**savings** [8] - 65:2, 71:19, 72:4, 73:22, 76:18, 76:19, 81:3, 82:5
**saw** [5] - 47:5, 78:2, 84:1, 94:25, 97:13
**scale** [1] - 99:18
**scam** [1] - 71:13
**scammed** [2] - 71:22, 80:21
**scare** [1] - 81:2
**schedule** [1] - 114:25
**scheduled** [1] - 51:24
**scheme** [54] - 8:7, 8:8, 8:12, 12:8, 23:4, 23:24, 24:8, 24:11, 24:19, 25:2, 25:11, 25:16, 25:22, 26:1, 33:25, 40:2, 41:18, 41:21, 41:22, 41:24, 42:16, 58:21, 59:1, 60:24, 61:1, 65:3, 65:7, 71:17, 78:6, 80:9, 80:24, 81:1, 82:2, 83:10, 83:16, 83:24, 84:21, 86:10,

86:13, 87:2, 91:12, 92:8, 93:25, 94:4, 94:12, 95:6, 96:11, 97:1, 97:12, 108:7, 109:2, 109:9, 109:17
**schemers** [1] - 113:9
**schemes** [3] - 24:20, 61:21, 108:19
**school** [2] - 63:25, 112:20
**Schwartz** [1] - 89:6
**science** [1] - 13:10
**Scola** [1] - 106:18
**scope** [5] - 18:20, 86:24, 87:7, 97:4, 97:24
**Scott** [2] - 105:2, 105:3
**screen** [5] - 27:15, 49:2, 51:5, 92:9, 95:15
**screenings** [1] - 116:9
**scrimp** [1] - 68:19
**scumbag** [1] - 72:17
**search** [1] - 90:7
**searched** [2] - 90:14, 91:15
**seated** [3] - 4:5, 11:10, 75:19
**Sebastian** [1] - 74:24
**SEC** [16] - 54:25, 55:2, 55:5, 86:8, 86:14, 89:8, 89:12, 89:19, 96:2, 101:7, 101:14, 101:15, 101:17, 101:18, 103:8
**SEC's** [1] - 48:18
**second** [5] - 27:1, 31:19, 40:22, 84:10, 95:16
**secure** [5] - 46:23, 59:9, 71:2, 71:25, 72:1
**secured** [6] - 17:23, 17:24, 49:6, 57:11, 71:5
**securities** [5] - 42:9, 49:18, 87:21, 87:23
**Securities** [2] - 54:24, 103:2
**SECURITY** [4] - 4:2, 75:15, 75:17, 117:22
**Security** [2] - 67:4, 72:14
**security** [15] - 47:9, 49:7, 49:13, 49:15, 56:17, 56:21, 56:24, 56:25, 57:3, 57:13, 59:3, 71:8, 78:14, 78:16, 79:6

**see** [32] - 24:19, 29:4, 29:13, 29:15, 30:3, 30:4, 31:18, 39:23, 40:2, 42:24, 51:5, 53:7, 72:17, 73:21, 73:24, 84:8, 88:24, 89:13, 89:15, 90:19, 90:23, 91:1, 94:13, 94:21, 95:2, 95:10, 100:9, 101:9, 101:23, 108:8, 109:6
**seek** [3] - 49:14, 83:10, 117:10
**seeking** [2] - 101:23, 112:8
**seize** [1] - 87:18
**self** [1] - 101:12
**sell** [3] - 54:12, 69:11, 72:13
**seller** [1] - 71:10
**selling** [1] - 43:1
**seminars** [2] - 71:1, 71:3
**send** [1] - 103:22
**sends** [1] - 104:22
**sense** [2] - 22:17, 108:13
**sent** [6] - 19:2, 19:5, 19:11, 49:22, 90:21, 112:20
**sentence** [47] - 66:8, 66:10, 72:16, 77:7, 80:20, 81:17, 84:11, 85:9, 96:10, 97:4, 97:16, 100:4, 103:17, 104:13, 104:15, 104:16, 104:17, 104:20, 105:25, 107:3, 107:23, 107:24, 108:2, 108:13, 108:16, 108:18, 108:21, 109:24, 111:7, 111:12, 111:13, 111:17, 112:1, 112:4, 112:14, 112:16, 113:7, 113:12, 114:3, 115:25, 116:2, 117:6
**sentenced** [7] - 66:7, 73:25, 80:25, 96:25, 97:8, 106:18, 107:25
**sentences** [2] - 97:19, 97:20
**sentencing** [24] - 5:12, 5:14, 5:15, 7:15, 7:19, 8:20, 9:2, 9:15, 9:25, 10:1, 10:11, 10:25, 61:7, 70:15,

85:17, 99:9, 100:1, 103:15, 104:21, 107:17, 107:18, 107:20, 109:4, 110:24
**SENTENCING** [1] - 1:9
**separate** [9] - 16:13, 62:13, 64:14, 89:1, 89:13, 89:14, 89:16, 92:21, 95:11
**September** [1] - 89:23
**serious** [12] - 85:21, 85:24, 86:20, 86:21, 87:7, 87:8, 87:9, 87:11, 98:25, 103:23, 113:7, 113:8
**seriousness** [1] - 97:25
**serve** [3] - 14:1, 83:13, 105:9
**served** [2] - 90:8, 115:11
**serves** [1] - 108:3
**service** [1] - 67:21
**Service** [1] - 92:25
**services** [1] - 15:1
**serving** [1] - 113:4
**session** [2] - 4:3, 75:18
**set** [10] - 8:11, 87:18, 89:3, 89:6, 92:20, 111:23, 114:10, 114:13, 117:2, 117:4
**settlement** [7] - 35:4, 35:17, 54:23, 93:23, 105:18, 105:20
**settlements** [1] - 97:2
**seven** [1] - 16:18
**sever** [2] - 111:22, 111:23
**several** [7] - 13:23, 20:25, 21:16, 23:19, 63:1, 84:25, 116:6
**severally** [1] - 114:16
**severe** [3] - 79:23, 105:24, 113:13
**severely** [1] - 113:13
**sewing** [1] - 67:25
**shaky** [1] - 12:14
**shame** [2] - 77:5, 78:19
**shape** [2] - 45:20, 79:7
**SHAPIRO** [1] - 1:7
**Shapiro** [81] - 5:5, 5:11, 7:25, 16:23, 16:25, 20:14, 36:16, 37:8, 37:11, 40:11, 40:18, 45:5, 45:6, 45:7, 47:24, 47:25,

48:1, 48:5, 48:13, 51:16, 55:13, 55:25, 56:4, 57:22, 58:7, 58:22, 61:4, 61:19, 63:11, 64:12, 65:2, 69:4, 69:21, 70:7, 71:14, 71:22, 74:18, 77:22, 80:4, 82:13, 82:20, 83:12, 83:18, 84:4, 84:6, 84:24, 85:5, 87:4, 88:9, 89:10, 89:18, 89:25, 90:10, 90:22, 92:13, 92:18, 93:4, 93:13, 93:14, 93:18, 94:21, 95:3, 96:7, 96:14, 97:8, 98:5, 100:25, 101:2, 102:11, 106:23, 109:20, 111:8, 111:19, 112:4, 112:17, 113:4, 114:4, 114:15, 117:6, 117:20
**Shapiro's** [10] - 48:2, 56:13, 61:10, 66:23, 76:19, 86:3, 92:15, 93:15, 99:11, 111:24
**Shapiros** [1] - 94:23
**share** [1] - 68:9
**sheet** [1] - 38:4
**shell** [4] - 85:25, 89:3, 89:6, 95:12
**shielding** [2] - 91:22, 93:20
**shifted** [1] - 62:10
**shoes** [1] - 95:22
**shop** [1] - 67:23
**shopping** [1] - 68:1
**short** [3] - 7:21, 72:3, 84:4
**short-term** [1] - 72:3
**shorter** [1] - 108:22
**shortly** [4] - 51:13, 64:25, 83:23, 116:23
**shot** [1] - 110:13
**show** [11] - 35:14, 39:21, 41:10, 42:12, 43:5, 60:10, 84:16, 84:24, 86:2, 92:9, 106:9
**showed** [3] - 84:1, 88:12, 91:5
**showing** [2] - 96:12, 96:13
**shown** [1] - 73:11
**shows** [6] - 39:23, 41:11, 88:22, 90:17, 90:25, 91:21
**sickening** [1] - 69:5

**side** [6] - 21:19, 23:12, 28:5, 34:24, 66:2
**sides** [1] - 102:14
**sign** [4] - 29:3, 93:20, 93:21, 96:3
**signature** [1] - 95:21
**signed** [2] - 50:21, 102:23
**significant** [6] - 31:17, 85:4, 97:5, 99:22, 102:19, 107:23
**significantly** [2] - 108:16, 108:18
**signing** [1] - 16:24
**signs** [1] - 24:19
**similar** [7] - 27:24, 34:20, 44:2, 91:7, 96:22, 110:3, 113:11
**similarly** [4] - 94:9, 96:20, 110:14, 110:16
**simple** [2] - 12:6, 101:10
**simply** [3] - 83:23, 84:23, 85:7
**single** [2] - 8:10, 95:7
**sit** [1] - 104:2
**sitting** [1] - 104:8
**situated** [4] - 94:9, 96:20, 110:15, 110:16
**situation** [3] - 32:18, 99:6, 109:24
**situations** [1] - 98:22
**six** [5] - 27:21, 29:16, 29:25, 30:2, 107:1
**six-month** [2] - 29:16, 29:25
**skills** [4] - 24:22, 24:23, 51:11, 52:4
**sleeping** [1] - 113:19
**slept** [1] - 69:23
**slight** [1] - 116:17
**slow** [2] - 30:1, 79:18
**slowly** [1] - 29:22
**small** [3] - 44:24, 67:9, 83:8
**smarter** [1] - 73:10
**snapshot** [1] - 26:15
**so-called** [1] - 78:22
**sobbing** [1] - 106:9
**Social** [2] - 67:4, 72:14
**social** [2] - 78:16, 79:6
**socially** [1] - 78:9
**society** [1] - 85:22
**software** [1] - 14:13
**sold** [13] - 7:23, 8:15, 17:11, 22:7, 22:10, 46:14, 53:20, 64:4,

64:21, 69:8, 73:16, 76:18, 81:7
**solely** [1] - 38:24
**solicited** [1] - 89:21
**someone** [3] - 82:18, 99:4, 106:16
**sometime** [2] - 15:4, 20:1
**somewhere** [1] - 108:4
**Sonny** [1] - 10:7
**soon** [1] - 101:14
**sophisticated** [1] - 86:11
**sorry** [12] - 11:11, 28:16, 29:19, 32:6, 35:9, 38:18, 38:21, 46:21, 69:3, 73:6, 74:10, 79:19
**sound** [1] - 68:21
**sounds** [1] - 22:14
**source** [8] - 18:22, 25:2, 29:14, 34:19, 35:1, 35:15, 36:23, 38:7
**sources** [2] - 14:9, 89:14
**South** [1] - 1:19
**Southern** [1] - 4:3
**SOUTHERN** [1] - 1:1
**speaks** [3] - 87:5, 87:11, 96:2
**spearheaded** [1] - 58:21
**special** [6] - 4:25, 7:22, 54:9, 79:25, 115:20
**specific** [11] - 8:6, 8:8, 10:13, 17:6, 52:25, 61:1, 94:7, 94:10, 95:25, 100:14, 103:16
**specifically** [5] - 83:2, 83:9, 84:17, 96:3, 113:2
**speculative** [4] - 7:16, 8:2, 9:13, 10:21
**speedy** [2] - 102:15, 111:21
**spell** [1] - 12:24
**spelling** [1] - 76:4
**spend** [4] - 15:6, 68:18, 72:8, 103:25
**spending** [1] - 87:6
**spends** [1] - 81:16
**spent** [4] - 69:5, 70:23, 91:2, 92:4
**spin** [1] - 89:22
**spirit** [1] - 21:6
**spots** [1] - 103:6

staff [1] - 25:14
stage [1] - 79:16
Staging [2] - 89:3, 94:24
stand [4] - 11:4, 81:15, 99:4, 103:14
standard [2] - 60:1, 115:15
standing [2] - 84:16, 99:12
start [8] - 4:10, 16:12, 28:10, 30:1, 43:2, 43:18, 84:7, 92:7
started [4] - 16:3, 63:24, 91:1, 93:25
starting [3] - 51:19, 63:2, 87:14
State [1] - 87:15
state [4] - 4:6, 22:17, 65:10, 76:10
statement [4] - 63:20, 109:14, 109:15, 109:16
statements [5] - 5:16, 57:8, 88:11, 92:21, 105:7
STATES [3] - 1:1, 1:4, 1:10
states [3] - 87:15, 87:25, 88:1
States [11] - 1:13, 4:2, 4:8, 70:18, 84:17, 84:25, 85:9, 91:20, 92:11, 115:7, 118:8
statistical [1] - 27:3
statutes [1] - 85:24
statutory [3] - 107:13, 112:2, 114:2
stayed [1] - 25:14
STEELMAN [1] - 4:17
Steelman [2] - 1:22, 4:16
Steiner [1] - 106:17
stem [1] - 6:10
step [3] - 59:16, 69:22, 86:2
stepchildren [1] - 106:5
STEPHANIE [2] - 2:2, 118:7
Stephanie_McCarn @flsd.uscourts. gov [1] - 2:5
Stephen [1] - 106:16
stepson [1] - 94:18
still [6] - 10:2, 36:6, 53:13, 103:3, 104:18, 112:10
stipulate [3] - 9:19, 10:17, 11:14

stipulated [2] - 10:10, 60:5
stipulating [1] - 11:18
stipulation [3] - 11:16, 11:23, 114:12
stocks [2] - 67:9, 82:10
stole [1] - 69:25
stolen [3] - 65:2, 78:13, 80:12
stop [2] - 28:14, 102:2
stopped [1] - 64:23
stops [1] - 79:2
storage [6] - 90:7, 90:8, 90:9, 91:9, 91:15, 91:23
stories [1] - 73:7
story [1] - 66:21
streamline [2] - 9:15, 10:25
streamlining [1] - 21:6
Street [1] - 1:14
street [1] - 72:15
streets [1] - 86:4
stress [1] - 80:2
stressful [1] - 78:21
strike [1] - 27:3
strongly [1] - 91:21
structured [6] - 35:4, 35:17, 61:14, 61:15, 88:17, 97:2
Structured [2] - 16:16, 35:24
struggle [1] - 65:23
struggling [1] - 68:17
stuck [1] - 104:8
stupid [1] - 74:8
sub [1] - 94:14
sub-charts [1] - 94:14
subject [4] - 54:9, 55:22, 56:10, 108:9
subjects [1] - 24:2
submit [4] - 74:14, 93:16, 107:22, 116:22
submitted [5] - 94:15, 106:8, 111:3, 116:5, 116:16
subpoena [1] - 90:8
subsequently [1] - 50:1
substance [2] - 6:9, 115:18
substantial [2] - 96:9, 109:7
substantiate [2] - 9:8, 12:1
subtract [4] - 12:9, 20:18, 23:2, 23:3
subtracting [1] - 21:1

subtraction [1] - 19:14
succeed [1] - 87:2
successful [2] - 64:1, 100:20
suddenly [1] - 65:6
suffer [1] - 98:12
suffered [1] - 98:12
suffering [2] - 70:2, 73:8
sufficient [3] - 24:13, 40:20, 112:15
suggest [1] - 6:5
suggested [1] - 6:21
suggesting [1] - 10:8
suit [2] - 82:19
Suite [1] - 1:19
sum [4] - 33:22, 48:9, 58:25
summary [3] - 26:20, 27:17, 92:11
supervise [1] - 22:2
supervised [3] - 104:18, 115:10, 115:14
supervision [7] - 56:2, 56:8, 56:12, 101:6, 101:13, 103:8, 115:15
support [7] - 33:16, 40:20, 48:17, 61:9, 80:8, 83:25, 106:13
supported [2] - 13:24, 60:13
supporting [1] - 60:25
supports [1] - 40:13
supposed [2] - 69:16, 72:3
Supreme [1] - 9:2
surprised [1] - 80:17
survivor [1] - 103:19
sustain [4] - 39:5, 40:3, 40:17
sweat [1] - 73:19
swimming [1] - 95:17
switch [2] - 42:21, 48:24
switched [2] - 84:6
synthesize [1] - 85:16
Syreta [2] - 1:22, 5:9
system [1] - 80:19

**T**

table [9] - 4:9, 5:4, 28:25, 29:2, 29:8, 53:4, 87:20, 91:12
tailor [1] - 60:3
target [1] - 83:20
targeted [3] - 83:9,

87:2, 113:2
targeting [2] - 76:21, 80:18
task [1] - 99:4
Tax [2] - 92:11, 93:13
tax [8] - 65:11, 68:20, 92:5, 93:12, 93:25, 94:5, 99:13, 112:22
taxes [9] - 65:10, 80:13, 84:25, 92:4, 92:7, 92:19, 94:3, 99:2, 115:24
taxpayers [1] - 104:5
team [3] - 16:14, 51:12, 83:22
team's [1] - 26:3
technical [1] - 61:12
teeth [1] - 68:22
ten [3] - 86:5, 93:25, 105:18
tender [3] - 15:22, 24:2, 52:18
term [13] - 7:8, 8:7, 8:18, 30:9, 31:25, 62:2, 70:5, 72:3, 73:25, 74:6, 83:10, 96:10, 114:6
terms [12] - 8:6, 30:1, 30:12, 39:21, 39:23, 44:23, 85:22, 85:23, 86:24, 87:8, 100:22, 117:16
terrible [2] - 79:8, 113:15
test [2] - 68:13, 79:25
testified [17] - 11:8, 12:10, 19:12, 25:20, 26:12, 27:25, 31:8, 35:8, 41:17, 42:3, 45:13, 50:9, 56:4, 56:16, 83:24, 111:2, 111:4
testify [2] - 12:5, 12:11
testifying [1] - 9:21
testimony [18] - 6:10, 7:9, 7:11, 9:7, 9:19, 9:20, 10:9, 23:23, 27:11, 34:10, 35:12, 36:3, 53:1, 54:16, 54:17, 60:6, 60:13, 85:3
Texas [1] - 87:15
THE [105] - 1:10, 1:12, 1:17, 3:3, 3:9, 4:5, 4:12, 4:22, 4:23, 5:2, 5:7, 5:11, 5:17, 5:18, 6:23, 7:1, 10:24, 11:5, 11:9, 11:10, 11:16, 12:16, 15:25, 24:10, 24:11, 26:24,

27:12, 32:6, 37:22, 51:1, 52:16, 59:16, 59:17, 59:19, 60:5, 60:9, 60:18, 60:23, 62:14, 62:23, 63:5, 63:8, 63:10, 63:14, 63:17, 63:21, 66:12, 66:16, 66:17, 66:18, 66:19, 70:17, 70:20, 70:21, 72:20, 72:23, 73:2, 73:4, 74:12, 74:16, 74:18, 75:11, 75:14, 75:19, 75:21, 76:2, 76:7, 76:10, 76:12, 76:14, 76:15, 76:25, 77:1, 77:9, 77:15, 77:20, 78:4, 81:18, 81:22, 82:22, 83:5, 84:13, 85:18, 98:1, 98:6, 98:7, 98:18, 106:3, 106:6, 106:22, 106:25, 107:3, 107:8, 108:15, 110:7, 110:19, 110:22, 114:15, 116:10, 116:24, 117:1, 117:13, 117:15, 117:18, 117:20
theme [1] - 108:15
themself [2] - 100:10, 109:11
themselves [5] - 86:25, 97:17, 97:19, 100:20, 104:23
theoretically [1] - 62:19
thereafter [1] - 83:23
therefore [3] - 62:13, 114:4, 114:9
thereof [2] - 6:20, 70:10
they've [1] - 77:24
thin [1] - 96:15
third [27] - 30:15, 31:19, 31:24, 32:14, 32:15, 32:17, 33:10, 33:11, 33:19, 33:23, 34:3, 34:6, 34:10, 34:16, 34:19, 38:16, 38:25, 44:6, 44:7, 44:14, 44:17, 44:20, 44:22, 45:9, 59:8, 84:3
third-party [24] - 30:15, 31:19, 31:24, 32:14, 32:17, 33:10, 33:11, 33:19, 33:23, 34:3, 34:6, 34:10, 34:16, 34:19, 38:16,

October 15, 2019

United States of America v. Robert Shapiro, 19-cr-20178-CMA

38:25, 44:6, 44:7, 44:14, 44:17, 44:20, 44:22, 59:8, 84:3
**THOMAS** [1] - 11:7
**Thomas** [3] - 3:4, 11:4, 12:23
**thoughts** [1] - 106:10
**thousand** [2] - 20:25, 68:11
**thousands** [5] - 71:20, 80:11, 85:5, 112:25
**three** [12] - 26:7, 34:23, 64:14, 64:15, 64:16, 64:18, 68:8, 69:17, 71:3, 104:18, 106:17, 115:10
**threshold** [2] - 60:4, 60:11
**throughout** [2] - 95:19, 101:22
**tied** [6] - 14:16, 15:18, 18:16, 34:19, 36:3, 37:10
**Titanic** [1] - 99:21
**title** [2] - 62:10, 67:19
**titled** [1] - 26:19
**TJ** [1] - 67:23
**today** [31] - 12:12, 15:6, 20:25, 21:24, 22:7, 22:10, 26:12, 36:3, 53:14, 54:13, 56:10, 63:23, 66:20, 71:14, 74:9, 78:5, 81:11, 83:19, 86:16, 98:14, 98:21, 98:23, 98:24, 99:11, 99:24, 103:14, 105:10, 105:21, 105:23, 111:8, 112:24
**together** [6] - 26:13, 26:17, 39:8, 46:22, 64:2, 85:17
**toll** [1] - 79:4
**Tom** [1] - 6:11
**took** [6] - 79:4, 86:8, 101:2, 111:19, 112:24
**top** [7] - 51:19, 82:13, 82:14, 88:22, 89:5, 89:24, 94:24
**torn** [1] - 103:24
**total** [20] - 12:7, 17:2, 18:15, 19:15, 19:18, 19:20, 19:22, 23:4, 23:6, 23:24, 30:5, 31:1, 33:22, 34:15, 36:7, 44:23, 94:6, 103:8, 115:21
**totality** [1] - 97:22
**touch** [1] - 94:7

**tough** [2] - 68:4, 98:9
**toward** [3] - 41:22, 114:18, 114:20
**towards** [1] - 84:17
**traceable** [1] - 89:15
**tracing** [2] - 91:4, 91:5
**tracings** [1] - 90:18
**track** [2] - 34:1, 37:9
**tracks** [1] - 39:15
**trailer** [2] - 67:19, 67:20
**training** [2] - 15:11, 17:5
**transactions** [14] - 14:9, 14:10, 16:7, 26:4, 26:6, 26:10, 27:18, 33:21, 37:3, 37:10, 38:1, 40:10, 100:16
**transcription** [1] - 118:3
**transfers** [1] - 38:2
**transpired** [2] - 60:25, 79:23
**travel** [4] - 67:18, 74:15, 78:10, 94:17
**traveled** [1] - 6:15
**travelled** [1] - 63:19
**treat** [3] - 62:3, 67:6, 106:16
**treated** [3] - 62:13, 82:16, 110:15
**treatment** [2] - 68:13, 104:12
**tremendous** [1] - 79:4
**Trend** [2] - 89:3, 94:24
**trial** [8] - 4:10, 85:8, 102:15, 106:18, 107:10, 111:21, 111:23, 112:11
**tried** [2] - 88:6, 102:12
**trip** [2] - 69:17, 73:15
**trips** [2] - 67:20, 72:11
**TRO** [1] - 103:1
**truck** [1] - 79:1
**true** [24] - 8:12, 18:10, 31:11, 31:19, 31:24, 34:17, 35:18, 36:23, 45:14, 45:18, 46:9, 47:5, 50:11, 55:7, 55:12, 56:3, 57:21, 58:18, 73:11, 93:21, 102:20, 102:21, 107:16
**Trujillo** [1] - 64:11
**trust** [4] - 61:18, 69:8, 86:1
**trusted** [2] - 72:4, 79:10
**trustee** [3] - 58:19,

58:23, 109:19
**trusts** [1] - 72:7
**truth** [2] - 84:3, 109:5
**try** [11] - 44:16, 77:21, 89:21, 95:5, 99:9, 99:25, 101:19, 101:20, 104:3, 104:4, 104:5
**trying** [5] - 9:14, 10:3, 67:2, 76:17, 105:17
**turf** [1] - 101:7
**turn** [3] - 36:10, 85:15, 115:8
**turning** [1] - 93:15
**turtle** [1] - 95:16
**TV** [1] - 67:23
**Twelfth** [2] - 2:3, 118:8
**two** [35] - 4:15, 7:14, 16:15, 16:17, 17:17, 17:21, 18:2, 18:10, 18:16, 19:16, 19:20, 26:17, 26:19, 27:1, 27:2, 29:9, 34:23, 39:10, 64:3, 75:22, 78:21, 80:13, 84:21, 85:10, 89:13, 89:16, 92:1, 92:2, 98:25, 99:21, 102:14, 106:25, 111:2, 113:18
**two-page** [2] - 26:17, 26:19
**type** [5] - 19:17, 41:4, 44:6, 46:25, 51:7
**types** [6] - 17:10, 17:17, 18:2, 19:16, 19:21, 36:2
**typically** [4] - 14:8, 14:10, 17:22, 40:2
**typo** [1] - 37:20

## U

**U.S** [8] - 5:10, 101:21, 101:22, 102:13, 114:25, 115:1, 115:4
**UCC** [1] - 49:19
**UCC-1** [1] - 57:8
**ultimate** [1] - 86:23
**ultimately** [6] - 7:23, 12:9, 88:4, 88:16, 92:10, 97:7
**umbrella** [1] - 86:1
**unable** [1] - 117:8
**unaccounted** [1] - 91:10
**unbeknownst** [1] - 71:17
**unbelievable** [1] -

65:2
**uncertain** [1] - 12:14
**uncontested** [1] - 86:17
**under** [25] - 9:1, 9:4, 15:21, 54:20, 56:1, 56:8, 56:12, 57:19, 60:1, 60:4, 62:21, 79:3, 85:8, 87:20, 91:12, 91:17, 93:22, 101:5, 103:17, 107:4, 111:6, 111:11, 111:13, 114:2
**under-the-table** [1] - 87:20
**undergoing** [1] - 112:11
**undermines** [1] - 105:8
**understood** [1] - 56:1
**undertaking** [1] - 100:19
**unexpected** [1] - 115:5
**unfortunately** [1] - 72:3
**unique** [3] - 4:20, 10:5, 53:24
**unit** [8] - 29:9, 36:4, 36:18, 38:12, 43:1, 90:11, 90:14, 91:9
**UNITED** [3] - 1:1, 1:4, 1:10
**United** [11] - 1:13, 4:2, 4:8, 70:18, 84:17, 84:25, 85:8, 91:20, 92:11, 115:7, 118:8
**units** [6] - 17:25, 18:12, 30:6, 33:9, 36:1, 42:8
**universe** [1] - 91:15
**University** [1] - 13:8
**unlawfully** [1] - 115:18
**unless** [1] - 114:14
**unlike** [1] - 61:20
**unnecessarily** [1] - 7:16
**unnecessary** [1] - 8:18
**unpaid** [1] - 51:25
**unravel** [2] - 86:8, 86:10
**unreasonable** [3] - 92:20, 92:24, 93:2
**unsecured** [3] - 13:22, 52:2, 55:8
**unwarranted** [1] - 94:9

**unwitting** [1] - 113:2
**up** [22] - 10:11, 11:12, 15:8, 16:8, 22:22, 27:1, 31:8, 42:2, 42:19, 64:19, 69:10, 69:24, 79:1, 82:3, 86:19, 89:3, 89:6, 96:15, 102:7, 104:20, 113:18
**upcoming** [1] - 79:21
**usage** [1] - 7:7
**uses** [1] - 14:9
**USPO** [1] - 1:22
**utilities** [1] - 68:20

## V

**vacations** [1] - 78:12
**valuation** [6] - 9:10, 11:25, 12:4, 21:15, 21:20, 23:19
**value** [12] - 7:11, 7:23, 7:24, 8:13, 10:5, 10:13, 12:5, 53:16, 62:22, 100:22, 100:23, 105:6
**valued** [3] - 22:23, 50:19, 51:21
**various** [2] - 18:1, 27:20
**vary** [1] - 100:2
**vast** [2] - 94:23, 103:19
**vehicle** [3] - 65:22, 68:16, 68:20
**vehicles** [1] - 71:23
**Verizon** [1] - 67:21
**via** [1] - 84:18
**victim** [13] - 5:16, 6:14, 6:16, 20:17, 75:1, 75:6, 75:23, 79:11, 89:15, 113:5, 113:15, 113:16
**victims** [36] - 8:16, 20:25, 41:25, 49:7, 49:18, 56:13, 59:13, 63:1, 65:15, 69:13, 70:14, 71:13, 77:23, 83:2, 85:6, 86:16, 86:24, 87:1, 87:8, 88:13, 97:24, 98:14, 98:21, 99:13, 99:23, 100:5, 105:9, 105:12, 105:16, 111:3, 112:8, 113:2, 113:3, 113:16, 115:8
**victims'** [1] - 69:5
**video** [17] - 42:7, 42:11, 42:19, 42:25, 43:10, 43:14, 43:19,

October 15, 2019

United States of America v. Robert Shapiro, 19-cr-20178-CMA

45:6, 45:7, 45:13, 45:16, 46:8, 47:5, 74:22, 75:4, 84:1, 111:2
**videos** [6] - 5:16, 6:17, 74:13, 85:3, 111:1, 113:16
**view** [1] - 111:1
**viewed** [3] - 74:16, 93:20, 113:15
**vignette** [1] - 75:4
**Virginia** [1] - 81:24
**virtue** [1] - 91:23
**visit** [1] - 109:18
**visited** [1] - 109:11
**voice** [1] - 108:12
**volume** [1] - 86:21
**voluntarily** [1] - 112:7
**voluntary** [1] - 93:19
**vs** [1] - 1:6

## W

**W-A-R-I-C-H** [1] - 76:13
**wages** [2] - 114:17, 114:18
**wait** [1] - 109:1
**waive** [1] - 102:15
**waking** [1] - 113:18
**walk** [2] - 67:10, 72:17
**wants** [2] - 9:16, 77:14
**Warich** [3] - 76:4, 76:11, 76:13
**WARICH** [5] - 76:4, 76:6, 76:8, 76:11, 76:13
**warich** [1] - 76:5
**warnings** [1] - 65:5
**warrant** [1] - 63:3
**warranted** [2] - 97:16, 97:22
**wars** [1] - 101:7
**waste** [2] - 11:14, 98:16
**watched** [1] - 98:19
**watches** [1] - 95:23
**watching** [1] - 69:9
**ways** [4] - 73:12, 98:10, 110:2, 112:7
**wealth** [1] - 97:18
**weather** [1] - 79:2
**Webre** [3] - 70:18, 72:20, 74:23
**WEBRE** [1] - 70:19
**wedding** [1] - 79:21
**week** [1] - 64:3
**weekend** [1] - 110:24
**weeks** [1] - 68:8
**whereas** [1] - 74:22

**white** [1] - 8:9
**whole** [4] - 7:13, 65:11, 71:17, 94:12
**wife** [14] - 64:1, 65:23, 69:5, 89:4, 90:11, 91:23, 94:18, 95:5, 95:8, 96:13, 102:20, 102:21, 102:23, 107:14
**wife's** [3] - 86:6, 89:7, 89:14
**wind** [1] - 21:10
**wind-down** [1] - 21:10
**wire** [1] - 99:14
**wires** [2] - 19:6, 48:12
**wishes** [2] - 11:2, 82:24
**withdraw** [1] - 62:24
**withdrawn** [2] - 60:22, 78:9
**witness** [21] - 6:7, 7:10, 7:11, 9:14, 9:20, 9:21, 11:8, 11:24, 11:25, 12:1, 12:4, 12:10, 23:18, 24:3, 24:4, 52:18, 72:21, 75:6, 88:11, 89:19
**WITNESS** [25] - 11:9, 24:11, 26:24, 59:17, 63:22, 66:14, 66:17, 66:19, 70:19, 70:21, 73:5, 76:6, 76:8, 76:11, 76:13, 76:15, 77:1, 77:19, 77:21, 78:1, 78:5, 79:19, 81:19, 81:21, 81:23
**WITNESSES** [3] - 3:2, 3:3, 3:9
**witnesses** [7] - 6:14, 7:9, 9:6, 74:14, 75:2, 75:6, 75:23
**wonder** [2] - 113:9, 113:17
**Woodbridge** [92] - 15:4, 15:7, 15:16, 16:4, 16:16, 16:17, 16:20, 17:2, 17:4, 17:6, 17:8, 18:5, 18:16, 19:3, 19:15, 20:1, 21:10, 23:4, 24:18, 25:11, 25:14, 25:21, 25:25, 26:4, 26:14, 26:19, 27:8, 27:22, 28:22, 29:9, 29:11, 29:16, 29:25, 30:10, 30:12, 30:17, 31:18, 31:22, 32:11, 32:15, 33:4, 33:5, 33:8, 33:12, 35:24,

36:12, 38:3, 38:7, 38:15, 38:20, 38:22, 39:13, 39:17, 39:18, 39:25, 40:17, 41:2, 41:3, 42:25, 43:5, 43:8, 43:16, 46:8, 46:10, 46:15, 47:17, 47:19, 47:21, 48:6, 50:19, 50:21, 51:8, 51:21, 52:1, 52:9, 52:12, 53:10, 61:14, 61:15, 64:14, 64:23, 71:3, 79:12, 88:6, 88:13, 89:1, 89:21, 90:21
**Woodbridge's** [2] - 32:2, 33:16
**word** [2] - 24:5, 43:15
**words** [10] - 17:6, 23:11, 30:16, 30:20, 35:12, 41:21, 46:25, 47:7, 70:10, 84:6
**works** [1] - 95:18
**world** [3] - 8:10, 67:18, 104:10
**worry** [2] - 68:23, 102:9
**worse** [2] - 113:17, 113:18
**worst** [1] - 67:22
**worth** [5] - 54:1, 54:3, 69:11, 84:21, 91:9
**wounded** [1] - 66:6
**written** [1] - 63:20
**wrote** [2] - 51:16, 64:13

## Y

**year** [22] - 27:19, 28:24, 29:24, 33:16, 39:15, 40:25, 45:16, 45:21, 46:1, 51:24, 64:1, 64:15, 67:10, 68:11, 82:6, 86:10, 86:12, 104:23, 104:24, 108:21, 111:23, 112:12
**years** [49] - 13:16, 13:23, 18:25, 21:20, 27:22, 31:11, 34:16, 35:17, 36:22, 37:11, 37:14, 63:24, 64:3, 64:6, 66:1, 66:4, 66:20, 68:17, 69:15, 70:22, 70:23, 71:1, 73:13, 74:7, 76:9, 76:15, 78:21, 78:25, 83:12, 84:12, 84:14, 85:1, 93:25, 94:3,

94:5, 96:10, 97:11, 97:23, 104:13, 104:14, 104:18, 105:19, 106:18, 107:5, 107:9, 108:8, 108:9, 115:10
**years'** [2] - 84:19, 96:25
**yield** [1] - 64:9
**York** [1] - 81:24
**younger** [1] - 67:3
**yourself** [1] - 58:18

## Z

**zero** [2] - 34:5, 34:7
**ZIEGLER** [1] - 1:18
**Ziegler** [1] - 5:5
**Zoila** [2] - 76:3, 76:11