**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES, LLC, *et. al.*, | Case No. 17-12560 (JKS) |
| Remaining Debtors. | Jointly Administered |
| MICHAEL GOLDBERG, in his capacity as Liquidating Trustee of the WOODBRIDGE LIQUIDATION TRUST, | Adv. Pro. No. 19-50965 (JKS) |
| Plaintiff,<br>v. | **Related Adv. D.I. 71-75, 77-78, 80-82, and 84** |
| JAMES E. CAMPBELL, JR. INC. (D/B/A CAMPBELL FINANCIAL CORP.) and JAMES E. CAMPBELL, JR., | |
| Defendants. | |

**MEMORANDUM OPINION[1]**

Before the Court is the Motion for Partial Summary Judgment (the "Motion for Partial Summary Judgment") filed by Michael Goldberg in his capacity as Liquidating Trustee of the Woodbridge Liquidation Trust ("Trustee" or "Plaintiff") and the Cross Motion for Summary Judgment (the "Cross Motion for Summary Judgment") filed by defendant James E. Campbell, Jr. ("Individual Defendant" or "Mr. Campbell"). Having considered the parties' submissions, and for the reasons discussed below, the Motion for Partial Summary Judgment is granted, in part, and denied, in part, and the Cross Motion for Summary Judgment is denied.

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## **PROCEDURAL BACKGROUND**[2]

On November 27, 2019, the Trustee commenced this adversary proceeding (the "Adversary Proceeding") by filing the Adversary Complaint: (I) for Avoidance and Recovery of Avoidable Transfers; and (II) for Sale of Unregistered Securities, for Fraud, and for Aiding and Abetting Fraud (the "Complaint") against James E. Campbell, Jr. Inc. (d/b/a Campbell Financial Corp.) (the "Corporate Defendant") and Mr. Campbell (collectively, the "Defendants").[3]

On October 10, 2020, Mr. Campbell, acting pro se, filed an answer to the Complaint on behalf of himself, and as President of the Corporate Defendant.[4]

On December 3, 2020, the parties entered into a Stipulation Regarding Appointment of Mediator[5] and, on December 4, 2020, the Adversary Proceeding was assigned to mediation and a mediator appointed.[6] Mediation was unsuccessful.[7]

A scheduling order was entered on April 10, 2024.[8] Fact discovery closed on August 30, 2024.[9]

---

[2] Citations to D.I. __ reference the docket entries in the lead bankruptcy case, *In re Woodbridge Group of Companies, LLC*, Case No. 17-12560 (JKS). Citations to Adv. D.I. __ reference the docket entries in this Adversary Proceeding, *Goldberg v. Campbell, et al.*, Adv. Pro. No. 19-50965 (JKS).

[3] Adv. D.I. 1 (Complaint).

[4] Adv. D.I. 4 (Defendant Response: (1) Regarding avoidance and recovery of avoidable transfers; and (2) Regarding accusation of sale of unregistered securities, fraud, and aiding and abetting fraud (the "Answer")).

[5] Adv. D.I. 25 (Stipulation Regarding Appointment of Mediator).

[6] Adv. D.I. 26 (Order Assigning Adversary Proceeding to Mediation and Appointing Mediator).

[7] *See* Adv. D.I. 62 (Status Report with Respect to Certain Adversary Matters).

[8] Adv. D.I. 64 (Scheduling Order).

[9] Adv. D.I. 64 (Scheduling Order).

On October 31, 2024, the Trustee filed the Motion for Partial Summary Judgment,[10] together with a Memorandum of Law,[11] the Sharp Declaration and Troszak Declaration in support of the motion,[12] and a Request for Judicial Notice.[13]

On December 20, 2024, Defendants, represented by counsel, filed Defendants' Response and Mr. Campbell filed a Cross Motion for Summary Judgment.[14]

On January 3, 2025, the Trustee filed the Trustee's Reply,[15] including the Nolan Declaration and Second Troszak Declaration.[16]

On January 16, 2025, Mr. Campbell filed a Reply in Support of Cross Motion for Summary Judgment.[17]  On the same date, Defendants filed an Amended Answer.[18]

---

[10]  Adv. D.I. 71 (Plaintiff's Motion for Partial Summary Judgment).

[11]  Adv. D.I. 72 (Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment (the "Memorandum")).

[12]  Adv. D.I. 73 (Declaration of Bradley D. Sharp in Support of Plaintiff's Motion for Partial Summary Judgment (the "Sharp Declaration")) and Adv. D.I. 74 (Declaration of Nicholas R. Troszak in Support of Plaintiff's Motion for Partial Summary Judgment (the "Troszak Declaration")).  The Sharp Declaration attaches a conformed copy of the Declaration of Bradley D. Sharp in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its Affiliated Debtors (D.I. 2829) (the "Sharp Confirmation Declaration"), dated October 19, 2018, which attaches, as Exhibit A, the Declaration of Soneet R. Kapila (the "Kapila Declaration"), dated December 18, 2017, a founding partner of KapilaMukamal, LLP, a forensic consulting and insolvency advisory firm that was retained by the United States Securities and Exchange Commission to conduct a forensic accounting investigation in Woodbridge matter.  The Sharp Confirmation Declaration, with the attached Kapila Declaration, was admitted into the record at the Confirmation Hearing.  *See* D.I. 2901 (Opinion on Confirmation), *In re Woodbridge Grp. of Cos*., LLC, 592 B.R. 761, 764 (Bankr. D. Del. 2018).

[13]  Adv. D.I. 75 (Request for Judicial Notice in Support of Plaintiff's Motion for Partial Summary Judgment) ("Request for Judicial Notice")).  Citations to "RJN" reference the Request for Judicial Notice.

[14]  Adv. D.I. 77 (Defendants' Response in Opposition to Plaintiff's Motion for Partial Summary Judgment (the "Defendants' Response") and James E. Campbell, Jr.'s Cross Motion for Summary Judgment (the "Cross Motion for Summary Judgment")).

[15]  Adv. D.I. 78 (Plaintiff's Reply in Support of Motion for Partial Summary Judgment (the "Trustee's Reply")).

[16]  Adv. D.I. 78 (Declaration of Jeffrey P. Nolan in Reply to and Support of Plaintiff's Motion for Partial Summary Judgment (the "Nolan Declaration") and Second Declaration of Nicholas R. Troszak in Reply and Support of Plaintiff's Motion for Partial Summary Judgment (the "Second Troszak Declaration")).

[17]  Adv. D.I. 80 (James E. Campbell, Jr.'s Reply in Support of Cross Motion for Summary Judgment) (the "Campbell Cross Motion Reply").

[18]  Adv. D.I. 81 (Amended Answer).

On January 23, 2025, the Trustee filed a Motion for Leave to file a sur-reply in further support of his Motion for Partial Summary Judgment and in response to Campbell's Reply.[19] The Trustee's Sur-Reply is attached to the Motion for Leave.[20]

On February 12, 2025, a Notice of Completion of Briefing was filed.[21]  On October 16, 2025, a status conference was held in the Adversary Proceeding.[22]  The Court heard oral argument on the motions on March 25, 2026.  This is the Court's decisions on the motions.

## FACTUAL BACKGROUND

### A.  The Chapter 11 Cases

On December 4, 2017 (the "Initial Petition Date"), the Woodbridge Group of Companies, LLC and certain of its affiliates commenced voluntary cases under chapter 11 of the Bankruptcy Code; additional affiliates (collectively, the "Debtors" or "Woodbridge") filed petitions the following year.[23]

On October 24, 2018, the Court held a contested hearing (the "Confirmation Hearing")[24] on the Debtors' First Amended Joint Chapter 11 Plan of Liquidation (the "Plan").[25]  On October 26, 2018, the Court issued its Opinion on Confirmation[26] and entered an order confirming the

---

[19]  Adv. D.I. 82 (Motion for Leave to File Sur-Reply in Further Support of the Motion for Partial Summary Judgment and in Response to Reply in Support of the Cross Motion for Summary Judgment (the "Motion for Leave")).

[20]  Adv. D.I. 82, Ex. A (Plaintiff's Sur-Reply in Response to Reply of James Campbell, Jr. (the "Trustee's Sur-Reply")).  By this Opinion, the Court grants leave to file the Trustee's Sur-Reply.

[21]  Adv. D.I. 84.

[22]  Adv. D.I. 87, 88, 92.

[23]  Additional affiliates filed petitions on February 9, 2018, March 9, 2018, March 23, 2018, and March 27, 2018.

[24]  *See* D.I. 2888 (Transcript of Oct. 24, 2018 Hearing).

[25]  *See* D.I. 2397.

[26]  *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761 (Bankr. D. Del. 2018).

Plan.[27]  The Opinion on Confirmation and Confirmation Order contain a finding that Woodbridge was operated as part of a Ponzi scheme.[28]  The effective date of the Plan occurred on February 15, 2019 (the "Effective Date").[29]

Pursuant to the Plan, on the Effective Date, the Liquidation Trust was established to pursue or liquidate Liquidation Trust Assets and make distributions for the benefit of the Liquidation Trust Beneficiaries.[30]  The Liquidation Trust, as successor in interest to the Debtors, has the right and power to file and pursue any and all "Liquidation Trust Actions" without any further order of the Bankruptcy Court.[31]

### B.  The Ponzi Scheme[32]

Under Robert Shapiro's ("Shapiro") control and during the period from August 2012 through December 1, 2017, the prepetition Debtors raised more than $1.29 billion from over 10,000 unsuspecting investors nationwide by selling those investors two primary products: five-year "Units" and twelve- to eighteen-month "Notes."[33]  The prepetition Debtors represented that

---

[27]  D.I. 2903 (Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors) (the "Confirmation Order").  The Plan is Exhibit A to the Confirmation Order.

[28]  D.I. 2903 (Confirmation Order) at ¶ NN; *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. at 769-71.

[29]  D.I. 3421 (Notice of Effective Date).

[30]  D.I. 2903 (Confirmation Order), Ex. A. Plan §§ 1.75 and 5.4.3.  "Liquidation Trust Actions" include, inter alia, "all Avoidance Actions and Causes of Action held by the Debtors or the Estates . . .."  D.I. 2903, Ex. A. § 1.76.  *See also In re Woodbridge Grp. of Cos.*, LLC, 592 B.R. at 766 n. 31 ("The Liquidation Trust Actions include, but are not limited to, causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under chapter 5 of the Bankruptcy Code and related statutes or common law, as well as any other claims, rights, or causes of action held by the Debtors' Estates.").  "Avoidance Actions" include "[a]ny and all causes of action . . . that may be brought by or on behalf of the Debtors or the Estates under Bankruptcy Code section[] . . . 548."  D.I. 2903 (Confirmation Order), Ex. A (Plan), at § 1.5.

[31]  D.I. 2903 (Confirmation Order), Ex. A (Plan) at § 5.4.15.

[32]  The overview of the Ponzi Scheme set forth in the Memorandum cites to the Sharp Confirmation Declaration. The factual background regarding the Ponzi Scheme is also included in "The Ponzi Scheme Summary" contained in the Opinion on Confirmation, *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. at 765-766.

[33]  *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. at 765.

the Units and Notes would be repaid based on the purported revenues the Debtors would receive from issuing short-term loans to unrelated third-party property owners.[34] "As marketed by the prepetition Debtors, the Debtors would make short-term loans, between $1 million and $100 million, to bona-fide third-party commercial property borrowers at high rates of interest, approximately 11%–15%, secured by a first-position mortgage on the property. These loans to third-parties would supposedly be provided at loan-to-value ratios of approximately 60%–70%. The result, according to the sales pitch, would be a robust and safe cash-flow stream that would provide revenues for the . . . Debtors to repay the Units and the Notes . . . ."[35]

"In reality, there was no robust and safe cash flow stream from third party borrowers, as a very small fraction of investor money flowed from the . . . Debtors to unrelated third parties."[36] Rather, Shapiro created disguised affiliates to which money was loaned, and which sometimes (but not always) purchased real estate assets with the funds. These "borrowers" did not have bank accounts or any ability to service the required interest payments on an ongoing basis. In addition, they had no ability to retire the debt when due, other than through the sale of real estate, which did not appear to have been contemplated and was not effectuated.

"[T]he annual cash flow from sales [of real property] (which sales were not frequent) was well below the amount of principal and interest paid by Shapiro to investors."[37] For example, as explained in the Sharp Confirmation Declaration, in 2015, $84.1 million in principal and interest payments were made to investors, while the net proceeds of real property sales were only $18.5 million. In 2016, $138.2 million in principal and interest payments were made to investors,

---

[34] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 22.

[35] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 22.

[36] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 23.

[37] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 24.

while the net proceeds of real property sales were only $28.4 million.  In 2017, $181.8 million in principal and interest payments were made to investors, while the net proceeds of real property sales were only $71.4 million.[38]  These figures demonstrate that property sales were insufficient to cover payments of principal and interest, and there was no other material source of revenue to make such payments other than from the sale of additional Notes and Units.[39]

The prepetition Debtors used funds received primarily from new investors to make payments of approximately $425 million of "interest" and "principal" to existing investors.  "Shapiro also used commingled investor money to pay approximately $80 million in commissions, primarily to sales agents who sold the fraudulent 'investments' and used investor money to pay at least $30 million for the benefit of Shapiro and his wife, as well as their related entities . . . ."[40]  While funds from the commingled account were used to purchase the Debtors' real properties, these purchases were directly contrary to material representations made to investors.

"Moreover, investments were solicited, and payments of 'interest' were made to existing investors, without regard to whether such investors' investments realized value (or even existed).  For example, on certain occasions, Shapiro issued Notes . . . [for] properties that the Debtors never actually acquired . . . ."[41]

"In late 2017, Shapiro's fraudulent scheme unraveled.  As federal and state investigations intensified and unfavorable press reports began to emerge, the prepetition Debtors found it increasingly difficult to raise new capital from investors.  As noted above, the prepetition

---

[38] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 24.

[39] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 24.

[40] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 25.

[41] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 26.

7

Debtors were reliant on funds from new investors to make the payments promised to existing Unitholders and Noteholders.  When new investment dried up, the inability to make the required Notes and Units servicing payments became inevitable; indeed, the prepetition Debtors were unable to make the December 1, 2017 interest and principal payments due on the Notes, which quickly precipitated the filing of the initial Debtors' bankruptcy cases."[42]

### C. Defendants Role and Payments From the Debtors

The Trustee alleges that "Defendant James E. Campbell, Jr., worked as an outside broker recruited by the Debtor to sell FPCM's (as defined below) and received commissions."[43]  "The brokers, including Defendant [Mr. Campbell], sold Notes and Units issued by Woodbridge to investors."[44]  The process included the brokers locating or marketing to Investors First Position Commercial Mortgages ("FPCM") as documented in "senior position packages," as they were sometimes referenced, which included primarily four documents: (a) Promissory Note in favor of the lender to memorialize the loan, (b) Form of Assignment, (c) Form of Collateral Assignment, and (d) Form of Intercreditor Agreement.[45]  "Once the Debtors exchanged the aforementioned forms and confirmed receipt of funds from Investors, the Debtors would issue a letter or email to the broker confirming the investment which would trigger payment of a commission to the broker."[46]

To promote the FPCMs, brokers were issued and circulated to prospective investors Woodbridge marketing items.[47]  In the marketing materials, "the Debtors claimed that

---

[42]  D.I. 2829 (Sharp Confirmation Decl.) at ¶ 27.

[43]  Adv. D.I. 74 (Troszak Decl.) at ¶ 8.

[44]  Adv. D.I. 74 (Troszak Decl.) at ¶ 9.

[45]  Adv. D.I. 74 (Troszak Decl.) at ¶ 9.

[46]  Adv. D.I. 74 (Troszak Decl.) at ¶ 9.

[47]  Adv. D.I. 74 (Troszak Decl.) at ¶ 10.

'Woodbridge funds 1-year bridge loan' to property owners.  The Debtors touted how they 'thoroughly evaluate[d]', appraised each property and performed a title search (even though in reality, the underlying properties were owned by the Debtors).  Each property was represented to 'hold a low loan-to-value (LTV) ratio[].'  The investments in FPCMs were represented to be 'secured' loans, with the Debtors offering investors 'assurance that their funds are secured by commercial real estate.'  The brochure described FPCMs as a 'safer alternative to help our clients reach their financial goals.'"[48]

The Trustee asserts Defendant sold Notes and Units between 2016 and the Initial Petition Date and Mr. Campbell was paid commissions of $146,166.47 (the "Two Year Transfers"), and $254,861.97 in the four years (the "Four Year Transfers"), prior to the Petition Date.[49]  Exhibit A to the Complaint sets forth details regarding commission payments (the "Commission Payment Ledger").[50]

### D.  The Debtors' and Defendants' Securities Law Violations

"Between 2015 and the Petition Date, numerous state governments flagged Woodbridge Notes and Units as not only unregistered securities, but fraudulent.  Many of the events, such as the decrees issued by the States of Texas and Massachusetts, were picked up by news publishing companies."[51]  According to the Troszak Declaration, "Defendant continued to sell the FPCM

---

[48] Adv. D.I. 74 (Troszak Decl.) at ¶ 10 and Ex. 3.

[49] Adv. D.I. 74 (Troszak Decl.) at ¶¶ 11-12, Ex. 4.

[50] Adv. D.I. 1 (Complaint), Ex. A.  The Commission Payment Ledger is also attached to the Troszak Declaration as Exhibit 4.  Adv. D.I. 74 (Troszak Decl.) at ¶¶ 11-12 and Ex. 4.

[51] Adv. D.I. 74 (Troszak Decl.) at ¶ 13.  *See also* RJN, Ex. C (May 4, 2025 consent order in the Commonwealth of Massachusetts); RJN, Ex. D (July 17, 2015 emergency cease-and-desist order issued by State of Texas Securities Board); RJN, Ex. E (October 4, 2016 temporary restraining order issued by the Securities Division of the State of Arizona); RJN, Ex. F (April 24, 2017 consent agreement and order between the Commonwealth of Pennsylvania and Woodbridge Structured Funding LLC); RJN, Ex. G (August 8, 2017 cease-and-desist notice issued by Michigan Department of Licensing and Regulatory Affairs).

after the various consent decrees issued by states and the coverage by various publication as evidenced by the Commission ledger, included in Exhibit 4 . . . ."[52]

### E.    Colorado Securities Commissioner Consent Cease and Desist Order

On October 12, 2017, the Staff of Colorado Division of Securities, issued a *Verified Petition* ("Colorado Petition") *for Order to Show Cause Directed to Woodbridge Group of Companies, LLC et al., Timothy C. McGuire, Ronald E. Caskey, and James E. Campbell, Jr.* ("Respondents"), Case No. 2017-CDS-052,[53] petitioning "the Securities Commission to enter an order directing Respondents to show cause why a final cease and desist order should not be issued against them" alleging Respondents "have offered or are offering for sale securities in the form of Respondent Woodbridge's First Position Commercial Mortgage (FCPM) Note Program in Colorado."[54]  According to the Colorado Petition, "James E. Campbell, Jr. … is the Registered Agent for Campbell Financial and was formerly licensed as an investment adviser representative with the State of Colorado until 2013.  At all times relevant to these allegations, Campbell acted as an independent Woodbridge sales agent through Campbell Financial, where he still serves as President and Control Person."[55]

On October 12, 2017, the Securities Commissioner for the State of Colorado issued an *Order to Show Cause* (the "OSC") *Directed to Woodbridge Group of Companies, LLC et al., Timothy C. McGuire, Ronald E. Caskey, and James E. Campbell, Jr.*, Case No. 2017-CDS-052, "to show cause why the Securities Commissioner should not enter a final order directing each of the named Respondents to cease offering and selling securities in the State of Colorado, or in the

---

[52]  Adv. D.I. 74 (Troszak Decl.) at ¶ 14.

[53]  Adv. D.I. 75 (RJN) at Ex. L.

[54]  Adv. D.I. 75 (RJN) at Ex. L.

[55]  Adv. D.I. 75 (RJN) at Ex. L (Colorado Petition) at ¶ 6.

alternative, to cease and desist offering and selling securities in the State of Colorado in violation of provisions of the Colorado Securities Act, and imposing such other terms, conditions and sanctions as provided in §11-51-606(1.5)(d)(IV), C.R.S. . . ."[56]

On April 5, 2018, the Colorado Securities Commissioner entered a *Consent Cease and Desist Order* (the "<u>CCDO</u>"), incorporating the terms of a S*tipulation for Consent Cease and Desist Order* (the "<u>Stipulation</u>"), executed by Mr. Campbell, in Case No. 2017-CDS-044, *In the Matter of Woodbridge Group of Companies, LLC et al., Timothy C. McGuire, Ronald E. Caskey and James E. Campbell, Jr., Respondents.* The CCDO ordered, among other things, "Campbell shall immediately and permanently cease marketing and selling interests in the FPCM Note Program in Colorado."[57]

### F.  The Complaint

The Complaint alleges that the "Defendants sold Notes and Units to unsuspecting Investors, created marketing materials and sales scripts to facilitate the sale of Notes and Units to unsuspecting Investors (often targeting unsophisticated, elderly investors with Individual Retirement Accounts)."[58] It further alleges that "[i]n so doing, Defendants made materially false and fraudulent statements to induce Investors to provide money. In connection with such conduct, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails."[59] The Complaint contains eight claims for relief.

---

[56]  Adv. D.I. 75 (RJN) at Ex. L (OSC) at p. 2.

[57]  Adv. D.I. 78 (Nolan Declaration), Ex. A (CCDO) at ¶ 3.

[58]  Adv. D.I. 1 (Complaint) at ¶ 14.

[59]  Adv. D.I. 1 (Complaint) at ¶ 14.

11

### G. The Trustee's Motion for Partial Summary Judgment

The Trustee seeks partial summary judgment in the Trust's favor and against the Defendants as to the following four claims set forth in the Complaint:[60]

> The Second and Fourth Claims for relief seek avoidance and recovery of actual intent fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code and California Civil Code section 3439.04(a)(1).
>
> The Third and Fifth Claims for relief seek avoidance and recovery of constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code and California Civil Code section 3439.04(a)(2).

The Trustee also seeks an award, on all claims for relief, of prejudgment interest on the transfers as permitted by law, costs of suit, and such other and further relief as is just and proper.[61]

### H. Mr. Campbell's Cross Motion for Summary Judgment

Mr. Campbell alleges that none of the transfers asserted in Claims Two through Five in the Complaint, were received by him and, therefore, he maintains he has no liability relating to the transfers. He seeks summary judgment in his favor and against the Trust as to Claims Two through Five of the Complaint.

### JURISDICTION

The Court has subject matter jurisdiction over this Adversary Proceeding under 28 U.S.C. §§ 157(a) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. Counts Two through Five

---

[60] Adv. D.I. 1 (Complaint) at ¶ 3.

[61] Adv. D.I. 1 (Complaint), Prayer for Relief ¶ 7. In the Memorandum, the Trustee suggests that the Court defer consideration of the prejudgment interest calculation until entry of a final judgment. *See* Adv. D.I. 72 (Memorandum), n. 6.

of the Complaint are core within the meaning of proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## LEGAL STANDARD

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[62]  An issue is genuine if there is a "sufficient evidentiary basis" on which a reasonable factfinder could find for the non-movant, and a factual dispute is material "only if it might affect the outcome of the suit under governing law."[63]

The movant bears the initial burden of proving that it is entitled to relief and to demonstrate the absence of any genuine issue of material fact.[64]  Once the movant has met its burden, the non-movant "must counter with evidence that demonstrates a genuine issue of fact."[65]  The non-movant must adduce more than a mere scintilla of evidence in its favor.[66]  It cannot simply reassert factually unsupported allegations contained in its pleadings.[67]  A material fact is one which "could alter the outcome" of the case.[68]  It is genuine when it is "triable," that is, when reasonable minds could disagree on the result.[69]

When considering a motion for summary judgment, the court must make its determination based upon the materials in the record, which may include depositions,

---

[62] Fed. R. Civ. P. 56, as made applicable to this contested matter by Fed. R. Bankr. P. 9014(c) and Fed. R. Bankr. P. 7056.  *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

[63] *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).

[64] *Celotex Corp. v. Catrett,* 477 U.S. at 323.

[65] *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[66] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

[67] *Big Apple BMW, Inc.*, 974 F.2d at 1363.

[68] *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995).

[69] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

documents, affidavits or declarations, and products of discovery.[70]  The court must view the evidence in the light most favorable to the non-movant and "draw all reasonable inferences in favor of the non-moving party."[71]  At the summary judgment stage, the Court does not "weigh the evidence and determine the truth of the matter;" rather, it determines "whether there is a genuine issue for trial."[72]

If a court finds that there is no genuine dispute of material fact, it may enter judgment as a matter of law, either for or against the movant, in full or in part, applying the applicable substantive law.[73]  "When the evidence yields conflicting inferences, summary judgment is improper, and the action must proceed to trial."[74]

"A cross-motion for summary judgment does not change the standards or analysis by which to grant or deny summary judgment to the moving party, and each moving party still bears the initial burden of demonstrating the absence of a genuine issue of material fact."[75]  "[T]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."[76]

---

[70]  Fed. R. Civ. P. 56(c).

[71]  *Fields v. Thompson Printing Co.*, 363 F.3d 259, 265 (3d Cir. 2004) (citation omitted); *Big Apple BMW, Inc.*, 974 F.2d at 1363 (holding that "[i]nferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.") (citations omitted).

[72]  *Anderson*, 477 U.S. at 249.

[73]  Fed. R. Civ. P. 56(a), (f).

[74]  *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (*citing Munger v. City of Glasgow Police Dep't,* 227 F.3d 1082, 1087 (9th Cir. 2000)).

[75]  *FBI Wind Down, Inc. Liquidating Tr. v. Careers USA, Inc. (In re FBI Wind Down, Inc.)*, 614 B.R. 460, 474 (Bankr. D. Del. 2020).

[76]  *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citations omitted).

## <u>CHOICE OF LAW</u>

The Fourth and Fifth Claims seek avoidance and recovery of actual and constructive transfers under the California Civil Code and/or comparable provisions of law in other jurisdictions that have adopted the Uniform Voidable Transaction Act, the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act.  The Trustee asserts that California law applies.  In a footnote, the Defendants dispute that California law applies arguing that Colorado or Delaware state law apply, without reference to any statute.  In their briefs, neither party provides support for their respective position regarding choice of law,[77] nor identifies how the application of a different state law affects the analysis of the issues presented.

At argument, the Trustee argued that Woodbridge's principal place of business was in California, the Notes were issued in California, and the checks were issued in California and dawn from a California institution.  The Defendants argued that Mr. Campbell resides, and was licensed in, Colorado and that the Corporate Defendant is a Colorado corporation.  Neither party specifically argued application of Delaware law, nor distinguished application of the different state laws.

In both California (2016) and Colorado (2025), the Uniform Voidable Transactions Act (UVTA) superseded the Uniform Fraudulent Transfer Act (UFTA).  Whereas, Delaware has adopted the UFTA.  The UVTA replaces the "fraudulent" language with "voidable."  The actual fraudulent intent statutes for California, Colorado, and Delaware,[78] as well as the constructive

---

[77] Woodbridge Group of Companies, LLC is a Delaware limited liability company with its principal place of business as 14225 Ventura Boulevard, Sherman Oaks, California 191423.  *See* D.I. 1 (Petition).  The Individual Defendant is a resident of Colorado, and the Corporate Defendant is a Colorado corporation.  *See* Adv. D.I. 1 (Complaint) at ¶¶ 13-14; Adv. D.I. 77 at Ex. 1 at ¶ 3.

[78] *See* Cal. Civ. Code § 3439.04(a)(1); 6 Del. C. § 1304(a)(1); and C.R.S.A. § 38-8-105(1)(a).

fraudulent transfer statutes for those states,[79] are substantially similar.  Because the Court finds that there are no material differences between California, Colorado, and Delaware law for purposes of the actual and constructive fraudulent transfer analyses, under the facts of this case, an in-depth choice of law analysis is unnecessary, and the Court will apply the California statute.

## THE AMENDED ANSWER

Defendants filed an Amended Answer, including affirmative defenses, after the conclusion of briefing on both motions.  Federal Rule 15(a)(2), made applicable by Bankruptcy Rule 7015, permits "a party to amend its pleading only with the opposing party's written consent or the Court's leave."[80]  Attached to Campbell's Reply is an email exchange between counsel for the parties in which the Trustee's counsel consents to the Amended Answer.[81]  Although the Trustee's Sur-Reply argues the Campbell Cross Motion Reply did not set forth "good cause" to amend the pleading retroactively, the Trustee did not move to strike the Amended Answer nor dispute that the Trustee consented to the amendment.

In view of the written consent of the opposing party, and the lack of formal opposition, the Amended Answer stands.  At oral argument, the Court inquired about the effect of the Amended Answer on the proceeding, and both parties indicated that neither additional discovery nor briefing was necessary.

An Amended Answer supersedes the original Answer, and facts that are not repeated or incorporated into the Amended Answer will no longer bind the pleader as judicial admissions.[82]

---

[79] *See* Cal. Civ. Code § 3439.04 (a)(2); 6 Del. C. § 1304(a)(2); and C.R.S.A. § 38-8-105(1)(b).

[80] Fed. R. Civ. P. 15(a)(2).

[81] *See* D.I. 80 (Campbell Cross Motion Reply), Ex. A (Email exchanges between counsel dated Sept. 4, 2024 through Oct. 7, 2024).

[82] *W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 171–72 (3d Cir. 2013).

16

A superseded pleading (such as the original Answer), however, may be offered as evidence[83] and may be used to rebut a subsequent contrary assertion.[84]

## DISCUSSION

The Trustee seeks to avoid the transfers under theories of both actual fraud and constructive fraud under the Bankruptcy Code and California State law.[85]  First, the Trustee argues that the transfers are avoidable as actual intent fraudulent transfer (Second and Fourth Claims) because the existence of a Ponzi scheme is sufficient to establish actual intent to hinder, delay, or defraud creditors under the Bankruptcy Code and state law.  The Trustee also maintains that the "badges of fraud" independently establish the actual intent to defraud.  Second, the Trustee argues that the transfers are avoidable as constructive fraudulent transfers (Third and Fifth Claims) because the Debtors were insolvent and the Debtors received no value for the transfers.

The Defendants argue the Motion must fail due to disputed material facts as to who received any alleged transfers and the amount received by each of the Defendants and the lumping of Defendants despite there being two separate and distinct Defendants who maintained corporate formalities.

In his Cross Motion for Summary Judgment, Mr. Campbell argues that none of the transfers were received by him and, therefore, maintains he has no liability relating to the transfers.

---

[83]  *Giannone v. U. S. Steel Corp.*, 238 F.2d 544, 547 (3d Cir. 1956) ("pleadings which do not amount to judicial admissions— *see* Wigmore, supra § 2589— may be used as evidence of factual allegations. By the weight of authority even withdrawn or superseded pleadings are admissible.")

[84]  *W. Run Student Hous. Assocs., LLC*, 712 F.3d at 171–73.

[85]  *See generally* Adv. D.I. 1 (Complaint).

**A.  Second and Fourth Claims: Actual Intent Fraudulent Transfers**

The Second and Fourth Claims seek the avoidance and recovery of actual intent fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code and California Civil Code section 3439.04(a)(1), respectively.

Section 548(a)(1) of the Bankruptcy Code provides, in relevant part, that a trustee may avoid a transfer of an interest of the debtor in property that was made within two years before the petition date with "actual intent to hinder, delay, or defraud" creditors.[86]

Section 544(b) of the Bankruptcy Code permits a trustee to avoid any transfer of a debtor's property that would be avoidable by an unsecured creditor under applicable state law.[87] Under the California Uniform Voidable Transactions Act (the "CUVTA"),[88] section 3439.04(a)(1) of the California Civil Code, the "actual intent" inquiry is the same as under section 548(a)(1)(A) of the Bankruptcy Code.[89] The CUVTA, however, provides for a four-year lookback period.[90]

---

[86]  11 U.S.C. § 548(a)(1)(A).

[87]  11 U.S.C. § 544(b).

[88]  Cal. Civ. Code §§ 3439–3439.14.0.

[89]  Cal. Civ. Code § 3439.04(a)(1) provides:

> (a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> > (1)  With actual intent to hinder, delay, or defraud any creditor of the debtor.

In California, the CUVTA supersedes the Uniform Fraudulent Transfer Act (UFTA).  The CUVTA applies to transfers made or obligations incurred after January 1, 2016.  However, the case law under the UFTA has been consistently applied to the CUVTA. *See Aghaian v. Minassian*, 59 Cal. App. 5th 447, 455 n.8 (2020) ("The enactment did not alter the essential elements of a cause of action for a fraudulent or voidable transfer.").

[90]  Cal. Civ. Code § 3439.09(a) provides:

> A cause of action with respect to a transfer or obligation under this chapter is extinguished unless action is brought pursuant to subdivision (a) of Section 3439.07 or levy made as provided in subdivision (b) or (c) of Section 3439.07:
>
> > (a) Under paragraph (1) of subdivision (a) of Section 3439.04, not later than four years after the transfer was made or the obligation was incurred or, if later, not later

18

### 1. The Payments to Defendants Were Transfers of Debtors' Property

A "transfer" under the Bankruptcy Code is defined as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property."[91]  Similarly, under the California Civil Code a "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money . . . ."[92]

According to the Debtors' books and records, "Defendant, James E. Campbell, Jr., was paid out of the Debtors' main operating account $146,166.47 in the two years and $254,861.97 in the four years, prior to the Petition Date."[93]  Exhibit A to the Complaint, the Commission Payment Ledger, identifies the transfers from the Debtors to Defendants in the two and four years prior to the Petition Date.[94]  The Second Troszak Declaration, however, states (i) 23 checks totaling $36,730.00 were payable to the Individual Defendant; (ii) 1 check totaling $112.00 was payable to Defendant James Campbell, Jr. Inc., and (iii) 127 checks totaling $197,294.00 were payable to Campbell Finance Corp.[95]  Copies of the 151 checks evidencing these transfers are attached to the Second Troszak Declaration.[96]  Based on the evidence presented, the Trustee has

---

than one year after the transfer or obligation was or could reasonably have been discovered by the claimant.

[91]  11 U.S.C. § 101(54)(D).

[92]  Cal. Civ. Code § 3439.01(m).

[93]  Adv. D.I. 78 (Second Troszak Decl.) at ¶¶ 4-7.

[94]  Adv. D.I. 1 (Complaint), Ex. 1; Adv. D.I. 74 (Troszak Decl.) at ¶ 12, Ex. 4.

[95]  Adv. D.I. 78 (Second Troszak Decl.) at ¶¶ 4-7 and Ex. 6.

[96]  Adv. D.I. 78 (Second Troszak Decl.) at Ex. 6.

established the transfer of 151 payments to Defendants in the two and four years prior to the

Petition Date (the "Transfers").[97]

## 2. The Transfers Were Made With Actual Intent to Hinder, Delay, or Defraud Creditors

The Trustee relies on the Ponzi scheme presumption to establish that the Transfers were

made with actual intent to defraud. The Ponzi scheme presumption posits that "all payments

made by a debtor in furtherance of a Ponzi scheme are made with actual fraudulent intent."[98] "If

the underlying fraud constitutes a Ponzi scheme, and if the transfer at issue serves to further that

scheme, 'actual intent' under the Bankruptcy Code [or Uniform Fraudulent Transfer Act] is

presumed."[99] As the Ninth Circuit explained in *Kirkland v. Rund*:

---

[97] The Trustee has not established that the Defendants should be legally regarded as a single entity; as a result, the Transfers to each respective Defendant will be respected as such.

[98] *Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*, 477 B.R. 504, 510 (Bankr. D. Del. 2012) (cleaned up; quoting *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002)). *See also Carickhoff v. Cantor (In re Live Well Financial, Inc.)*, Adv. Pro. No. 21-50990 (LSS), 2023 WL 3995900, *16 (Bankr. D. Del. June 13, 2023); *Barclay v. Mackenzie (In re AFI Holding, Inc.),* 525 F.3d 700, 704 (9th Cir. 2008) ("We allow 'a finding of fraudulent intent under section 548(a)(1) [the analog to § 3439.04(a)] on the basis of circumstantial evidence.' Furthermore, 'the mere existence of a Ponzi scheme' is sufficient to establish actual intent under § 548(a)(1) or a state's equivalent to that section.") (internal citation omitted); *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC),* 458 B.R. 87, 104 (Bankr. S.D.N.Y. 2011) (citations omitted) ("There is a presumption of actual intent to defraud because 'transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.'"); *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011); *Hafen v. Howell*, 121 F.4th 1191, 1200 (10th Cir. 2024); *Tabor v. Davis (In re Davis)*, Nos. 05-15794-L, 2016 WL 11696269, *9 (Bankr. W.D. Tenn. June 14, 2016); *Bash v. Textron Fin. Corp.*, 483 B.R. 630, 656 (N.D. Ohio 2012); *Picard v. Citicorp N. Am., Inc. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 181 (2d Cir. 2021) ("Voidability under § 548(a)(1)(A) focuses on the fraudulent intent of the debtor-transferor. Under the so-called "Ponzi scheme presumption, the existence of a Ponzi scheme demonstrates actual intent as a matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.") (cleaned-up, internal quotation marks and citations omitted).

[99] *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 09-1182 (BRL), 2011 WL 3897970, *4 (S.D.N.Y. Aug. 31, 2011) (citing *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007)); *see also In re Live Well Financial, Inc.*, Adv. Pro. No. 21-50990 (LSS), 2023 WL 3995900 at *16 (Finding that "[t]he applicability of the Ponzi scheme presumption turns on a plaintiff's ability to demonstrate both that a Ponzi scheme existed and the specific transfers at issue were in furtherance of the Ponzi scheme."). *But see Finn v. All. Bank*, 860 N.W.2d 638, 646 (Minn. 2015) (citations omitted) ("[T]he Ponzi-scheme presumption, by operation of its three components, allows a creditor to bypass the proof requirements of a fraudulent-transfer claim by showing that the debtor operated a Ponzi scheme and transferred assets 'in furtherance of the scheme.'); *see also Janvey v. GMAG, L.L.C.,* 592 S.W.3d 125, 129 (Tex. 2019) (applying Tex. fraudulent transfer law) (failing to acknowledge the existence of a Ponzi presumption for actual fraudulent transfer claim related to a Ponzi debtor and instead establishing that the nonexclusive badges of fraud may be used to show fraudulent intent).

20

> Although the Bankruptcy Code contains no provision specifically directed at Ponzi schemes, this Court has long recognized a presumption under which a debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme. This is called the Ponzi scheme presumption.[100]

Even when a Ponzi scheme is present, the presumption does not relieve the Trustee of the burden to show that the transfers at issue were made "in furtherance of" the Ponzi scheme.[101] This is because even where the plaintiff has alleged the existence of a broad, fraudulent scheme, "the court must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of an actual[] fraudulent transfer."[102] In sum, the Trustee must prove the Debtors were engaged in a Ponzi scheme and that the Transfers were related to or in furtherance of the scheme.[103]

Here, the existence of a Ponzi scheme has been established[104] and is the law of the case.[105] Specifically, the Opinion on Confirmation accepts "the conclusions of Mr. Kapila and Mr. Sharp that the Debtors were operated as a Ponzi scheme"[106] and finds "the Debtors were

---

[100] *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1158 (9th Cir. 2024) (internal quotation and citation omitted).

[101] *In re DBSI, Inc.*, 477 B.R. at 511 (citations omitted); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 11 (noting that the court must determine "whether the transfers at issue were related to a Ponzi scheme" before it can apply the Ponzi presumption); *Kapila v. Integra Bank, N.A. (In re Pearlman)*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010) ("To rely on the Ponzi scheme presumption, the trustee must allege the debtors' loan repayments were somehow in furtherance of [the] . . . Ponzi schemes.").

[102] *In re DBSI, Inc.*, 477 B.R. at 511 (cleaned up; quoting *Bayou Superfund, LLC v. WAM Long/Short Fund II, LP (In re Bayou Grp., LLC)*, 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007)).

[103] *Id.*

[104] *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. at 769-71.

[105] The law of the case doctrine "prevents reconsideration of legal issues already decided in earlier stages of a case." *Bedrosian v. IRS*, 42 F.4th 174, 181 (3d Cir. 2022).

[106] *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. at 771.

21

operated as part of a massive Ponzi scheme."[107]  The Confirmation Order contains the following

findings regarding the existence of the Ponzi scheme:

> The evidence demonstrates, and the Bankruptcy Court hereby finds, that (i) beginning no later than July 2012 through December l, 2017, Robert H. Shapiro used his web of more than 275 limited liability companies, including the Debtors, to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide; (ii) the Ponzi scheme involved the payment of purported returns to existing investors from funds contributed by new investors; and (iii) the Ponzi scheme was discovered no later than December 2017.[108]

The Confirmation Order is a final, non-appealable order.  The Court's findings and conclusions

are binding in this Adversary Proceeding.  There is no genuine dispute that the Debtors operated

a Ponzi scheme beginning no later than July 2012 through December l, 2017.

A Ponzi scheme having been established, the Trustee must therefore show that the

Transfers were made "in furtherance of" that scheme.  The Trustee argues that when brokers are

paid commissions for their efforts promoting a Ponzi scheme, the commissions are fraudulent

transfers under sections 548 and 544 of the Bankruptcy Code.

Courts in various jurisdictions have concluded that commission payments to salespeople,

brokers, and agents for bringing in new investors are transfers made "in furtherance of" a Ponzi

scheme.[109]  In *Bernard L. Madoff Inv. Sec. LLC*, the trustee sought to avoid and recover

commissions and fees paid to an entity that recruited and referred victims to a Ponzi scheme.  In

that case, the bankruptcy judge observed, "it is conceivable that 'certain transfers may be so

---

[107]  *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. at 779.

[108]  D.I. 2903 (Confirmation Order) at ¶ NN.

[109]  *See e.g. In re DBSI, Inc.*, 477 B.R. at 512; *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp. LLC)*, 439 B.R. 284, 307-08 (S.D.N.Y. 2010); *In re World Vision Entm't, Inc.*, 275 B.R. at 657 ("The debtor recruited insurance agents to sell its promissory notes and paid the brokers commissions . . . Without question, the debtor paid these commissions with the actual intent to defraud both current and future investors.").

unrelated to a Ponzi scheme that the presumption should not apply,'" but found that commissions were "clearly tainted as payments from a Ponzi schemer to an individual to reward them for locating new investors."[110]  Similarly, in *World Vision Entertainment, Inc.*, the bankruptcy court observed:  "A Ponzi scheme is by definition fraudulent.  By extension, any acts taken in furtherance of the Ponzi scheme, such as paying brokers' commissions, are also fraudulent.  Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay, or defraud creditors, primarily the new investors."[111]  Likewise, in *In re Randy*, the trustee sought to recover commissions paid by the debtor to brokers "for their efforts in coopting new investors" into a Ponzi scheme.[112]  There, the bankruptcy court explained:

> The underlying reasoning that courts have used to find that profits paid in a Ponzi scheme to innocent investors are fraudulent transfers applies equally well to commissions paid to brokers who promoted or aided the investment scheme, whether or not they had any culpable intent.  Therefore, as a matter of law, when brokers are paid commissions for their efforts in promoting a Ponzi scheme, these commissions are fraudulent transfers under §§ 548 and 544 of the Code.[113]

Also, In *DBSI, Inc.*, the trustee alleged that the Ponzi scheme was propped up by the sale of tenant-in-common ("TIC") interests which were sold through a real estate channel and

---

[110] *Picard v. Cohmad Securities Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) (citation and internal quotation marks omitted).

[111] *In re World Vision Ent., Inc.*, 275 B.R. at 656. *But see Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664 (Bankr. S.D.N.Y. 2000), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001) (Holding that commissions that Chapter 7 debtor, in its capacity as operator of alleged Ponzi scheme, paid to brokers for originating mortgages and soliciting additional investors in good faith, without knowledge that debtor was operating Ponzi scheme, were not subject to avoidance as *constructively fraudulent transfers* on theory that brokers' services, which merely prolonged Ponzi scheme and permitted debtor to incur debts to additional investors, had not conferred financial benefit on debtor but had only deepened debtor's insolvency, where trustee did not contend that commission payments were in any way disproportionate to commissions paid for like services in marketplace; in deciding whether debtor had received "reasonably equivalent value," bankruptcy court could not consider significance of payments in Ponzi scheme as whole, but could only compare amount of commissions with value of brokerage services performed.).

[112] *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 438 (Bankr. N.D. Ill. 1995).

[113] *Id.*

23

licensed real estate brokers and/or agents sold the interests to investors, who received a commission or referral fee for their sales efforts.[114] The Delaware Bankruptcy Court reasoned: "Such commissions and referral fees in this context would be made in furtherance of the DBSI Ponzi scheme, as the scheme was dependent upon the brokers/agents' sales of TIC interests to generate cash flow."[115] The Court found the Ponzi scheme presumption applicable to show fraudulent intent, and found the trustee had adequately stated a claim for the avoidance of actual fraudulent transfers under section 548(a)(1)(A).

The record establishes that the Individual Defendant (a) "worked as an outside broker recruited by the Debtor to sell FPCM's and received commissions,"[116] (b) "sold Notes and Units issued by Woodbridge to investors,"[117] (c) found new investors to refer to the Debtors,[118] and (d) was paid out of the Debtors' main operating account in the two and four years prior to the Petition Date.[119] As noted above, the Second Troszak Declaration establishes that: (a) 23 checks, in the amount of $36,730.00 payable to Mr. Campbell; (b) 1 check, in the amount of $112.00 payable to Defendant James Campbell Jr., Inc.; and (c) 125 checks, in the total amount of $197,294.00 payable to Defendant Campbell Financial Corp.[120] The Opinion on Confirmation

---

[114] *Zazzali v. 1031 Exchange Grp. LLC (In re DBSI, Inc.),* 476 B.R. 413, 422-23 (Bankr. D. Del. 2012).

[115] *Id.* at 423 (citations omitted) ("Consequently, the Ponzi presumption is applicable here to show fraudulent intent, and Trustee has adequately stated a claim for the avoidance of actual fraudulent transfers under § 548(a)(1)(A)."). *See also World Vision Ent'mt,* 275 B.R. at 657 (holding that commission payments to brokers who sold promissory notes were fraudulent transfers where the note sales were the primary source of funds supporting the debtor's Ponzi scheme).

[116] Adv. D.I. 74 (Troszak Decl.) at ¶ 8. ("Based upon my review of the Debtors' books and records, Defendant James E. Campbell, Jr., worked as an outside broker recruited by the Debtor to sell FPCM's (as defined below) and received commissions.") (cleaned-up).

[117] Adv. D.I. 74 (Troszak Decl.) at ¶ 9.

[118] Adv. D.I. 74 (Troszak Decl.) at ¶¶ 9-10.

[119] Adv. D.I. 74 (Troszak Decl.) at ¶ 12.

[120] Adv. D.I. 78 (Second Troszak Decl.) at ¶¶ 4-7 and Ex. 6. The Individual Defendant disputes the number of checks payable to him individually. Checks 21 and 22 were not payable to the Individual Defendant and check 77 is payable to the individual defendant.

found that "Debtors used funds received primarily from new investors to make payments of . . . 'interest' and 'principal' to existing investors.  Shapiro also used commingled investor money to pay approximately $80 million in commissions, primarily to sales agents who sold the fraudulent 'investments' . . . ."[121]  On this record, the Court finds that commission payments to the Defendants were in furtherance of the Ponzi scheme as the scheme was dependent on the sale of FPCMs to generate cash flow to pay principal and interest to existing investors.  Further, there is no genuine dispute that the Transfers at issue occurred two and four years prior to the Petition Date, and therefore, the transfers occurred after June 2012 and are within the period of time in which the Ponzi scheme was operated.

Consequently, the Court concludes that the Ponzi scheme presumption is applicable to show fraudulent intent, and that the Trustee has established that the Transfers were made with the intent to hinder, delay, or defraud creditors under section 548(a)(1)(A) of the Bankruptcy Code and California Civil Code section 3439.04(a)(1).

### 3.    The Defenses Asserted Do Not Give Rise to Genuine Issues of Material Fact

The Court next considers whether the Defendants' Response, Cross Motion for Summary Judgment, or Amended Answer sets forth any specific facts or evidence showing that there is a genuine issue for trial.[122]  The Defendants "must do more than simply show that there is some metaphysical doubt as to the material facts."[123]

---

[121]  *In re Woodbridge Group of Companies, LLC*, 592 B.R. at 766 (footnotes omitted).

[122]  The Cross Motion for Summary Judgment is a single paragraph denial of the Individual Defendant's liability relating to the Transfers that seeks summary judgment in Mr. Campbell's favor and against the Trust as to Claims Two through Five of the Complaint.  *See* Adv. D.I. 77 (Cross Motion for Summary Judgment).  The Campbell Cross Motion Reply is essentially a reply to the Motion for Partial Summary Judgment.  The Court will address the Cross Motion for Summary Judgment in the context of the Motion for Partial Summary Judgment, as well as on its individual and separate basis, in accordance with the summary judgment standard.

[123]  *Matsushita Elec. Indus. Co.,* 475 U.S. at 586.

### a. Defendants Have Not Countered with Persuasive Evidence Demonstrating a Genuine Issue of Material Fact

In the Amended Answer, Defendants admit that Mr. Campbell is an individual residing in Colorado and James E. Campbell, Jr. Inc. (D/B/A Campbell Financial Corp.) is a Colorado corporation,[124] however, Defendants deny acting as a financial advisor and/or broker that sold securities or Notes and received a commission. The evidence establishes otherwise. The Amended Answer is contrary to the Troszak Declaration, the canceled checks, the CCDO and accompanying Stipulation, the Campbell Declaration, and the original Answer.[125] Defendants have not countered with persuasive evidence demonstrating a genuine issue of material fact. To the contrary, as discussed below, the evidence establishes that Defendants acted as a broker, sold Notes, and received commissions.

First, in the original Answer,[126] which is written in the first person by Mr. Campbell, and executed by Mr. Campbell individually and as President of the Corporate Defendant, Defendants admitted acting "as a broker,"[127] selling Woodbridge "commercial mortgage notes",[128] taking advantage of "a loophole in the securities laws that left their intended product free from regulation" and "personally warn[ed] every client before doing business with [him] that it was possible the Division of Securities in Colorado could eventually decide the product must be regulated…".[129] Although the original Answer denied knowledge of the Ponzi scheme, Defendants confirmed selling the investments as part of a "valid business model that was upset

---

[124] Adv. D.I. 81 (Amended Answer) at ¶13; Adv. D.I. 77, Ex. 1 (Campbell Decl.) at ¶¶ 1-3.

[125] Adv. D.I. 81 (Amended Answer) at ¶¶ 13-14.

[126] Adv. D.I. 4 (Answer).

[127] Adv. D.I. 4 (Answer) at ¶ 13; p. 12 Prayer for Relief ("I acted reasonably in my capacity as a broker").

[128] Adv. D.I. 4 (Answer) at ¶ 16.

[129] Adv. D.I. 4 (Answer) at ¶ 1.

by unreasonable government interference."[130]  The original Answer admitted: "I usually received a smaller percentage commission than normally taken by other Woodbridge brokers.  Whereas, most brokers offered their larger clients 6%, I typically offered 7%."[131]  Defendant(s) admitted that he acted as a broker, sold Notes, and received commissions.  Although, the Amended Answer supersedes the original Answer, the original Answer is offered as evidence[132] and may be used to rebut a subsequent contrary assertion.[133]  Here, the original Answer rebuts the subsequent denial in the Amended Answer that Defendants acted as a broker, sold Notes, and received commissions.

Second, the Court takes judicial notice[134] of the Colorado Petition which corroborates that "James E. Campbell, Jr. … is the Registered Agent for Campbell Financial and was formerly licensed as an investment adviser representative with the State of Colorado until 2013. . ..

---

[130]  Adv D.I. 4 (Answer) at ¶ 15.

[131]  Adv. D.I. 4 (Answer) at ¶ 18.

[132]  *Giannone*, 238 F.2d at 547 ("pleadings which do not amount to judicial admissions— *see* Wigmore, supra § 2589— may be used as evidence of factual allegations. By the weight of authority even withdrawn or superseded pleadings are admissible.").

[133]  *W. Run Student Hous. Assocs., LLC*, 712 F.3d at 171–73.

[134]  Plaintiff's Request for Judicial Notice, pursuant to Fed. R. Evid. 201, asks the Court to take judicial notice of, among other things, the OSC.  *See* Adv. D.I. 75 (RJN) at Ex. L.  In addition, the Nolan Declaration, which attaches the CCDO and related Stipulation, requests the Court take judicial notice of the records accessed from the State of Colorado website.  *See* Adv. D.I. 78 (Nolan Decl.) at Ex. A.  Fed. R. Evid. 201(b) permits a court to take judicial notice of a fact that "is not subject to reasonable dispute because it: . . . (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(2).  Further, under Fed. R. Evid. 201(c)(2), a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).  Plaintiff has provided the Court with the necessary information required to take judicial notice.  Defendants have not disputed the authenticity or accuracy of the documents or opposed the request.  A court may take judicial notice of matters of public record.  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (holding district court could take judicial notice of matters of public record, such as filings with Securities and Exchange Commission); *NACH, Inc. Securities Litigation*, 306 F.3d 1314, 1331 (3d Cir. 2002) ("the underlying documents should be considered for their contents rather than for the truth of the contained statements").  The Court takes judicial notice of the aforementioned documents filed before the Colorado Securities Commission, not for the truth of the facts recited therein, but for the existence of the proceedings and the entry of the CCDO.

Campbell acted as an independent Woodbridge sales agent through Campbell Financial, where he still serves as President and Control Person."[135]

Third, the Stipulation, executed by Mr. Campbell personally, states James E. Campbell, Jr. "sold … interests in the Woodbridge First Commercial Mortgage Note Program …, for which Campbell was paid a commission."[136]  Although Mr. Campbell neither admitted nor denied the allegations, the statement rebuts the Amended Answer.  Further, the CCDO, which Mr. Campbell did not contest,[137] ordered: "Campbell shall immediately and permanently cease marketing and selling interests in FPCM Note Program in Colorado."[138]

Fourth, the Campbell Declaration acknowledges receipt of funds from the Debtors. Although the Declaration states "any and all funds would have been attributable to the Corporate Defendant and not him [Mr. Campbell] personally,"[139] at bottom, the Declaration does not deny Defendants receipt of funds from the Debtors as reflected on Exhibit A to the Complaint.  A party is bound by what it states in its pleadings.[140]

Finally, Exhibit 6 to the Second Troszak Declaration contains copies of the front and back of 151 checks issued by the Debtors and made payable to, and endorsed by, the Defendants.[141]

---

[135]  Adv. D.I. 75 (RJN) at Ex. L; ¶¶ 6, 15, 24, 25-27.

[136]  Adv. D.I. 78 (Nolan Declaration) at Ex. A (CCDO) at ¶ 3.

[137]  Adv. D.I. 78 (Nolan Declaration) at Ex. A (CCDO) ("Campbell does not contest that the entry of this Consent Cease and Desist Order is necessary and appropriate in the public interest and is consistent with the purposes and provisions of the Act. . .. By consenting to the entry of the Consent Order, Campbell agrees not to take any action or to make, or permit to be made, any public statement denying, directly or indirectly, and Finding or Conclusions in the Consent Order or that the Order lacks factual basis."  *Id.* at ¶¶ 6-7.).

[138]  Adv. D.I. 78 (CCDO) ¶ 3.

[139]  Adv. D.I. 77, Ex. 1 (Campbell Decl.) at ¶ 5.

[140]  *Parilla v. IAP Worldwide Servs. VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2024) (citing *Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.,* 125 F.3d 481, 483 (7th Cir.1997) (noting the "well-settled rule that a party is bound by what it states in its pleadings")).

[141]  Adv. D.I. 78 (Second Troszak Decl.), Ex. 6.

Exhibit 6 also contains the Debtors' monthly bank statements that establish that each check sent from the Debtors to the Defendants was negotiated and subsequently deposited.[142]

Defendants' denials in the Amended Answer are insufficient to meet their burden on summary judgment.[143]  Defendants "'may not rest upon the mere allegations or denials of [their] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'"  Defendants' denials do not rebut the Trustee's documentary evidence (or contrary evidence submitted by the Defendants).  Based on the evidence presented, there is no genuine question of material fact as to whether Defendants acted as a broker, sold notes, and received the commission checks.

In addition, Defendants denial of "knowing participation in any way with an illegal Ponzi scheme" does not rebut summary judgment.  Courts have established that fraudulent conveyances under section 548(a)(1)(A) are determined by reference to *the intent of the debtor-transferor* in making the transfer; "the state of mind of the transferee is irrelevant."[144]  Therefore, the Defendants' state of mind is not a defense to the Trustee's avoidance action.

---

[142]  Adv. D.I. 78 (Second Troszak Decl.), Ex. 6. According to the Second Troszak Declaration, the monthly bank statements of Comerica Bank have been a regular business record maintained in the business records of the Debtors which were accessed in preparing analysis, general financial statements, and forensic accounting. Comerica Bank produced bank records pursuant to subpoenas issued by the Debtors.  Adv. D.I. 78 (Second Troszak Decl.) at ¶ 3.

[143]  *See Paladino v. Newsome,* 885 F.3d 203, 208 (3d. Cir. 2018) (citations and internal quote marks omitted) (Finding "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment" because it failed to "set forth specific facts that reveal a genuine issue of material fact.").

[144]  *In re Bayou Grp., LLC*, 439 B.R. at 304; *Carickhoff v. Wedbush Secs., Inc. (In re Live Well Fin., Inc.)*, 652 B.R. 699, 704-05 (Bankr. D. Del. 2023) ("It is the intent of the transferor, not the transferee, that must be established."); *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 709 (Bankr. D. Del. 2010); *In re Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 09-1182 (BRL), 2011 WL 3897970 at *3; *In re Davis*, Nos. 05-15794-L, 2016 WL 11696269 at *9; *Trauner v. SEICO, Inc. (In re Carter Bros. Sec. Servs., LLC)*, Adv. Pro. No. 20-06129-JWC, 2021 WL 1157896, *3 (Bankr. N.D. Ga. Mar. 25, 2021).

### b. Individual Defendant Has Not Countered with Persuasive Evidence Demonstrating a Genuine Issue of Material Fact

The Court next considers the Individual Defendant's defenses.  In his Cross Motion for Summary Judgment the Individual Defendant maintains that he has no liability relating to the Transfers, and the Campbell Cross Motion Reply asserts the following additional defenses to the Transfers: (1) the date of honor doctrine applies, (2) the Individual Defendant did not have dominion over the checks and, therefore, cannot be considered a transferee, and (3) even if he received the Transfers, the mere conduit defense applies.[145]

Mr. Campbell argues that the date of honor doctrine controls the issue of liability between him, the Individual Defendant, and the Corporate Defendant.  He contends he is not a transferee because he never actually received the Transfers because the checks were deposited in the Corporate Defendant's account and honored by the bank.

Under the "date of honor" rule, outlined in *Barnhill v. Johnson,* a transfer made by check is deemed to occur on the date the check is honored.[146]  The Individual Defendant's reliance on *In re Oakwood Markets, Inc.*, in which the Sixth Circuit adopted the date of honor rule in the context of section 549(a), is misplaced.[147]  That case addressed transfers made by checks that were received from debtor prepetition but honored by transferee's bank postpetition and were subject to avoidance under section 549(a), which governs postpetition transactions.  Here, the

---

[145]  The date of honor rule and "dominion or control" arguments, as well as the mere conduit defense were raised for the first time in the Cross Summary Judgment Reply.  It is well settled that a party cannot raise an issue for the first time in a reply brief. *United States v. Montoya,* 45 F.3d 1286, 1300 (9th Cir.) (issues not raised and argued in the opening brief are deemed waived), *cert. denied,* 516 U.S. 814, 116 S.Ct. 67, 133 L.Ed.2d 29 (1995). *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 653 n. 3 (2d Cir. 1979) (noting that an issue cannot be raised for the first time in a reply brief).

[146]  *Barnhill v. Johnson*, 503 U.S. 393, 112 S. Ct. 1386, 1387, 118 L. Ed. 2d 39 (1992).

[147]  *Guinn v. Oakwood Properties, Inc. (In re Oakwood Markets, Inc.),* 203 F.3d 406, 409 (6th Cir. 2000).

commission checks were issued (and negotiated) pre-petition and are property of the estate, so the date of honor rule is inapposite.

Importantly, once a trustee demonstrates the right to recover fraudulent conveyances under section 544(b), the trustee must then establish the amount of recovery under section 550(a). Section 550(a) provides: "to the extent that a transfer is avoided under section 544 . . ., the trustee may recover, for the benefit of the estate, the property transferred."[148] Section 550 is intended "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."[149]

Moreover, to the extent a transfer is avoided, section 550(a) permits a trustee to recover from "the *initial transferee* … or the *entity for whose benefit such transfer was made*" or "*any immediate or mediate transferee of such initial transferee*.[150] The term transferee is not defined in the Bankruptcy Code, but it is widely accepted that a transferee is one who has "dominion or control" over the money or other asset —"the right to put the money to one's own use for whatever purpose the recipient so desires."[151]

Mr. Campbell argues even if the Court determines he received the Transfers payable to him individually, he was not a transferee, but a "mere conduit." He maintains he did not have "dominion" over checks made out to him personally because the checks were purportedly

---

[148]   11 U.S.C. § 550(a).

[149]   5 Collier on Bankruptcy ¶550.02[3] (Richard Levin & Henry J. Sommer eds. 16th ed.) (footnote omitted).

[150]   11 U.S.C. § 550(a)(1) and (2) (emphasis added). *Danning v. Miller (In re Bullion Reserve of N. Am.),* 922 F.2d 544, 546–47 (9th Cir. 1991) ("Theoretically, the trustee can recover from both the initial transferee and any secondary transferee, as well as from any entity for whose benefit the initial transfer was made." (emphasis removed)).

[151]   *Southmark Corp. v. Schulte, Roth & Zabel, L.L.P.*, 242 B.R. 330, 338 (N.D. Tex. 1999), *aff'd in part sub nom. In re Southmark Corp.*, 239 F.3d 365 (5th Cir. 2000), as amended on reh'g (Dec. 11, 2000) (citations omitted). *See also Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988) (Finding that "[a]lthough the Bankruptcy Code does not define 'transferee', and there is no legislative history on the point, we think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes.").

31

deposited in a corporate bank account, and therefore, he is not a transferee but cites no authority to support this proposition.

Application of the "dominion and control" test "requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable."[152] As detailed above, the evidence establishes that Mr. Campbell, the President of, and Registered Agent for, the Corporate Defendant, was a broker, sold notes and received commissions. The evidence also demonstrates that checks totaling $36,730.00 were payable to Mr. Campbell, individually, as opposed to the Corporate Defendant.[153] Mr. Campbell did not put forth any evidence to show that he could not exercise legal control over the checks that were payable to him or that he did not have the right to use the checks for his own purposes. There is nothing in the record to suggest that the Debtors issued checks to the Individual Defendant, as an agent for the Corporate Defendant, or that the Individual Defendant was obligated to use the Transfers for the benefit of the Corporate Defendant.

Furthermore, there is nothing in the record to reflect that Mr. Campbell acted as a "mere conduit" in receiving the Transfers solely for the Corporate Defendant and not his own benefit. To successfully assert the "mere conduit" defense to liability as transferee on avoided transfer, Individual Defendant "must establish that it lacked dominion and control over the transfer because the payment simply passed through its hands and it had no power to redirect the funds to its own use."[154] As the burden falls on the Individual Defendant to show that he lacked the requisite dominion and control, the mere conduit defense fails.

---

[152] *In re Bullion Reserve of N. Am.*, 922 F.2d at 549.

[153] Adv. D.I. 74 (Second Troszak Decl.) at Ex. 6.

[154] *Dembsky v. Frommer. Lawrence & Haug, LLP (In re Lambertson Truex, LLC)*, 458 B.R. 155, 159 (Bankr. D. Del. 2011) (citation omitted).

Based on the evidence presented, there is no genuine question of fact as to whether Mr. Campbell was as an initial transferee as to the commission checks made payable to him individually.[155]

### 4. Defendants Have Not Established a Defense Under Section 548(c) of the Bankruptcy Code or Section 3439.08(a) of the California Civil Code

Section 548(c) of the Bankruptcy Code creates a defense for an initial transferee of a fraudulent transfer if they received the transfer for value and in good faith.[156] The CUVTA includes an analogous defense.[157] Defendants bear the burden of proof on this defense, and thus to defeat the avoidance of a transfer on summary judgment, Defendants must offer affirmative evidence sufficient to create a material issue of fact as to whether they took for value and in good faith.[158]

Defendants have not provided facts or evidence to establish that they have any applicable defenses. Defendants have not submitted evidence establishing that they provided "value" to the Debtors, nor do they dispute the legal standard argued by the Trustee – namely, that the recruitment of new investors to a Ponzi scheme does not constitute "value" for purposes of fraudulent transfer statutes. The value and good faith defense under 11 U.S.C. 548(c) is

---

[155] *HLI Creditor Tr. v. Hyundai Motor Co. (In re Hayes Lemmerz Int'l, Inc.)*, 329 B.R. 136, 139 (Bankr. D. Del. 2005).

[156] *See* 11 U.S.C. § 548(c) ("[A] transferee . . . of such a transfer . . . that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer . . ..").

[157] *See* Cal. Civ. Code § 3439.08(a) ("A transfer or obligation is not voidable under paragraph (1) of subdivision (a) of Section 3439.04, against a person that took in good faith and for a reasonably equivalent value given the debtor or against any subsequent transferee or obligee.").

[158] *Schneider v. Barnard*, 508 B.R. 533, 551 (E.D.N.Y. 2014) ("Because Bankruptcy Code § 548(c) is an affirmative defense, the transferee bears the burden of establishing all elements of the . . . defense."); *In re Bayou Grp., LLC*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("The good faith/value defense provided in Section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense."); *Plotkin v. Pomona Valley Imports, Inc. (In re Cohen)*, 199 B.R. 709, 718 (B.A.P. 9th Cir. 1996) (citations omitted) ("The issue of good faith under [the CUVTA] is a defensive matter as to which the defendants asserting the existence of good faith have the burden of proof.").

conjunctive, therefore, Defendants must prove they provided "value" and were a "good faith" transferee. Because Defendants do not offer evidence of value to Debtors, the Court need not adjudicate good faith.[159]

### 5. Conclusion as to Second and Fourth Claims

The Court finds that there is no genuine dispute that the Debtors were operated as a Ponzi scheme and that the commissions paid to Defendants for their promotion and sale of the Debtors' fraudulent securities were related to and in furtherance of the Ponzi scheme. The Transfers are avoidable pursuant to section 548(a)(1)(A) and California Civil Code § 3439.04(a)(1).

Insofar as the Trustee has met his burden to prove each of the Transfers were made with actual intent to hinder, delay, or defraud creditors, the Court need not reach the merits of the Trustee's argument that the "badges of fraud" also establish actual intent to hinder, delay, or defraud creditors.

### B. Third and Fifth Claims: Constructive Fraudulent Transfers

#### 1. Debtors Received Less Than Reasonably Equivalent Value in Exchange For the Transfers and Were Insolvent On the Date of Such Transfers

The Third and Fifth Claims assert that the Transfers were constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code and section 3439.04(a)(2) of the California Civil Code.[160]

---

[159] *See Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006) (holding that because the broker defendant could not have provided value, "we need not draw a conclusion on good faith"). To determine whether a transfer was in good faith, courts "look to what the transferee objectively 'knew or should have known' . . . rather than examining what the transferee actually knew from a subjective standpoint." *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528, 535–36 (9th Cir. 1990). Good faith is not present "if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose." *Id.* (emphasis supplied). As the Trustee argues, the Answer admits Defendants acted as a fiduciary, in concert with Shapiro, and Defendants were selling unregistered securities through a perceived "loop-hole". *See* D.I. 4 (Answer) at ¶ 15.

[160] *See* Adv. D.I. 1 (Complaint) at ¶ 42.

To establish that the Transfers were constructively fraudulent under the Bankruptcy Code, section 548(a)(1)(B) requires the Trustee to show that the Debtors received less than reasonably equivalent value in exchange for such Transfers and was insolvent on the date of such Transfers or became insolvent because of the Transfers.  Under the Bankruptcy Code, inability to pay debts as they come due constitutes "insolvency" for purposes of the constructive fraudulent transfer test.[161]

Here, both constructive fraudulent transfer elements are satisfied.  First, numerous courts have determined that a salesperson's or broker's solicitation of an additional investor in a Ponzi scheme provides no value to the debtor because it can "only exacerbate the harm to the debtor's creditors."[162]  As the Fifth Circuit observed in *Janvey v. Gold Channel, Inc.,* "given that Ponzi schemes, by definition, create greater liabilities than assets with each subsequent transaction, each new investment in the [] Ponzi scheme *decreased* the value of the estate by creating a new liability that the insolvent business could never legitimately repay."[163]  Defendant's recruitment of new investors into the Ponzi scheme provided no value.

Second, the Debtors were insolvent at the time of the Transfers through the Initial Petition Date.  As set forth in the Opinion on Confirmation, the Court found "[t]he annual cash

---

[161]  The Bankruptcy Code defines insolvent as "the financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation."  11 U.S.C. § 101(32).

[162]  *In re Randy*, 189 B.R. at 441.  *See also Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997) ("[a]s a matter of law, the defendant gave no value to the debtors for the commissions attributable to investments made by others" into a Ponzi scheme); *Bell v. Disner*, No. 3:14CV91, 2016 WL 7007522, at *12 (W.D.N.C. Nov. 29, 2016), *aff'd sub nom. Bell v. Li Yu Chen*, 731 F. App'x 239 (4th Cir. 2018) ("[C]ourts have routinely and specifically held that there is no value in recruiting new investors to a fraudulent scheme."); *Carroll v. Stettler*, 941 F. Supp. 2d 572, 581 (E.D. Pa. 2013) ("Because the selling of investments in furtherance of a Ponzi scheme serves only to perpetuate an illegal fraud, the value conferred by the salespeople is illegal in its nature. Thus, as the argument goes, no exchange of reasonably equivalent value could have taken place.").

[163]  *Janvey v. Gold Channel, Inc.,* 792 F.3d 539, 546 (5th Cir. 2015) (emphasis supplied).  *Warfield,* 436 F.3d at 560 ("It takes cheek to contend that in exchange for the payments he received, the [] Ponzi scheme benefited from his efforts to extend the fraud by securing new investments.").

35

flow from sales of real property was well below the amount of principal and interest paid by Shapiro to investors."[164]  For every year from 2013 to 2017, the income derived from the sales of real property was well short of the amount required to pay investors their principal and "profits."[165]  The Debtors could not pay investors from their legitimate existing operations.[166]  The Debtors used funds received primarily from new investors to make payments to old investors.[167]

In addition, the Court found "beginning no later than July 2012 through December 1, 2017," Shapiro used his companies, including Debtors, "to conduct a massive Ponzi scheme."[168]  Courts have held that "an enterprise engaged in a Ponzi scheme is insolvent from its inception and becomes increasingly insolvent as the scheme progresses."[169]  Thus, the evidence establishes that the Transfers were constructively fraudulent under section 548(a)(1)(B) of the Bankruptcy Code.

The Fifth Claim seeks relief under section 3439.04(a)(1) of the California Civil Code.[170]  The Complaint does not cite to, nor address a claim under, section 3439.05 of the California Civil Code.  The Memorandum, however, addresses the Fifth Claim, on the one hand, citing to, and relying upon, section 3439.05(a) of the California Civil Code; and, on the other hand,

---

[164]  *In re Woodbridge Group of Companies, LLC,* 592 B.R. at 766.

[165]  D.I. 2829 (Sharp Confirmation Decl.) at ¶ 24.

[166]  D.I. 2829 (Sharp Confirmation Decl.) at ¶¶ 24–25.

[167]  D.I. 2829 (Sharp Confirmation Decl.) at ¶ 25.

[168]  D.I. 2903 (Confirmation Order) at ¶ NN.

[169]  *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) (citations omitted) (finding "a Ponzi scheme is, as a matter of law, insolvent from its inception."); *In re Ramirez Rodriguez*, 209 B.R. at 431-32; *In re Randy*, 189 B.R. at 441; *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993).

[170]  *See* Adv. D.I. 1 (Complaint) at ¶ 43 (citing Cal. Civ. Code 3439.04(a)(1)).  *But see* Adv. D.I. 72 (Mem.) at ¶¶ 4, 69 (citing Cal. Civ. Code 3439.04(a)(2)).

arguing the evidence establishes constructive fraud under section 3439.04(a)(2) and seeks summary judgment under section 3439.05.[171]

Although California law allows claims under California Civil Code sections 3439.04(a)(2) and 3439.05 to avoid constructive fraudulent transfers, here the Complaint does not assert a constructive fraudulent transfer claim under section 3439.05, thus summary judgment cannot be considered on that basis.  Further, the Motion is silent as to which of the two statutory provisions serve as the grounds for the relief, and the Memorandum, as noted, cites to both sections.  "A party is not allowed to raise a claim in summary judgment which was not pled in the operative complaint."[172]  Consequently, the Court will not grant summary judgment as to the Fifth Claim.

### 2. Defendants Have Not Established a Defense Under Section 548(c) of the Bankruptcy Code

As discussed above, Defendants have not sufficiently provided any facts or evidence to establish any applicable defenses.

### 3. Conclusion as Third and Fifth Claims

The Court finds that there are no disputes of material facts that prevent the Court from finding in favor of Trustee and against Defendants on the Third Claim.  As to the Fifth Claim, the request for summary judgment is denied as set forth herein.

---

[171] *See* Adv. D.I. 72 (Mem.) at ¶ 69. ("The evidence thus establishes beyond dispute that the Transfers were constructively fraudulent under both section 548(a)(1)(B) of the Bankruptcy Code and **California Civil Code § 3439.04(a)(2).**  Moreover, for all of the reasons set forth in Part IV.B.2, supra, Defendant is not entitled to a "for value and in good faith" defense under Bankruptcy Code section 548(c) or analogous state law.  The Liquidating Trustee is entitled to summary judgment on his Third Claim (avoidance and recovery of the Two Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code) and Fifth Claim (avoidance and recovery of the Four Year Transfers under **California Civil Code § 3439.05**.") (emphasis added).

[172] *Nationwide Judgement Recovery Inc. v. Sorrells (In re Sorrells)*, 644 B.R. 158, 170 (Bankr. E.D. Tex. 2022) (citing *Cutrera v. Board of Supervisors of La. State Univ.,* 429 F.3d 108, 113 (5th Cir. 2005); *Lawmaster v. Ward*, 125 F.3d 1341, 1345 n. 2 (10th Cir. 1997) (holding that the court will not consider claims first raised in a motion for summary judgment and not contained in the complaint)).

### C. Prejudgment Interest

The Complaint seeks prejudgment interest on the Transfers.[173]  In the Memorandum, the Trustee proposes that the Court defer consideration of the prejudgment interest calculation until entry of a final judgment and states: "In the event the Court desires supplemental briefing or evidence on Plaintiff's entitlement to prejudgment interest or the calculation thereof, Plaintiff will submit such briefing or evidence as requested by the Court."[174]  In light of the absence of argument (and evidence), the Court does not address, nor award, prejudgment interest.

### D. Mr. Campbell's Cross Motion for Summary Judgment

As discussed above, Mr. Campbell alleges that none of the Transfers asserted in Second through Fifth Claims of the Complaint were received by him and, therefore, he maintains he has no liability relating to the Transfers.  He seeks summary judgment in his favor and against the Trustee as to those Claims.

With respect to the Cross Motion for Summary Judgment, Mr. Campbell bears the initial burden of demonstrating the absence of any genuine issue of material fact and that he is entitled to judgment as a matter of law.[175]  For the reasons discussed above, the evidence establishes summary judgment in the Trustee's favor and against the Defendants as to Second through Fourth Claims in the Complaint and Mr. Campbell has not met his burden as to the Fifth Claim. "Merely stating statutory elements and repeating conclusory statements is insufficient."[176]  The Cross Motion for Summary Judgment is denied.

---

[173]  Adv. D.I. 1 (Complaint), Prayer for Relief ¶ 7 (requesting prejudgment interest).

[174]  Adv. D.I. 72 (Mem.) at ¶10, n. 6.

[175]  *Celotex Corp.,* 477 U.S. at 323.

[176]  *In re FBI Wind Down, Inc.*, 614 B.R. at 483.

**CONCLUSION**

In conclusion, there exists no disputes of material facts that prevent the Court from finding in favor of Trustee and against Defendants with respect to the Second, Third and Fourth Claims.

The Cross Motion for Summary Judgment is denied.

A separate order consistent with this Memorandum Opinion will issue

Dated: May 6, 2026

_____
J. Kate Stickles
United States Bankruptcy Judge